UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAN BURGESS, et al.,

        Plaintiffs,                Civil No. 4:17-cv-11218

v.                             Hon. Linda V. Parker
                                    Mag. Judge R. Steven Whalen

UNITED STATES OF AMERICA,

        Defendant.

---

## Defendant United States of America's Motion to Dismiss For Lack of Subject-Matter Jurisdiction

---

Defendant United States moves to dismiss the Plaintiffs' claims for lack of subject-matter jurisdiction pursuant to a factual challenge under Federal Rule of Civil Procedure 12(b)(1). The Plaintiffs assert jurisdiction under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-80. For the reasons discussed in the accompanying Memorandum in Support, the Plaintiffs' claims fall within the discretionary function exception to the limited waiver of sovereign immunity under the Federal Tort Claims Act, 28 U.S.C. § 2680(a). This exception to liability applies because the United States Environmental Protection Agency's response to water quality issues in Flint was not constrained by mandatory and specific rules or regulations and because such a response was grounded in a weighing of competing

policy considerations. Additionally, the Federal Tort Claims Act limits the liability of the United States to "the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. §§ 1346(b), 2674. Plaintiffs' claims must fail because they do not correspond to an analogous tort claim available against a private individual under Michigan law. Accordingly, due to two independent jurisdictional bars, the Court lacks jurisdiction and the United States' Motion to Dismiss should be granted.

This motion is submitted pursuant to the briefing schedule in the Court's Stipulated Initial Case Management Order entered July 14, 2017. Pursuant to Local Rule 7.1(a), counsel for Defendant contacted counsel for Plaintiffs on February 15, 2018, by email, and Plaintiffs' counsel indicated that they oppose the motion.

Respectfully submitted,

Chad A. Readler
Acting Assistant Attorney General, Civil Division[1]

Thomas G. Ward
Deputy Assistant Attorney General, Torts Branch

J. Patrick Glynn
Director, Torts Branch

Christina M. Falk
Assistant Director, Torts Branch

Michael L. Williams

---

[1] Attorney for the United States, Acting Under Authority Conferred by 28 U.S.C. § 515.

2

Bethany J. Henneman
Trial Attorneys, Torts Branch

_s/ Michael L. Williams_
MICHAEL L. WILLIAMS
DC Bar #471618
Trial Attorney, Torts Branch
Environmental Tort Litigation
175 N Street, N.E.
Washington, DC 20002
e-mail: michael.l.williams@usdoj.gov
phone: 202-307-3839

_s/ Bethany J. Henneman_
BETHANY J. HENNEMAN
MD Attorney #1512150313
Trial Attorney, Torts Branch
Environmental Tort Litigation
175 N Street, N.E.
Washington, DC 20002
e-mail: Bethany.J.Henneman@usdoj.gov
phone: 202-616-4447

3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAN BURGESS, et al.,

                Plaintiffs,             Civil No. 4:17-cv-11218

v.                                Hon. Linda V. Parker
                                Mag. Judge R. Steven Whalen

UNITED STATES OF AMERICA,

                Defendant.

---

**Defendant United States of America's Memorandum in Support of its Motion to Dismiss for Lack of Subject-Matter Jurisdiction**

---

## ISSUES PRESENTED

1.  Whether this Court lacks subject-matter jurisdiction over Plaintiffs' tort claims against the United States due to the discretionary function exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(a).

2.  Whether this Court lacks subject-matter jurisdiction over Plaintiffs' tort claims against the United States due to the analogous private liability requirement of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2674.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

**Cases**

*Berkovitz v. United States*, 486 U.S. 531 (1988)

*Carlyle v. United States*, 674 F.2d 554 (6th Cir. 1982)

*Gaubert v. United States*, 499 U.S. 315 (1991)

*Lockett v. United States*, 938 F.2d 630 (6th Cir. 1991)

*Myers v. United States*, 17 F.3d 890 (6th Cir. 1994)

*Raymer v. United States,* 660 F.2d 1136 (6th Cir. 1981)

*Rosebush v. United States*, 119 F.3d 438 (6th Cir. 1997)

*Smith v. Allendale*, 303 N.W.2d 702 (Mich. 1981)

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797 (1984)

**Statutes**

28 U.S.C. § 1346(b)

28 U.S.C. § 2674

28 U.S.C. § 2680(a)

42 U.S.C. § 300i

42 U.S.C. § 300g-3

**Rule**

Fed. R. Civ. P. 12(b)(1)

# TABLE OF CONTENTS

ISSUES PRESENTED ................................................................... ii

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................. iii

INDEX OF EXHIBITS ................................................................. vi

INTRODUCTION ...................................................................... 1

STATEMENT OF FACTS ............................................................. 3

   I.  Plaintiffs' First Amended Complaint ..................................... 3

   II.  Safe Drinking Water Act ................................................ 3

      A. SDWA is a model of cooperative federalism ......................... 3

      B. EPA oversees MDEQ's implementation of SDWA .................... 5

      C. EPA has discretionary enforcement powers in overseeing Michigan's implementation of SDWA's public water system program ...................... 6

         1.  SDWA 1431 ....................................................... 7

         2.  SDWA 1414 ....................................................... 8

   III. Flint's public water system ............................................ 9

      A. MDEQ did not require Flint to provide corrosion control when Flint changed its water source to the Flint River in 2014 ................... 9

      B. Flint had water quality problems with bacteria and trihalomethanes ...... 10

      C. Flint citizens complained to Flint, MDEQ, and EPA ............................ 11

      D. Miguel Del Toral investigated LeeAnn Walters' citizen complaint ........ 12

      E. On April 24, 2015, MDEQ first notified EPA it was not requiring corrosion control in Flint .......................................................... 13

      F. MDEQ agreed to commence a process to implement corrosion control treatment in Flint ........................................................ 14

      G. Region 5 decided not to issue a SDWA 1431 order in the fall of 2015 ... 15

      H. EPA decided to issue a SDWA 1431 order in January 2016 ................. 17

STANDARD OF REVIEW ............................................................. 18

ARGUMENT .......................................................................... 19

   I.  The discretionary function exception deprives the Court of jurisdiction because Plaintiffs' claims challenge government conduct that allows for judgment and is susceptible to policy analysis ............................. 19

A. Purpose of the discretionary function exception and its application........19

B. No specific and mandatory statutes, rules, or regulations removed discretion from EPA in responding to the Flint Water Crisis .................22

    1. SDWA 1431 is replete with discretionary judgment calls.................23

    2. SDWA 1414 is premised on a discretionary "finding".......................26

C. EPA's decisions about how to respond to the Flint Water Crisis are susceptible to policy analysis .................................................................29

    1. EPA's entire response to the Flint Water Crisis was based on SDWA and grounded in considerations of public policy ..................29

    2. EPA's decisions concerning SDWA 1431 and SDWA 1414 were based on competing policy, public health, and environmental issues.....................................................................................................32

        a. Region 5's decision to forego a SDWA 1431 order in fall 2015...32

        b. Decision to issue a SDWA 1431 in January 2016 .......................36

        c. Region 5 considered using SDWA 1414 in 2015 .......................38

II. This Court lacks subject-matter jurisdiction because there is no state law analogue that will support an FTCA action against the United States .........................................................................................................40

A. The FTCA's state law analogue requirement ...........................................40

B. Plaintiffs' state law analogue..................................................................41

C. The United States did not assume a duty to Plaintiffs ............................42

    1. The United States' undertaking was a government function for the benefit of the general public...........................................................42

    2. Alternative bases for the imposition of a duty under § 324A ............48

        a. The United States did not increase the risk of harm .....................48

        b. The United States did not undertake to perform a duty owed by MDEQ .........................................................................50

        c. Harm was not suffered because of reliance of MDEQ or Plaintiffs upon an undertaking of the United States .....................52

CONCLUSION ........................................................................................56

## INDEX OF EXHIBITS

This Court entered a Stipulated Case Management Order on July 14, 2017, that allowed for expedited threshold jurisdictional discovery. Plaintiffs deposed seven EPA Region 5 employees. Deposition transcripts are attached as *Exhibits A-G*. Deposition exhibits are numbered consecutively and attached as *Exhibits 1-65*.

**Deposition transcripts (Exhibits A-G)**

A. Deposition of Miguel Del Toral, Regulations Manager, Groundwater and Drinking Water Branch, Water Division, Region 5, EPA, Chicago, Illinois, 10/12/2017

B. Deposition of Rita Bair, Supervisor, Groundwater and Drinking Water Branch, Water Division, Region 5, EPA, Chicago, Illinois, 10/12/2017

C. Deposition of Tinka Hyde, Director, Water Division (2014 to October 2016), Director, Great Lakes National Program Office (October 2016 to present), Region 5, EPA, Chicago, Illinois, 10/26/2017

D. Deposition of Deborah Baltazar, Branch Chief, State and Tribal Programs Branch, Water Division, Region 5, EPA, Chicago, Illinois, 10/26/2017

E. Deposition of Jennifer Crooks, Michigan Program Manager and Drinking Water State Revolving Fund Set-Aside Coordinator, Groundwater and Drinking Water Branch, Water Division, Region 5, EPA, Chicago, Illinois, 11/16/2017

F. Deposition of Thomas Poy, Branch Chief, Groundwater and Drinking Water Branch, Water Division, Region 5, EPA, Chicago, Illinois, 11/16/2017

G. Deposition of Robert Kaplan, Regional Counsel (2007-2014), Deputy Regional Administrator (2014 to 2015), Acting EPA Regional Administrator (January 2016 to 2017), Region 5, EPA, Chicago, Illinois, 11/17/2017

**Deposition exhibits**

Exhibits 1-8 Del Toral

Exhibits 9-12 Bair

Exhibits 13-32 Hyde

Exhibits 33-39 Baltazar

Exhibits 40-45 Crooks

Exhibits 46-48 Poy

Exhibits 49,[1] 51-65 Kaplan

**Exhibits 66-69**

Exhibit 66, OARM Delegations Manual, 9-17. Emergency Administrative Powers Office of Human Resources, 5/11/1994

Exhibit 67, OARM Delegations Manual, 9-7-A. Finding and Notification of Noncompliance-Part B, 7/23/1997

Exhibit 68, Region V Manual, 9-7-A Finding and Notification of Noncompliance-Part B, 2/1987

Exhibit 69, *Angle v. United States*, 89 F.3d 832 (6th Cir. 1996) (unpublished)

---

[1] Exhibit 50 was marked, but did not become part of the deposition record.

# INTRODUCTION

Inadequate drinking water treatment exposed many of the nearly 100,000 residents of the City of Flint (Flint) to lead after Flint changed its water source to the Flint River in 2014. Numerous lawsuits are pending in state and federal courts against Flint, the State of Michigan, and an array of municipal and state government employees alleging negligence or even criminal activity related to the Flint Water Crisis. *Burgess v. United States*, however, involves none of those parties. Plaintiffs' core allegation in this case is that the United States Environmental Protection Agency (EPA) negligently waited until January 2016 to issue an emergency order pursuant to Section 1431 of the Safe Drinking Water Act (SDWA) for Flint's public water system. Plaintiffs also allege that EPA failed to provide advice and technical assistance to the Michigan Department of Environmental Quality (MDEQ) and Flint and to commence an enforcement action under SDWA Section 1414. Subject-matter jurisdiction is unavailable for all of Plaintiffs' claims due to two independent jurisdictional bars in the Federal Tort Claims Act (FTCA).

First, the discretionary function exception to the FTCA waiver of sovereign immunity eliminates subject-matter jurisdiction for Plaintiffs' claims. In order to survive this motion, Plaintiffs must establish that EPA personnel violated a mandatory and specific directive that left no room for judgment. If Plaintiffs are

unable to do so, the Court must consider whether the types of decisions made by EPA personnel during a water crisis are susceptible to policy analysis. EPA is afforded discretion concerning whether or when to employ SDWA Sections 1431 and 1414 and EPA's decisions about whether to use these statutory tools to respond to the Flint Water Crisis are susceptible to policy analysis. The policy reasons behind such discretion are at the heart of SDWA. Even EPA's discretionary enforcement powers are limited in a state, such as Michigan, that has primary enforcement authority over local water systems (primacy) under SDWA. EPA's oversight of MDEQ's implementation of SDWA "is a model of cooperative federalism, not an agency relationship." *Mays v. City of Flint, Mich.*, 871 F.3d 437, 447 (6th Cir. 2017). To be sure, the Flint Water Crisis was a tragic, blameworthy, preventable event. Regardless of Plaintiffs' invitation for the Court to reevaluate EPA's response to the Flint Water Crisis, the discretionary function exception protects federal agencies' regulatory decisions from courts' second-guessing through the medium of a tort suit for money damages.

Second, Plaintiffs' claims do not correspond to an analogous tort claim available against a private defendant under Michigan law. The FTCA eliminates subject-matter jurisdiction over claims against the United States that do not have analogous private liability. Plaintiffs attempt to couch negligence allegations in terms of the Restatement of Torts (Second), Section 324A's Good Samaritan

doctrine. This doctrine does not fit the basic facts of this case; the State of Michigan has primacy through the MDEQ, and the EPA never withdrew authorization for MDEQ's primacy role or usurped MDEQ's enforcement and oversight role for Flint's public water system. The United States' programmatic oversight of Michigan's drinking water program did not give rise to a legal obligation sufficient to support Plaintiffs' FTCA action.

## STATEMENT OF FACTS

### I.    Plaintiffs' First Amended Complaint

Plaintiffs seek money damages for injuries to person and property as a result of the negligence of EPA "in its mishandling of the Flint Water Crisis." First Amended Complaint (FAC) ¶1. Specifically, Plaintiffs allege that, during the Flint Water Crisis, EPA failed to take mandatory actions required by SDWA (Count I), negligently investigated complaints about exposure to poor water quality (Count II), and failed to warn the public of environmental risks to public health (Count III). FAC ¶¶96-134.

### II.    Safe Drinking Water Act

#### A. SDWA is a model of cooperative federalism

In 1974, Congress enacted SDWA, 42 U.S.C. §§ 300f-300j, to protect public health by regulating the United States' public drinking water supply. SDWA employs a cooperative federalism approach to environmental regulation. *Mays v.*

*City of Flint, Mich.*, 871 F.3d 437, 447 (6th Cir. 2017). EPA may authorize states to assume primary enforcement responsibility (primacy) for public water systems, including implementation and enforcement of state drinking water regulations which are no less stringent than national primary drinking water regulations promulgated by EPA. Prior to authorizing a state for primacy, EPA must determine that a State "has adopted and is implementing adequate enforcement procedures for the enforcement of such State regulations." 42 U.S.C. § 300g-2(a)(2). Primacy means that a state has been authorized to handle the implementation and enforcement of a public water system program under SDWA. *Ex. 32*, p.2, ¶5. EPA has ten regional offices, each of which is responsible for the execution of EPA programs within several states and territories. Region 5's office in Chicago serves six states including Michigan as well as thirty-five tribes. All Region 5 states have obtained primacy for their drinking water programs. Michigan first received primacy in 1978 and maintained primacy during the years 2014-2017. *Ex. 58*, p.1; *Ex. G*, 124:11-15.

Michigan has over ten thousand public water systems. *Ex. 58*, p.2. MDEQ implements the program for public water systems in Michigan and enforces drinking water standards. *Ex. 32*, ¶5. Each year MDEQ and Region 5 develop an annual work plan to promote a clear understanding of both state and EPA commitments and collaborative inter-agency program planning and

4

implementation. *Ex. 26*; *Ex. G,* 134:11-135:06. MDEQ's core annual activities include commitments to notify all systems of regulatory requirements and respond to questions, determine violations for all rules, and maintain an adequate enforcement and compliance assistance program. *Ex. 26*, p.2.

As a primacy agency, MDEQ has a significant role in implementing the Lead and Copper Rule (LCR). 40 C.F.R. § 141.80 *et seq.* A key requirement in the LCR is that large public water systems meet requirements for "optimized corrosion control treatment" (OCCT). 40 C.F.R. § 141.2. MDEQ is required to engage in an iterative process with large public water systems to determine how to meet the corrosion control treatment requirements in the LCR given the source water and other considerations. 40 C.F.R. § 141.81(d). MDEQ must review and approve the addition of a new source or long-term change in treatment before it is implemented. 40 C.F.R. §§ 141.90(a)(3), 141.86(d)(4)(vii).

## B. EPA oversees MDEQ's implementation of SDWA

Because the state is the primary regulator of its drinking water systems in primacy states, EPA's role typically involves oversight of the operation of state programs rather than directly supervising particular water systems. *Ex. G*, 33:24-25; *Ex. F*, 12:04-06. Indeed, EPA generally does not interact directly with public water systems. *Ex. C,* 114:21-22. Region 5's core activities include responding to questions from MDEQ about regulations; maintaining a forum for Region 5 and

MDEQ communications through monthly conference calls, an annual meeting, and additional meetings/calls as needed; tracking primacy applications; providing comments on draft rules; and assisting MDEQ in acquiring resources. *Ex. 26*, p.3. Region 5 evaluates MDEQ's end-of-year progress on annual work plans and completes a report with input from MDEQ. *Ex. 58*, p.1, n.1. In addition, Region 5 periodically evaluates its six primacy states' implementation and enforcement of public drinking water standards at a programmatic level. *Id.* at p.1. A program review includes "collection, analysis, and interpretation of data, that results in recommendations by EPA to improve the state's drinking water program's effectiveness." *Id.*

### C. EPA has discretionary enforcement powers in overseeing Michigan's implementation of SDWA's public water system program

There are no mandatory and specific statutes, rules, or regulations that inform EPA how it must act or respond to particular drinking water issues that might arise in a primacy state, whether in Flint, Michigan, or elsewhere. *Ex. G,* 124:25-125:06; *Ex. C,* 123:24-124:11. Instead, EPA has informal and formal discretionary enforcement powers related to compliance with SDWA. *Ex. G,* 73:01-03. EPA will "use the tool that's best suited to obtain compliance in the quickest possible way." *Ex. G,* 75:16-18. EPA often proceeds with informal enforcement efforts prior to using formal enforcement powers. *Ex. G,* 49:06-10, 73:01-05. For example, EPA may elect to provide technical or compliance

6

assistance to supplement a state's efforts to return a particular local water system to compliance with SDWA. *Ex. C,* 130:12-15. SDWA Sections 1431 and 1414 are formal tools that EPA also uses in certain circumstances. *Ex. G,* 48:20-21.

## 1. SDWA 1431

SDWA 1431, 42 U.S.C. § 300i, *Emergency powers*, is premised on two threshold assessments: (1) a contaminant is present in or likely to enter a public water system…which may present an imminent and substantial endangerment to the health of persons; and (2) appropriate State and local authorities have not acted to protect the health of such persons. *Ex. 27; Ex. G,* 125:20-126:04, 126:17-25. Both assessments require the decisionmaker to weigh facts and make judgments. *Ex. G,* 68:01-22. If both of these threshold issues are answered affirmatively, then the Administrator "*may* take such actions as he *may* deem necessary in order to protect the health of such persons." 42 U.S.C. 300i(a) (emphasis added). *Ex. 27;*[2] *Ex. G,* 128:12-129:19. EPA uses professional judgment when weighing the facts upon which it relies, ranging from drinking water sample results, health data, and "varying things depending on the precise situation, precise risks." *Ex. G,* 126:05-16. The EPA Administrator has discretion regarding the manner in which EPA will engage in a threshold assessment, and whether to proceed with issuing a SDWA

[2] The Administrator's authority in Section 1431 of SDWA has been delegated to the Regional Administrators and the Assistant Administrator for Enforcement and Compliance Assurance. 42 U.S.C. § 300j-9; *Ex. 66.*

1431 order. *Ex. G,* 129:15-19; *Ex. C,* 127:20-25 ("Then we use our knowledge and our best professional judgment to figure out what would be the most appropriate steps….what are the options in order to address the problem and move forward to solve the problem."). SDWA 1431 is always a consideration at EPA when a serious water quality issue arises. *Ex. G,* 38:05-07. Regardless of whether EPA concludes that it may be appropriate to issue a SDWA 1431 order, it is within the Agency's discretion as to whether or not to do so. *Ex. G,* 94:09-10.

## 2. SDWA 1414

SDWA 1414, 42 U.S.C. § 300g-3, *Enforcement of drinking water regulations,* allows the EPA Administrator to act in conjunction with the state or independently, if the Administrator finds that a public water system does not comply with an applicable drinking water regulation. *Ex. 65*.[3] The process for arriving at a threshold "finding" involves an evaluation of situation-specific facts and applicable drinking water regulations, and both the facts and the law may be unclear. *Ex. G,* 51:25-52:04.  If such a "finding" is made in a primacy state, the Administrator provides notice to the state and public water system and if, after 30 days, the state has not

---

[3] The Administrator's authority in Section 1414 of SDWA has been delegated to the Regional Administrators and the Assistant Administrator for Enforcement and Compliance Assurance. 42 U.S.C. § 300j-9; *Ex. 67*. This authority was redelegated in Region 5 down to the level of Director, Water Division. *Ex. 68.*

commenced an appropriate enforcement action, the Administrator may

commence his own enforcement action. 42 U.S.C. § 300g-3(a)(1)(A)-(B).[4]

## III.    Flint's public water system

### A. MDEQ did not require Flint to provide corrosion control when Flint changed its water source to the Flint River in 2014

Flint owns and operates a public water system that provides piped drinking

water to nearly 100,000 citizens. *Ex. 32,* p.2, ¶3. Before April 2014, Flint

purchased finished drinking water from Detroit Water and Sewerage Department

("DWSD"). *Ex. 3*, p.2. DWSD obtained its water from Lake Huron and added a

treatment chemical called orthophosphate to control lead and copper levels; *i.e.*

optimal corrosion control treatment. *Id*. On or around April 25, 2014, Flint ceased

purchasing treated drinking water from DWSD and began drawing drinking water

from the Flint River. *Ex. 32,* p.2, ¶7. MDEQ and Flint did not, and were not

required to, notify EPA of the source water switch. *Ex. C,* 37:10-18. In a primacy

state, EPA does not approve a source water switch. *Ex. C,* 35:08-18; *Ex, 15,* p.2.

MDEQ approved Flint's water source change, but did not require Flint to begin its

---

[4] EPA is authorized under Section 141.82(i) of the LCR to make corrosion control treatment decisions in lieu of the state in certain circumstances and after following a process that includes providing notice and comment on a proposed determination. This LCR provision, however, does not require the Regional Administrator to step in and make corrosion control treatment decisions: "the EPA Regional Administrator *may* review treatment determinations."  40 C.F.R. § 1414.82(i)(emphasis added).

own corrosion control program prior to implementing the source water change. *Ex. 2,* p.1; *Ex. 3,* p.2. MDEQ did not designate new corrosion control treatment requirements for Flint prior to switching water sources or require Flint to use the corrosion control treatment that DWSD used for its water source. MDEQ interpreted the LCR to allow Flint to complete two consecutive six-month rounds of sampling[5] prior to determining what, if any, corrosion control treatment would be optimal for water sourced from the Flint River, and even then, MDEQ argued that Flint could be given up to two years to install the treatment under its interpretation of the LCR. *Ex. 20,* pp.1-2; *Ex. 22,* pp.1-3.

## B. Flint had water quality problems with bacteria and trihalomethanes

The Flint River provided inconsistent water quality because of elevated levels of organic matter. *Ex. 35,* p.1. Flint water officials used high levels of disinfection to address the high concentrations of organic matter in the water. *Id.* Flint violated certain drinking water standards, including acute and non-acute coliform bacteria and total trihalomethanes (TTHM) in 2014-2015. *Ex. 3*, p.1. Flint returned to compliance for the bacteria violations. *Ex. 15*, p.1. MDEQ cited Flint

---

[5] Flint also employed a procedure known as pre-flushing for its LCR sampling. Pre-flushing involves flushing a water line the night before samples are taken the next morning. *Ex. B,* 121:22-122:01. *Ex. 20.* Pre-flushing is not prohibited by the LCR. *Ex. A,* 143:01-16; *Ex. C,* 83:08-14.

on December 16, 2014, for a TTHM violation and directed Flint to implement operational techniques at the Flint water plant. *Ex. 15*; *Ex. 35*.

### C. Flint citizens complained to Flint, MDEQ, and EPA

In 2014, after the source water switch, Flint, MDEQ and EPA began to receive complaints from Flint residents. Citizen complaints came to EPA at various levels within the agency and through various channels. *Ex. C,* 10:04-12. Some citizens called Region 5 employees directly. *Ex. 16; Ex. C,* 10:08-12. Flint citizens also filed complaints online through a platform known as the SDWA hotline, and those complaints were channeled to Region 5. *Ex. 41*, pp. 4-5; *Ex. 43*, pp. 2-3. Other citizens wrote to the White House, and those complaints, also known as controlled correspondence, were channeled to Region 5 when appropriate. *Ex. C,* 10:13-11:03. Citizen phone calls and complaints from the SDWA hotline were most often sent to and answered on the staff level by EPA's Michigan Program Manager and Drinking Water State Revolving Fund Set-Aside Coordinator. *See Ex. 41; Ex. 42; Ex. 43*. While some citizen complaints were handled entirely on the staff level, others went through various higher channels up to the Water Division Director or even Regional Administrator. *Ex. C,* 11:01-03, 25:06-09.

In 2014, Region 5 received citizen complaints concerning the color, smell, and taste of drinking water in Flint as well as concerns about rashes. *Ex. 16; Ex. 41; Ex. 42*. In early 2015, Region 5 received controlled correspondence from the

11

White House concerning, in part, Flint's December 2014 TTHM violation. *Ex. 15;*
*Ex. 18*. When Region 5 received citizen complaints from Michigan residents,
employees would discuss the issues with technical contacts, check for violations in
the various databases, and "call the State person responsible for that system and
talk to them about the complaint." *Ex. E,* 24:05-14, 49:19-22; *Ex. F,* 33:11-13.
After Region 5 conducted background research and communicated with the State,
it would respond to citizens through emails, phone calls, and by writing letters. *Ex.*
*E,* 36:10-37:16. Responses to Flint citizen complaints included information about
the water source switch and water quality issues as well as contact information for
the appropriate officials at the state and local level. *Ex. 15; Ex. 16; Ex. 18; Ex.43.*

### D. Miguel Del Toral investigated LeeAnn Walters' citizen complaint

Flint citizen LeeAnn Walters contacted EPA in early 2015 upon receiving
the results of drinking water samples collected by the City of Flint. *Ex. 3*, pp. 2-3.
EPA contacted MDEQ, which advised that the source of lead in LeeAnn Walters'
home was the interior plumbing. *Ex. 3*, p.3. Miguel Del Toral, Regulations
Manager, Groundwater and Drinking Water Branch, Water Division, Region 5,
investigated the potential source of lead and concluded that the Walters' home
contained plastic piping and was not the source of high levels of lead. *Ex. 3*.
Instead, the high lead levels were introduced from outside the Walters' home,
likely from a lead service line. *Ex. 3,* p.3. Miguel Del Toral prepared an interim

report that set forth his findings and three recommendations: (1) EPA should follow up with the MDEQ and Flint to provide Flint technical assistance for managing water quality issues, including lead in the drinking water; (2) EPA should review the compliance status of Flint with respect to whether the system is in violation of the LCR requirement to install and maintain optimal corrosion control and whether MDEQ was properly implementing the LCR provisions regarding optimal corrosion control treatment for large systems; and (3) EPA should review whether relevant resident-requested samples were being included by Flint in LCR sampling. *Ex. 3,* pp.4-5. All three recommendations were addressed by Region 5. *Ex. 6; Ex. 20*.

### E. On April 24, 2015, MDEQ first notified EPA it was not requiring corrosion control in Flint

MDEQ originally represented to EPA on February 27, 2015, that Flint had an optimized corrosion control program. *Ex. 1,* p.1. On April 24, 2015, however, MDEQ informed EPA that Flint in fact was not practicing corrosion control treatment. *Ex. 2,* p.3; *Ex. 32,* p.3, ¶10. During May and specifically on June 10, 2015, Region 5 staff at all levels expressed concern to MDEQ and Flint about the lack of corrosion control and recommended that MDEQ utilize the expertise of EPA's Office of Research and Development to avoid further water quality problems moving forward. *Ex. 32,* p.3, ¶11; *Ex. 3,* p.4.

13

### F. MDEQ agreed to commence a process to implement corrosion control treatment in Flint

The Director of the Water Division, Region 5, convened a formal conference call on July 21, 2015, with MDEQ management to discuss the status of Flint's lead sampling results and MDEQ's interpretation of the LCR. *Ex. 20.* Under MDEQ's interpretation of the LCR, the appropriate next step for Flint would be to commence a corrosion control study due to the two six-month rounds of sampling. *Id*. Region 5's interpretation of the LCR would have required Flint to maintain corrosion control when it changed sources. *Id*. MDEQ requested an opinion from EPA Headquarters to resolve the discrepancy in the LCR interpretation. *Id*. Region 5 agreed to seek an opinion. *Id*.; *Ex. C,* 42:11-16. Given the dispute over interpretation of the LCR between Region 5 and MDEQ, Region 5 believed that the issuance of a SDWA 1414 order was not a practical option without an opinion from EPA Headquarters confirming Region 5's interpretation of the LCR. *Ex. G,* 80:16-19.[6] During the call, however, Region 5 persuaded MDEQ to direct Flint to

---

[6] In response to the request, EPA issued a policy memorandum on November 3, 2015, which recognized that the LCR does not specifically address the procedures or timeframe for determining optimal corrosion control treatment in a situation such as in Flint, where a system is disconnected from a water source that provides corrosion control treatment and begins distributing water from a new source. *Ex. 31*; *Ex. C*, 41:14-16. The policy memorandum confirmed, however, that in the future large water systems and primacy agencies should take the steps necessary to ensure that appropriate corrosion control treatment is maintained at all times, including upon changing sources. *Ex. 31*.

implement corrosion control treatment as soon as possible. *Ex. C,* 62:20-21, 62:23-63:06; *Ex. 32,* p.3, ¶12; *Ex. 20.* Region 5 also reaffirmed EPA's prior commitment to provide technical assistance. *Ex. 20.*

MDEQ formally instructed Flint on August 17, 2015, to implement corrosion control as soon as possible, but no later than January 1, 2016, and to fully optimize its treatment within six months. *Ex. C,* 52:05-07; *Ex. 32,* p.3, ¶13. In an August 31, 2015, call with MDEQ, EPA Region 5 discussed public outreach to reduce exposures to high lead levels in Flint and reiterated its offer of technical assistance in implementing corrosion control treatment. *Ex. 32,* p.3, ¶14. Flint Mayor Dayne Walling announced on September 3, 2015, that Flint would implement corrosion control and invited EPA to provide its technical expertise by joining the Flint Technical Advisory Committee (Flint TAC). *Ex. 32,* p.3, ¶15. On October 16, 2015, EPA established the Flint Safe Drinking Water Task Force (EPA Flint Task Force) to provide EPA's technical expertise through regular dialogue with designated officials from MDEQ and Flint. The EPA Flint Task Force worked with MDEQ and Flint to determine how best to implement corrosion control treatment as soon as possible. *Ex. G,* 83:01-20; *Ex. 61,* p.1.

**G. Region 5 decided not to issue a SDWA 1431 order in the fall of 2015**

Region 5 considered issuing a SDWA 1431 order in the fall of 2015, *Ex. C,* 51:11-17, and indeed there were EPA personnel in Headquarters who felt that "it

was appropriate for the region to take Section 1431 action." *Ex. 53*, p.7. Region 5, however, weighed whether state and local authorities were acting appropriately to address the potential threat of elevated lead levels in public drinking water and considered several key developments. Not only had MDEQ agreed to direct Flint to implement corrosion control and accepted EPA's offer to technical assistance, Region 5 and MDEQ had ongoing discussions in September 2015 to develop a strategy to provide bottled water, premixed baby formula, and water filters for Flint residents until corrosion control was optimized, which resulted in the roll-out of Michigan and Flint's formal 10-Point Plan. *Ex. 32,* p.4 ¶¶ 16, 20; *Ex. 61; Ex. 29; Ex. C,* 51:18-52:09. In addition, following a recommendation from the Flint TAC on October 7, 2015, Region 5 persuaded MDEQ to direct Flint to switch back and return to purchasing treated water from Detroit. *Ex. G,* 75:23-76:01, 73:10-14. Region 5 concluded that it would not be appropriate to issue a SDWA 1431 order because the State and local authorities "were, in fact, taking actions to address the problem." *Ex. C,* 146:15-18; *Ex. 30* (Michigan and Flint's plan covered "all the things we might otherwise put in 1431"); *Ex. G,* 76:22-77:14 ("the State and Flint were doing everything possible to get CCT [corrosion control treatment] in place as soon as possible").

### H. EPA decided to issue a SDWA 1431 order in January 2016

EPA issued a SDWA 1431 emergency order in January 2016. *Ex. 32.*
Several key events that occurred in late 2015 and early January 2016 informed
EPA's decision to issue the order. On November 25, 2015, and subsequently, the
EPA Flint Task Force requested but did not receive key water system information
that would have allowed EPA to determine the progress being made with respect to
corrosion control in Flint. *Ex. 32*, p.4-5, ¶20. Without that information, the EPA
Flint Task Force could not be assured that contamination was appropriately
controlled. *Id.* Also, despite the fact that Flint commenced providing additional
corrosion control treatment at the Flint water plant in December 2015, in the
absence of data to show otherwise, high levels of lead and other contaminants were
presumed to persist. *Ex. 32*, p. 5, ¶21. In addition, Flint declared an emergency,
Michigan requested emergency disaster assistance, and President Obama declared
a federal emergency. *Ex. 32,* p.4, ¶¶20-24, p.8, ¶34.

By January 2016, EPA concluded that Flint, MDEQ, and the State had
"failed to take adequate measures to protect public health." *Ex. 32*, p. 8, ¶ 34.
Despite some measure of progress, there were delays in responding to critical EPA
recommendations and in taking actions to reduce not only lead but other
contaminants as well. *Id.* EPA was concerned that Flint lacked the professional
expertise and resources to safely manage the water system. *Id.* Specifically, EPA

was concerned about Flint's capacity to safely change its water source yet again, this time to untreated raw water from the Karegnondi Water Authority. Even though Flint temporarily changed its water source back to the Great Lakes Water Authority (GLWA) f/k/a DWSD in October 2015, *Ex. 61*, Flint still intended to change its water source in the future, as it originally envisioned in 2014. EPA was also concerned about a potential outbreak of Legionella and lack of chlorine residual in Flint's system. *Ex. G,* 42:16-43:02, 46:01-47:04, 150:24-151:03. These additional concerns are reflected in the SDWA 1431 order issued by EPA Headquarters' in January 2016.  The order specified, in several subparagraphs, the manner in which Flint needed to effectuate a transition to a new water source. *Ex. 32,* pp.13-15, ¶60. The order also specifically addressed the need to maintain chlorine residual in Flint's distribution system. *Ex. 32,* p.13, ¶57

## STANDARD OF REVIEW

Jurisdiction is a threshold issue. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). "Without jurisdiction the court cannot proceed at all in any cause." *Ex parte McCardle*, 74 U.S. 506, 514 (1868). The requirement that jurisdiction be established at the outset of a case "spring[s] from the nature of judicial power of the United States" and is "inflexible and without exception." *Steel Co.*, 523 U.S. at 94-95 (quoting *Mansfield, C. & L.M. Ry. Co. v. Swan,* 111 U.S. 379, 382 (1884)).

There are two types of Federal Rule of Civil Procedure 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction: (1) facial attacks and (2) factual attacks. *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). The United States moves to dismiss the complaint for lack of subject-matter jurisdiction pursuant to a factual attack based on Rule 12(b)(1). When a Rule 12(b)(1) motion attacks the factual basis for jurisdiction, no presumptive truthfulness attaches to plaintiffs' allegations and the district court must weigh conflicting evidence to resolve disputed jurisdictional facts. *Id.; Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005); *DLX, Inc. v. Kentucky,* 381 F.3d 511, 516 (6th Cir. 2004); *Land v. Dollar,* 330 U.S. 731, 735 n.4 (1947)("when a question of the District Court's jurisdiction is raised, either by a party or the court on its own motion,…the court may inquire by affidavits or otherwise, into the facts as they exist")(internal citations omitted).

## ARGUMENT

### I. The discretionary function exception deprives the Court of jurisdiction because Plaintiffs' claims challenge government conduct that allows for judgment and is susceptible to policy analysis

#### A. Purpose of the discretionary function exception and its application

The United States "can be sued only to the extent that it has waived sovereign immunity." *United States v. Orleans*, 425 U.S. 807, 814 (1976). The FTCA's waiver of immunity is limited, and contains a series of exceptions that

preserve the government's sovereignty. 28 U.S.C. § 2680. One of these exceptions—known as the discretionary function exception—states that the FTCA's waiver does not apply to "[a]ny claim … based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government." 28 U.S.C. § 2680(a).[7] The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984). If the United States could be sued for damages resulting from actions rooted in policy judgments, the constant threat of suit "would seriously handicap efficient government operations." *Id.* at 814 (quoting *United States v. Muniz*, 374 U.S. 150, 163 (1963)).

The Supreme Court has established a two-prong test to determine the applicability of the exception. The first prong "requires a determination of whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or choice." *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997) (citing *Gaubert v. United States*, 499 U.S. 315, 322-23 (1991)). "Thus,

---

[7] The exception applies "whether or not the discretion involved be abused," 28 U.S.C. § 2680(a), and thus "negligence is irrelevant" to the discretionary function inquiry. *Kohl v. United States,* 699 F.3d 935, 942 (6th Cir. 2012).

the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). To constitute the type of mandatory and specific requirement necessary to remove discretion, the provision must tell the government actor precisely what to do and how to do it. *See, e.g., Lockett v. United States*, 938 F.2d 630, 636-37 (6th Cir. 1991)(finding regulatory scheme that did not require any "specific and mandatory course of conduct" was not sufficiently specific to remove discretion); *Sharp v. United States*, 401 F.3d 440, 444 (6th Cir. 2005)(finding broad policy statements could not be read as eliminating agency discretion).

If there is a violation of a mandatory regulation or policy, then the discretionary function exception will not apply because there was no element of judgment or choice, and thus "the employee has no rightful option but to adhere to the directive." *Berkovitz*, 486 U.S. at 536. If, on the other hand, there was room for judgment or choice in the decision, then the challenged conduct was discretionary. *Rosebush*, 119 F.3d at 441. In such a case, the second prong of the test requires a court to evaluate "whether the conduct is 'of the kind that the discretionary function exception was designed to shield'" from liability. *Id.* (quoting *Gaubert*, 499 U.S. at 322-23). The discretionary-function exception was designed "to prevent judicial 'second-guessing' of . . . administrative decisions grounded in

21

social, economic, and political policy through the medium of an action in tort."
*Varig Airlines*, 467 U.S. at 814. Importantly, the focus of the inquiry under the
discretionary function exception is not on an agent's subjective intent, but rather on
whether the nature of the actions taken are susceptible to policy analysis. *Gaubert*,
499 U.S. at 325.

In the Sixth Circuit, "[o]nly after a plaintiff has successfully invoked
jurisdiction by a pleading that facially alleges matters not excepted by § 2680 does
the burden fall on the government to prove the applicability of a specific provision
of § 2680." *Carlyle v. United States*, 674 F.2d 554, 556 (6th Cir. 1982). As the
Supreme Court reiterated in *Gaubert*, however, when a government employee acts
pursuant to a discretionary statute, regulation, or guideline, there is a "strong
presumption" that the employee's conduct is grounded in policy when exercising
that discretion. 499 U.S. at 324; *A.O. Smith Corp. v. United States*, 774 F.3d 359,
365 (6th Cir. 2014).

### B. No specific and mandatory statutes, rules, or regulations removed discretion from EPA in responding to the Flint Water Crisis

Prong one of the Supreme Court's test for the discretionary function
exception is satisfied because no specific and mandatory statutes, rules, or
regulations constrained the conduct of EPA employees in responding to the Flint
Water Crisis. Michigan has primacy under SDWA. MDEQ implements the public

drinking water program in Michigan. MDEQ is obligated to notify public water systems of regulatory requirements and to enforce drinking water rules. EPA oversees states' implementation of SDWA at a programmatic level. While EPA has discretionary enforcement powers in states with primacy, such as Michigan, there are no statutes, rules, or regulations that mandate action or specify how EPA must act or respond to particular drinking water issues, whether in Flint or elsewhere. Indeed, EPA uses informal enforcement techniques to ensure compliance with SDWA. EPA also may use SDWA 1431 and 1414 under certain circumstances, but use of both of these provisions is discretionary.

### 1. SDWA 1431 is replete with discretionary judgment calls

SDWA 1431 is contingent on EPA making two threshold assessments: (1) a contaminant is present in or likely to enter a public water system…which may present an imminent and substantial endangerment to the health of persons; and (2) appropriate State and local authorities have not acted to protect the health of such persons. *Ex. 27; Ex. G,* 125:20-126:04, 126:17-25. Both threshold assessments require an analysis of facts. *Ex. G,* 68:01-22. EPA makes professional judgment calls in selecting and weighing the information to use in each assessment, ranging from drinking water sample results, health data, and "varying things depending on the precise situation, precise risks." *Ex. G,* 126:05-16. If both of these threshold issues are answered affirmatively, then the Administrator "***may*** take such actions

as he may deem necessary in order to protect the public health of such persons."

*Ex. 27* (emphasis added)*; Ex. G,* 128:12-129:19.[8] SDWA 1431 enumerates a series

of assessments and judgment calls that enabled EPA to evaluate the nature and

adequacy of MDEQ and Flint's response to water quality issues and to decide what

action, if any, would be appropriate. This is the opposite of eliminating judgment

or choice or specifically telling EPA employees what to do and how to do it.

*Berkovitz,* 486 U.S. at 536; *Lockett,* 938 F.2d at 636.

Courts considering SDWA 1431 in other contexts agree that the provision is

laden with discretion and provides EPA broad powers to act as it may deem

necessary. *See Trinity Am. Corp. v. EPA*, 150 F.3d 389, 397 (4th Cir. 1998)

("Section 1431 provides EPA with broad emergency powers to act as it 'deems

necessary'"); *United States v. City of North Adams, Mass.*, 777 F. Supp. 61, 83 (D.

Mass. 1991)(stating Section 1431 "permits—but does *not* require—the

Administrator to seek a 'restraining order *or* permanent *or* temporary injunction' as

one of the actions authorized against 'imminent and substantial endangerment' to

health"); *United States v. Range Prod. Co*., 793 F. Supp. 2d 814, 821 (N.D. Tex.

2011)("If the subject of an administrative order does not comply with its terms,

Section 1431(b) permits the EPA to file suit in district court to enforce the order …

---

[8] *Nankervis v. United States,* 127 F.3d 1102, 1997 WL 650828, *3 (6th Cir. 1997)
(unpublished) (terms "should" and "may" in applicable regulations demonstrate
discretion).

The EPA is not required to bring such an action; instead, it has discretion to determine whether it wants to enforce an administrative order through filing suit in federal court."); *United States v. Hooker Chems. & Plastics Corp.*, 101 F.R.D. 451, 455 (W.D.N.Y. 1984) (finding that the SDWA does not authorize citizen suits to compel EPA to take action under 1431).

Even prior to reaching SDWA 1431's "may" language, courts have found that the Administrator is vested with broad discretion in determining whether state and local authorities have acted appropriately to protect public health. *Trinity Am. Corp.*, 150 F.3d at 398 ("EPA, the agency with expertise in this area, determines if the state efforts were adequate"). Going even further, the Third Circuit has suggested that the purpose of SDWA 1431's state and local action language is, essentially, to require consideration of state and local action as a prerequisite to federal action. *See W.R. Grace & Co. v. EPA*, 261 F.3d 330, 339 (3d Cir. 2001) (citing H.R. Rep. No. 93-1185 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6454, 6487-88) ("the Committee intends that this broad administrative authority not be used when the system of regulatory authorities provided elsewhere in the bill could be used adequately to protect the public health"). Congressional reports and floor debates, moreover, support the view that Congress inserted the state and local action language in Section 1431 (and added certain pre-requisites before allowing Federal enforcement in a primacy state) to avoid duplication between federal and

state enforcement and to preserve the primary responsibility for protecting the

public at the state and local level. *See* H.R. Rep. 93-1185 at 35-36 (1974)

(directing "the Administrator to refrain from precipitous preemption of effective

State and local abatement efforts"). *Ex. 52*, pp.17-18 n.25.

### 2. SDWA 1414 is premised on a discretionary "finding"

SDWA 1414 did not create any mandatory and specific duties or

requirements for EPA in responding to the situation in Flint for three reasons. First,

SDWA 1414 is premised on a threshold discretionary "finding." SDWA 1414 does

not set forth a specific course of action that binds EPA decisionmaking; rather, it

allows the Administrator to take action "if [he] finds that a public water system

does not comply with federal drinking water regulations." *United States v. City of*

*North Adams, Mass.*, 77 F. Supp. 61, 69 (D. Mass. 1991). The process for arriving

at a "finding" for SDWA 1414 involves an evaluation of situation-specific facts

and applicable drinking water regulations, and both the facts and the law may be

unclear. *Ex. G,* 51:25-52:03. Notably, the language "[w]henever the Administrator

finds" under SDWA 1414 [(§ 300g-3(a)(1)(A)] is similar to the "during any period

for which the Administrator determines" language under SDWA § 300g-2(a).[9] In

*Nat'l Wildlife Fed'n v. EPA,* 980 F.2d 765, 771 (D.C. Cir. 1992), the court found

---

[9] Under 42 U.S.C. § 300g-2(a) "a State has primary enforcement responsibility for
public water systems during any period for which the Administrator determines"
that such State has met various requirements.

that § 300g-2(a) of SDWA "builds ample discretion into the front-end of the EPA's decisionmaking process by giving the agency discretion to decide 'the manner in which the Administrator may determine that [primacy] requirements are no longer met.'" *See also Myers v. United States*, 17 F.3d 890, 896 (6th Cir. 1994)("This requirement of an antecedent assessment or determination presents the MSHA official or inspector with a *choice*; does the condition exist or doesn't it?  This choice is sufficient to satisfy the first prong of the *Berkovitz/Gaubert* analysis.").

Second, a "finding" of noncompliance under SDWA 1414 was never made for Flint, and thus the ensuing SDWA 1414 provisions that employ the term "shall" were not triggered. If the requisite "finding" is made for SDWA 1414, then the Administrator (1) "shall so notify the State and such public water system and provide such advice and technical assistance to such State and public water system as may be appropriate to bring the system into compliance with the requirement by the earliest feasible time" and (2) "[i]f, beyond the thirtieth day after the Administrator's notification …, the State has not commenced appropriate enforcement action, the Administrator shall issue an order … requiring the public water system to comply with such applicable requirement or the Administrator shall commence a civil action …." 42 U.S.C. § 300g-3.

A compliance issue that potentially could have justified further action by Region 5 under SDWA 1414 was MDEQ's decision not to require corrosion

control for Flint after it changed to the Flint River. MDEQ planned to await the results of two six-month rounds of LCR sampling. Employees in Region 5 disagreed with MDEQ's interpretation of the LCR, but Region 5 did not make a "finding" of noncompliance under SDWA 1414. Based on EPA delegation manuals, such a "finding" would need to have been made by, at the lowest organizational level, EPA Water Division Director, Tinka Hyde. A "finding" in fact did not happen. Thus, additional activities contemplated by SDWA 1414 were never authorized.

And third, it is difficult to fathom that an agency's enforcement decision, otherwise presumptively unreviewable under an APA abuse of discretion standard, could be subject to a lawsuit for money damages under the FTCA which shields the government from liability for discretionary conduct "whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). *Compare Varig Airlines*, 467 U.S. at 814 (The FTCA discretionary-function exception was designed "to prevent judicial 'second-guessing' of . . . administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."), *with Heckler v. Chaney*, 470 U.S. 821, 830- 31 (1985) (finding agency enforcement decisions presumptively unreviewable under the APA because "[a]n agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise." . . .  "[When [n]o judicially

28

manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for "abuse of discretion.").[10]

### C. EPA's decisions about how to respond to the Flint Water Crisis are susceptible to policy analysis

Prong two of the Supreme Court's test for the discretionary function exception is satisfied because EPA's entire response to the Flint Water Crisis was predicated on SDWA and grounded in considerations of public policy. EPA's specific decisions concerning use of SDWA 1431 and SDWA 1414 were judgment calls based on an ongoing weighing of competing policy, public health, and environmental issues.

#### 1. EPA's entire response to the Flint Water Crisis was based on SDWA and grounded in considerations of public policy

SDWA delegates broad discretion to the EPA, and therefore, the Court may presume that EPA's actions were grounded in considerations of public policy when

---

[10] Enforcement actions are discretionary regardless of a statute's use of the word "shall" when the statute provides no standards or guidelines limiting agency discretion. *Heckler v. Cheney*, 470 U.S. 821, 834 (1985). There is no case law directly examining the discretion afforded in SDWA's 1414 enforcement provision. But several courts have examined the nearly identical enforcement provision of the Clean Water Act ("CWA"), 33 U.S.C. § 1319, and determined that the enforcement provision is discretionary. *Sierra Club v. Whitman*, 268 F.3d 898, 902-03 (9th Cir. 2001) (holding that Section 1319(a)(3) of the CWA is discretionary); *City of Olmstead Falls v. EPA*, 233 F. Supp. 2d 890, 904 (N.D. Ohio 2002); *Dubois v. Thomas*, 820 F.2d 943, 951 (8th Cir. 1987) (same).

acting pursuant to that discretion. *Gaubert*, 499 U.S. at 324; *A.O. Smith Corp*., 774 F.3d at 365. The policy considerations inherent in EPA action under SDWA are evident from the statute's text.[11] *See Gaubert*, 499 U.S. at 324 ("[i]t will most often be true that the general aims and policies of the controlling statute will be evident from its text."). The discretionary function exception prohibits FTCA actions based upon an alleged failure to warn when the failure is part of an overall discretionary policy or program. *Rosebush v. United States*, 119 F.3d 438, 443 (6th Cir. 1997)(finding decision of whether to warn visitors of the danger of open fire pits was protected by the discretionary function doctrine because the agency was vested with discretion to develop and implement operation plans for the management of the campground); *see also Angle v. United States*, 89 F.3d 832, *5 (6th Cir. 1996)(unpublished, *Ex. 69*)("if it had been intended to leave base commanders with no choice but to issue warnings, the regulations would have said so"). More generally, the manner in which the United States evaluates and addresses risks posed by public health hazards involves policy considerations. *Lockett v. United States*, 938 F.2d 630, 639 (6th Cir. 1991).

---

[11] The congressional findings in SDWA, 42 U.S.C. §§ 300f-300j, expressly direct EPA to "set priorities that will allow scarce Federal, State, and local resources to be targeted toward the drinking water problems of greatest public health concern," 8(A), and maximize "the value of the different and complementary strengths and responsibilities of the Federal and State governments in those States that have primary enforcement responsibility for the Safe Drinking Water Act," 8(B).

In *Lockett v. United States*, plaintiffs alleged that EPA acted negligently in failing to initiate a clean-up action immediately upon discovery that a hazardous waste site was contaminated with polychlorinated biphenyl ("PCB"). *Id*. at 631. The Sixth Circuit rejected the plaintiffs' challenge to the manner in which the EPA dealt with a release of PCBs, concluding that EPA's response to the PCB spill fell within the discretionary function exception. *Id*. at 639. The Sixth Circuit found that EPA's

> discretionary decisions, based upon "judgment calls" concerning the sufficiency of evidence of violations of applicable regulations, the allocation of limited agency resources, and determinations about priorities of serious threat to public health, are the very "public policy" discretionary judgments Congress intended to shield from liability under section 2680(a).

*Id*. A court should not second-guess the decisions of government officials "who must balance the environmental, economic, and social implications of each enforcement decision." *Id*.; *see also Rosebush*, 119 F.3d at 443 (finding decisions regarding the proper response to hazards are generally shielded from tort liability by the discretionary function exception); *Seaside Farm Inc., v. United States,* 842 F.3d 853, 859 (4th Cir. 2016)(finding that emergencies are unpredictable and dynamic, and therefore, an agency's strategy "must be unique to each situation"); *Daigle v. Shell Oil Co*., 972 F.2d 1527, 1541 (10th Cir. 1992)(assessment of hazards and implementation of safety measures constitute "the very essence of social, economic, and political decisionmaking—the precise policy choices

protected by the discretionary function exception"); *Ford v. American Motors Corp*., 770 F.2d 465, 467 (5th Cir. 1985)("both the evaluation of actual or suspected hazards, and the decision to proceed in a particular manner in light of those hazards, are protected discretionary acts, not subject to tort claims in the district court.")(citations omitted).

### 2. EPA's decisions concerning SDWA 1431 and SDWA 1414 were based on competing policy, public health, and environmental issues

#### a. Region 5's decision to forego a SDWA 1431 order in fall 2015

Region 5 considered issuing a SDWA 1431 order in the fall of 2015, and indeed discussion of it commenced in July 2015. *Ex. C,* 51:11-17, 52:08-09. In light of the threshold assessments for issuing an emergency order under SDWA 1431, Region 5 evaluated whether officials at MDEQ and Flint were acting appropriately to protect people from the risk presented by the lack of corrosion control in Flint's drinking water system. Four significant developments in the summer and fall of 2015 informed Region 5's decision not to issue a SDWA 1431 order at that time.

First, in summer 2015, MDEQ agreed to direct Flint to implement corrosion control as soon as possible despite the difference of opinion regarding the appropriate interpretation of the LCR. As noted previously, during the July 21, 2015, conference call, Region 5 persuaded MDEQ to direct Flint to implement

corrosion control based on a pressing potential health concern in Flint and working

to "figure out a path forward." *Ex. C,* 125:24; 127:20-25. Accordingly, it was not

necessary for EPA and MDEQ to resolve their dispute about the interpretation of

the LCR once MDEQ agreed to direct Flint to implement corrosion control.

Second, Region 5 could offer technical assistance regardless of whether it

issued a SDWA 1431 order. Region 5 concluded that it was important to prioritize

offering technical assistance to MDEQ and Flint. *Ex.* 30; *Ex.* 61, p. 2. Region 5

first learned on April 24, 2015, that MDEQ had not required Flint to implement

corrosion control. During May 2015 and specifically on June 10, 2015, Region 5

staff at all levels expressed concern to MDEQ and Flint about lead in Flint

drinking water and the lack of corrosion control and recommended that the

expertise of EPA's Office of Research and Development should be used to avoid

further water quality problems moving forward. *Ex. 32,* p.3, ¶11. Region 5

followed up on these prior offers of assistance during the July 21, 2015,

management-level conference call with MDEQ. EPA reiterated its offer of

technical assistance in implementing corrosion control treatment on August 31,

2015. *Ex. 32,* p.3, ¶14. Flint Mayor Dayne Walling formally accepted EPA's offer

of technical assistance on September 3, 2015, and EPA established the EPA Flint

Task Force on October 16, 2015. *Ex. 32,* p.4, ¶15. MDEQ, Flint, and EPA

technical experts worked to implement corrosion control through an ongoing

dialogue, navigating an array of highly technical water quality and treatment issues. *Ex. G,* 83:01-20 ("As far as appropriate dose, I want to emphasize that there's not a table or a chart that you look down to see what the appropriate dose of orthophosphate is."). Thus, Region 5 concluded that a collaborative process would be more appropriate than issuing a SDWA 1431 order.

Third, Region 5 decided to take advantage of state-level solutions and resources to address public health concerns in Flint instead of issuing a SDWA 1431 order. *Ex. 29.* Michigan and Flint developed and rolled out a 10-Point Plan in September and October of 2015 to respond to the drinking water situation. The plan included action items to be handled primarily by MDEQ and MDHHS:

1. Bottled water and pre-mixed formula for households with infants and children (the Michigan Department of Health and Human Services is working with USDA to do this through the WIC program)
2. Lead filters for households with infants and children (a group of nonprofits pledged $1 million for this purpose and will be working with the Meijer discount chain to obtain filters at wholesale.)
3. Water will be tested in all Flint schools. (MDEQ)
4. Water will be tested for lead in all Flint households with lead service lines that have infants and children. (MDEQ)
5. All other Flint households can request a free water test. (MDEQ)
6. The State will step up health advisory/public education efforts to encourage flushing and use of filters (MDEQ/MDHHS)
7. MDEQ will establish an end date for Flint to complete implementation of fully-optimized corrosion control—and move up the start date to commence implementation of corrosion control. (The current start date is 1/16)
8. MDEQ will expand the City's Technical Advisory Committee by adding several University of Michigan scientists and will immediately convene

the committee. (This committee includes ORD scientists from the Cincinnati Lab)

9. The State of Michigan's "Chief Medical Executive" will oversee a review of data that has been collected on Flint children's blood lead levels.

10. MDEQ will help Flint finance accelerated replacement of lead service lines (using SRF)

*Ex. 29*; *Ex. C,* 140:03-142:08. Region 5 Administrator Susan Hedman communicated regularly with Michigan leaders to help develop and work out details for the 10-Point Plan. *Ex. 29; Ex. C,* 140:16-18, 142:15-23.

Fourth, Flint switched back to using water purchased from GLWA f/k/a DSWD in October 2015. *Ex. 61.* GLWA treated the water with control corrosion prior to distribution to the Flint water plant. MDEQ, the Flint TAC, and the EPA Flint Task Force continued to collaborate and to evaluate how to optimize corrosion control in Flint and to operate Flint's public water system. *Ex. 32,* p.3, ¶¶15, 17, 18, 19.

Overall, Region 5 navigated competing policy, public health, and environmental issues and concluded that it would not be appropriate to issue a SDWA 1431 order in the fall of 2015. Region 5 management believed that the State and local authorities "were, in fact, taking actions to address the problem" *Ex. C,* 146:17-18, and MDEQ and Flint's plans covered "all the things we might otherwise put in [a] 1431 [order]" *Ex. 30. See also Ex. G,* 76:24-77:04 ("the State and Flint were doing everything possible to get CCT in place as soon as possible.

35

If we had doubts about that, we would have considered other means, but they were moving as of August with alacrity.").

The EPA Office of Inspector General (OIG) later concluded that "EPA Region 5 had the authority and sufficient information to issue a SDWA Section 1431 emergency order to protect Flint residents from lead-contaminated water as early as June 2015." *Ex. 53*. But that conclusion, like Region 5's conclusion *not* to issue the order, is the result of a discretionary judgment call. As the Acting Regional Administrator of Region 5 testified:

> They chose to substitute their judgment for our judgment on that point. It's always discretionary when to issue a 1431. We weigh various factors. They are calling it differently than I would call it.

*Ex. G*, 94:06-11. The facts surrounding Region 5's responses to the Flint Water Crisis illustrate the complexity of decisionmaking required to address the issues in Flint. Even if, in retrospect, different approaches at various times might now be thought to have been better, those decisions were committed to the agency's policy-based discretion. Plaintiff's invitation for this Court to second-guess Region 5's decision not to pursue a SDWA 1431 order is prohibited by the discretionary function exception. *Varig Airlines*, 467 U.S. at 814.

### b.  Decision to issue a SDWA 1431 in January 2016

EPA Headquarters issued a SDWA 1431 emergency order based on its evaluation of several key events that occurred in late 2015 and January 2016. The

SDWA 1431 calculus in January 2016 had changed drastically from the fall of 2015. *Ex. 32*, pp.4-5, ¶¶20-24. EPA Headquarters determined that although some progress had been made in addressing the drinking water crisis in Flint, "there continue to be delays in responding to critical EPA recommendations and in implementing the actions necessary to reduce and minimize the presence of lead and other contaminants in the water supply both now and in the near future." *Ex. 32,* p.8, ¶34. These new developments changed the policy calculus and weighed in favor of issuing a SDWA 1431 emergency order in January 2016. *Ex. G,* 116:18-24.

In January 2016, Robert Kaplan was involved in discussions with Regional Administrator Susan Hedman and officials in EPA Headquarters about whether EPA should issue a SDWA 1431 order. *Ex. G*, 39:24-40:07, 40:08-41:16. Robert Kaplan was concerned about issues other than lead in drinking water as of January 2016. *Ex. G*, 150:22-23 ("…in January of 2016, we were of the opinion that we were doing all that we could do to control lead…"). First, Robert Kaplan was concerned about Flint's plan to change its water source again without adequate preparation at the Flint water plant. EPA's January 2016 SDWA 1431 order specifies how Flint needs to effectuate a transition to a new water source. *Ex. 32,* pp.13-15. Second, there was a concern about a potential outbreak of Legionella in 2016. *Ex. G,* 42:16-43:02, 46:01-47:04, 150:25-151:03. EPA Headquarters'

January 2016 SDWA 1431 order specifically addressed the need to add chlorine residual to allay concerns related to Legionella poisoning. *Ex. 32,* p.13, ¶57.

EPA made a decision to issue the SDWA 1431 emergency order in January 2016, but there was debate about whether it should be issued. *Ex. C,* 50:22-23. Certain management-level personnel did not agree with the decision to issue the order. *Ex. C,* 51:02-05 ("Well, at that point, bottled water and filters and corrosion control and switch back to Detroit water and home testing and notification and a variety of other things were actually going on at that point."). EPA Headquarters issued the 1431 order because, in its judgment, it was appropriate under the circumstances that developed by January 2016. *Ex. 32.*

### c.  Region 5 considered using SDWA 1414 in 2015

Region 5 evaluated the potential use of SDWA 1414 to ensure the implementation of corrosion control in Flint's drinking water system based on policy concerns at the state and federal level. On the state level, Region 5 needed to navigate the policies of state primacy under SDWA and to respect MDEQ's role as the primary enforcer of drinking water regulations in Michigan. There is a strong element of federalism embedded in SDWA because of the traditional nature of states providing and overseeing drinking water. *Ex. G,* 127:06-08 (SDWA "came along long after the states were, in fact, providing drinking water, overseeing individual plants in doing so."). In deference to the State's primacy role

38

as envisioned under SDWA, EPA generally does not leap over state regulators and directly interact with particular local water systems. The SDWA is neither designed for nor requires Region 5 to be closely involved in day-to-day operations or testing at water plants throughout Michigan, let alone the entire region. For example, when Flint encountered drinking water problems with bacteria and TTHM, before lead was known to be a pressing issue in the system, MDEQ did what primacy states are supposed to do—cited Flint on December 16, 2014, for the violation and directed Flint to implement operational techniques at the Flint water plant. *Ex. 15,* pp.1-2; *Ex. 35*, p.1. The State of Michigan also provided reportedly close to $2 million to hire private consultants to address water quality issues. *Ex. 35,* p.2.

EPA establishes policy on a national level. If a primacy state interprets a regulation differently than an EPA Region, then EPA Headquarters may get involved to ensure that a consistent policy is implemented nationwide. *Ex. C,* 42:11-16 ("So Michigan is the primacy program. They run the drinking water program in the state of Michigan. They interpret the regulations as they implement their program. When we have a disagreement, we work with headquarters to make sure we have a nationally consistent and clear interpretation. And that's what we did."). Region 5 thus honored MDEQ's request for an opinion from EPA Headquarters concerning the interpretation of the LCR when a public water system

changes sources. That opinion was provided in November 2015 and is available to guide implementation of the LCR nationwide in the future.

## II.    This Court lacks subject-matter jurisdiction because there is no state law analogue that will support an FTCA action against the United States

### A. The FTCA's state law analogue requirement

The United States is immune from liability absent its consent, and the terms of that consent define a court's jurisdiction to entertain a suit against the United States. *United States v. Mitchell*, 445 U.S. 535, 538 (1980). The "'limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied.'" *Lehman v. Nakshian*, 453 U.S. 156, 161 (1981) (quoting *Soriano v. United States*, 352 U.S. 270, 276 (1957)). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475-76 (1994). Subject to several exceptions, the FTCA authorizes suits against the United States for:

> Money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1); *see also* 28 U.S.C. § 2674 ("The United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances"). The "reference to the 'law of the place' means law of the

State – the source of substantive liability under the FTCA." *Meyer*, 510 U.S. at 478. "Congress's chief intent in drafting the FTCA was simply to provide redress for ordinary torts recognized by state law." *Howell v. United States*, 932 F.2d 915, 917 (11th Cir. 1991). It is well-settled that the FTCA was not intended to redress breaches of federal statutes or regulations. *See, e.g.*, *Myers*, 17 F.3d at 905 (refusing to authorize FTCA recovery on the basis of breach of a duty imposed by federal regulations).

The state law analogue requirement is the principal limitation upon the government's liability in tort; it is an independent jurisdiction requirement. *Id.*; *see id.* at 898 (addressing the discretionary function exception without resolving a challenge based on analogous private liability is "putting the cart before the horse"). Under the FTCA's general waiver of immunity, the plaintiff bears the burden of persuading the court that it has subject-matter jurisdiction. *Wilburn v. United States*, 616 F. App'x 848, 852 (6th Cir. 2015) (citing *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005)).

**B. Plaintiffs' state law analogue**

The only Michigan state law basis for a tort duty that Plaintiffs identify is Section 324A of the Restatement (Second) of Torts, also referred to as the Good Samaritan doctrine. FAC ¶¶100-101. The Michigan Supreme Court has accepted §

324A as an accurate statement of Michigan law. *See, e.g.*, *Smith v. Allendale Mut.*

*Ins. Co.*, 303 N.W.2d 702 (Mich. 1981). Under the Good Samaritan doctrine:

> One who undertakes, gratuitously or for consideration, to render
> services to another which he should recognize as necessary for the
> protection of a third person or his things, is subject to liability to the
> third person for physical harm resulting from his failure to exercise
> reasonable care to protect[12] his undertaking, if
>
>     (a)    his failure to exercise reasonable care increases the
>              risk of such harm, or
>     (b)    he has undertaken to perform a duty owed by the
>              other to the third person, or
>     (c)    the harm is suffered because of reliance of the
>              other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965). Thus, the threshold inquiry is

whether the defendant has undertaken to render services to another for the

protection of a third person. *Myers*, 17 F.3d 902. If the threshold requirement is

met, the plaintiff must demonstrate that the defendant's undertaking falls within

one of the three alternative bases for the imposition of a duty in § 324A(a-c). *Id.*

**C. The United States did not assume a duty to Plaintiffs**

       **1.  The United States' undertaking was a government function for
          the benefit of the general public**

When the United States carries out statutory responsibilities, its actions are

not gratuitous undertakings within the meaning of the Restatement (Second) of

---

[12] The use of the word "protect" is apparently a typographical error and should
instead read "perform." *Hill v. United States Fid. and Guaranty Co.*, 428 F.2d 112,
115 n.5 (5th Cir. 1970).

Torts § 324A. In applying the threshold requirement of the Good Samaritan doctrine, the Michigan Supreme Court has focused on the purpose of the alleged undertaking to determine whether the unambiguous object of the undertaking was to benefit another and would not have been performed primarily for the actor's purposes. *Smith*, 303 N.W.2d at 715-716 (Mich. 1981). Plaintiffs cannot meet this threshold requirement. The unambiguous object of the United States' undertaking to render services to MDEQ was not to benefit Plaintiffs, rather, the United States undertaking was performed in accordance with statutory responsibilities, consistent with Michigan's primacy role under SDWA, and for the benefit of the general public.

The Michigan Supreme Court considered the issue of Good Samaritan liability in *Smith v. Allendale Mut. Ins. Co*., 303 N.W.2d 702 (1981). In *Smith*, the defendants-insurance companies conducted fire inspections of their insureds' premises. *Id*. at 705. After fires occurred injuring or killing several of the insureds' employees, the plaintiffs-employees filed complaints against the insurance companies alleging that the companies breached an assumed duty of care by failing to inspect carefully. *Id*. Considering § 324A,

> the [*Smith*] Court stressed that in order for the duty to arise, it is not enough for the actor merely to act; rather, the actor must have undertaken to render services to another. There, the Court concluded that no duty would arise unless the insurance companies intended or agreed to benefit either the employers or the plaintiff-employees. The Court held that this intention or agreement will not be found,

43

> however, with the mere conferral of some benefit to those parties, because persons pursuing their own interests often benefit others.

*Saline River Properties, LLC v. Johnson Controls, Inc*., 823 F. Supp. 2d. 670, 677 (E.D. Mich. 2011); citing *Nalepa v. Plymouth-Canton Cmty. Sch. Dist.*, 525 N.W.2d 897, 903 (Mich. Ct. App. 1994)(internal citations omitted). The Supreme Court of Michigan declined to find an undertaking under § 324A, holding that the insurance companies inspected the insureds' premises with their own interests in mind, not to benefit the insured or the plaintiffs. *Smith,* 303 N.W.2d at 713.

Under the lens of *Smith*, the United States' programmatic oversight of drinking water programs in primacy states does not give rise to a legal obligation sufficient to support an FTCA action. Federal drinking water regulation is not a service to any specific state or state agency, but is meant to meet certain federal objectives set forth by Congress. While the United States interacts with primacy states to address water quality issues, often by providing technical assistance and guidance, federal drinking water regulation and enforcement activities are conducted for the benefit of the general public. In essence, the United States undertaking to render services to MDEQ was a government function addressed to the public safety; it was not intended to protect individual Flint residents nor was there an agreement to do the same.  The United States is unaware of any Michigan case upholding a claim against a private person in analogous circumstances; and,

44

furthermore, numerous decisions from federal courts in this and other circuits

support dismissal of Plaintiffs' First Amended Complaint.

For example, in *M.R. (Vega Alta), Inc. v. Caribe Gen. Elec. Prod., Inc*., 31

F. Supp. 2d 226, 238 (D. P.R. 1998) the court found that EPA's regulatory duty to

oversee and direct environmental cleanup under CERCLA did not give rise to a

legal obligation sufficient to support plaintiffs' FTCA claims. In *Vega Alta*, the

property owners of a CERCLA site sought recovery under the FTCA alleging that

EPA exercised "inadequate oversight of the cleanup of Vega Alta" and failed "to

require the Private Defendants to comply with EPA orders and regulations." *Id*. at

235. The district court refused to find that "by undertaking to monitor private

parties' compliance with governmental [environmental] regulations, the

government has assumed a duty of care towards the beneficiaries of those safety

regulations such that it is liable for the negligence of its employees in the conduct

of this monitoring." *Id*. at 238 (citing *Myers*, 17 F.3d at 901). The court made clear

that

> Congress has passed certain environmental laws for the purpose of
> protecting the environment and the public's enjoyment and use of the
> environment. Congress created the EPA and passed CERCLA in order
> to ensure compliance with those environmental laws. While the EPA
> and its regulatory scheme in this sense benefit the public, their
> purpose is to ensure compliance with environmental regulations.

*Id*. (citing *Myers*, 17 F.3d at 900). The analysis of EPA's actions under SDWA

should be no different than the *Vega Alta* court's analysis of EPA's actions under

CERCLA. In response to water quality issues in Flint, the United States undertook services to MDEQ, including monitoring MDEQ's compliance with regulations pertaining to drinking water. As in *Vega Alta*, the United States worked to support another party's compliance with an environmental regulation for the very purpose of ensuring compliance with that regulation. This undertaking was not a service to MDEQ for the benefit of Plaintiffs under § 324A.

Numerous decisions support this conclusion. In *Stables v. United States,* 366 F. Supp. 2d 559 (S.D. Ohio 2004), a deceased pilot's widow claimed the Federal Aviation Administration negligently oversaw and enforced its safety regulations thereby causing her husband's death. The court held the Good Samaritan doctrine had no applicability because "there is no evidence that the FAA undertook to render services to benefit [the pilot] Kevin Stables," rather, "[t]he FAA undertook to promote compliance with its regulations." *Id*. at 571; *see also Zabala Clemente v. United States*, 567 F.2d 1140, 1149 (1st Cir. 1977) (finding the Good Samaritan doctrine did not create a duty running from the FAA inspector to passengers of the aircraft). Similarly, in *Starnes ex rel. AS v. United States*, No. 06-10079-CIV, 2007 WL 5238398 (S.D. Fla. May 15, 2007), a four year old was assaulted under the care of a Navy certified family child care provider. The court considered the Military Child Care Act of 1989, and found that the Navy had not undertaken to render services to the plaintiffs, the minor's parents and next of friends. *See id*. at

46

*11 (finding that while "the Navy endeavored to ensure the family care professionals it certified were qualified individuals who would provide proper care," it did not owe an independent duty of care to children enrolled in the program). Finally, in *Florida Auto Auction of Orlando, Inc. v. United States*, 74 F.3d 498 (4th Cir. 1996), a car auction company brought a claim against the United States after customs officials violated regulations requiring originals or certified copies of certificates of title in order to export vehicles. The Fourth Circuit declined to find an undertaking within the meaning of § 324A because the customs officials were acting pursuant to regulations and legislation intended to deter the removal of stolen automobiles. *Id*. at 504-505.

Plaintiffs' allegations that "[t]he EPA undertook the duty of rendering services to MDEQ 'for the protection' of Flint water users," FAC ¶102, and "[t]he EPA, in employing environmental safety experts such as Del Toral, undertook the task of providing the MDEQ with environmental safety technical advice and expertise," FAC ¶130, are nothing more than allegations that the United States acted under the framework of SDWA to promote compliance with its regulations. Per *Smith*, the mere conferral of some benefit is not enough; the government, in undertaking a service, must have intended or agreed to benefit the plaintiffs. Plaintiffs did not and cannot plead facts as required to make this showing because the United States, acting pursuant to regulations and authorizing legislation or

47

within the framework of the same, has not unambiguously undertaken to render services to another for the benefit of a third person under § 324A.[13]

### 2. Alternative bases for the imposition of a duty under § 324A

Even if Plaintiffs could meet the threshold requirement, they could not establish that the United States' undertaking falls within one of the three alternative bases for the imposition of a duty in § 324A(a-c). Plaintiffs cannot satisfy any of the three alternatives because a) the United States did not increase the risk of harm to Plaintiffs, b) the United States did not undertake to perform a duty owed by MDEQ to Plaintiffs, and c) harm was not suffered because of reliance of MDEQ or Plaintiffs upon an undertaking of the United States.

### a. The United States did not increase the risk of harm

Plaintiffs' allegations that the United States increased the risk of harm by failing to comply with SDWA (FAC ¶123) and failing to warn claimants (FAC

---

[13] Plaintiffs additionally allege that the United States "rendered service to the MDEQ and responded to LeeAnn Walters' complaints." FAC ¶109. This claim must fail because LeeAnn Walters is not a Plaintiff and because Plaintiffs have not pleaded facts sufficient to justify their assertion that an undertaking to respond to LeeAnn Walters, or any other individual who filed a complaint, was intended to benefit Jan Burgess and 2,625 other individuals. Furthermore, EPA employee Miguel Del Toral responded to LeeAnn Walters' complaint and went to Flint to collect samples and data from homes, including LeeAnn Walters' home, with the intention of "inform[ing] the NDWAC process and ultimately better inform[ing] the LCR rulemaking." *Ex. 6*. As stated by Miguel Del Toral, "from a public health standpoint, but also from a research standpoint, it was important to try to find out what the cause of these very high lead levels might be." *Ex. 12*.

¶134) highlight Plaintiffs' fundamental misconception of § 324A(a). As the circuit courts of appeals have explained to exhaustion, "a duty is imposed only if the risk is increased over what it would have been had the defendant not engaged in the undertaking at all." *Myers*, 17 F.3d at 903; *see also Howell*, 932 F.2d at 919 ("for purposes of the section 324A 'good samaritan' doctrine, a risk is only increased 'when a nonhazardous condition is made hazardous through the negligence of a person who changed its condition or caused it to be changed'"); *Patentas v. United States*, 687 F.2d 707, 717 (3d Cir. 1982) ("the comment to section 324A makes clear that 'increased risk' means some physical change to the environment or some other material alteration of the circumstances.").

In *Myers*, coal miners were killed in an explosion when the release of a dangerous concentration of methane gas was ignited by a miner's forbidden use of a cigarette lighter. 17 F.3d at 893. The plaintiffs contended that the negligence of Mine Safety and Health Administration (MSHA) inspectors increased the risk of harm to the miners. *Id*. at 902. In considering liability under § 324A(a), the Sixth Circuit rejected the same argument Plaintiffs make here; in essence the *Myers* plaintiffs' argued that "by failing to detect safety violations in the mine, the dangerous conditions were allowed to continue over time." *Id*. The Sixth Circuit held that the plaintiffs could not proceed under § 324A(a) because they had not alleged "facts showing that the governmental actor affirmatively either made, or

49

caused to be made, a change in the conditions which change created or increased the risk of harm that befell the miners." *Id.* at 903. The Sixth Circuit explained that liability for increasing the risk would be proper "had it been a MSHA inspector who lit a cigarette and caused the explosion, rather than a miner." *Id.* at 903 n.15. The United States did not light the proverbial cigarette, or in this case, approve of the decision to switch Flint's water supply to the Flint River without implementing corrosion control. The United States did not increase the risk of harm; instead, it mitigated the continuation of an existing risk. Plaintiffs may not proceed under § 324A(a).

### b. The United States did not undertake to perform a duty owed by MDEQ

Plaintiffs' assertions concerning an imposition of liability under § 324A(b), FAC ¶124, ¶133, ignore two of the most basic facts surrounding this matter: Michigan gained primacy in 1978, *Ex. 58*, p.1, and Michigan maintained primacy from 2014 through 2017. *Ex. G,* 124:11-15. The statutory scheme of SDWA provides that States which gain primacy under Section 1413, 42 U.S.C. § 300g-2, have the primary oversight and enforcement responsibility for public water systems. There is a regulatory mechanism for the withdrawal of primacy approval which was authorized by Congress in 42 U.S.C. § 300g-2 and promulgated by the EPA at 40 C.F.R. § 142.17. Unless Michigan decides to give up primacy or EPA withdraws primacy pursuant to 40 C.F.R. § 142.17, MDEQ remains the primary

authority responsible for implementation of SDWA drinking water standards in Michigan.

Courts considering § 324A(b) have declined to impose a duty where the United States was operating under comprehensive, multi-party, regulatory schemes. In *Raymer v. United States*, the court found that plaintiffs had not satisfied § 324A(b) because the role of the Bureau of Mines in promoting mine safety was strictly secondary to the role of the mine operators. 660 F.2d 1136, 1143 (6th Cir. 1981), *cert. denied*, 456 U.S. 944 (1982). The Federal Coal Mine Health and Safety Act provided that "the operators of such mines with the assistance of the miners have the primary responsibility to prevent the existence of such (unsafe and unhealthful) conditions and practices in such mines." *Id*. The Sixth Circuit held that this statutory language completely negated "the idea that responsibility for mine safety has been shifted to the federal government." *Id*. Similarly, in *Howell*, the Eleventh Circuit considered whether the FAA or its inspector undertook to perform a duty owed by the airline to its passengers. 932 F.2d at 918. The Eleventh Circuit made clear that the requirements of § 324A(b) could not be met: "[w]hatever the FAA does or does not do, the Federal Aviation Regulations assign the chief responsibility for ensuring the airworthiness of an aircraft and its crew to the craft's owner, operator, or pilot. The duties of the FAA supplement rather than supplant the duties of the airline—duties which the airline could not,

51

and did not, delegate." *Id*. at 919 (internal citation omitted). The facts surrounding

the statutory framework of SDWA and Michigan's primacy status are substantially

similar to the regulatory frameworks and relationships considered in *Myers* and

*Howell*. Michigan's status as a primacy state negates any possibility that the United

States undertook to perform a duty MDEQ owed Plaintiffs within the meaning of §

324A(b).

### c.   Harm was not suffered because of reliance of MDEQ or Plaintiffs upon an undertaking of the United States

The government is not liable under § 324A(c) for any negligence where the

regulation upon which the plaintiff relies precludes reasonable reliance. *Moody v.*

*United States*, 774 F.2d 150, 157 (6th Cir. 1985), *cert denied,* 479 U.S. 814 (1986).

For example, in *Raymer*, plaintiffs alleged that Bureau of Mines' inspectors were

negligent in granting an operator an extension of time to correct a safety violation.

660 F.2d at 1138. The court found that it was unreasonable for plaintiffs to rely on

the inspectors when the operative statute placed primary responsibility for

compliance with safety standards on the operators. *Id.* at 1143; *see also Stables,*

366 F. Supp. 2d at 571 (holding that the regulation placing responsibility on

airlines for ensuring that aircraft conform to FAA regulations precludes reasonable

reliance by the plaintiff on the FAA). Similarly for Plaintiffs, reliance would not be

warranted in light of SDWA's directive that the primacy state is primarily

responsible for drinking water safety. Again, Michigan maintained primacy from

2014 through 2017 and the United States could not withdraw approval for its primacy program absent use of the provisions in 40 C.F.R. § 142.17.[14]

For the same reasons, any claim that MDEQ detrimentally relied on the United States, causing harm to the Plaintiffs, must also be denied. Illustratively, in *Pate v. Oakwood Mobile Homes, Inc.*, the plaintiff only asserted § 324A(c) as a basis for liability, arguing that his employer relied on the fact that OSHA had not followed up to ensure abatement of a previously cited violation. 374 F.3d 1081, 1086 (11th Cir. 2004). The Eleventh Circuit found insufficient evidence of reliance and further concluded that plaintiff's employer would not be justified in relying on OSHA's omissions because the OSH Act places ultimate responsibility on the employer for ensuring compliance with safety regulations. *Id*. at 1086-1087. Correspondingly, MDEQ would not be justified in relying on the United States where MDEQ had the primary responsibility for ensuring compliance with drinking water regulations.

Specifically, Plaintiffs allege that "Burgess, for herself and on behalf of other CLAIMANTS, relied on the EPA to undertake the task of investigating complaints and fashioning the appropriate remedy." FAC ¶128. As stated

---

[14] Regulations published in "the Code of Federal Regulations, have the force and effect of law, and all persons affected thereby are charged with legal notice of their provisions." *Adamsville Lumber Co. v. Rainey*, 348 F. Supp. 373, 376 (W.D. Tenn. 1972) (citing *FCIC v. Merrill*, 332 U.S. 380 (1947)).

previously, "such reliance—even had it occurred—would have been manifestly unreasonable and unjustified" due to the framework of SDWA. *Myers*, 17 F.3d at 904. For that reason alone, Plaintiffs should not proceed under § 324A(c). While Jan Burgess and some additional Plaintiffs possibly submitted complaints to the United States, this is a "joinder action." FAC ¶1. Plaintiffs' theory of general reliance belies the fact that the 2,626 Plaintiffs have not alleged any particular instance in which they detrimentally relied on an undertaking of the United States. As the Restatement explains, the harm cannot be said to have resulted from the undertaking or the plaintiffs' reliance thereon—unless the plaintiffs were "induced … to forgo other remedies or precautions against such a risk." Restatement, § 324A cmt. e (1965); *accord Myers*, 17 F.3d at 903; *see also Dorking Genetics v. United States*, 76 F.3d 1261, 1268 (2d Cir. 1996) (holding that conclusory assertions of reliance were insufficient where plaintiff did not show "that it took, or declined to take, any action in reliance on the United States' performance of its duty"). Furthermore, with respect to individual Plaintiffs who actually corresponded with EPA, Plaintiffs' pleadings and the undisputed facts undermine any assertion of reliance.

EPA's Michigan Program Manager, Jennifer Crooks, received and responded to many complaints from Flint citizens. *Ex. E*, 29:07-19. When Jennifer Crooks received correspondence from Flint citizens, she would "call the State

person responsible for that system and talk to them about the complaint." *Ex.* E, 49:19-22. Jennifer Crooks would also follow up with the citizen who submitted the complaint through emails, phone calls, and by writing letters. *Ex. E*, 36:10-37:16. Jennifer Crooks' correspondence with Jan Burgess is Plaintiffs' principal example of these communications. After receiving Jan Burgess' October 14, 2014, complaint, *Ex. 42*, pp.2-3, Jennifer Crooks reached out to colleagues in EPA for technical assistance and contacted MDEQ to discuss the issues. *Ex. E*, 91:20-92:11. Jennifer Crooks then responded to Jan Burgess, saying "[t]he MDEQ has been working closely with the Operator-in-Charge at the Flint Water Treatment plant to ensure a palatable drinking water is provided to the citizens of Flint." *Ex. 43*, p.1. Within the same communication, Jennifer Crooks provided Jan Burgess with contact information for MDEQ's district engineer and the Flint Water Service Center, and explained that "MDEQ is aware of the multiple complaints from citizens and is working closely with the Flint Water Department to ensure the distribution system and the water treatment processes work more efficiently and more effectively." *Ex. 43*, p.1. Jan Burgess and Jennifer Crooks did not have any further communications. *Ex. E*, 98:04-17. There is nothing about this communication that could have possibly induced Jan Burgess to forego other

remedies or precautions—nor is there a scintilla of evidence that the other 2,625 Plaintiffs were aware that Jan Burgess corresponded with Jennifer Crooks.[15]

Plaintiffs cannot meet the threshold undertaking requirement or satisfy an alternative basis for the imposition of a duty under § 324A(a-c). These requirements must be met to establish Good Samaritan liability under Michigan law, and thus the United States' liability under the FTCA, therefore, this Court lacks subject-matter jurisdiction and Plaintiffs' First Amended Complaint should be dismissed.

## CONCLUSION

The United States' motion to dismiss for lack of subject-matter jurisdiction should be granted for two independent reasons. First, Plaintiffs' tort claims against the United States fall within the discretionary function exception of the FTCA. Second, Plaintiffs' claims do not correspond to an analogous tort claim available against a private defendant under Michigan law.

---

[15] Notably, claims arising out of a failure to communicate information fall within the misrepresentation exception to the FTCA waiver of immunity. 28 U.S.C. § 2680(h); *see Block v. Neal*, 460 U.S. 289, 296 (1983) ("the essence of an action for misrepresentation, whether negligent or intentional, is the communication of misinformation on which the recipient relies"); *JBP Acquisitions, LP v. United States*, 224 F.3d 1260, 1264 (11th Cir. 2000) (finding this exception is applicable when "the essence of the claim involves the government's failure to use due care in obtaining and communicating information").

Respectfully submitted,

Chad A. Readler
Acting Assistant Attorney General, Civil Division

Thomas G. Ward
Deputy Assistant Attorney General, Torts Branch

J. Patrick Glynn
Director, Torts Branch

Christina M. Falk
Assistant Director, Torts Branch

Michael L. Williams
Bethany J. Henneman
Trial Attorneys, Torts Branch

*s/ Michael L. Williams*
MICHAEL L. WILLIAMS
DC Bar #471618
Trial Attorney, Torts Branch
Environmental Tort Litigation
175 N Street, N.E.
Washington, DC 20002
e-mail: michael.l.williams@usdoj.gov
phone: 202-307-3839

*s/ Bethany J. Henneman*
BETHANY J. HENNEMAN
MD Attorney #1512150313
Trial Attorney, Torts Branch
Environmental Tort Litigation
175 N Street, N.E.
Washington, DC 20002
e-mail: Bethany.J.Henneman@usdoj.gov
phone: 202-616-4447

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2018, the foregoing Motion to Dismiss for Lack of Subject-Matter Jurisdiction and Memorandum in Support were filed via the U.S. District Court's CM/ECF electronic filing system and a copy thereof was served upon all counsel of record.

*s/ Michael L. Williams*
MICHAEL L. WILLIAMS