JAN BURGESS, and all 2,959 individuals
identified in the Burgess FTCA administrative
Complaint,

         Plaintiffs,                           Civil Case No. 17-11218
                                            Honorable Linda V. Parker

v.

UNITED STATES OF AMERICA,

         Defendant.
_____/

WILLIAM THOMAS, and all 1,923 individuals
identified in the Thomas FTCA administrative
Complaint,

         Plaintiffs,
                                          Civil Case No. 18-10243
v.                                            Honorable Linda V. Parker

UNITED STATES OF AMERICA,

         Defendant.
_____/

## OPINION AND ORDER

     This is one of many cases emerging from what is now infamously known as

the Flint Water Crisis. The crisis arose when the City of Flint, Michigan ("City" or

"Flint"), changed the source of its water supply from the Detroit Water and

Sewerage Department ("DWSD") to the Flint River. The raw water drawn from

the Flint River, processed through Flint's outdated and previously mothballed water treatment plant, was highly corrosive and not properly treated by the City's public works department. As a result, water with excessive lead and copper levels flowed through the City and into residents' homes, causing them physical injury and damage to water mains and service lines.

The Sixth Circuit recently described "[t]he harmful effects" from the switch in water sources as "swift" and "severe." *Guertin v. State of Michigan*, 912 F.3d 907, 915 (2019). Flint residents complained of foul smelling and tasting water, their hair began to fall out, they developed skin rashes, there were positive tests for E. coli, a spike in Legionnaires' disease, and an elevation in the blood lead levels of Flint's children. *Id.* Criminal and civil proceedings have followed to hold the many Michigan and Flint officials and employees and independent contractors legally responsible for this crisis. *See, e.g., id.*; *Mich. Dep't of Env. Quality v. City of Flint*, 282 F. Supp. 3d 1002, 1004 (E.D. Mich. 2017) (listing some of the cases). In the above-captioned lawsuits, groups of Flint residents are suing the United States for the Environmental Protection Agency's role under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680.[1]

---

[1] Three additional and substantively identical lawsuits filed by different groups of plaintiffs against the United States are also pending before the undersigned: *Abraham v. United States*, No. 19-cv-10625 (E.D. Mich. filed Mar. 4, 2019); *Adams v. United States*, No. 18-cv-13166 (E.D. Mich. filed Oct. 10, 2018); **Cont'd…**

Plaintiffs allege that Environmental Protection Agency ("EPA") officials

and employees negligently responded to the water crisis, including by failing to

utilize the agency's enforcement authority under the Safe Drinking Water Act

("SDWA") to intervene, investigate, obtain compliance, and warn Flint residents of

the health risks posed by the water.  The United States (hereafter also

"Government") has filed motions to dismiss Plaintiffs' lawsuits for lack of subject

matter jurisdiction.  The United States contends that it has not waived its immunity

from Plaintiffs' claims because Michigan law would not impose liability on private

individuals in similar circumstances—the extent to which the FTCA only waives

Government immunity—and because the alleged misconduct by the EPA is

excepted from liability under the FTCA's discretionary function exception.  The

motions have been fully briefed.

The impact on the health of the nearly 100,000 residents of the City of Flint

remains untold.  It is anticipated, however, that the injury caused by the lead-

contaminated public water supply system will affect the residents for years and

likely generations to come.  While this Court will not decide today the issue of

ultimate liability, it can today state with certainty that the acts leading to the

creation of the Flint Water Crisis, alleged to be rooted in lies, recklessness and

---

*Anderson v. E.P.A.*, No. 18-cv-12725 (E.D. Mich. filed Aug. 31, 2018).  The Court
has entered stipulated orders staying those cases pending its decision on the
motions here.

profound disrespect have and will continue to produce a heinous impact for the people of Flint.

The issue presented to the Court by the Government's pending motions to dismiss is not whether EPA officials and employees were negligent or even abused their discretion in responding to the Flint Water Crisis. Instead, the issue is whether the Government is subject to tort liability under the FTCA for that conduct.

## I.     Standard for Dismissal

The Government's motions to dismiss for lack of subject matter jurisdiction are filed pursuant to Federal Rule of Civil Procedure 12(b)(1). Where the defendant is raising a factual challenge to the existence of subject matter jurisdiction, as is the case here, the court must "'weigh the conflicting evidence to arrive at the factual predicate that subject-matter does or does not exist.'" *Wayside Church v. Van Buren Cty.*, 847 F.3d 812, 817 (6th Cir. 2017) (quoting *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2008)). "[N]o presumptive truthfulness applies to the [plaintiff's] factual allegations" and the "court has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

"'[I]t is a universal rule . . . that a party who invokes the jurisdiction of a federal court must allege all facts necessary to give the court jurisdiction of the subject matter.'" *Carlyle v. United States*, 674 F.2d 554, 556 (6th Cir. 1982) (quoting *Stewart v. United States*, 199 F.2d 517, 520 (7th Cir. 1952)).  Therefore, a plaintiff suing under the FTCA must invoke jurisdiction by alleging facts not excepted under the statute.  *Id*.  This includes facts establishing that the complaint is facially outside the exceptions of the FTCA's discretionary function exception. *Id*.  If the plaintiff succeeds, the burden falls on the government to prove the FTCA's inapplicability, including that the plaintiff's claims fall within any of the statute's exceptions.

## II.     Background Regarding Control of Public Water Supply Systems in Michigan and the EPA

The SDWA was enacted in 1974 "to assure that water supply systems serving the public meet minimum national standards for protection of public health."  H.R. Rep. No. 93-1185 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6454, 6454.  The statute authorizes the EPA "to establish Federal standards for protection from all harmful contaminants[] … applicable to all public water systems[.]"  *Id*. at 6454-55.  It also "establish[es] a joint Federal-State system for assuring compliance with th[o]se standards and for protecting underground sources of drinking water.  *Id.* at 6455.

States adopting, among other things, drinking water regulations that are no less stringent than the national primary drinking water regulations are eligible to obtain primary enforcement authority [primacy] over their public water systems. 42 U.S.C. § 300g-2(a)(1). Michigan has obtained primacy and the Michigan Department of Environmental Quality ("MDEQ") thus has primary enforcement authority with respect to the State's water systems. *See Mays v. City of Flint*, 871 F.3d 437, 446 (6th Cir. 2017). As the Sixth Circuit has described it, "the MDEQ-EPA relationship is a model of cooperative federalism …." *Id*. at 447.

Nevertheless, the SDWA reserves the EPA's oversight and primacy States must periodically submit compliance reports to the EPA for that purpose. 42 U.S.C. §§ 300g-3, 300i; *see also* 40 C.F.R. §§ 141.82(i), 141.83(b)(7), 141.90, 142.15, 142.19, 142.30. For example, Section 1414 of the statute sets forth the EPA's response when a public water system is not in compliance. With respect to primacy States, the provision reads in relevant part:

> (a) Notice to State and public water system; issuance of administrative order; civil action
>
> (1)(A) Whenever the Administrator finds during a period during which a State has primary enforcement responsibility for public water systems (within the meaning of section 300g-2(a) of this title) that any public water system--
>
> (i) for which a variance under section 300g-4 or an exemption under section 300g-5 of this title is not in effect, does not comply with any applicable requirement, or

…

he shall so notify the State and such public water system and provide such advice and technical assistance to such State and public water system as may be appropriate to bring the system into compliance with the requirement by the earliest feasible time.

(B) If, beyond the thirtieth day after the Administrator's notification under subparagraph (A), the State has not commenced appropriate enforcement action, the Administrator shall issue an order under subsection (g) requiring the public water system to comply with such applicable requirement or the Administrator shall commence a civil action under subsection (b).

42 U.S.C. § 300g-3. Section 1431 of the statute grants the EPA certain emergency

powers:

**(a) Actions authorized against imminent and substantial endangerment to health**

Notwithstanding any other provision of this subchapter, the Administrator, upon receipt of information that a contaminant which is present in or is likely to enter a public water system or an underground source of drinking water, or that there is a threatened or potential terrorist attack (or other intentional act designed to disrupt the provision of safe drinking water or to impact adversely the safety of drinking water supplied to communities and individuals), which may present an imminent and substantial endangerment to the health of persons, and that appropriate State and local authorities have not acted to protect the health of such persons, may take such actions as he may deem necessary in order to protect the health of such persons. To the extent he determines it to be practicable in light of such imminent endangerment, he shall consult with the State and local authorities in order to confirm the correctness of the information on which action proposed to be taken under this subsection is based and to ascertain the action which such authorities are or will be taking. The action which the Administrator may take may include (but shall not be limited to) (1) issuing such orders as may be necessary to protect the health of persons who are or may be users of such system

> (including travelers), including orders requiring the provision of
> alternative water supplies by persons who caused or contributed to the
> endangerment, and (2) commencing a civil action for appropriate
> relief, including a restraining order or permanent or temporary
> injunction.

42 U.S.C. § 300i.  The EPA has enacted regulations pursuant to the SDWA setting

forth primacy States' obligations and the EPA's oversight and responsibilities.  *See*

40 C.F.R. §§ 142.10 *et seq.*

The EPA has ten regional offices, each of which is responsible for executing

EPA programs within several States and territories.  "Region 5" serves six States,

including Michigan, and a number of tribes.  Congress has granted the EPA

Administrator the authority to "delegate any of his functions under [the statute]

(other than prescribing regulations) to any officer or employee of the Agency."  42

U.S.C. § 300j-9.  The EPA Administrator has delegated  his authority under

Sections 1414 and 1431 of the SDWA, 42 U.S.C. §§ 300g-3 and 300i, to the

Regional Administrators and the Assistant Administrator for Enforcement and

Compliance Assurance.  (Def's Mot. Exs. 66-68, ECF Nos. 41-7, 41-8, 41-9.)[2]

Against this legislative and administrative backdrop, the Court turns to the

facts relevant to Plaintiffs' allegations in these lawsuits.

---

[2] All docket citations in this Opinion and Order are to *Burgess v. United States*, No.
17-11218.

## III.    Factual Background

Flint owns and operates a public water system that provides drinking water to its nearly 100,000 citizens. Before April 2014, Flint purchased finished drinking water from the DWSD. DWSD drew its water from Lake Huron and treated the water to control potential contaminants, including copper and lead levels.

In approximately late April 2014, Flint switched its water source from DWSD to the Flint River. The use of the Flint River as a water source was intended to be temporary, as Flint planned to connect to the Karegnondi Water Authority pipeline in 2016, which also draws its water from Lake Huron. (*See* Def.'s Mot. Ex. 43 at 1, ECF No. 40-3 at Pg ID 1349.) MDEQ and Flint did not, and were not required to, notify the EPA of the changing water sources for Flint. (Def.'s Mot. Ex. C at 37, ECF No. 37-3 at Pg ID 862.) The EPA does not approve such a switch in a primacy State. (*Id*. at 35, Pg ID 862; Ex. 15 at 2.) MDEQ approved Flint's water source change, but did not require Flint to begin corrosion control prior to the switch. (Ex. 2 at 1, ECF No. 38-1; Ex. 3 at 2, ECF No. 38-2 at Pg ID 1142.) MDEQ interpreted the Lead and Copper Rule ("LCR") as allowing Flint to complete two consecutive six-month rounds of sampling prior to determining what, if any corrosion control treatment was needed for the Flint River water. (*Id.* Ex. 20, ECF No. 39-3 at Pg ID 1206-07; Ex. 22 at 1-3, ECF No. 39-5 at

Pg ID 1209-1211.) Its wrongful and damaging interpretation was later admitted by MDEQ Director Dan Wyant.

The Flint River provided inconsistent water quality because of elevated levels of organic matter. (*Id.* Ex. 35 at 1, ECF No. 39-18 at Pg ID 1313.) By August 2014, elevated levels of fecal coliform and E. coli bacteria were detected in the water and the MDEQ issued a "boil water advisory" instructing Flint residents to not drink the water. (Def.'s Mot. Ex. E at 66, ECF No. 37-5 at Pg ID 975; Pls.' Resp. Ex. 70 at 7, ECF No. 53-27 at Pg ID 2114.) A second E. coli exceedance occurred on September 5, 2014. (*Id.*) The City's use of chlorine to address bacteria exceedances led to another problem—high levels of total trihalomethane ("TTHM"), which poses health risks to consumers. (Pls.' Resp. Ex. 3, ECF No. 53-4 at Pg ID 1931; Ex. 70 at 7, ECF No. 53-27 at Pg ID 2114.)

Flint's residents immediately noticed the change in the quality of the water when the City switched its water source to the Flint River. Jennifer Crooks, Region 5's Michigan Program Manager for the Drinking Water Program, who was responsible for reviewing and responding to complaints from Michigan citizens on the agency's behalf, testified in this matter that she had never received as many citizen complaints since she began working for the EPA in 1987 than she did after the Flint water switch. (Def.'s Mot. Ex. E at 29, 30-32, ECF No. 37-5 at Pg ID 965-66.) When Region 5 received citizen complaints from Michigan residents,

10

employees would discuss the issues with technical contacts, check for violations in the various databases, and contact the State person responsible for the water system and discuss the complaint. (*Id*. Ex. E at 24, 49, ECF No. 37-5 at Pg ID 964, 970; Ex. F at 33-34, ECF No. 37-6 at Pg ID 1018-19.) After Region 5's employees conducted background research and communicated with the State, they responded to citizens through emails, phone calls, and written letters. (*Id*. Ex. E at 36-37; *see also id*. Exs. 15, 16, 18.)

In its communications with Flint residents, the EPA indicated that MDEQ was working closely with the City "to ensure that the citizens of Flint are provided drinking water that meets health standards." (*See, e.g., id*. Ex. 15 at 1, ECF No. 58-14 at Pg ID 1184.) The EPA informed Flint's residents that "[t]he most recent laboratory analyses obtained from MDEQ of the City of Flint's drinking water indicate that almost all regulated contaminants meet State and Federal health standards, as required under the Federal and Michigan Safe Drinking Water Acts." (*Id*.) TTHMs pose a health risk for some sub-populations, such as the immune-compromised and pregnant women. (*See id*. Ex. 14 at Pg ID 1183.) Despite being aware of those risks (*see id*.), the EPA did not convey those risks in at least some of its communications with Flint residents. (*See id*. Exs. 15, 18.)

In early 2015, Flint citizen LeeAnn Walters contacted the EPA after receiving the test results of drinking water samples the City of Flint had collected

from her home.  (Def.'s Mot. Ex. 3 at 2-3, ECF No. 38-2 at Pg ID 1142-43.)  Those

results showed highly elevated lead and iron levels.[3]  (*Id.*)  Ms. Crooks from

Region 5 sent an email to MDEQ the day after receiving the test results,

documenting her concerns and requesting assistance in dealing with the high lead

levels in the Walters' home.  (*Id*. Ex. E at 69, ECF No. 37-5 at Pg ID 975.)  MDEQ

indicated in response that the lead was coming from the home's plumbing,

although Ms. Walters had indicated that all of the plumbing was plastic.  (*Id.* Ex. 3

at 3, ECF No. 38-2 at Pg ID 1143.)

　　Ms. Crooks and Miguel Del Toral, Region 5's Regulations Manager for the

Groundwater and Drinking Water Branch, were in subsequent communication with

MDEQ and the City concerning Ms. Walters' situation and whether there was a

more widespread lead issue.  (*See* Pls.' Resp. Ex. 1, ECF No. 53-2.)  In a February

26, 2015 email to MDEQ officials, Ms. Crooks stated that (1) Flint must have

Optimized Corrosion Control Treatment ("OCCT"), (2) the test results for the

Walters' home must "be included in with compliance calculation of the 90th

percentile", and (3) the City cannot flush the system in advance of taking

compliance samples.  (*Id.* at 3-4, Pg ID 1921-22.)  Mr. Del Toral, who had been

copied on Ms. Crooks' email, sent a follow-up email to MDEQ on February 27,

---

[3] The LCR results from the Walters' home showed a level of 104 ppb for lead.
(Pls.' Resp. Ex. 1 at 5, ECF No. 53-2 at Pg ID 1924).  The regulatory limit is 15
ppb.  (*Id.*)

2015, explaining his concerns about the lead situation and Flint's testing protocols. (*Id.* at 2-3, Pg ID 1920-21.) Mr. Del Toral conveyed that pre-flushing the tap before collecting testing samples "biases the results low by eliminating the highest lead values" and "provides false assurance to residents about the true lead levels in the water." (*Id.*) Mr. Del Toral suggested that MDEQ contact Region 5's "resident expert", Mike Schock, for help with compliance. (*Id.*) Ms. Crooks forwarded Mr. Schock's contact information to MDEQ the same day. (*Id.*)

On February 27, 2015, Stephen Busch from the MDEQ responded to Ms. Crooks' and Mr. Del Toral's emails, thanking them for their information and indicating: "[W]e will take it under consideration." (*Id.* at 1, Pg ID 1919.) Mr. Busch represented in the same email, among other things, that Flint "[h]as an Optimized Corrosion Control Program", "[c]onducts quarterly Water Quality Parameter monitoring at 25 sites and has not had any unusual results[,]" and "[h]as never had a 90th percentile lead AL exceedance[.]" (*Id.*)

Region 5 visited the Walters' home on April 27 and May 6, 2015, to inspect the plumbing and conduct additional testing. (Def.'s Mot. Ex. 3 at 3, ECF No. 38-2 at Pg ID 1143.) Finding that the interior plumbing was primarily plastic, the EPA concluded that it was not the source of the high lead levels found in the water at the residence. (*Id.*) Shockingly, as Mr. Del Toral noted in an email to colleagues within Region 5, local officials were telling Flint residents that the

source of the high lead was the home's internal plumbing.  (Pls.' Resp. Ex. 2 at 5, ECF No. 53-3 at Pg ID 1929.)

During EPA's May 6 trip to the Walters' home, the service line to the residence was replaced and the EPA sent three portions of the extracted line for testing, which confirmed that a portion of the line was made of galvanized iron pipe.  (*Id.*)  The EPA's inspection of the remaining portion confirmed that the service line from the water main to the external shut-off valve was lead.  (*Id.*)  Region 5 collected water samples from other Flint residents' homes, which also showed noncompliant lead levels.  (*Id.* at 4, Pg ID 1144.)

Meanwhile, on April 23, 2015, Mr. Del Toral sent an email to MDEQ asking: "What's Flint doing now (post Detroit) for corrosion control treatment?" (Pls.' Resp. Ex. 2 at 4, ECF No. 53-3 at Pg ID 1928.)  MDEQ responded the following day, indicating that Flint is not practicing CCT and that the results of testing for two six-month periods indicated that no treatment was needed.  (*Id.* at 3, Pg ID 1927.)  Mr. Del Toral emailed MDEQ on April 25, 2015, expressing his concern regarding the lack of CCT following the water source switch considering the known corrosivity of the Flint River and the City's extensive lead service lines.  (*Id.* at 1, Pg ID 1925.)  Mr. Del Toral further reemphasized that the City's pre-flushing ahead of compliance sampling may be distorting test results.  (*Id.*)  Mr. Del Toral expressed that "[g]iven the very high lead levels found at one home and

the pre-flushing happening at Flint . . . the whole town may have much higher lead levels than the compliance results indicated ….” (*Id.*)

In May and June 2015, EPA Region 5 staff continued to express concern to MDEQ and the City about increasing concentrations of lead in Flint's drinking water and the City's lack of corrosion control treatment and offered the EPA's expertise to move forward and rectify the water quality problems. (Def.'s Mot. Ex. 32 at 3, ECF No. 39-15 at Pg ID 1294; Ex. 3 at 4, ECF No. 38-2 at Pg ID 1144; Pls.' Resp. Ex. 6 at 1, ECF No. 53-7 at Pg ID 1945.) During this period, Mr. Del Toral prepared the EPA's interim report on high lead levels in Flint's water system, which was circulated to his colleagues. In the report, Mr. Del Toral indicated that Flint was not including tests from homes showing high lead levels in its compliance sampling pool. (Pls.' Resp. Ex. 3 at 5, ECF No. 53-4 at Pg ID 1935.) He also expressed concern that this omission, as well as Flint's sampling procedures, conceal a more wide-spread problem with high lead levels throughout the City's water supply. (*Id.* at 2, Pg ID 1932.) As Mr. Del Toral further explained in an email to his colleagues:

> The widespread high lead is my judgment based on a couple of decades of working with lead issues and I stand by it despite the limited data set from Flint. A simple application of scientific principles to the circumstances in Flint along with the limited data are enough to know that there is a problem there. They have no corrosion control treatment in place for over a year now and they have lead service lines. It's just basic chemistry on lead solubility. You will have high lead leaching into the water where you are doing nothing to

15

mitigate that. We don't need to drop a bowling ball off every building in every town to know that it will fall to the ground in all of these places. The fact that their sampling is designed not to capture lead (everything is fine) does not negate our scientific understanding of what is going on. The only reason we don't have more data is because the City of Flint is flushing away the evidence before measuring it. …

(*Id.*, Ex. 5 at 3, ECF No. 53-6 at Pg ID 1942.)

Tinka Hyde, the Director of the Water Division for Region 5, convened a formal conference call with MDEQ management on July 21, 2015, to discuss the status of Flint's lead sampling results (including MDEQ's position on pre-flushing) and MDEQ's interpretation of the LCR, which conflicted with Region 5's interpretation. (Def.'s Mot. Ex. 20, ECF No. 39-3 at Pg ID 1206-07.) The EPA interpreted the rule as requiring a public water system to use optimal corrosion control treatment upon switching water sources. (*See id.* Ex C at 41-42, ECF No. 37-3 at Pg ID 863-64; Ex. 11 at 1-2, ECF No. 38-10 at Pg ID 1169-70.) MDEQ decided to treat Flint's change in water sources as a "new source" which would require OCCT only after monitoring reflects the need for treatment. (*See id.* Ex. 20 at 1, ECF No. 39-3 at Pg ID 1206.)

In preparation for the July 21, 2015 conference call between EPA and MDEQ, EPA drafted a "Briefing Paper" which reflects what EPA already knew about Flint's water crisis and state and local officials' response (or lack thereof) to that crisis. (*See* Pls.' Resp. Exs. 11, 22, ECF Nos. 53-8, 53-16.) This included the

fact that Michigan was not requiring corrosion control in Flint. (*Id.*) It further reflects EPA's knowledge that Flint was not including in its testing the citizen-requested samples where high-lead levels were detected—despite EPA's direction that they needed to be included—and EPA's knowledge that Flint was "pre-flushing" lines before sampling—again, despite EPA's explanation of why this distorts testing. (*Id.*) These documents also reflects EPA s expectation that proper sampling would show high lead levels in the water supplied to Flint residents and a need for corrosion control. (*Id.*)

During the July 21, 2015 conference call, MDEQ requested an opinion from EPA headquarters to resolve the discrepancy in the LCR interpretation.[4] (*Id.*; *see also* Ex. C at 42, ECF No. 37-3 at Pg ID 864.) MDEQ nevertheless communicated a willingness "to initiate discussion with Flint sooner rather than later on corrosion control." (*Id.*, Ex. 20 at 1, ECF No. 39-3 at Pg ID 1206.) But MDEQ was unwilling to budge on its pre-flushing requirement until new regulations were issued, maintaining that the State's lead compliance sampling procedures comply

---

[4] In response to this request, the EPA issued a policy memorandum on November 3, 2015, clarifying how the LCR should be interpreted on a prospective basis and agreeing with Region 5's interpretation. (Def.'s Resp. Ex. 31, ECF No. 39-14.) In the memo, EPA headquarters recognized that "the language of the LCR does not specifically discuss [the situation where a public water system disconnects from one source and begins distributing water from another source]" and "that there are differing possible interpretations of the LCR with respect to how the rule's optimal corrosion control treatment procedures apply to this situation ….." (*Id.* at 1, Pg ID 1290.)

with federal SDWA requirements and that pre-flushing instructions are not requirements but suggestions.  (*Id*. at 2, Pg ID 1207.)  Region 5 again offered the EPA's technical assistance.  (*Id*. Ex. 20 at 1-2, ECF No. 39-3 at Pg ID 1206-07.)

On August 17, 2015, MDEQ instructed Flint to implement corrosion control as soon as possible, but no later than January 1, 2016, and to fully optimize its treatment within six months.  (Def.'s Mot. Ex. C at 52, ECF No. 37-3 at Pg ID 866; Ex. 32 at 3, ECF No. 39-15 at Pg ID 1294; Pls.' Resp. Ex. 70 at 15, ECF No. 53-27 at Pg ID 2122.)  During an August 31, 2015 conference call between MDEQ and Region 5, the results of the second six-month (January-July 2015) monitoring test results for Flint were discussed, which reflected that corrosion control was needed. (Pls.' Resp. Ex. 70 at 15, ECF No. 53-27 at Pg ID 2122.)  During this call, Region 5 discussed the need for outreach to Flint's citizens to reduce their exposure to high lead levels in the drinking water and reiterated the offer of technical assistance in implementing corrosion control treatment.  (Def.'s Mot. Ex. 32 at 3, ECF No. 39-15 at Pg ID 1294.)  But Region 5 viewed MDEQ as having the responsibility to alert the public as the primacy agency.  (*Id.* Ex. C at 109, ECF No. 37-3 at Pg ID 880).

Instead, as EPA's agents were well aware, City officials continued to assure Flint residents that there was no corrosivity issue and that MDEQ and the EPA found the City in compliance with safe water standards.  (Pls.' Resp. Ex. 47 at 3,

ECF No. 53-22 at Pg ID 2059.)  At the same time, the EPA learned that pediatricians at Hurley Medical Center in Flint had conducted a study which showed a rise in the blood lead levels of Flint's children after the switch to the Flint River as the City's water source.  (*Id*. at 2-3, Pg ID 2058-59.)  For example, in the two zip codes where the highest level of lead was found in the water, the EBL (elevated blood lead) levels for infants less than fifteen months old rose from 1.5% to 4.4%.  (*Id.*)  The rest of Flint had an increase from .6 to 1.1% for the same age group.  (*Id.*)  There was no change, in comparison, for non-Flint infants less than fifteen months old.  (*Id.*)  For children less than five-years old, EBL levels rose from 2.1% to 4.0% throughout Flint and from 2.5% to 6.3% in the two most-affected zip codes.  (*Id.*)

On September 3, 2015, Flint's Mayor announced that the City would implement corrosion control treatment and invited EPA corrosion control experts to join the Flint Technical Advisory Committee ("TAC").  (Def.'s Mot. Ex. 32 at 4, ECF No. 39-15 at Pg ID 1295.)  On October 7, 2015, the TAC recommended that MDEQ direct Flint to resume purchasing treated water from the DSWD, now called the Great Lakes Water Authority.  (*Id.* Ex. G at 73, 75-76; ECF No. 37-3 at Pg ID 1078; Ex. 32 at 4, ECF No. 39-15 at Pg ID 1295.)  On October 16, 2015, the EPA established the Flint Safe Drinking Water Task Force ("EPA Flint Task Force") to provide technical expertise to MDEQ and the City.  (Ex. 32 at 4, ECF

No. 39-15 at 1295.)  On the same date, Flint switched back to purchasing finished water from Detroit.

Despite the switch, corrosion control treatment remained necessary because the corrosive Flint River water had eroded away the protective coatings in the system.  (*See id*. Ex. G at 76, ECF No. 37-7 at Pg ID 1078, Ex. 32 at 5, ECF No. 39-15 at Pg ID 1296.)  On November 25, 2015, and on subsequent dates, the EPA Flint Task Force requested information which was not being shared to assess the City's progress with corrosion control.  (*Id*. Ex. 32 at 4-5, ECF No. 39-15 at Pg ID 1295.)  Without the information, the EPA could not evaluate whether the contamination in the City's water system had been eradicated.  (*Id*.)  While the City began additional corrosion control treatment in early December 2015, the EPA was not assured that high levels of lead and other contaminants had been removed from the water system.  (*Id*.)

On December 14, 2015, the City declared an emergency.  On January 14, 2016, Michigan's Governor requested emergency disaster assistance.  Two days later, President Obama declared a federal emergency in the City.  On January 21, 2016, the EPA issued an emergency order pursuant to Section 1431 of the SDWA. (*Id*. Ex. 32, ECF No. 39-15 at Pg ID 1292-1309.)  The EPA identified several reasons for issuing the order at that time, including continued "delays in responding to critical EPA recommendations and in implementing the actions

necessary to reduce and minimize the presence of lead and other contaminants in the water supply" presently and moving forward. (*Id*. at 8 at Pg ID 1299.) Further, the EPA noted MDEQ's and the City's failure and continued failure to provide necessary information for the EPA, the EPA Flint Task Force and Flint citizens "to fully understand and respond promptly and adequately to the current deficiencies." (*Id*.) Additionally, the City viewed its switch back to Detroit water as temporary and planned to eventually move to untreated water from KWA. The EPA viewed the transition as posing "complex technical and managerial challenges … that have serious implications for drinking water safety and public health." (Pls.' Resp. Ex. 63 at 2, ECF No. 41-4 at Pg ID 1723.) The EPA was concerned that the City lacked the professional expertise and resources to manage the transition and carry out the recommended actions to safely manage the City's water system. (*Id.*; Def.'s Mot Ex. 32 at 8, ECF No. 39-15 at Pg ID 1299.)

On October 20, 2016, the EPA Office of Inspector General (OIG) issued a "Management Alert" in which it found that "Region 5 had the authority and sufficient information to issue a SDWA Section 1431 emergency order to protect Flint residents from lead-contaminated water as early as June 2015." (Pls.' Resp. Ex. 53 at 1, ECF No. 53-25 at Pg ID 2019.) The OIG indicated that "EPA's 1991 guidance on SDWA Section 1431 orders states that if state actions are deemed insufficient, the EPA can and should proceed with a SDWA Section 1431 order,

and the EPA may use its emergency authority if state action is not protecting the public in a timely manner." (*Id*.)

## IV.    Applicable Law and Analysis

### A.    The FTCA and its Discretionary Function Exception Generally

"Jurisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity, together with a claim falling within the terms of the waiver." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (internal citations omitted).  Through its enactment of the FTCA, Congress waived the United States' immunity from suits:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

18 U.S.C. § 1346(b)(1).  The statute provides also that:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

28 U.S.C. § 2674.  Thus, the FTCA does not waive the Government's sovereign immunity *unless* a private person under similar circumstances would be liable under Michigan law to Plaintiffs for the EPA's alleged conduct.

Even if this analogous private liability requirement is satisfied, Congress has delineated a number of additional exceptions to the FTCA's waiver of sovereign immunity. *See* 28 U.S.C. § 2680. Relevant here is § 2680's discretionary function exception, which excludes from FTCA's waiver:

> (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). This exception applies only to "acts that are discretionary in nature, acts that 'involve an element of judgment or choice[.]'" *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (brackets omitted) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).

As such, the exception is inapplicable where "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536. In that instance, "the employee has no rightful option but to adhere to the directive." *Id.* "'[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a case.'" *Id.* (quoting *United States v. Varig Airlines*, 467 U.S. 797, 813 (1984)).

Thus, a court's first step in analyzing whether the discretionary function exception applies is deciding whether the government's agent had discretion in exercising the challenged act or omission. But even if "the challenged conduct involves an element of judgment," the Supreme Court has advised that the discretionary function exception applies only if "that judgment is the kind that the … exception was designed to shield." *Berkovitz*, 486 U.S. at 536. As the Court has explained: "The basis for the discretionary function exception was Congress' desire to 'prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Id*. at 536-37 (quoting *Varig Airlines*, 467 U.S. at 814). Accordingly, the second step in deciding whether the discretionary function exception applies is determining whether the government's actions and decisions are "based on considerations of public policy." *Id*. at 537; *Gaubert*, 499 U.S. at 323.

In *Gaubert*, the Supreme Court held that "choices made by regulatory agency actors are *presumptively* based on considerations of policy." *Myers v. United States*, 17 F.3d 890, 896 (6th Cir. 1994) (citing *Gaubert*, 499 U.S. at 324-25). As the *Gaubert* Court stated:

> When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion.

499 U.S. at 324. While this presumption is "strong," it may be rebutted. *Myers*, 17 F.3d at 896.

"In determining whether the conduct in a particular case sufficiently rebuts this presumption, the inquiry must focus on the objective evaluation of the discretion conferred rather than a review of the actor's subjective method of choosing a course of action." *Myers*, 17 F.3d at 896 (citing *Gaubert*, 499 U.S. at 325); *Gaubert*, 499 U.S. at 325 ("The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis."). Stated differently, "[t]he proper inquiry is whether the challenged actions are 'susceptible to policy analysis,' not whether they were the result of a policy analysis." *Rosebush v. United States*, 119 F.3d 438, 444 (6th Cir. 1997) (quoting *Gaubert*, 499 U.S. at 324-25); *see also Myslakowski v. United States*, 806 F.2d 94, 97 (1986) ("even the negligent failure of a discretionary government policymaker to consider all relevant aspects of a subject matter under consideration does not vitiate the discretionary character of the decision that is made.").

In *Gaubert*, the Supreme Court provided an example of a discretionary act not based on public policy, which is often repeated by courts attempting to apply this second-step of the discretionary function analysis:

> If one of the officials involved in this case drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply. Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.

499 U.S. at 325 n.7. Although the Supreme Court was not applying the discretionary function exception when deciding *Indian Towing Company v. United States*, 350 U.S. 61 (1955), the Court has since used the Coast Guard's conduct in that case—that being the failure to maintain a lighthouse by allowing the light to go out—as an example of an act "'not involv[ing] any permissible exercise of policy judgment.'" *Gaubert*, 499 U.S. at 326 (quoting *Berkovitz*, 486 U.S. at 538 n.3); *see also id*. at 335-36 (Scalia, J., concurring). Circuit Courts have found government agents' discretionary conduct not susceptible to policy determinations in a variety of circumstances. *See, e.g., Anestis v. United States*, 749 F.3d 520, 529 (6th Cir. 2014) (failing to provide emergency care for veteran at Veteran Affairs clinics); *Whisnant v. United States*, 400 F.3d 1177, 1183 (9th Cir. 2005) (failing to control the accumulation of toxic mold within naval commissary's meat department); *Gotha v. United States*, 115 F.3d 176, 181-82 (3d Cir. 1997) (navy's decision whether to provide safeguards such as handrails or sufficient lighting on a steep pathway); *Myers*, 17 F.3d at 896-97 (mining inspectors' failure to find safety violations inside mine); *Andrulonis v. United States*, 952 F.2d 652, 655 (2d Cir.

1991) (federal scientist's failure to warn the plaintiff of the hazards associated with the use of a rabies vaccine).

In *Myers*, the Sixth Circuit distinguished the case before it from *Gaubert* based on the fact that the agency's decisions in *Gaubert* followed a "*balancing* of interests[,]" leading the court to "believe that some authorization to conduct this type of balancing is a necessary prerequisite for finding that the actions complained of are protected by the discretionary function exception." 17 F.3d at 898 (emphasis in original). As the Sixth Circuit explained: "[T]he decisions [of the federal agents in *Gaubert*] were authorized to be made, and were in fact made, based upon considerations of what was good for the public fisc and the industry as a whole, as well as what was good for the [thrift] industry as a whole, as well as what was good for the particular [savings and loan] institution." *Id*. In comparison, the *Myers* court found that in the case before it, Congress and the Secretary of the Department of Labor in promulgating the various safety measures applicable to the nation's mines balanced the relevant interests and did not authorize the federal inspectors whose conduct was at issue to reweigh those interests. *Id*. "Rather, they are to determine compliance and, in the event of non-compliance, issue the mandatory citations and orders." *Id*. The inspectors' decisions, the Sixth Circuit found, "are to be made … in light of their own observations, informed by professional judgment and knowledge of the industry."

*Id*. "Considerations of 'political, social or economic policy' are not authorized to play a part in these assessments." *Id*.

Notably, in reaching its decision, the *Myers* court did not adopt the plaintiffs' argument that the inspectors "should be guided by objective principles of safety, not concerns of public policy." *See id*. at 897. The Sixth Circuit in fact has found federal agency decisions implicating safety susceptible to policy analysis. *See, e.g., A.O. Smith Corp.*, 774 F.3d 359, 369-70 (6th Cir. 2014) (instructing that the government's failure to warn property owners of flood water danger "is the type of decision that fits within the second prong of the discretionary function test") (citation and quotation marks omitted); *Sharp*, 401 F.3d 440, 445 (6th Cir. 2005) (quoting *Reetz v. United States*, 224 F.3d 794, 797 (6th Cir. 2000)) ("'Decisions protected from tort liability by the discretionary function exception to the FTCA include: 1) the proper response to hazards; 2) how to make federal lands safe for visitors; and 3) whether to warn of potential dangers.'"); *Rosebush*, 119 F.3d at 443-44 (indicating that "[d]ecisions concerning the proper response to hazards" and "whether to warn of potential danger" are "protected from tort liability by the discretionary function exception"). Thus, even where safety or public hazards are at issue, the Sixth Circuit has instructed that the government conduct at issue must be analyzed under the two-prong *Berkovitz/Gaubert* test. *A.O. Smith Corp.*, 774 F.3d at 369.

**B.      Whether the Discretionary Function Exception Applies Here**

**1.      Identifying the Conduct Underlying Plaintiffs' Claims**

The Sixth Circuit has advised that the "crucial first step" in deciding whether

the discretionary function exception applies is "determin[ing] exactly what conduct

is at issue." *Rosebush*, 119 F.3d at 441 (citation omitted).  Here, in the complaints

filed in both cases, Plaintiffs allege that the United States is liable because the EPA

failed to more quickly intervene in response to the Flint Water Crisis pursuant to

the authority granted it under Sections 1414 and 1432 of the SDWA.  Specifically,

Plaintiffs claim the EPA failed to timely investigate, provide technical assistance,

obtain compliance or commence a civil action.  Plaintiffs also claim that EPA was

negligent in failing to warn them of the health risks posed by the Flint water.  In

response to Defendants' motion, Plaintiffs further contend that EPA was negligent

when responding to the complaints it received from Flint residents, misleading

them regarding the safety of the water and the extent to which MDEQ and the City

were handling the crisis to ensure the water met health standards.

**2.      Claims Based on the EPA's Failure to Act**

Plaintiffs contend that Sections 1414 and 1431 of the SDWA mandated EPA

action in response to Flint's contaminated water system.  Sixth Circuit precedent

leads this Court to conclude instead that these statutory provisions grant the EPA

discretion to act.  For example, in *Myers*, the Sixth Circuit held that the conduct of

mine inspectors involved discretion because their instructions followed an

" 'if/then' logical structure" that required the inspectors "to determine that some

predicate condition exists" before acting. 17 F.3d at 895-96. In *Anestis*, although

finding that the federal employees' actions did not satisfy the second prong of the

*Berkovitz/Gaubert* test, the court implicitly found the first prong satisfied when it

recognized that "VA's emergency policies did allow limited discretion in

determining whether a patient was in an emergency state[.]" *Id*. at 529. Recently

in *Jude v. Commissioner of Social Security*, 908 F.3d 152 (6th Cir. 2018), the court

concluded that the Social Security Act granted some discretion to the Social

Security Administration in handling suspicions of fraud where the statute provided

instructions "if there is reason to believe that fraud or similar fault was involved in

[an individual's application for benefits]." *Id*. at 159-60.

Even assuming that there was a finding of noncompliance for Flint,[5] the

SDWA grants the EPA a significant "element of judgment or choice" in its

response. Under Section 1414, the federal agency is granted discretion to decide

what "advice and technical assistance … may be appropriate to bring the system

into compliance" and what "the earliest feasible time[]" is to reach compliance.[6]

---

[5] The Government asserts that a finding was never made for Flint, an assertion
Plaintiffs vigorously dispute.

[6] Section 1414 of the SDWA *requires* the EPA to "notify the State and such public
water system" of a finding of noncompliance, 42 U.S.C. § 300g-3(a); however,
**Cont'd…**

42 U.S.C. § 300g-3(a)(1)(A). Section 1414 also instructs the EPA to issue an order requiring the public water system to comply with the applicable requirement, but first the agency must decide whether "the State has [] commenced appropriate enforcement action[.]" *Id.* § 300g-3(B).

In addition to finding "information that a contaminant … is present in or is likely to enter a public water system[,] Section 1431 requires the EPA to also find "that appropriate State and local authorities have not acted to protect the health of such persons[]" before responding. 42 U.S.C. § 300i(a). Assessing what State and local authorities have done, whether those actions will protect public health, and whether those actions are sufficient certainly involve an element of choice and judgment. This provision grants the EPA further discretion by stating that, prior to issuing an order or commencing a civil action, it may determine whether it would "be practicable in light of such imminent endangerment[]" to "consult with State and local authorities "to confirm the correctness of the information on which action is proposed to be taken . . . is based and to ascertain the action which such authorities are or will be taking." *Id.*

Plaintiffs contend that EPA's 1991 memorandum, which it issued to provide final guidance regarding Section 1431, "elucidate[s] the mandatory nature of the

---

Plaintiffs do not allege that Region 5 failed to contact MDEQ and Flint when it began receiving complaints regarding the water.

EPA's responsibility.  (Pls.' Resp. Br. at 34, ECF No. 53 at Pg ID 1883-84.)  To the contrary, the Court finds that the memorandum emphasizes the discretionary nature of the agency's actions under this provision.[7]  The example Plaintiffs quote from the manual reads:

> *If* EPA has information that State/local agencies are going to act, EPA must decide whether the action is timely and protective of public health.  *If* EPA determines that the action is insufficient and State and local agencies do not plan to take stronger or additional actions to ensure public health protection, in a timely way, EPA should proceed with an action under Section 1.431 [sic].

(Pls.' Resp. Ex. 52 at 9, ECF No. 50-24, emphasis added.)  This instruction highlights the " 'if/then' logical structure" at play in Section 1431.

Addressing specifically Plaintiffs' assertion that the EPA was negligent in failing to warn Flint residents of the health risks posed by the water, neither Section 1414 nor Section 1431 set forth a mandatory obligation for the EPA to issue warnings.  Plaintiffs identify no other statute or regulation imposing this duty on the EPA.  The regulations in fact impose this requirement on public water

---

[7] Moreover, "an agency manual, in contrast to a regulation, is not necessarily entitled to the force and effect of law."  *Aragon v. United States*, 146 F.3d 819, 824 (10th Cir. 1998) (citing *Schweiker v. Hansen*, 450 U.S. 785, 789 (1981)).  "This is particularly true if the agency did not intend the manual to be mandatory, but rather intended it as a guidance or advisory document."  *Id.* (citing *Hamlet v. United States*, 63 F.3d 1097, 1103-05 (Fed. Cir. 1995)); *see also Little Traverse Lake Property Owners Assoc. v. Nat'l Park Service*, 883 F.3d 644, 657 (6th Cir. 2018) (quoting *Reich v. Manganas*, 70 F.3d 434, 437 (6th Cir. 1995) ("'internal [agency] operating manuals do not carry the force of law, bind the agency, or confer rights upon the regulated entity.'"))

systems. *See* 40 C.F.R. § 141.85. The Sixth Circuit addressed a similar claim in *Lockett v. United States*, 938 F.2d 630 (1991), where the plaintiffs sued under the FTCA based on the EPA's negligent failure to warn them of the dangers posed by the contamination of land due to polychlorinated biphenyls ("PCBs"). Finding no statute or regulation mandating the EPA's response when it learned of test results reflecting the presence of PCBs exceeding permissible levels, the Sixth Circuit concluded that the EPA was granted discretion to formulate a response. *Id*. at 637.

As Plaintiffs point out, the SDWA's general purpose is "to assure that the water supply systems serving the public meet minimum national standards for protection of public health." H.R. Rep. 93-1185 at 1, *reprinted in* 1974 U.S.C.C.A.N. 6454, 6454 (1974). Nevertheless, the Supreme Court and Sixth Circuit have advised that such broad general policy pronouncements do not remove the discretion invested in federal officials to exercise judgment when making decisions. *See Varig Airlines*, 467 U.S. at 816, 821 (concluding that the Federal Aviation Administration's statutory duty to promote safety in air transportation does not remove discretion from inspectors); *Sharp ex rel. Estate of Sharp v. United States*, 401 F.3d 440, 444 (6th Cir. 2005); *A.O. Smith Corp.*, 774 F.3d at 368 (using "aspirational, goal-oriented language in describing the Corps' management" of water storage protocol did not leave it "with no choice but to adhere to the protocol").

For these reasons, the Court finds the first step of the discretionary function exception analysis satisfied with respect to Plaintiffs' claims based on the EPA's failure to act. Again, at the second step, this Court must determine whether the judgment exercised by the EPA in failing to act is of the kind the exception was designed to shield.

The Court begins its analysis with the presumption that the EPA's lack of action was grounded in considerations of public policy. *Gaubert*, 499 U.S. at 324; *A.O. Smith Corp.*, 774 F.3d at 365. Plaintiffs counter the presumption, arguing that the EPA's decision whether to intervene in the face of the "blatant safety hazard[]" posed by the Flint Water Crisis was a matter of objective scientific and professional standards rather than public policy. Plaintiffs equate the present matter to *Myers*, where the Sixth Circuit determined that an MSHA safety inspector does not "permissibly exercise policy choice" when making a safety compliance determination. 17 F.3d at 898. Though the court determined that an inspection involves discretion, the court concluded that an inspector is not authorized to make these discretionary determinations based on anything other than objective safety criteria, reasoning:

> [T]he balancing of the interests of the miner and the mine owners, and the consideration of the most effective use of MSHA resources has been done, first by Congress and then, to a greater degree, by the Secretary of Labor in promulgating the various safety regulations. The MSHA inspectors whose conduct is at issue ... are *not authoriz*ed to reweigh these interests on a case-by-case basis. Rather, they are to

determine compliance and, in the event of non-compliance, issue the
mandatory citations and orders.

*Id*., emphasis in original.  Courts similarly found no competing policies to safety in

the following cases cited by Plaintiffs: *Whisnant*, 400 F.3d at 1183-84 ("Cleaning

up [toxic] mold involves professional and scientific judgment, not decisions of

social, economic, or political policy"); *Andrulonis*, 952 F.2d at 655 (federal

scientist's failure to warn bacteriologist of the hazards associated with rabies

vaccine being used in laboratory experiments did not implicate any policy of the

federal agency); *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 583 F.

Supp. 2d 758, 782-84 (E.D. La. 2008) (concluding that FEMA's response (or lack

thereof) after learning of unsafe levels of formaldehyde in temporary housing

provided to victims of Hurricanes Katrina and Rita was guided by fear of litigation,

which was not a permissible exercise of policy judgment);[8] *In re Yosemite Nat'l*

*Park Hantavirus Litig.*, No. 14-2532, 2016 WL 758671, at *22 (N.D. Cal. Feb. 26,

2016) (unpublished) (finding that the United States failed to explain how

considerations of access, conservation, and resources played into National Park

---

[8] As the Government correctly points out, the district court in *In re FEMA Trailer
Formaldehyde Products Liability Litigation* subsequently dismissed the plaintiffs'
claims based on the lack of analogous private liability under applicable state law.
*See In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, MDL No. 07-1873, 2010
WL 2010487 (E.D. La. May 18, 2010) (unpublished).  This subsequent decision
does not undermine the court's earlier reasoning on the discretionary function
exception, however.

Services' decision to delay notification to visitors of park of possible risk of exposure to a disease during their visit). The present matter is analogous to these cases.

In passing the SDWA, Congress intended to leave the primary responsibility for overseeing public water systems with the States. *See* H.R. 93-1185, 1974 U.S.C.C.A.N. 6454, 6461. However, Congress sought to set national standards for compliance "to assure that water supply systems serving the public meet minimum national standards for protection of public health" and to empower the federal government to intervene if States fail in their primary responsibilities. *Id.* at 6454-56. Federalism and the efficient use of federal and state resources were policy considerations that factored into devising the regulatory scheme and establishing conditions for the federal government's intervention. Nevertheless, Congress expressly directed the EPA to intervene under specified conditions. In other words, having weighed varying policy interests, Congress decided when federal intervention is necessary. Unlike *Lockett*, the statutory scheme here mandates a specific EPA response when certain conditions exist. The assessment of whether those conditions have been satisfied are informed by objective scientific standards, scientific knowledge, and the professional judgment of experts in the field. For example, determining whether Flint's water system complied with EPA regulations and, when it did not, whether the State's response was sufficient to rectify the

violations involved only the performance of professional and scientific analysis and reasoning.

Moreover, the EPA's failure to warn Flint residents of the severe health risks the City's water supply posed to them cannot be justified by any permissible exercise of policy judgment. Within weeks of the switch to the Flint River, the people of Flint suffered rashes and hair loss. The EPA was well aware that the Flint River was highly corrosive and posed a significant danger of lead leaching out of the City's lead-based service lines at alarming rates into residents' homes. The EPA was well aware of the health risks posed by lead exposure, particularly to children and pregnant women. Mr. Del Toral certainly made the risks clear to his Region 5 colleagues within the first half of 2015.

Further, the EPA knew that MDEQ and Flint officials were not warning Flint's residents that they were being supplied lead-laced water. Quite to the contrary, the EPA learned that State and local officials were misleading residents to believe that there was nothing wrong with the water supply and that the lead levels in some homes resulted from the interior plumbing (as MDEQ tried to do with the EPA when alerted to the high lead levels in the Walters' home—a myth the EPA quickly debunked). These lies went on for months while the people of Flint continued to be poisoned.

As the Third Circuit noted in *Abunabba*, federal officials "could be aware of a safety hazard so blatant that its failure to warn the public could not reasonably be said to involve policy considerations." 676 F.3d at 340 n.6. In that case, the court was speaking about safety hazards posed to the visitors of a remote national park. At issue here is an obvious danger imperiling a city's nearly 100,000 residents. (*See* Pls.' Resp. Ex. 11 at 1, ECF No. 53-8 at Pg ID 1946.) This fact very clearly distinguishes the present matter from every case the parties have cited and which this Court has reviewed concerning the applicability of the discretionary function exception.

This fact further suggests that this is an instance where decisions by government actors, even if discretionary, "may pass a threshold of objective unreasonableness such that no reasonable observer would see them as susceptible to policy analysis." *Hajdusek v. United States*, 895 F.3d 146, 152 (1st Cir. 2018). As the Sixth Circuit recently indicated in *Guertin v. Michigan*, 912 F.3d 907 (2019)—the civil rights action brought by Flint residents against the State of Michigan, the City of Flint, and related government officials with respect to their conduct in connection with the Flint Water Crisis—there may be instances in which no legitimate government purpose could "justify the yearlong contamination of an entire community." *Id.* at 926. The *Guertin* court could "'conceive of no legitimate governmental objective for this violation of [the] plaintiffs' bodily

integrity.'" *Id.* (quoting *Mays v. Snyder*, 916 N.W.2d 227, 262 (Mich. Ct. App. 2018)). This Court similarly cannot conceive of a public policy consideration that could be legitimately balanced against the need to warn and protect an entire community from involuntary and continued poisoning. *See Guertin*, 912 F.3d at 925.

For these reasons, the Court concludes that the discretionary function exception does not bar Plaintiffs' claims that the EPA was negligent in failing to timely act in response to the Flint Water Crisis.

### 3. Claims Based on the EPA's Actions

Plaintiffs claim that the EPA acted negligently when responding to citizen complaints about Flint's water. Specifically, Plaintiffs assert that agency officials acted negligently by assuring residents that the EPA was providing the required oversight and that Flint and MDEQ were supplying safe drinking water. For the reasons discussed in the previous section, the agency's decision whether and how to respond to citizen complaints was discretionary. However, once the Government decided to act, it was required to do so without negligence. *See Wysinger v. United States*, 784 F.2d 1252, 1253 (5th Cir. 1986) (citing *Indian Towing Co.*, 350 U.S. 61; *Rayonier, Inc. v. United States*, 352 U.S. 315 (1957)); *see also Whisnant*, 400 F.3d at 1182-83 (quoting *Bear Medicine v. United States*, 241 F.3d 1208, 1216-17 (9th Cir. 2001) ("'The decision to adopt safety precautions

may be based in policy considerations, but the implementation of those precautions is not.'"); *Callas' Estate v. United States*, 682 F.2d 613, 624 (7th Cir. 1982) (explaining that "the government has no discretion to carry out its policies negligently").

The Court therefore concludes that Plaintiffs' claim arising from the EPA's response to citizen complaints is not barred by the discretionary function exception. The Government nevertheless contends that the claim is barred by the FTCA's misrepresentation exception. (Def.'s Reply Br. at 19 n.15, ECF No. 56 at Pg ID 2285.)

The misrepresentation exception to the FTCA precludes any claim against the government "arising out of …misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h). This exception encompasses "claims arising out of negligent, as well as willful, misrepresentation." *United States v. Neustadt*, 366 U.S. 696, 702 (1961). In enacting § 2680(h), Congress intended to adopt "the traditional and commonly understood legal definition of the tort of 'negligent misrepresentation.'" *Id*. at 706. As the Supreme Court has explained, that cause of action arises from a failure "to use due care in obtaining and communicating information upon which that party may reasonably be expected to rely in the conduct of his *economic* affairs[.]" *Id*. (emphasis added). It "has been confined 'very largely to the invasion of interests of a *financial or commercial*

character, in the course of business dealings.'" *Block v. Neal*, 460 U.S. 289, 296

n.5 (1983) (emphasis added) (quoting W. Prosser, Torts, § 85, at 702-03 (1941

ed.)).

The misrepresentations alleged in the present matter were not of a financial

or commercial character.  Moreover, the gravamen of Plaintiffs' complaint is that

the EPA was negligent in its performance of operational tasks, that being to

respond to residents' complaints and provide them with guidance.  As such, this

Court finds the FTCA's misrepresentation exception inapplicable.  *See Block v.*

*Neal*, 460 U.S. 289, 297-98 (1983); *Kohn v. United States*, 680 F.2d 922, 926 (2d

Cir. 1982); *Vogelaar v. United States*, 665 F. Supp. 1295, 1304-05 (E.D. Mich.

1987); *Phillips v. United States*, 508 F. Supp. 544 (D.S.C. 1981) (citing cases).

## C. Whether Plaintiffs State a Cause of Action Under Michigan Law

As stated earlier, the FTCA waives the Government's immunity but only

"under circumstances where the United States, if a private person, would be liable

to the claimant in accordance with the law of the place where the act or omission

occurred."  28 U.S.C. § 1346(b).  Stated differently, "the FTCA does not *create*

liability, it merely waives sovereign immunity to the extent that state-law would

impose liability on a 'private individual in similar circumstances.'"  *Myers*, 17 F.3d

at 899 (emphasis in original) (quoting 28 U.S.C. § 2674).  Michigan law is

applicable here.

In their pleadings, Plaintiffs invoke the Good Samaritan doctrine as the source of state law imposing liability upon the Government in this case.  (*See, e.g.*, Am. Compl. ¶¶ 101-02, ECF No. 75 at Pg ID 2591-92.)  The Michigan Supreme Court has adopted the doctrine as expressed in Section 324A of the Restatement of Torts, 2d.  *Fultz v. Union-Commerce Assoc.*, 683 N.W.2d 587, 598 (Mich. 2004); *Smith v. Allendale Mut. Ins. Co.*, 303 N.W.2d 702, 711-12 (Mich. 1981).  Section 324A, titled "Liability to Third Person for Negligent Performance of Undertaking" reads:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965).  The Sixth Circuit has explained that "[i]t is a fundamental rule of American tort law that the fact that an actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."  *Myers*, 17 F.3d at 901 (quotation marks, brackets, and citation omitted).  The *Myers* court

42

went on to explain, however, that "[t]he common law recognizes … that an actor, by his affirmative acts, can create or assume a duty where none otherwise would have existed." *Id*.

Like the mine inspectors in *Myers*, the EPA undertook to render services to Plaintiffs by engaging in oversight, including monitoring, of the State's and local water systems' compliance with the SDWA and by responding directly to citizen complaints. *See Myers*, 17 F.3d at 902 (citing *Raymer v. United States*, 660 F.2d 1136, 1144 (6th Cir. 1981)) ("[T]his circuit has held that MSHA inspections are sufficient undertakings to justify application of the [G]ood Samaritan doctrine's other elements."). The EPA must also have been negligent in its oversight and interactions with Flint residents. *Id*. "Negligence alone, however, is not sufficient under Section 324A because a plaintiff must also demonstrate that one of the three alternative bases for the imposition of a duty also existed." *Id*.

An alternative basis for imposing liability exists with respect to the EPA's communications with Flint residents in response to their complaints about the water. The EPA conveyed that the water was safe for consumption and that State officials were working with Flint to "provide[] drinking water that meets health standards." Unlike the plaintiffs in *Myers*, Plaintiffs here allege justifiable detrimental reliance on the EPA's representations. As a result of the EPA's assurances, Plaintiffs were induced "'to forgo other remedies or precautions

against the risk [e.g., use bottled water].'" *Myers*, 17 F.3d at 903 (quoting Restatement § 324A cmt. e (1965)).

Further, with respect to the EPA's oversight and monitoring of Flint's water system, the public relied on EPA's expertise to assess whether harmful contaminants were present in their water supply and to provide technical advice to correct any failings by State and local officials. It was foreseeable that the EPA's negligence in performing these operational tasks would create a severe and likely risk of harm to Flint's residents. The EPA's alleged negligent performance of these tasks states a claim under the Good Samaritan doctrine. *See Neal v. Bergland*, 646 F.2d 1178, 1184 (6th Cir. 1981), *aff'd sub nom. Block v. Neal*, 460 U.S. 289.

The Court therefore concludes that Plaintiffs plead state-law liability to proceed under the FTCA.

V. **Conclusion**

In summary, the Court concludes that Plaintiffs plead facts sufficient to hold the Government liable under the FTCA for its response to the Flint Water Crisis. The discretionary function exception is not applicable under the circumstances of this case and Plaintiffs plead facts sufficient to justify liability under applicable state law.

Accordingly,

44

**IT IS ORDERED**, that the Government's motions to dismiss are **DENIED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: April 18, 2019

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, April 18, 2019, by electronic and/or U.S. First Class mail.

s/ R. Loury
Case Manager