UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| *In re* FTCA Flint Water Cases | Civil No. 4:17-cv-11218 (Consolidated) |
| This Motion Relates to: | Linda V. Parker United States District Judge |
| THE FIRST BELLWETHER PROCEEDINGS | Curtis Ivy, Jr. United States Magistrate Judge |

---

## United States of America's Motion to Dismiss for Lack of Subject-Matter Jurisdiction Pursuant to the Federal Tort Claims Act's Discretionary Function Exception

---

Defendant United States moves to dismiss the 11 bellwether Plaintiffs' claims for lack of subject-matter jurisdiction. For the reasons discussed in the accompanying Memorandum in Support, these Plaintiffs' claims fall within the discretionary function exception to the Federal Tort Claims Act's limited waiver of sovereign immunity. 28 U.S.C. § 2680(a). This motion is submitted pursuant to the briefing schedule in the Court's December 5, 2023 Order Modifying and Extending CMO 4 Deadlines and Denying as Moot the United States' Motion to Extend and Modify Case Management Deadlines. ECF 259 at PageID.4978. Pursuant to Local Rule 7.1(a), the parties conferred on February 6, 2024, and Plaintiffs indicated that they oppose this motion.

1

Dated:  February 9, 2024               Respectfully submitted,


BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General, Civil Division

AUGUST FLENTJE
Special Counsel
Torts Branch

J. PATRICK GLYNN
Director

CHRISTINA FALK
Assistant Director


*/s/ Eric Rey*
ERIC REY (DC Bar # 988615)
MICHAEL WILLIAMS
Trial Attorneys
United States Department of Justice
Civil Division, Torts Branch
Environmental Tort Litigation
1100 L St., NW
Washington, DC 20005
Phone: 202-606-4224
E-mail: eric.a.rey@usdoj.gov

*Attorneys for Defendant*
*United States of America*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 9, 2024, I electronically filed the foregoing

and accompanying Memorandum in Support and Exhibits using the Electronic

Case Filing ("ECF") system of this Court. The ECF system will send a "Notice of

Electronic Filing" to the attorneys of record.

*/s/ Eric Rey*
Eric Rey

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

*In re* FTCA Flint Water Cases

This Motion Relates to:

THE FIRST BELLWETHER
PROCEEDINGS

Civil No. 4:17-cv-11218
(Consolidated)

Linda V. Parker
United States District Judge

Curtis Ivy, Jr.
United States Magistrate Judge

---

**United States of America's Memorandum in Support of its
Motion to Dismiss for Lack of Subject-Matter Jurisdiction Pursuant to the
Federal Tort Claims Act's Discretionary Function Exception**

---

**ISSUE PRESENTED**

Whether the discretionary function exception of the Federal Tort Claims

Act, 28 U.S.C. § 2680(a), bars this Court's subject-matter jurisdiction over the 11

bellwether Plaintiffs' tort claims against the United States.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

**Cases**

*A.O. Smith Corp. v. United States*, 774 F.3d 359 (6th Cir. 2014)

*Berkowitz v. United States*, 486 U.S. 531 (1988)

*Dalehite v. United States*, 346 U.S. 15 (1953)

*Jude v. Comm'r of Soc. Sec.*, 908 F.3d 152 (6th Cir. 2018)

*Kohl v. United States*, 699 F.3d 935 (6th Cir. 2012)

*Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320 (6th Cir. 1990)

*Rosebush v. United States*, 119 F.3d 438 (6th Cir. 1997)

*United States v. Gaubert*, 499 U.S. 315 (1991)

*Varig Airlines*, 467 U.S. 797 (1984)

**Statutes**

28 U.S.C. § 2680(a)

## TABLE OF CONTENTS

ISSUE PRESENTED ............................................................................. ii

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................. iii

INDEX OF EXHIBITS ......................................................................... vi

INTRODUCTION ................................................................................1

STATEMENT OF FACTS .....................................................................3

RELEVANT PROCEDURAL BACKGROUND ..................................................16

STANDARD OF REVIEW ....................................................................17

ARGUMENT .....................................................................................18

I. The Conduct at Issue Must Be Defined Without Regard to Negligence. ............19

II. The Court Should Conclude, Especially Based on the Additional Factual Record, That Plaintiffs Cannot Overcome the "Strong Presumption" That the Challenged Conduct Was "Susceptible to Policy Analysis." ................................21

   A. Negligence Is Irrelevant to the DFE Step Two and Decisions Involving Scientific and Professional Judgments Still Satisfy DFE Step Two. ............21

   B. All the Conduct Plaintiffs Challenge Satisfies DFE Step Two. ....................23

      *1. EPA's Decisions Not to Issue a Section 1414 Order and Not to Issue a SDWA Section 1431 Order Until January 2016 Were Susceptible to Policy Analysis* ........................................................................24

      *2. EPA's Decisions Whether, When, and How to Warn Were Susceptible to Policy Analysis.* ........................................................................32

      *3. EPA's Decisions Regarding How to Respond to Citizen Complaints Were Susceptible to Policy Analysis.* ................................................34

III. The Court Correctly Held That DFE Step One Is Satisfied for All the Challenged Conduct and the Court Should Not Revisit that Ruling. .....................36

CONCLUSION ...................................................................................................40

## INDEX OF EXHIBITS

**Exhibit A:** Deposition of Thomas Poy, June 22 and 23, 2020, excerpted

**Exhibit B:** Rule 30(b)(6) Deposition of Thomas Poy, December 7, 2021, excerpted

**Exhibit C:** Flint Drinking Water Issues Briefing Paper

**Exhibit D:** Deposition of Heather Shoven, September 15, 2022, excerpted

**Exhibit E:** Deposition of Miguel Del Toral, June 11 and 12, 2020, excerpted

**Exhibit F:** Deposition of Jennifer Crooks, July 6 and 7, 2020, excerpted

**Exhibit G:** Deposition of Jennifer Crooks, November 16, 2017, excerpted

**Exhibit H:** Email from Jennifer Crooks (October 23, 2014) (previously filed at ECF-40-3)

**Exhibit I:** Email from Mike Prysby (September 17, 2014) (previously filed at ECF-40-1), excerpted

**Exhibit J:** Email from Stephen Busch (October 16, 2014) (previously filed at ECF 40-2), excerpted

**Exhibit K:** Email from Jennifer Crooks (March 03, 2015) (previously filed at ECF 38)

**Exhibit L:** Deposition of Tinka Hyde, May 28 and 29, 2020, excerpted

**Exhibit M:** Email from Pat Cook (April 28 2015)

**Exhibit N:** Rule 30(b)(6) Deposition of Robert Kaplan, January 13 and 14, 2022, excerpted

**Exhibit O:** Email from Jennifer Crooks (May 07, 2015) (previously filed at ECF 38-7)

**Exhibit P:** Miguel Del Toral's Interim Report (June 24, 2015) (previously filed at ECF 38-2)

**Exhibit Q**: Deposition of Miguel Del Toral, October 12, 2017, excerpted

**Exhibit R:** Miguel Del Toral's Final Report (November 4, 2015), excerpted

**Exhibit S:** Email from Miguel Del Toral (June 25 2015) (previously filed at ECF 38-4)

**Exhibit T:** Deposition of Susan Hedman, July 16 and 17, 2020, excerpted

**Exhibit U:** Email from Edward Moriarty (July 15, 2015) (previously filed at ECF 40-4)

**Exhibit V:** Deposition of Stanley Meiburg, July 11 and 12, 2023, excerpted

**Exhibit W:** OARM Delegations Manual, 9-7-A. Finding and Notification of Noncompliance-Part B, 1997 (previously filed at ECF 41-8)

**Exhibit X:** Region V Manual, 9-7-A Finding and Notification of Noncompliance-Part B, 1987 (previously filed at ECF 41-9)

**Exhibit Y:** Lead and Copper Rule Requirements for Optimal Corrosion Control Treatment for Large Drinking Water Systems, November 03, 2015, memorandum (previously filed at ECF 39-14)

**Exhibit Z:** Email from Susan Hedman (July 10, 2015)

**Exhibit AA:** Briefing Paper for Call with MDEQ on July 21, 2015 (previously filed at ECF 39-3)

**Exhibit AB:** Email from Jennifer Crooks (September 10, 2015)

**Exhibit AC:** Email from Thomas Poy (August 31, 2015)

**Exhibit AD:** Email from Thomas Poy (September 21, 2015)

**Exhibit AE:** Email from Miguel Del Toral (September 22, 2015)

**Exhibit AF:** City of Flint, City of Flint Issues Lead Advisory (September 25, 2015)

**Exhibit AG:** Genesee County Board of Commissioners, Public Health Advisory for People Using the Flint City Water Supply, September 29, 2015

**Exhibit AH:** Email from Susan Hedman (September 29, 2015), excerpted (previously filed at ECF 39-12)

**Exhibit AI:** Deposition of Richard Snyder, June 25 and 26, 2020, excerpted

**Exhibit AJ:** Email from Susan Hedman (October 2, 2015), excerpted

**Exhibit AK:** Deposition of Cynthia Giles, November 13, 2023, excerpted

**Exhibit AL:** Deposition of Robert Kaplan, November 17, 2017, excerpted

**Exhibit AM:** Deposition of Tinka Hyde, October 26, 2017, excerpted

**Exhibit AN:** EPA's Response to NRDC's Section 1431 petition (December 10, 2015)

**Exhibit AO:** Email from Susan Shinkman (October 1, 2015) (previously filed at ECF 39-13)

**Exhibit AP:** SDWA Section 1431 Order (January 21, 2016)

# INTRODUCTION

The Flint Water Crisis was a tragic and unprecedented situation that began in April 2014 when, to save money, the City of Flint stopped purchasing its drinking water from the City of Detroit and instead used the Flint River as its drinking water source. Per the direction of the Michigan Department of Environmental Quality (MDEQ), which regulated drinking water within the State, Flint did not treat the Flint River water with corrosion control—a process to prevent lead and other substances from leaching from pipes into the water—and instead undertook over a year of sampling to determine whether corrosion control would be needed.

When the U.S. Environmental Protection Agency (EPA) learned in April 2015 that Flint was not using corrosion control (and thereafter of increased lead levels in Flint's drinking water), EPA faced difficult decisions regarding how best to reinstitute corrosion control quickly and effectively. These technical and enforcement decisions were further complicated by the fact that (1) the SDWA's cooperative federalism structure placed primary regulatory authority in MDEQ, (2) MDEQ contested that the SDWA required corrosion control (raising the specter of litigation and delays), and (3) it was not clear whether the SDWA in fact required Flint to implement corrosion control as soon as it switched to the Flint River. Against this backdrop, multiple EPA decisionmakers (including high-ranking, experienced enforcement officials) concluded that informal resolution and persuasion were the

best, most effective, and quickest way to resolve Flint's drinking water issues. Ultimately, EPA persuaded the State and the City to return Flint to Detroit water (with its existing corrosion control)—the best technical solution per the experts and something that several witnesses testified EPA could not have ordered Flint to do.

In this tort case, Plaintiffs challenge EPA's response to the Flint Water Crisis, but the FTCA's discretionary function exception (DFE) retains the United States' sovereign immunity for such tort claims. For the DFE to apply, the challenged conduct must satisfy a two-step inquiry: (1) whether the conduct was discretionary; and (2) if so, whether it was susceptible to policy analysis. Plaintiffs challenge: (1) EPA's decisions whether and when to issue enforcement orders under SDWA Sections 1431 and 1414; (2) EPA's alleged failure to warn Flint residents; and (3) EPA's response to citizens' complaints.[1] In 2019, this Court held that the DFE did not apply to this challenged conduct because, although all the conduct was discretionary (and satisfied DFE's first step), the conduct was not susceptible to policy analysis (the second step). *Burgess v. United States*, 375 F. Supp. 3d 796 (E.D. Mich. 2019) ("2019 Op."). The Court recognized, however, that "facts remain to be developed and future discovery may impact the Court's analysis." *Burgess v. United*

---

[1] The State of Michigan, the City of Flint, and three of its contractors—none of which are defendants in this case—have settled residents' claims arising from the Flint Water Crisis, and the Sixth Circuit affirmed the approval of most of these settlements in March 2023. *In Re Flint Water Cases*, 63 F.4th 486 (6th Cir. 2023).

*States*, No. CV 17-11218, 2019 WL 4734686, at *1 (E.D. Mich. Sept. 27, 2019) (denying the United States' motion for interlocutory appeal for this reason).

Now, after extensive discovery, this Court should conclude that all the conduct Plaintiffs challenge was susceptible to policy analysis, and therefore DFE bars their claims. Since this Court's 2019 opinion, years of discovery—including nearly 9,000 pages of testimony from EPA employees—has created a more robust record regarding the policy analysis EPA conducted. In addition, although the United States previously presented—and the Court addressed—step two in terms of EPA's conduct overall, the more robust record now warrants a more fine-grained analysis of EPA's decisions at each milestone of the Crisis. This approach also better reflects how EPA confronted evolving facts and considerations over time.

The Flint Water Crisis was an unfortunate situation, but it also was one in which EPA (1) did not operate the water system, (2) was not involved in the decisions to switch to the Flint River and forgo corrosion control, and (3) was not the primary regulator. In enacting the FTCA, "Congress could not have intended to impose liability for the regulatory enforcement activities of the [EPA] challenged in this case." *Varig Airlines*, 467 U.S. 797, 821 (1984) (dismissing case under the DFE).

### STATEMENT OF FACTS

The United States incorporates the Court's prior discussion of the background of the SDWA (2019 Op. at 801-03 (Section II)), including the two SDWA

enforcement provisions at issue (Sections 1431 and 1414), and the Court's factual findings (*id.* at 803-09 (Section III)). We highlight below facts relevant to the Court's DFE analysis, including those from discovery since the Court's 2019 opinion.

1. April 2014 to April 23, 2015: The Michigan Department of Environmental Quality (MDEQ), the City of Flint, and their contractors did not involve EPA in their decisions to switch to the Flint River in April 2014 and to forgo treating the water with corrosion control.[2] MDEQ and the City were not required to involve EPA since Michigan has SDWA primacy—*i.e.*, primary responsibility for SDWA compliance and enforcement within the State.[3] By early 2015, EPA Region 5 was aware that MDEQ issued Flint SDWA violations regarding coliform and TTHM exceedances–which were unrelated to corrosion control or lead—and that MDEQ and a consultant were working with Flint to address them.[4] As the Chief of EPA Region 5's Ground Water/Drinking Water Branch (Thomas Poy) testified, these violations were not "necessarily an indicator of lead issues" and "it's not uncommon for systems to have issues with microbiological contaminants." Exh. A at 320:2-5.[5]

---

[2] 2019 Op. at 803; Exh. A at 206:12-210:14 & 340:13-341:20.

[3] 2019 Op. at 802.

[4] Exh. C; Exh. A at 19:17-28:11; *see also* 2019 Op. at 804.

[5] *See also* Exh. D at 97:9-12 ("it happens often that once you have an E. coli MCL, that an overcorrection can occur with the water system to overdisinfect and possibly get these MCLs."); *id.* at 88:5-20 ("If you would look at the number of total coliform violations across the nation, there's no way that U.S. EPA can be concerned of that type of violation" and Flint's violation "actually never made it to enforcement level because it was returned to compliance quite quickly"). The absence of corrosion

4

During this period, EPA Region 5 (which oversees 42,000 public water systems throughout six states, including 10,000 within Michigan alone[6]) began receiving complaints from Flint residents about their water. When Region 5 received a complaint, Jennifer Crooks (Program Manager) generally would: (1) forward it to MDEQ, which would investigate and provide a response; and (2) then provide MDEQ's response and other information back to the citizen.[7] In these exchanges, MDEQ did not notify EPA that Flint lacked corrosion control. Exh. F at 421:18-23.

On February 26, 2015, Ms. Crooks notified MDEQ of high lead results reported that morning by a Flint resident (Lee-Anne Walters) at her home. Ms. Crooks and Miguel Del Toral (EPA Region 5's Regulations Manager for the Groundwater and Drinking Water Branch) then asked what Flint was doing for corrosion control. 2019 Op. at 804-05; Exh. K at 4.[8] MDEQ responded in pertinent part: "Flint '[h]as an Optimized Corrosion Control Program.'" 2019 Op. at 805; Exh.

---

control in Flint's monthly operating reports was not remarkable, since the reports did not have to include such parameters. Exh. E at 394:23-395:8; 397:5-398:2.

[6] Exh. D at 23:13-17, 42:13-21, 278:8-11.

[7] Exh. F at 227:8-24; 420:23-421:23; Exh. G at 24:4-25:8, 90:2-92:17 (explaining Ms. Crooks' response to Ms. Burgess' complaint, which is Exh. H); Exh. I & J.

[8] Mr. Del Toral also recommended against flushing the "system in advance of taking compliance samples," which is known as "pre-flushing." 2019 Op. at 805. Mr. Del Toral testified that, although he disagreed with the practice of "pre-flushing" because he personally believed it "was inconsistent with the intent of the sampling in the [LCR]," he recognized that "pre-flushing" "was not specifically prohibited by the [LCR]" and, in fact many other states' procedures also allowed "pre-flushing." Exh. E at 331:19-332:12; *accord id.* 340:6-23

K at 1. Mr. Del Toral took this to mean that Flint "ha[d] the treatment in place and [was] doing the water quality parameter monitoring." Exh. E at 345:21-346:1.

Prior to April 23, 2015, Region 5 personnel were unaware that Flint was not utilizing corrosion control, Exh. A at 199:14-200:3, and Mr. Del Toral viewed Ms. Walters' results as "an isolated situation" and not indicative of "a systemwide problem." Exh. E at 82:5-83:3.[9]

2. <u>April 23, 2015 – June 24, 2015</u>: On April 23, 2015, MDEQ informed Mr. Del Toral that Flint in fact was "not practicing" corrosion control. 2019 Op. at 805. MDEQ then argued that, because the Flint River was a new drinking water source, the SDWA did not require Flint to implement corrosion control immediately, but rather Flint first had to conduct two 6-month rounds of lead and copper sampling before determining whether corrosion control was needed. Exh. M at 4. Nonetheless, EPA Region 5 personnel continued to investigate and pressed MDEQ to change its view and order Flint to implement corrosion control. First, "[i]n May and June 2015, EPA Region 5 staff continued to express concern to MDEQ and the City about increasing concentrations of lead in Flint's drinking water and the City's lack of corrosion control treatment and offered the EPA's expertise to move forward and rectify the water quality problems." 2019 Op. at 806.[10] Second, Region 5 requested

---

[9] *See also* Exh. L at 326:4-13 (explaining why it is "not uncommon to have some hits of lead" in sampling); *accord* Exh. A at 72:15-23 (same).

[10] *See also* Exh. B at 185:9-186:15 (June 10, 2015 call with MDEQ); Exh. N at

that Mr. Del Toral document his investigation related to the Walters' high sample results, Exh. A at 355:2-15, which he did in a June 24, 2015 interim report, Exh. P.

Although Mr. Del Toral suspected that the absence of corrosion control would cause a lead problem throughout the water system, Exh. E at 445:14-21, the available facts at that time did not clearly show such a problem. The results of Flint's first round of systemwide sampling (collected July – December 2014, Exh. M at 4) were 6 parts per billion (ppb) for lead—well below SDWA's 15 ppb action level that, if triggered, would have required Flint to undertake mandatory public notification and corrective action. Exh. A at 46:12-16; 40 C.F.R. § 141.80(c)(1), (e)-(g) (effective Dec. 10, 2007 to Dec. 15, 2021).[11] In addition, as Mr. Del Toral explained, he "would not use . . . the results from [the Walters'] home, as anything that could represent a systemwide issue," because of, among other things, the Walters' abnormally long lead service line, as well as recent nearby road work.[12] In Region 5's experience, high lead results at some homes also was not uncommon in water systems and did not necessarily indicate a systemwide issue.[13]

---

437:6-10 (April 29, 2015 call with MDEQ); Exh. O.

[11] *See also* Exh. D at 139:8-11 ("I know there was a concern for [potential widespread lead release], but there was no data that could tell us that, because the lead and copper compliance data showed low levels.").

[12] Exh. Q at 85:2-86:21, 98:12-99:7; Exh. E at 162:10-17. As Mr. Del Toral noted in his Final Report, "[a] recent EPA study indicates that physical disturbances in proximity to lead service lines can cause the dislodging of the protective scales from within the service lines." Exh. R at 6 of 25.

[13] Exh. A at 316:10-17 (These "circumstances, community with lead service lines,

3.  <u>June 24, 2015 – July 20, 2015</u>: The next month, EPA continued to discuss—internally and with MDEQ—whether the SDWA required Flint to implement corrosion control immediately,[14] with EPA ultimately convincing MDEQ to order Flint to begin corrosion control. Within twenty-four hours of Mr. Del Toral issuing his June 24, 2015 interim report, Region 5 personnel scheduled a briefing with the Region 5 Water Division Director, Tinka Hyde, to discuss Mr. Del Toral's report. Exh. S.[15] During this call and thereafter, EPA personnel in Region 5 and Headquarters discussed whether Flint's failure to implement corrosion control upon switching to the Flint River violated the SDWA.[16] Neither the Region 5 Administrator, Susan Hedman, nor Director Hyde—the two officials within Region 5 delegated the authority to determine SDWA violations—made a finding that Flint's lack of corrosion control violated SDWA.[17] EPA Headquarters ultimately "found differing possible interpretations" of whether the SDWA required Flint to implement

---

some homes with high levels, is typical of any other community that has lead service lines, that there are going to be some homes that have high levels for various reasons, but it doesn't necessarily mean that there's a systemwide issue.").

[14] *See* n.17 and accompanying text.

[15] *See also* Exh. T at 497:6- 498:24 ("The statements that you just referenced from [Mr. Del Toral] were not the statements of scientific precision that one typically heard from [him] based on data. . . . And the data that we had [at that time] was insufficient to issue a [ Section 1431] order. But the data and information that we had was sufficient to convince the primacy agency to order corrosion control to convince the city to accept that and for the . . . process to move toward optimization.").

[16] Exh. E at 723:10-734:1; Exh. U; Exh. D at 178:6-179:23; Exh. V at 72:22-74:19.

[17] Exh. N at 519:6-20; Exh. B at 168:11-169:5; Exh. W and X.

corrosion control as soon as it switched to the Flint River and issued a memo clarifying that, for future cases, primary agencies (*e.g.*, MDEQ) should ensure corrosion control continues after a change in water source.[18]

On July 10, 2015, EPA Region 5 (led by Regional Administrator Hedman) issued a press release in response to growing concerns regarding Flint's drinking water.[19] Regional Administrator Hedman testified that she balanced several considerations in crafting the release, including that: (1) Region 5 "did not have enough data at that point to be able to generalize," and so "we did not say you have high lead levels," Exh. T 37:6-20; *see also id.* 403:10-17, 494:13-19; Exh. D at

---

[18] "In [a November 3, 2015] memo, EPA headquarters recognized that 'the language of the [Lead and Copper Rule (LCR)—the SDWA regulation regarding corrosion control—]does not specifically discuss [the situation where a public water system disconnects from one source and begins distributing water from another source]' and 'that there are differing possible interpretations of the LCR with respect to how the rule's optimal corrosion control treatment procedures apply to this situation . . . .'" 2019 Op. at 807 n.4 (quoting Exh. Y). This memo was necessary because how the LCR applied in this situation "was not an opinion that was universally shared within the Agency." Exh. V at 234:9-10.

[19] The press release stated: "EPA continues to work closely with the Michigan Department of Environmental Quality and the City of Flint to ensure that Flint residents are provided with safe drinking water. EPA conducted limited drinking water sampling for lead in Flint in response to a citizen complaint. The initial results and staff recommendations to management were documented in an internal memorandum, which was cited in the ACLU article. EPA will work with Michigan DEQ and the City of Flint to verify and assess the extent of lead contamination issues and to ensure that Flint's drinking water meets federal standards.

Flint residents who are concerned about lead in their drinking should contact the utility and may request that their water be sampled. Additional information about lead in drinking water is available at http://water.epa.gov/drink/contaminants/basicinformation/lead.cfm." (Exh. Z).

309:24-310:19; (2) she wanted "something both measured—we're working with the appropriate authorities whose job it is to do this, but also to tell people that they needed to reduce their exposure to lead and provide the information on the EPA website about how to do that, and provide information about reaching out to their water utilities to get their water tested," Exh. T at 274:22-275:5; *see also id.* 284:9-17; and (3) she wanted the release to be both understandable and to not "unduly alarm the public," *id.* 274:18-22, 404:18-405:2, 494:20-25.

4. July 21, 2015 – September 19, 2015: On July 21, 2015, EPA Region 5 and MDEQ discussed Flint's water issues again in light of the recently available results (11 ppb) from Flint's second round of lead sampling.[20] On the call, MDEQ still insisted that the SDWA did not require Flint to use corrosion control upon switching to the Flint River (including requesting "an opinion from EPA Headquarters to resolve the discrepancy" between MDEQ and Region 5's SDWA interpretation, 2019 Op. at 807), but finally agreed to order Flint to implement corrosion control.[21]

As this Court explained, "[o]n August 17, 2015, MDEQ instructed Flint to implement corrosion control as soon as possible, but no later than January 1, 2016, and to fully optimize its treatment within six months." 2019 Op. at 807. On August 31, 2015, MDEQ and Region 5 again discussed Flint's drinking water issues,

---

[20] Exh. L at 191:22-23; *see also* Exh. AA at 1.
[21] Exh. A at 364:2-9, 415:3-7; Exh. N at 465:13-22; Exh. B at 212:11-20; Exh. L 213:10-17; 2019 Op. at 807.

including MDEQ's plans to educate the public on reducing their lead exposure. Exh. AB at 1. "On September 3, 2015, Flint's Mayor announced that the City would implement corrosion control treatment and invited EPA corrosion control experts" to assist. 2019 Op. at 808.

Such expertise and extended deadlines were necessary because, as several witnesses have testified since this Court's 2019 opinion: "you can't just walk into the plant and dump a bunch of orthophosphate [a form of corrosion control treatment] into the plant and hope that it fixed the problem. It's more complicated and it involves . . . some thoughtfulness and some chemistry and . . . a series of steps that the technical folks needed to work through in order to get that in place." Exh. L at 58:12-18.[22] In fact, experts at EPA and elsewhere (including Dr. Marc Edwards of Virginia Tech University and EPA's Office of Research and Development) were concerned that adding orthophosphates without proper study could make Flint's corrosivity problem ***worse*** in the short term.[23]

5. <u>September 20, 2015 – October 16, 2015</u>: On September 20, 2015, Dr. Edwards informed EPA that Flint's two rounds of lead sampling did not comply with the SDWA (including because Flint failed to sample homes with lead service lines), and therefore the systemwide lead data relied upon to date were not reliable. Exh. D at

---

[22] Exh. T at 229:21 ("It would have been physical impossible" to implement corrosion control by the end of August 2015); *accord* Exh. N at 453:10-21.
[23] *See, e.g.*, Exh. AC; Exh. A at 351:9-22.

244:5-14; Exh. AD.[24] The next day, Dr. Edwards informed EPA of Dr. Mona Hanna-Attisha's recent study of elevated blood lead levels in children in Flint. Exh. AE; 2019 Op. at 807-08.

With this new information, local authorities and the State (in consultation with EPA) quickly took several actions. First, on September 25 and 29, 2015, the City of Flint and Genesee County, respectively, issued public health advisories. Exh. AF & AG. Second, on October 2, 2015, the State of Michigan publicly released a 10-Point Plan (which Regional Administrator Hedman helped craft) to address Flint's water problems, including: (1) providing free bottled water and pre-mixed formula to Flint residents; (2) providing free water filters; and (3) accelerating implementation of corrosion control.[25] Third, on October 16, 2015, Governor Snyder ordered Flint to return to Detroit water. Exh. AI at 219:6-20; 269:5-271:12; 518:17-519:4.

Experts long viewed returning to Detroit water (with its existing corrosion control) as the best solution for Flint,[26] but several witnesses testified this solution was not one EPA could order MDEQ or Flint to take because EPA does not possess "the authority . . . to direct the use of a particular water source."[27] Nonetheless,

---

[24] Dr. Edwards' own sampling, which was released in September 2015, revealed higher results that exceeded the LCR action level. Exh. A at 53:24-54:3.

[25] Exh. AH; Exh. AI at 753:23-758:12; Exh. AJ at 3; Exh. T at 426:15-24; Exh. N at 213:8-18.

[26] *E.g.*, Exh. E at 671:7-8; Exh. AK 39:10-17.

[27] Exh. T at 235:6-13; Exh. E at 671: 12-14 ("We don't have the authority to make them switch their source. So even if it's something that's desirable, we have no

Regional Administrator Hedman and others persuaded the State that returning to purchasing Detroit water was Flint's best solution, despite the cost concerns.[28]

High-ranking EPA officials with extensive enforcement experience agreed that "the fastest pathway to restoring safe drinking water was not . . . [for EPA to issue] an enforcement order." Exh. AK at 53:3-5; *see also* Exh. V at 52:6-63:1. Regional Administrator Hedman concluded that persuasion and other informal enforcement means were the "most expeditious way to proceed" and avoided the risk of MDEQ or Flint legally challenging (and thereby delaying) an EPA order. Exh. T at 219:9-220:21.[29]

Assistant Administrator Cynthia Giles (who for eight years headed EPA's Office of Enforcement and Compliance Assurance responsible for enforcement nationwide, Exh. AK at 21:17-23) agreed. After this Court's 2019 opinion, she testified that issuing a Section 1431 order risked Flint and MDEQ becoming "much more contentious" and contesting the order in court, which would have been "distracting and counterproductive to the purpose of everyone applying 100 percent

---

authority to require it."); *accord* Exh. AK at 38:14-18 & 39:10-17; Exh. N at 174:2-175:6; Exh. L at 347:4-24; Exh. AL at 75:23-25; Exh. D at 193:3-15.

[28] Exh. T at 42:11-22; 44:2-16; Exh. N at 458:12-18; Exh. AL at 73:1-14; 75:23-25.

[29] *Id.* 66:10-67:21, 236:11-238:5; Exh. N at 193:8-195:12, 476:19-477:14, 516:1-19; 521:5-23; Exh. D at 251:11-252:2; *supra* at n.18. Her prior working history with the State also supported this decision. Exh. T at 62:2-5 & 333:22-25; *see also id.* at 325:10-18 (Region 5 issued the most enforcement actions of any EPA Region "[a]nd if we thought [formal] enforcement mechanism was the thing that would get it done, we wouldn't have hesitated"); *accord id.* 523:9-18.

of the attention and authority to fixing this problem." *Id.* 46:14-47. In addition, in her view, a Section 1431 order constrained EPA's options and could not require Flint to return to Detroit water. *Id.* 38:14-18, 47:3-6. Therefore, "so long as [Flint and MDEQ] were doing everything that needed to be done to return this system as quickly as possible to good functioning, it was better not to take the chance of the downside risks that come with issuing an enforcement order." *Id.* 47:7-12.[30]

Assistant Administrator Giles also considered a Section 1414 order to be an ineffective enforcement tool in the case of Flint. For one, it could be issued only to the City, but "it seemed very important that the state be on the hook for compliance obligations as well because the city . . . did not have the capability or the resources to do everything that was needed." *Id.* 71:16-21. In addition, given the ambiguity over whether Flint's failure to implement corrosion control violated the SDWA (*see supra* at n.18), a Section 1414 order "could result in . . . wasted time in litigation around the question of what is and isn't a violation." Exh. AK at 72:3-6. "And the third reason is that the remedy for violating a 1414 order is primarily focused on assessment of civil penalties," which "seemed counterproductive" given that Flint

---

[30] *See also id.* 45:3-47:12 (explaining why a Section 1431 order was not the "fastest way" to achieve EPA's aim of "providing the people of Flint with safe drinking water"); *id.* at 71:6-73:6 (same for a Section 1414 order); Exh. V at 49:1-13 (explaining the analysis in whether to issue a formal order); *id.* 85:9-86:3 (same).

was "already struggling with substantial lack of resources" and the Crisis arose from Flint's financial woes. *Id.* 72:7-16.

Moreover, during the summer and fall of 2015, EPA's informal enforcement efforts appeared to be bearing fruit, including: (1) on July 21, 2015, MDEQ relented and agreed to order Flint to implement corrosion control; (2) Flint agreed to implement corrosion control shortly thereafter; and (3) on October 2, 2015, the State issued the 10-Point Plan, which Assistant Administrator Giles agreed "cover[ed] all the things [EPA] might otherwise put in [a] 1431 [order]." Exh. AO. EPA's efforts also ultimately helped persuade Flint to return to Detroit water—something several witnesses have testified EPA could not have unilaterally ordered under Section 1414 or 1431. *See supra* n.27.[31]

6. <u>October 16, 2015 – January 21, 2016</u>: Between December 2015 and January 2016, it became clear to EPA that MDEQ and the City were incapable or unwilling to complete the remaining work needed to fully remedy Flint's water problems. 2019 Op. at 808.[32] Assistant Administrator Giles testified that, in January 2016, a formal order became necessary because:

---

[31] Exh. T at 219:16-19; Exh. AM at 146:1-18; Exh. AL at 76:20-77:4; Exh. D at 249:1-7 ("right after September 21, the 10-point plan I think was October 2, so they were already working on notifying the public of the alternate water and those things that a 1414 action would have accomplished."); Exh. AN (EPA's response to NRDC's Section 1431 petition, noting in part that the City's and State's actions could prevent Section 1431's "jurisdictional prerequisites" from being met).

[32] *See also* Exh. N at 116:15-121:23; 514:7-19; Exh. T at 140:4-10; Exh. D at 252:3-

the city and state were becoming more resistant, less responsive to the advice that they were getting from outside experts, and that was increasingly concerning because it was very apparent that they did not have the capacity on their own to deal with this emergency situation. And it appeared to me that the risks of them appealing the order were lower. So the downside risks were lower. The upside need was higher. And the balance shifted in favor of doing the order.

Exh. AK at 49:19-50:8; *id.* at 37:3-38:4 (order needed for "faster results"). These concerns—plus, *inter alia*, the City's plan to switch water sources yet again to the Karegnondi Water Authority—prompted EPA to issue a SDWA Section 1431 order on January 21, 2016. 2019 Op. at 808; Exh. N at 120:22-121:14; Exh. AP.

## RELEVANT PROCEDURAL BACKGROUND

The United States timely presents this DFE motion to dismiss. ECF 259 at PageID.4978. Fact discovery on the 11 bellwether Plaintiffs' claims closed on December 15, 2023, *id.* at PageID.4977, and Plaintiffs have had over four years to take additional discovery of the United States, ECF 112 at PageID.3085. Additional grounds for dismissing the bellwether Plaintiffs' claims may be raised in motions after the completion of expert discovery. ECF 259 at PageID.4979.

Since the Court's 2019 decision, Judge Levy denied both the United States' DFE motion in the *In re Flint Water Cases*, 482 F. Supp. 3d 601 (E.D. Mich. 2020) ("Levy MTD Op."), and motion for interlocutory appeal thereof, *In re Flint Water Cases*, 627 F. Supp. 3d 734 (E.D. Mich. 2022) ("Levy 1292(b) Op.").

---

253:16; Exh. V at 63:13-64:4.

## STANDARD OF REVIEW

The United States incorporates the Court's prior standard for a Rule 12(b)(1) factual attack, 2019 Op. at 801 (Section I)), including that "'[n]o presumptive truthfulness applies to the [plaintiff's] factual allegations' and the 'court has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts,'" *id.* (quoting *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). In a Rule 12(b)(1) factual attack, "the district court must . . . weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist." *Ohio Nat. Life*, 922 F.2d at 325. The same applies to this factual Rule 12(h)(3) motion to dismiss.[33]

Judge Levy instead applied a Rule 56 standard because "the merits of this case intertwine with the jurisdictional issues," Levy MTD Op. at 616, but this was error. For one, the United States' DFE arguments are not intertwined with the merits of Plaintiffs' negligence claim because "[n]egligence . . . is irrelevant to [the DFE] inquiry." *Kohl v. United States*, 699 F.3d 935, 941 (6th Cir. 2012). Other courts within the Sixth Circuit agree.[34] Judge Levy relied upon *Wright v. United States*, 82

---

[33] "A motion to dismiss brought under Rule 12(h)(3) is analyzed in the same manner as [one] under Rule 12(b)(1)." *Cohan v. MGM Hosp., Inc.*, No. 20-CV-10981, 2021 WL 4478744, at *1 (E.D. Mich. Sept. 30, 2021).

[34] *E.g.*, *In re Steinle*, 835 F. Supp. 2d 437, 442 (N.D. Ohio 2011) (since negligence is irrelevant to the DFE holding that "the appropriate standard of review remains that of a 12(b)(1) factual attack . . . ."); *Michigan DNR v. United States*, 2012 WL 13028277, at *2 (W.D. Mich. May 29, 2012).

F.3d 419 (6th Cir. 1996)—an unpublished and non-binding decision—and out-of-circuit decisions, but these decisions conflict with the Sixth Circuit's more recent and binding decisions that negligence is irrelevant to DFE (*e.g.*, *Kohl*).

## ARGUMENT

The DFE involves a two-step inquiry. The "first step . . . is deciding whether the government's agent had discretion in exercising the challenged act or omission." 2019 Op. at 810. In this step, the Court analyzes whether "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," leaving "the employee [] no rightful option but to adhere to the directive." *Id.* at 809 (quoting *Berkowitz v. United States*, 486 U.S. 531, 536 (1988)). Second, the Court analyzes "whether the decision-making surrounding the conduct was 'susceptible to policy analysis.'" *Jude v. Comm'r of Soc. Sec.*, 908 F.3d 152, 159 (6th Cir. 2018) (quoting *United States v. Gaubert*, 499 U.S. 315, 325 (1991)). When discretion is found (step one), there is a "strong" presumption that step two is also met. 2019 Op. at 810 (citations omitted).

Below, after defining the challenged conduct (Section I), the United States then addresses DFE step two (Section II) since this Court previously held step two was not met in this case, but that DFE step one was met (Section III).

I.     **The Conduct at Issue Must Be Defined Without Regard to Negligence.**

When the Court previously defined the conduct at issue,[35] it mistakenly "collapse[d] the discretionary function inquiry into a question of whether the [government] was negligent." *Kohl*, 699 F.3d at 941 (quoting *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997)). The proper question for the Court in deciding whether the DFE applies is whether the government had discretion to make the decisions that it did—not whether it acted negligently (or otherwise improperly) in making those decisions. *See Dalehite v. United States*, 346 U.S. 15, 33 (1953) (with DFE, "Congress exercised care to protect the Government from claims, however negligently caused, that affected the governmental functions."); 28 U.S.C. § 2680(a) (defining the DFE and that it applies "where or not the discretion involved be abused"). Accordingly, "[n]egligence . . . is irrelevant to [the DFE] inquiry . . . ." *Kohl*, 699 F.3d at 941; *see also Rosebush*, 119 F.3d at 442 (the DFE "applies to policy judgments, even to those constituting abuse of discretion," such as "negligence or a wrongful act.") (quoting *Dalehite*, 346 U.S. at 33).

---

[35] The Court identified the challenged conduct as: (1) "EPA failed to more quickly intervene in response to the Flint Water Crisis pursuant to the authority granted it under Sections 1414 and 143[1] of the SDWA;" (2) "EPA was negligent in failing to warn [Plaintiffs] of the health risks posed by the Flint water;" and (3) "EPA was negligent when responding to the complaints it received from Flint residents . . . ." 2019 Op. at 812. These are negligence questions.

Consequently, "'even the negligent failure of a discretionary government policymaker to consider all relevant aspects of a subject matter under consideration does not vitiate the'" DFE. *Rosebush*, 119 F.3d at 444 (citation omitted). Questions about what the United States could or should have done differently also are irrelevant to DFE, including DFE step two. *E.g.*, *Bailey v. United States*, 623 F.3d 855, 863 (9th Cir. 2010) ("In hindsight it may be easy to say the Corps should have replaced the signs sooner, but that is exactly the judicial second-guessing of government decision-making that the discretionary function exception is designed to prevent.").

Accordingly, in *Kohl*, the Sixth Circuit reframed plaintiff's formulation of the challenged conduct—operating "the winch in a safe manner"—because it was akin to "ask[ing] whether the employees had discretion to be negligent" and reframed it as "the recovery of forensic evidence and the necessary actions taken to facilitate that recovery." *Id.* at 942. This Court should likewise reframe Plaintiffs' challenged conduct as: "whether the controlling statutes, regulations and administrative policies mandated that" EPA perform the following "in any specific manner":

1. Intervene in the Flint Water Crisis using SDWA Sections 1431 or 1414;

2. Warn Flint residents of the health risks posed by the Flint water; or

3. Respond to citizens' complaints regarding the Flint water.

*Rosebush*, 119 F.3d at 442. Each must be analyzed separately.[36]

---

[36] *E.g.*, *A.O. Smith*, 774 F.3d at 366-69 (analyzing separately the Army Corps

II.   **The Court Should Conclude, With the Benefit of the Additional Factual Record, That Plaintiffs Cannot Overcome the "Strong Presumption" That the Challenged Conduct Was "Susceptible to Policy Analysis."**

This Court previously declined to dismiss based on DFE step two, but the evidence developed in discovery shows that the challenged conduct here was susceptible to policy analysis. To satisfy DFE step two, the conduct "need only have been theoretically susceptible to policy analysis." *Jude*, 908 F.3d at 159 (the analysis "need not have actually occurred in the disputed instance"). The term "policy analysis" includes "social, economic, or political policy," as well as "[b]udgetary considerations' and 'effectiveness inquiries." *Id.* (citations omitted). In addition,

> decision making concerning "the allocation of limited agency resources," . . . "time constraints and the availability of personnel with experience," . . . and decisions relating to the amount of personnel to assign to a particular task, . . . all are policy considerations that trigger the discretionary function exception.

*A.O. Smith*, 774 F.3d at 371 (citations omitted). "Stated another way, if there is a reason for the conduct to require a balancing of interests, it falls within the exception." *Mynatt v. United States*, 45 F.4th 889, 898 (6th Cir. 2022).

A.   Negligence Is Irrelevant to the DFE Step Two and Decisions Involving Scientific and Professional Judgments Still Satisfy DFE Step Two.

Before analyzing the challenged conduct and the new factual record under DFE step two, the United States addresses two aspects of the Court's 2019 DFE step

---

decisions spanning about a one-week period that were challenged by the plaintiffs); *Nanouk v. United States*, 974 F.3d 941, 945-50 (9th Cir. 2020) (same).

two ruling. First, we submit that the Court erred in concluding that DFE step two was not satisfied because "once the Government decided to act, it was required to do so without negligence." 2019 Op. at 816. This Court cited to the U.S. Supreme Court's *Indian Towing* case and its progeny for this proposition, but the Sixth Circuit has made clear that "*Indian Towing*, decided in 1955, is 'simply not persuasive authority in the context of the discretionary function exception' given subsequent Supreme Court decisions" and that DFE "was not at issue in *Indian Towing*." *Kohl*, 699 F.3d at 944 n.4. Instead, as explained above, the DFE retains the United States' sovereign immunity for its discretionary conduct, even if that conduct was negligent.

Second, the Court relied on the Ninth Circuit's decision in *Whisnant v. United States*, 400 F.3d 1177 (9th Cir. 2005) to hold that DFE step two is not satisfied when the conduct "involves professional and scientific judgment." 2019 Op. at 815. But the Ninth Circuit itself does not construe *Whisnant* so broadly, and has reaffirmed that "[s]imply because technical data is at issue does not mean that the decisions are stripped of their policy implications." *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1178 (9th Cir. 2002). Instead, "where there is even *one* policy reason why officials may decide not to take a particular course of action to address a safety concern, the exception applies," regardless of whether it involves scientific and professional judgment. *Chadd v. United States*, 794 F.3d 1104, 1112 (9th Cir. 2015).

B. <u>All the Conduct Plaintiffs Challenge Satisfies DFE Step Two.</u>

Applying these DFE step two principles to the expanded record now available, the Court should hold that DFE step two is satisfied. Although step two only requires that the challenged conduct be "theoretically susceptible to policy analysis," *Jude*, 908 F.3d at 159, the record in this case shows that, after EPA learned in April 2015 that Flint lacked corrosion control, EPA in fact balanced several policy considerations in deciding whether, when, and how to exercise its oversight authorities. Indeed, once the extent of the problem became known, chief among EPA's concerns was how to most quickly, efficiently, and effectively reinstitute corrosion control, including by persuading Flint and MDEQ to rejoin the Detroit system—something that, since the Court's 2019 opinion, several witnesses have testified EPA could not mandate in an order. *See supra* n.27. EPA also balanced several other factors: (1) the City and MDEQ's need to satisfy their SDWA obligations to operate and primarily regulate, respectively, the Flint water system; (2) Region 5's limited resources, which prevented it from being able to step-in and operate one of the 42,000 water systems under its second-tier SDWA oversight umbrella; (3) the need to maintain an effective relationship with MDEQ and City, who were best positioned to address the City's drinking water issues; and (4) the risk that City or MDEQ could legally contest a formal order, which could have delayed relief to Flint or, at worst, cemented the status quo of no corrosion control.

1. *EPA's Decisions Not to Issue a Section 1414 Order and Not to Issue a SDWA Section 1431 Order Until January 2016 Were Susceptible to Policy Analysis.*

There is a "strong presumption"[37] that EPA's decisions whether and when to issue a SDWA Section 1414 or 1431 order were susceptible to policy analysis because, as this Court has held, Sections 1414 and 1431 "grant[] the EPA a significant 'element or judgment or choice' in its response." 2019 Op. 812-13 (EPA's conduct under Section 1414 and 1431 is discretionary and satisfies DFE's first step).[38] As detailed below, Plaintiffs are unable to overcome this strong presumption, especially in light of the more robust factual record now available.

From April 2014 to April 23, 2015, EPA was unaware that Flint was not practicing corrosion control, and therefore it had no reason to issue a Section 1414 or 1431 order related to Flint's lack of corrosion control. Although EPA received citizen complaints[39] and was aware of coliform and TTHM exceedances, further

---

[37] *A.O. Smith*, 774 F.3d at 365 (citation omitted); *accord* 2019 Op. at 809.

[38] This Court held that "[u]nder Section 1414, the federal agency is granted discretion to decide what 'advice and technical assistance . . . may be appropriate to bring the system into compliance' and what 'the earliest feasible time[ ]' is to reach compliance." 2019 Op. at 813 (quoting 42 U.S.C. § 300g-3(a)(1)(A)); *see also id.* discussing discretion in Section 1414(a)(1)(B)). It also held that Section 1431 is discretionary because "[a]ssessing what State and local authorities have done, whether those actions will protect public health, and whether those actions are sufficient certainly involve an element of choice and judgment" by EPA. *Id.* at 813 (analyzing several discretionary components of 42 U.S.C. § 300i(a)).

[39] Exh. L at 71:3-6 ("it's not uncommon for us to get . . . complaints, and it's not uncommon for us to get large volumes of citizen complaints on a particular topic"); *id.* 71:9-13 (complaints were relevant information, "but we were already aware that

discovery has revealed that such exceedances are common in water systems, were not indicative of a systemwide lead problem, and were being addressed by MDEQ and Flint. *See supra* at 4.[40] Under these circumstances, EPA's decision not to issue a Section 1414 or 1431 order for these exceedances was "susceptible to policy analysis." Such orders could have been ineffective and an inefficient use of EPA's limited resources because MDEQ and Flint were already responding, and therefore the statutory prerequisites for issuing such orders were absent. 2019 Op. at 813.

During the next period, from April 23, 2015, to June 24, 2015, once EPA Region 5 learned of Flint's lack of corrosion control, the available systemwide lead data was 6 ppb—well below the SDWA's 15 ppb lead action level. As the Enforcement Team Leader for Region 5's Ground Water and Drinking Water Branch (Heather Shoven) testified in 2020, while some were concerned about a systemwide lead problem at this time, "there was no data that could tell us that, because the lead and copper compliance data showed low levels." Exh. D at 23:1-17 & 139:8-11.

Testimony since the Court's 2019 opinion also explains why EPA did not consider the high lead result at the Walters' residence to be indicative of a

---

the State was working on violations at the City, and so there were already efforts going on to try to address some of the problems there").

[40] Exh. D at 88:5-20 (Enforcement Team Leader for Region 5's Ground Water and Drinking Water Branch (Heather Shoven): "If you would look at the number of total coliform violations across the nation, there's no way that U.S. EPA can be concerned of that type of violation" and Flint's violation "actually never made it to enforcement level because it was returned to compliance quite quickly").

systemwide lead problem. Chief of EPA Region 5's Ground Water/Drinking Water Branch (Thomas Poy) testified, for example, that in systems like Flint that contain lead service lines, having "some homes with high levels, is typical," could occur "for various reasons, but it doesn't necessarily mean that there's a systemwide issue." Exh. A at 316:10-17. Region 5 Water Division Director, Tinka Hyde, agreed: "[i]t's not uncommon to have some hits of lead" from "lead sources in the distribution system and in the home." Exh. L at 326:4-6.

Given the information available to EPA during this period, EPA's decision to first offer technical assistance and try to persuade MDEQ to change its position on corrosion control (as opposed to issuing a SDWA Section 1414 or 1431 order at this time) was "susceptible to policy analysis." In making these judgments, EPA confronted several policy considerations, including that MDEQ (not EPA) was the primary regulator, that MDEQ should not be allowed to abdicate its regulatory responsibilities, that EPA's approach was the "most expeditious way to proceed" without risking delay, and that a more confrontational approach of issuing an order could slow down progress or cement the status quo if the City or MDEQ challenged the order in court. *See supra* 13-14.

During the third period (June 24, 2015, to July 20, 2015), Region 5 became increasingly concerned of a potential systemwide issue (although systemwide lead sampling results remained under the SDWA's 15 ppb action level); but its decision

to continue with informal enforcement instead of issuing a Section 1414 or 1431 order was "susceptible to policy analysis" for the same reasons noted for the prior period. EPA believed its chosen path could be the "most expeditious way to proceed" without the risk of delay, diversion of limited resources in a protracted dispute, and the aforementioned risk of a legal challenge from the City or MDEQ to a formal order. *See supra* at 13-14.

As Regional Administrator Hedman testified in 2020, EPA's decision to pursue informal enforcement rather than issue a Section 1414 or 1431 enforcement order was not because Region 5 was a reluctant regulator—in fact, "Region 5 was known as the enforcement region," as they "issued more enforcement actions and got more fines and penalties" than any other EPA region. Exh. T at 325:7-18; *see also id.* at 325:16-18 ("if we thought the enforcement mechanism was the thing that would get it done, we wouldn't have hesitated"). Instead, it was because EPA determined that a formal order "wasn't the most efficient way" of obtaining EPA's objective of "ensur[ing] that the water for the people of Flint had the lead issue addressed as quickly as possible." Exh. T at 523:1-18. This was in part because "the data that [Region 5] had was insufficient to issue an order," "[b]ut the data and information that [Region 5] had was sufficient to convince the primacy agency [MDEQ] to order corrosion control[,] to convince the city to accept that[,] and for the . . . process to move toward optimization." *Id.* at 498:19-24. With MDEQ's July

21, 2015 agreement to order Flint to implement corrosion control, Region 5's informal enforcement approach appeared successful. *See supra* at 10.

During the fourth period (July 21, 2015, to September 19, 2015), after EPA secured from MDEQ (and then from the City) an agreement to implement corrosion control, EPA's decision not to issue a Section 1414 or 1431 order remained susceptible to policy analysis. Specifically, issuing such an order at this juncture could have been inefficient and ineffective because it could risk: (1) diverting EPA, MDEQ, and City resources away from evaluating the complex issue of how best to implement corrosion control and to disputing, defending, and litigating the order; and (2) thereby delaying implementation of corrosion control, which would have delayed relief to Flint residents. *See supra* at 13-15.

More specifically, since the Court's 2019 opinion, several witnesses have testified as to why restarting corrosion control treatment for Flint was a complex technical problem that could not be solved overnight. Regional Administrator Hedman testified that it would have been "physically impossible" to start corrosion control within a month. Exh. T at 229:18-21. Region 5 Water Division Director, Tinka Hyde, elaborated that this is because "you can't just walk into the plant and dump a bunch of orthophosphate [a form of corrosion control treatment] into the plant and hope that it fixed the problem;" instead, it requires scientific and technical study to implement. Exh. L at 58:12-18. Given this, Assistant Administrator Giles

(head of EPA's nationwide enforcement Office of Enforcement and Compliance Assurance) testified that a formal order would have been "distracting and counterproductive to the purpose of everyone applying 100 percent of the attention and authority to fixing this problem . . . ." Exh. AK at 46:14-47.

During the remaining periods (September 20, 2015, to January 21, 2016), the City and State acted in response to the new information that Flint's sampling data was flawed (and therefore no longer was a reliable measure of the water system) and to Dr. Hanna-Attisha's blood lead study. Specifically, within about a week (and on September 25 and 29, 2015, respectively) the City of Flint and Genesee County issued public health advisories. Exh. AF; Exh. AG. Less than a week later (on October 2, 2015), the State released its 10-Point Plan to address Flint's water problems, including providing free bottled water and pre-mixed formula to Flint residents; (2) providing free water filters; and (3) accelerating implementation of corrosion control.[41] Two weeks later, on October 16, 2015, Governor Snyder ordered Flint to return to Detroit water. Exh. AI at 219:6-20; 269:5-271:12; 518:17-519:4.

EPA's decision not to layer a Section 1414 or 1431 order on top of these actions was "susceptible to policy analysis" for the same reasons as in the July 21, 2015 - September 19, 2015 time period and also because, as the more robust factual

---

[41] Exh. AH; Exh. AI at 753:23-758:12; Exh. AJ; Exh. T at 426:15-24; Exh. N at 213:8-18.

record demonstrates, the State's and City's actions could have made such orders susceptible to legal challenge—*i.e.*, ineffective and counterproductive. *See* 2019 Op. at 813 (discussing State inaction being a prerequisite for EPA to issue Section 1414 and 1431 orders). For example, the Enforcement Team Leader for Region 5's Ground Water and Drinking Water Branch (Heather Shoven) testified that, with the State's 10-Point Plan, MDEQ and the City "were already working on notifying the public of the alternate water and those things that a 1414 action would have accomplished." Exh. D at 249:1-7. Assistant Administrator Giles agreed that the State's 10-Point Plan "cover[ed] all the things [EPA] might otherwise put in [a] 1431 [order]." Exh. AO. Therefore, Assistant Administrator Giles determined that, "so long as [Flint and MDEQ] were doing everything that needed to be done to return this system as quickly as possible to good functioning, it was better not to take the chance of the downside risks that come with issuing an enforcement order." Exh. AK at 47:7-12.[42] More generally, Assistant Administrator Giles testified that a Section 1414 order would have been ineffective enforcement tool in this case because: (1) could only be issued against the City (and not MDEQ); (2) focused on

---

[42] Those downside risks included that MDEQ or Flint "could appeal the order and [EPA] could get embroiled in a judicial proceeding that would be distracting and counterproductive . . . ." and MDEQ or Flint could become "much more contentious," "potentially leading to their lack of willingness to be as cooperative with outside help [that they needed to solve Flint's drinking water problems] as they were presently being." *Id.* at 46:14-24.

civil penalties—a counterproductive move given that the City's dire financial condition led to the Crisis; and (3) "could result in . . . wasted time in litigation around the question of what is and isn't a [LCR] violation." *Id.* at 71:16-72:16.

EPA's policy considerations with respect to a Section 1431 order changed, however. In January 2016, Assistant Administrator Giles issued the SDWA Section 1431 order because it became apparent to her that "the city and state were becoming more resistant, less responsive to the advice that they were getting from outside experts." Exh. AK at 49:19-50:8; Exh. N. at 118:13-121:23. This, coupled with her perception that "the risks of [the City or MDEQ] appealing the order were [now] lower," caused her to conclude that "the balance shifted in favor of doing the order." Exh. AK at 50:4-8. That Flint was planning to switch its water source again to the Karegnondi Water Authority also changed EPA's calculus, as EPA wanted to be sure Flint residents remained protected after another water change. Exh. N. at 120:17-21; Exh. AP (Section 1431 Order) ¶ 60 (requiring MDEQ and the City to be prepared to implement corrosion control if Flint switched sources again). In other words, EPA rebalanced policy considerations in light of new information.

In conclusion, for each of these time periods, EPA's decisions whether to issue a SDWA Section 1414 or 1431 order were susceptible to—and actually the product of—policy analysis, and therefore EPA's decisions satisfy DFE's second step.

2.  *EPA's Decisions Whether, When, and How to Warn Were Susceptible to Policy Analysis.*

Plaintiffs cannot overcome the "strong presumption" that EPA's discretionary decisions whether, when, and how to warn residents were susceptible to policy analysis.[43] As the Sixth Circuit has held, "the government is 'generally shielded from tort liability' in deciding whether to warn of potential dangers," because such decisions are "the type . . . that 'fit[] within the second prong of the [DFE] test.'" *A.O. Smith*, 774 F.3d at 369 (citation omitted). Warning decisions are saturated with policy considerations, including "effectiveness inquiries," *id.* at 370, and "whether to warn, when to warn, of what possible dangers to warn, whom to warn, in what manner to warn, and what to advise in any such warning," *Vallier v. Jet Propulsion Lab.*, 120 F. Supp. 2d 887, 914 (C.D. Cal. 2000), *aff'd on other grounds by*, 23 F. App'x 803 (9th Cir. 2001); *In re Consol. U.S. Atmospheric Testing Litig.,* 820 F.2d 982, 998–99 (9th Cir. 1987) ("If the decision to issue or not to issue a 'warning' is within the discretionary function exception, then logically the failure to consider whether to issue one necessarily falls within the exception as well. Any other interpretation of the statute would create insurmountable problems in its administration . . .").

---

[43] 2019 Op. at 813-14 ("neither Section 1414 nor Section 1431 set forth a mandatory obligation for the EPA to issue warnings. Plaintiffs identify no other statute or regulation imposing this duty on the EPA. The regulations in fact impose this requirement on public water systems.").

So too here, EPA's decisions whether, when, and how to warn were susceptible to policy analysis. Indeed, Regional Administrator Hedman's 2020 deposition testimony demonstrates the policy considerations she had to consider in crafting the July 2015 press release, including: (1) the constraints of the available data; (2) the need to provide residents information on lead in drinking water; (3) the need to make that information understandable—*i.e.*, effective; and (4) the need not to unduly alarm the public. *See supra* at 9-10. Any decision by EPA to issue a warning would need to balance these types of policy considerations. *Abunabba*, 676 F.3d at 337 (DFE "protects both the decision whether to warn *and* decisions regarding the scope and content of such warnings.").[44]

Finally, if Plaintiffs contend EPA should have issued a subsequent press release, whether to do so was susceptible to policy analysis. For one, in August 2015, MDEQ informed EPA Region 5 that it was working on additional public education; EPA could have taken that into consideration in deciding whether its own press statement would have been needed, appropriate, confusing, or effective. *See supra* at 10-11. Additionally, the City of Flint and Genesee County issued public health

---

[44] *See also Lockett v. United States*, 714 F. Supp. 848, 853 (E.D. Mich. 1989) ("Congress has left to the EPA to decide the manner in which, and the extent to which, it will protect individuals and their property from exposure to hazardous wastes.... In deciding not to warn Cisco about the contaminated landfill, the EPA made political, social and economic judgments pursuant to its grant of authority." (quoting *Cisco v. United States*, 768 F.2d 788, 788-90 (7th Cir. 1985))).

advisories on September 25 and 29, 2015, respectively, within days of EPA learning of Dr. Hanna-Attisha's study and that Flint's samples were not collected pursuant to the SDWA (and therefore were not as representative as EPA was led to believe). *See supra* at 12. Days later (October 2, 2015), the State of Michigan issued its 10-Point Plan and, two weeks later (October 16, 2015), ordered Flint to return to Detroit water. *Id.* After these public statements by the City, County, and State, EPA's decisions whether, when, and how to warn were susceptible to policy analysis, including the effectiveness and necessity of another warning and the risk of different or additional wording causing confusion. *A.O. Smith*, 774 F.3d at 370.

### 3. EPA's Decisions Regarding How to Respond to Citizen Complaints Were Susceptible to Policy Analysis.

Plaintiffs also cannot overcome the "strong presumption" that EPA's discretionary decisions regarding how to respond to citizen complaints was susceptible to policy analysis. 2019 Op. at 816 ("the agency's decision whether and how to respond to citizen complaints was discretionary"). EPA's decision to rely mostly upon MDEQ (the primary regulator) and the City (the water system operator) for answers—as opposed to conducting its own, independent investigations in response to each complaint—involved several policy considerations, including the most effective and efficient use of EPA's limited personnel, resources, and time to oversee 42,000 public water systems and whether doing so would interfere with or confuse responses by primacy agencies. *See supra* at 5. The same applies if Plaintiffs

were to contend that EPA should have responded differently or more often to the complaints.[45]

The Court's 2019 DFE step two analysis for this challenged conduct rests entirely upon mistakenly conflating DFE with a negligence inquiry, 2019 Op. at 816 (although "the agency's decision whether and how to respond to citizen complaints was discretionary," "once the Government decided to act, it was required to do so without negligence"). But, as discussed above, this was error and negligence is irrelevant to the DFE. *See supra* at 19-20.

*          *          *

In conclusion, Plaintiffs are unable to overcome the "strong presumption" that the discretionary conduct they challenge satisfies DFE step two. That EPA could have—or Plaintiffs or the Court would have—performed the challenged conduct differently is not the appropriate inquiry under DFE. Instead, all that is required to satisfy DFE step two is that the conduct Plaintiffs challenge was "theoretically susceptible to policy analysis." *Jude*, 908 F.3d at 159. The challenged conduct more than meets this standard, especially since the more robust factual record now before

---

[45] Exh. T at 345:5-9 (Regional Administrator Hedman: "I'm not aware of any . . . duty to update [responses to citizens]. . . [I]f during the time that I was regional administrator[,] I had to go back and update every piece of correspondence I wrote, I think I would have been in a continuous feedback loop.").

the Court demonstrates that EPA in fact balanced many policy considerations in deciding how to respond to the Flint Water Crisis.

### III. The Court Correctly Held That DFE Step One Is Satisfied for All the Challenged Conduct and the Court Should Not Revisit that Ruling.

The Court previously and correctly held that all the conduct Plaintiffs challenge in this case satisfies the DFE's first step. 2019 Op. at 812-13 (SDWA Sections 1414 and 1431 "grant the EPA discretion to act"); *id.* at 813-14 (same with respect to failure to warn); *id.* at 816 ("the agency's decision whether and how to respond to citizen complaints was discretionary"). Judge Levy subsequently reached the same conclusions, except for Section 1414. Levy MTD Op. at 626-32. If Plaintiff challenge this Court's prior DFE step one rulings, the Court should reach the same conclusions as before, including because (as explained below), Judge Levy's Section 1414 ruling is erroneous.

Based on Section 1414's text, this Court correctly held that, "[e]ven assuming that there was a finding of noncompliance for Flint, SDWA grants EPA a significant element of judgment or choice in its response." 2019 Op. at 812-13. Specifically, this Court held that whether to issue a Section 1414 order is discretionary because: (1) EPA "is granted discretion to decide what 'advice and technical assistance ... may be appropriate to bring the system into compliance" and what "the earliest feasible time[ ]" is to reach compliance;" *id.* at 813 (quoting 42 U.S.C. § 300g-3(a)(1)(A)); and (2) "Section 1414 also instructs the EPA to issue an order requiring the public

water system to comply with the applicable requirement, but first the agency must decide whether 'the State has [ ] commenced appropriate enforcement action[.]'" *Id.* (quoting 42 U.S.C. § 300g-3(a)(1)(B)); *see also Cohen v. United States*, 151 F.3d 1338, 1343 (11th Cir. 1998) (statute's use of "appropriate" meant it was discretionary for purposes of DFE). Judge Levy dismissed this textual analysis as irrelevant. Levy MTD Op. at 631; *accord* Levy 1292(b) Op. at 740-41. But this discretionary language controls whether the EPA Administrator may issue a Section 1414 order, and therefore it cannot be dismissed from the Court's DFE step one analysis.[46]

Judge Levy further disregarded Section 1414's discretion by analyzing whether *any* EPA employee believed that Flint's lack of corrosion control violated SDWA. Levy MTD Op. at 628-29; Levy 1292(b) Op. at 741-42. But Congress did not confer the discretion of whether to issue a Section 1414 order to any subordinate employee, but to the Administrator and her delegees. 42 U.S.C. § 300g-3(a) ("Whenever the Administrator finds . . . ."); *id.* § 300f(7) ("'Administrator' means the Administrator of the Environmental Protection Agency.").

---

[46] In addition, contrary to Section 1414's discretionary language, Judge Levy incorrectly found that violations for which the State already commenced enforcement action (*i.e.*, the TTHM and MCL violations) required a Section 1414 order. Levy MTD Op. at 628; *supra* at 4 & 24-25. Judge Levy also incorrectly concluded that "pre-flushing," which discovery has made clear is not in fact barred by SDWA, was a violation that could be the basis for a Section 1414 order. Levy 1292(b) Op. at 742; *supra* at n.8.

The EPA Administrator (and those to whom she delegated Section 1414 authority, *see supra* at 8) neither found that Flint's lack of corrosion control violated SDWA (the predicate for a Section 1414 order) nor had a non-discretionary duty to do so. As numerous courts have held in the context of the Clean Water Act's comparable enforcement provision,[47] Section 1414 "contains no language suggesting that the Administrator has a duty to make findings." *Sierra Club v. Whitman*, 268 F.3d 898, 902 (9th Cir. 2001).[48] The Sixth Circuit reached the same decision with respect to comparable language in the Clean Air Act. *Ohio Pub. Int. Rsch. Grp., Inc. v. Whitman*, 386 F.3d 792, 797-798 (6th Cir. 2004) ("Whenever the Administrator makes a determination" is discretionary).[49] The same is true here, and Judge Levy was incorrect to reason otherwise.

Enforcement decisions—like whether to issue a Section 1414 order—are "quintessential examples of governmental discretion . . . to be immune under the discretionary function exception." *Huntress v. United States*, 810 F. App'x 74, 76

---

[47] *See* 33 U.S.C. § 1319(a)(3) ("Whenever on the basis of any information available to [her] *the Administrator finds* that any person is in violation of [permit conditions], he shall issue an order requiring such person to comply with such section or requirement, or he shall bring a civil action in accordance with subsection (b) of this section.") (emphasis added).

[48] *Accord City of Olmstead Falls v. EPA*, 233 F. Supp. 2d 890, 904 (N.D. Ohio 2002); *Dubois v. Thomas*, 820 F.2d 943, 951 (8th Cir. 1987).

[49] *New York Pub. Int. Rsch. Grp. v. Whitman*, 321 F.3d 316, 330 (2d Cir. 2003) ("As the EPA correctly notes, the key phrase of [Clean Air Act] § 502(i)(1) is the opening one, "Whenever the Administrator makes a determination," and this language grants discretion.").

(2nd Cir. 2020).[50] Indeed, the U.S. Supreme Court has held that "an agency's decision not to take enforcement action should be presumed immune from judicial review," as "such a decision has traditionally been 'committed to agency discretion.'" *Heckler v. Chaney*, 470 U.S. 821, 832 (1985). Judge Levy contrasted Sections 1414 and 1431 and pointed to Section 1414's 1986 amendment, but that reasoning again overlooks Section 1414's discretionary language. *See supra* at 36-37.[51] The 1986 revision from "may" to "shall" in Section 1414 also cannot rebut the *Heckler* presumption; indeed, the Supreme Court held one year earlier in *Heckler* that an enforcement provision was discretionary, despite also containing "shall" language. 470 U.S. at 835.[52]

Finally, as part of its enforcement discretion, EPA had the discretion to pursue informal enforcement instead of issuing a formal Section 1414 order. *Gaubert*, 499 U.S. at 329–30 (concluding that an agency's decision to use informal enforcement satisfied DFE step one because "there is nothing in the language or structure of the

---

[50] *See, e.g.*, *Blanco Ayala v. United States*, 982 F.3d 209, 216 (4th Cir. 2020) ("this process is infused with discretion thrice-over—whether to investigate a possible violation of immigration law, how to conduct that investigation, and then whether to bring an enforcement action after drawing factual and legal conclusions").

[51] *See also Lam v. United States*, 979 F.3d 665, 677 (9th Cir. 2020) (Policies must be viewed "in their totality," as "[t]he use of a few mandatory words like 'shall' does not create a mandatory policy if the policy otherwise allows for discretion.").

[52] *See also Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2019) ("It is a commonplace of statutory interpretation that 'Congress legislates against the backdrop of existing law.'") (citation omitted).

[relevant] statutes that prevented the regulators from invoking less formal means of supervision of" the regulated entities).

In sum, the Court should once again hold that all the challenged conduct satisfies the DFE's first step, including whether to issue a Section 1414 order.

## CONCLUSION

For the reasons set forth above, the Court should dismiss the remaining 11 bellwether Plaintiffs' claims pursuant to the FTCA's discretionary function exception. In 2019, the Court correctly found "the first step of the discretionary function exception analysis satisfied with respect to" the challenged conduct. 2019 Op. at 814. Based on the more robust factual record now before it—and when viewing the Flint Water Crisis as an evolving set of facts and policy considerations EPA confronted at each milestone of the Crisis—the Court should now hold that the second step of the discretionary function exception also is satisfied with respect to Plaintiffs' challenged conduct.

Dated:        February 9, 2024          Respectfully submitted,

                                        *s/ Eric Rey*
                                        ERIC REY
                                        Trial Attorney, Torts Branch
                                        Environmental Tort Litigation
                                        1100 L Street NW
                                        Washington, DC 20005
                                        e-mail: eric.a.rey@usdoj.gov
                                        phone: 202-616-4224