# Exhibit D

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF MICHIGAN

3                    SOUTHERN DIVISION

4    _____
                                    )
5                                   )  Civil Action No.
                                    )  5:16-cv-10444-JEL-MKM
6    In re:  FLINT WATER CASES   )  (consolidated)
                                    )
7                                   )  Hon. Judith E. Levy
     _____)
8

9

10                 HIGHLY CONFIDENTIAL

11             Thursday, September 15, 2022

12

13

14          Remote videotaped deposition of

15   HEATHER SHOVEN, commencing at 8:59 a.m., on the above

16   date, before Carol A. Kirk, Registered Merit Reporter,

17   Certified Shorthand Reporter, and Notary Public.

18

19

20

21

22          GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
23                deps@golkow.com

24

```
 1          R E M O T E   A P P E A R A N C E S

 2                        - - -

 3   On behalf of the Class Plaintiffs:

 4           WEITZ & LUXENBERG
             BY:  PAUL F. NOVAK, ESQUIRE
 5                pnovak@weitzlux.com
                  PAULINA KENNEDY, ESQUIRE
 6                pkennedy@weitzlux.com
             3011 West Grand Boulevard, Suit 2150
 7           Detroit, Michigan  48202
             313-800-4170
 8
             COHEN MILSTEIN SELLERS & TOLL, PLLC
 9           BY:  LESLIE M. KROEGER, ESQUIRE
                  lkroeger@cohenmilstein.com
10           11780 U.S. Highway One, Suite N500
             Palm Beach Gardens, Florida  33408
11           561-515-1400

12
     On behalf of Individual Plaintiffs:
13
             FIEGER LAW
14           BY:  DONALD H. DAWSON, JR., ESQUIRE
                  d.dawson@fiegerlaw.com
15           19390 West Ten Mile Road
             Southfield, Michigan  48075-2463
16           248-355-5555

17

18

19

20

21

22

23

24
```

```
 1     R E M O T E   A P P E A R A N C E S (Cont'd)

 2                        - - -

 3   On behalf of Defendants Veolia Water North America
     Operating Services, LLC, Veolia North America, LLC,
 4   and Veolia North America, Inc.:

 5          CAMPBELL CONROY & O'NEIL
            BY:  CHRISTOPHER R. HOWE, ESQUIRE
 6               chowe@campbell-trial-lawyers.com
            20 City Square, Suite 300
 7          Boston, Massachusetts  02129
            617-241-3000
 8
            CAMPBELL CONROY & O'NEIL
 9          BY:  ANDREAS RINGSTAD, ESQUIRE
                 aringstad@campbell-trial-lawyers.com
10          1205 Westlakes Drive, Suite 330
            Berwyn, Pennsylvania  19312
11          610-964-1900

12
     On behalf of Defendants Leo A. Daly Company and
13   Lockwood, Andrews & Newnam, Inc.:

14          FAEGRE DRINKER BIDDLE & REATH, LLP
            BY:  TRAVIS S. GAMBLE, ESQUIRE
15               travis.gamble@faegredrinker.com
            1717 Main Street, Suite 5400
16          Dallas, Texas  75201
            469-357-2534
17

18   On behalf of McLaren Regional Medical Center:

19          BEVERIDGE & DIAMOND, P.C.
            BY:  SUSAN E. SMITH, ESQUIRE
20               ssmith@bdlaw.com
            456 Montgomery Street, Suite 1800
21          San Francisco, California  94104
            1-415-262-4000
22


23


24
```

Highly Confidential - Heather Snoven

```
 1     R E M O T E   A P P E A R A N C E S (Cont'd)

 2                         - - -

 3   On behalf of the United States of America:

 4          U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
            BY:  MICHAEL I. WILLIAMS, ESQUIRE
 5              michael.l.williams@usdoj.gov
            175 N. Street, N.E.
 6          Washington, D.C.  20002
            202-307-3839
 7

 8

 9   Also Present:

10          Brian McGee, Videographer
            Dan Eagles, USDOJ
11

12                         - - -

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Heather Shoven

```
 1        Q.    What were your -- could you just
 2   describe for us your duties and responsibilities
 3   as the enforcement team leader for the Ground
 4   Water and Drinking Water branch at Region 5 from
 5   October of 2011 through April of 2018.
 6        A.    Of course I can.
 7              I was the lead for the enforcement
 8   targeting tool, the ETT, analysis for the
 9   Region 5 water systems.  Region 5 at the time I
10   was there -- I know things -- so you know, all
11   my water experience, 2021 is my last, you know,
12   time with that.
13              And so at that time, we had 42,000
14   water systems that we oversaw in Region 5.  110
15   were tribal.  All the rest were overseen by the
16   primacy states, the six primacy states within
17   the region.
18        Q.    And the EPA is divided into ten
19   regional offices, correct?
20        A.    Correct.  Correct.
21        Q.    And each regional office is
22   responsible for the execution of the public
23   drinking water programs within its geographical
24   territory, correct?
```

Highly Confidential   Heather Shoven

1   need to be done to correct them.  And the

2   important thing is that the public is notified

3   and knows of the risks.

4              So I would say that her job at

5   that time, the Water Division director, should

6   always be to ensure that we have strong state

7   programs.  And every year that person would have

8   to sign that there was proper operator

9   certification and capacity development in place.

10  And you would also transmit an end-of-year

11  evaluation report.  So that is what I can say

12  the director is in charge of and has the

13  authority to issue violations.

14             So my experience as the

15  enforcement team leader, if I had a notice of

16  violation for a system or an administrative

17  order -- I had one referral to DOJ in my time --

18  those were delegated higher up.

19             So I could see a violation that I

20  wanted to have a notification, but the authority

21  to do that was with Tinka Hyde and people

22  higher.

23        Q.    And your job duties and

24  responsibilities as the enforcement team leader

```
 1   were to ensure that the region's public water

 2   systems were complying with federal regulations,

 3   correct?

 4               MR. WILLIAMS:  Objection; asked

 5          and answered.

 6          Q.    You can answer.

 7          A.    So what I will say here is, of the

 8   42,000 water systems, I would look at what rose

 9   to the level of concern.  If there was a

10   violation that -- you know, if there were

11   violations that didn't hit the priority

12   threshold, I've got a triage.

13               I only had a staff of about five.

14   So I was really concerned by repeat violators

15   and those that were called priority systems.

16   They were above the threshold.

17               So, no, I do not take

18   responsibility for 42,000 systems.  I oversaw

19   and identified the ones that I thought needed

20   federal intervention or more information from

21   the state.

22          Q.    Which department or division was

23   responsible for overseeing compliance and

24   enforcement of the EPA's regulatory
```

Highly Confidential - Heather Shoven

```
 1            Q.    Did Region 5 identify the city's

 2    total coliform bacteria violations as any

 3    indicator of a problem with Flint's water system

 4    at the time?

 5            A.    If you would look at the number of

 6    total coliform violations across the nation,

 7    there's no way that U.S. EPA can be concerned of

 8    that type of violation, because total coliform

 9    is an indicator of possible bacterial

10    contamination.

11            So it is not -- now, E. coli,

12    those also happen, especially in hot summer

13    months.  So, again, you know, that is not

14    something that would rise to EPA.  I think we

15    became aware of it -- I don't know.

16            Jennifer was aware of it, and I

17    think it's because she was in communications

18    with the state about it.  But it actually never

19    made it to enforcement level because it was

20    returned to compliance quite quickly, so ...

21            It was not on my radar as ...

22            MR. HOWE:  Why don't we go off the

23        record.

24            THE VIDEOGRAPHER:  The time is
```

1    that you learned of the boil water advisory

2    notices in Flint sometime in September 2014?

3              A.    Yes.  And most -- yeah.

4              Q.    Following the city's switch to the

5    Flint River in 2014, at some point did you come

6    to learn that Flint had issued a violation

7    notice to the city regarding an exceedance of

8    the maximum contaminant level standard for total

9    trihalomethanes at certain locations within the

10   city's drinking water distribution system?

11             A.    Yes.

12             Q.    And do you know approximately when

13   you first learned of that violation?

14             A.    Yes.  So I actually January of

15   2015 received a call.  This was the first

16   complaint that I recall receiving directly from

17   a citizen in the City of Flint.  It was an

18   Arthur Woodson.  And we had quite a long

19   conversation that I ended up documenting in an

20   e-mail afterwards to Tom Poy and

21   Jennifer Crooks, because, again, I wasn't

22   involved in complaints usually unless it rose to

23   the level.

24                   So that discussion -- there's

1   public notice that happens with the TTHM,

2   disinfection byproducts exceedance, and so I

3   made sure that that notice -- that Mr. Woodson

4   was aware of the risks and everything, because

5   if I recall, he was worried about a family

6   member with cancer, and it's a disinfection

7   byproduct, which is cancer causing.

8               And it was a long discussion, and

9   he was talking about the emergency manager

10  situation and the concern about, you know, MDEQ

11  overseeing the city, but there was a state

12  program manager.  So we talked about that.

13              But the real focus -- he gave me

14  this background, but the real focus was he

15  wanted to know why isn't EPA taking enforcement.

16  We had some -- you know, the boil water.  We've

17  now had this TTHM MCL.  Where are you?

18              And I said, you know, "I'm aware

19  of the situation."  And I explained to him the

20  enforcement targeting tool in the best lay terms

21  I could.  And that would be explaining just the

22  number of systems that we have and how we target

23  our limited resources to the highest priority

24  systems with violations.

Highly Confidential - Heather Shoven

```
 1                    And I explained to him the

 2    follow-up that was occurring with the

 3    operational evaluation level for the -- because

 4    the Stage 2 Disinfection Byproducts Rule and

 5    that things were being looked at to figure out

 6    how can we, you know, return to compliance on

 7    this violation.

 8                    And, also, that was when I

 9    mentioned to him that it's quite -- it happens

10    often that once you have an E. coli MCL, that an

11    overcorrection can occur with the water system

12    to overdisinfect and possibly get these MCLs.

13                    So I was explaining that to him.

14    And then I did, like I say, do a follow-up

15    e-mail.

16         Q.    And when do you recall that the

17    TTHM violation notice was issued to the city?

18         A.    I think it was in January right

19    before my call.  I think he was responding to

20    that.  Although, the way that the monitoring

21    would occur, it could have been December,

22    because it's quarterly monitoring, and you do

23    the locational running annual average.

24                    So I cannot confirm with you.
```

1   with them, not really with enforcement yet.

2   That was all Miguel.  I was aware of this, but

3   not in the weeds of it at that time.

4           Q.    Do you recall whether there was

5   any discussion of the potential widespread lead

6   release due to the City's lack of corrosion

7   control treatment and pre-flushing?

8           A.    I know there was a concern for

9   that, but there was no data that could tell us

10  that, because the lead and copper compliance

11  data showed low levels.  But, yes, there's that

12  concern.  That is our -- that was our whole

13  concern at the beginning; if you don't have

14  corrosion control, there's that risk.

15          Q.    And do you recall whether there

16  was any discussion of MDEQ's implementation of

17  the Lead and Copper Rule with respect to

18  corrosion control treatment in Flint and any

19  disagreement that Region 5 had with MDEQ over

20  whether the city needed to maintain corrosion

21  control treatment for Flint?

22          A.    Our biggest concern at that time

23  was, first of all, not being told the truth in

24  February.  And then a whole year after the

1    has got a job.  And then Office of Water, of

2    which OGWDW is below, is making sure that you

3    have safe water and everything is implemented

4    properly, and we're following the Safe Drinking

5    Water Act.

6           Q.    And their involvement was

7    necessary for issuances of a 1431 order,

8    correct?

9           A.    We don't need headquarters for a

10   1431.  We do talk to them, but I think the

11   critical thing here, why he's talking about

12   Ed coming in, OGWDW and OGC, is this whole

13   fundamental disagreement with whether there is a

14   violation or not, the interpretation of the

15   regulation, and that's what headquarters is for,

16   is national consistency.

17              So that's why it was bumped up.

18   Even though we thought we were right, you have

19   state relations, and they needed to have that

20   higher opinion.

21          Q.    Okay.  And was it Region 5's

22   opinion that the City of Flint had violated the

23   Lead and Copper Rule by not continuing corrosion

24   control treatment in Flint?

```
 1                MR. WILLIAMS:  Objection; lack of
 2          foundation.
 3          Q.    You can answer.
 4          A.    It was the position of Tom Poy,
 5   Miguel, Heather, and -- it was our position that
 6   there was a treatment technique violation.
 7                When you go up to the delegated
 8   authority, Tinka Hyde, the division director,
 9   she makes that decision.  She may make that
10   decision to do a 1414.
11                However, at that time when she
12   looked at it, she's like, "Oh, the state
13   disagrees with the interpretation.  It looks
14   like there could be some ambiguity."
15                I have no idea in this point where
16   our regional counsel was, but there -- she saw
17   that maybe there was an ambiguity, a difference
18   of opinion, between her 1256 and the state.  She
19   wanted headquarters' opinion.  She saw the lead
20   and copper compliance data below 15.
21                So that's where she was.  So she
22   came from that perspective.  And the staff were
23   at a different place.
24          Q.    What about the Office of the
```

```
 1              Q.    And what I want to focus on is the

 2   top e-mail from Mr. Del Toral to yourself dated

 3   Thursday, September 3, 2015, the subject of

 4   which is "Update of Flint Water Study and the

 5   use of the orthophosphate."

 6              Do you see that?

 7         A.    I do.

 8         Q.    And Mr. Del Toral states, "The

 9   suggestion to go back to Detroit Water, at least

10   until the KWA pipeline is finished, seems like

11   the best solution for now.  It would also give

12   Flint the time to study/learn how to treat the

13   raw water they will be getting from the KWA

14   pipeline since they don't seem to be able to

15   manage treating a raw source right now."

16              Do you see that?

17         A.    Yes.

18         Q.    Do you know whether this was the

19   first time there was any discussion within

20   Region 5 about whether the best solution for the

21   City of Flint was to return to Detroit Water?

22         A.    I can't recall, but I -- we had

23   had a discussion even offline on this before

24   this e-mail, but it is -- we thought that was a
```

Highly Confidential          Heather Shoven

```
 1    good solution.  I don't recall when we came up

 2    with that.

 3          Q.    And did Region 5 ultimately make

 4    that recommendation to MDEQ and/or the City of

 5    Flint?

 6          A.    Unfortunately, it is not --

 7    neither EPA nor MDEQ can tell a public water

 8    system what their source should be.  Now, the

 9    State of Michigan with the emergency manager --

10    interesting.  But all that we do is we deal with

11    this is the public water system the community or

12    private group has developed, and these are the

13    regulations.  We can't say what the source would

14    be, and we have no control over saying this

15    should be your source.

16                MR. HOWE:  I'm going to mark this

17          e-mail exchange as the next exhibit,

18          Exhibit 21.

19                      - - -

20      (Shoven Deposition Exhibit 21 marked.)

21                      - - -

22    BY MR. HOWE:

23          Q.    Ms. Shoven, you mentioned just a

24    few minutes ago a letter or e-mail exchange that
```

```
 1    I was talking about it seriously with OECA and

 2    Region 5 on September 21, 2015.

 3         Q.    When Dr. --

 4         A.    Edwards.

 5         Q.    -- Dr. Edwards reported his

 6    results and his concerns over the sampling sites

 7    that the city was using for its 90th percentile?

 8         A.    Right, because the thing that I

 9    thought was an indicator of systemwide lead

10    levels was gone.  So everything was suspect by

11    that time.  And we had the data from the study

12    then, too, that was coming out in August.  So

13    things were coming up to, okay, enough is

14    enough.

15         Q.    At some point did you learn that

16    the former -- that former Governor Rick Snyder

17    had appointed a task force to conduct an

18    independent review of the Flint water crisis?

19         A.    Yes, I do know that they had a

20    task force, and it possibly could have been

21    before our task force was announced.  I can't

22    recall.  But yes.

23         Q.    Were you interviewed by the task

24    force as part of its review?
```

1    the follow-up was occurring, so you really

2    couldn't hit the prong of the state and locals

3    not acting.

4          Q.    You would agree, however, that EPA

5    statutory authority under Section 1431 of the

6    SDWA doesn't require any such notice, correct?

7          A.    What is the such notice you speak

8    of?

9          Q.    You mentioned under 1414, that

10   1414 notice requires 30 days notice to the state

11   and -- the primacy state and public water

12   authority, correct?

13         A.    Oh, okay.  So, yeah, notice was

14   used in a couple different ways.  So in a -- if

15   I did -- if we did a Section 1414 action, the

16   notice of violation, that tells the system,

17   "Hey, you incurred this violation, treatment

18   technique, this is what you need to do to return

19   to compliance, and then this is notice to the

20   public regarding this violation and the risk

21   with the water."

22              So, like, to get the information

23   out to the public, it would have -- they had 30

24   days to do that.  So what I'm trying to say is

```
1    when I was drafting a notice of violation, that

2    was in the September -- right after

3    September 21, the 10-point plan I think was

4    October 2, so they were already working on

5    notifying the public of the alternate water and

6    those things that a 1414 action would have

7    accomplished.

8              Q.    Okay.  I just want to make sure I

9    understand your testimony.

10             When I asked you earlier what was

11   the earliest point that you believed that the

12   EPA could have issued an emergency order, were

13   you referring to Section 1414 or Section 1431 of

14   the SDWA?

15             MR. WILLIAMS:  Objection;

16        mischaracterizes prior testimony and

17        asked and answered.

18             MR. HOWE:  That's why -- I'm

19        asking for clarification.

20             A.    Okay.  So here's the thing, is

21   both of those authorities are always available

22   to you.  So 1414 was the one that I was really

23   focused on for the most part until when you get

24   to the September 20th time frame -- the 1431 is
```

1   a tool, but here's where the issue is with the

2   1431.

3              So I could -- you know, the notice

4   to the public, the alternate water and the

5   corrective actions.  Okay.  We see there's --

6   there's most likely a lead problem because of

7   the questionable compliance monitoring that

8   happened, Marc Edwards' data, and LeeAnne

9   Walters, and the lack of corrosion control.  We

10  know those things.

11             What can EPA do?  Okay.  We don't

12  know all of those things until September 21st,

13  okay.  So you get in the office September 21st,

14  you know all those things.  We had a discussion

15  September 21st.  And I think there are probably

16  notes out there, because I was starting to draft

17  a 1414.

18             The reason why -- a 1431 totally

19  there, but a 1431 cannot do what a critical

20  thing for timeliness would be to say switch back

21  to Detroit.  That's going to be one way to

22  really help the situation, is switch your water

23  source.

24             All that we could do is say,

1    "Provide alternate water, do the actions to

2    return to compliance, notify the public."

3              So as things were evolving,

4    Susan Hedman makes the decision for 1431.  She's

5    having discussions with Wyant.  All these

6    discussions I did not know about until I put

7    together the timeline.  I'm like, oh, this was

8    happening.

9              So we were feeding information up.

10   They had seen the copy of my notice of

11   violation.  The thought was the state was doing

12   enough.  We won't focus on the NOV, and, you

13   know, let this play out as they're doing the

14   things to try to get back into compliance.

15             So -- and the NOV would be signed

16   by Tinka who did not want to do an NOV, at least

17   through September 21st, when we found out the

18   compliance data that we were banking on was not

19   accurate.  She had another set of things to look

20   at.

21             But in that ten days, between

22   September 21st and October 2nd, I saw in the

23   record that there was a lot of exchanges, and

24   DEQ Director Wyant was much more involved and

1    the state was responding.  So that's where the

2    agency was at that time.

3            Q.    If the state agency, the MDEQ, is

4    responding, then why was the EPA's emergency

5    administrative order issued in January 2016?

6            A.    That is critical because what

7    happens is you're switching back -- they decided

8    to switch the sources, and we had our task force

9    and -- the Flint Task Force.  There were so many

10    things that were not in place for that public

11    water system, such as the things you showed

12    earlier, an inventory of their materials for the

13    piping.

14                They had no idea where the lead

15    service lines were.  They didn't have a lead

16    sampling site plan.  They had a wholly

17    inaccurate total coliform sample site plan and

18    low or nonexistent chlorine residuals.

19                They didn't have the capacity to

20    really operate the water system.  And they

21    didn't have water quality parameters.  There

22    were so many things that weren't happening

23    that -- you know, these things came to light as

24    we had our task force.

1              We were like, "Wow, these

2    fundamental things aren't covered.  We need to

3    get in there and get the state to remedy the way

4    they were implementing the program, and the city

5    needs to get on task."

6              So all the things that you would

7    see in that order are looking at the basic water

8    chemistry, them figuring out the sites, and now

9    we still -- I was on the order until February of

10   2018, and we were still arguing about the Lead

11   and Copper Rule sample site plan and whether

12   they had the capacity to run a water system.

13             So I believe the order was very

14   much needed to get on the right track.  Because,

15   yes, maybe you handled the immediate fire, but

16   there were lots of other areas of vulnerability.

17        Q.    Okay.  I just want to wrap this

18   up.

19             Finding 33 states that "There was

20   and remains no justification for MDEQ not

21   requiring corrosion control treatment for the

22   switch of water source to the Flint River."

23             Do you see that?

24        A.    Yes.

1  those discussions.

2       Q.    And is it fair to say that with

3  respect to the possible relationship between

4  disinfection of the municipal water supply and

5  the increase in infectious diseases such as

6  Legionnaires' disease, you would defer to the

7  technical experts in the Office of Research and

8  Development?

9       A.    Yes, I would.

10      Q.    And I'm sorry to jump around.  I'm

11  simply trying to move through this efficiently

12  and not duplicate the efforts of others.

13      A.    Of course.

14      Q.    I understand, Ms. Shoven, from the

15  testimony of some of your colleagues from the

16  EPA Region 5 that you had a role with the file

17  review and enforcement verification process that

18  was conducted in 2016.

19          Do you recall that?

20      A.    Oh, yes.  Most definitely.  And I

21  was a principal member and the lead for the

22  enforcement review.

23      Q.    Okay.  And could you tell us what

24  your role was in that process, focusing on the

Highly Confidential - Heather Shoven

```
 1   reviews conducted in 2016.

 2        A.    My role was as far as -- it was,

 3   you know, coordination with the state, letting

 4   them know what records that we wanted to look

 5   at.  I made sure that we looked at systems that

 6   may have enforcement issues.  You can only look

 7   at a subset.

 8             There are, I think, 10,000 water

 9   systems in the State of Michigan, and there's no

10   way you can look at all those files with all the

11   regulations.  So I think we ended up with 30

12   systems that we looked at.

13             And so I made sure for the

14   enforcement side that I got some with

15   violations, without, what action level

16   exceedance.

17             So I helped assist in selection

18   and then putting together the tools for how I

19   would -- how we would review the data and what

20   we would capture, and also put together -- we

21   interviewed the enforcement staff and looked at

22   their documents, escalation policy, whatnot.

23   And then the writing of the report.

24             Tom Murphy was the lead for the
```

```
 1    if a violation was not issued?
 2              MR. WILLIAMS:  Objection; asked
 3         and answered.
 4         A.    For public notice, a violation
 5    occurs or a public health emergency.  There's a
 6    violation that triggers public notice rule
 7    requirements.
 8         Q.    So as I understand it, the EPA
 9    would have been precluded from issuing notice to
10    the public because there was no violation?
11         A.    EPA -- so public notice provisions
12    in 141.200, the public notification rule, it
13    lists the three different tiers of public notice
14    and what triggers those requirements.
15              EPA -- the primacy agency actually
16    does not issue public notice.  It's the public
17    water system that notifies the public.  And so
18    EPA doing a public notice where there's a
19    primacy agency, that doesn't really happen, and
20    so we had no reason at that time -- could you
21    remind me what time I'm in?  Is it June of 2015
22    you said?
23         Q.    Yes.
24         A.    Okay.  So in June of 2015, as I've
```

Highly Confidential    Heather Shoven

```
1    stated before, you know, I personally believe

2    there was a treatment technique violation which

3    would have required Tier 2 public notice by the

4    system.

5              However, we didn't know if there

6    was a systemwide lead issue, because, yes, we

7    did have LeeAnne Walters' home, but the

8    compliance monitoring data for lead and copper

9    did not show elevated levels.

10             So what would you notify the

11   public?  You didn't have enough information.

12   And so that's why we talked to the state in

13   June, looking at their next set of data, saying,

14   "Hey, we really interpret this regulation that

15   you needed to maintain corrosion control

16   treatment.  You think otherwise.  We're getting

17   that legal interpretation.  But corrosion

18   control treatment is needed and that needs to

19   happen, so ...

20             MR. HOWE:  I'm going to mark as

21        the next exhibit, Exhibit 31 [sic], a

22        document entitled R2 Heather Shoven R5

23        interview.

24                      - - -
```

```
 1                   CERTIFICATION

 2

 3        I, Carol A. Kirk, Registered Merit Reporter and

 4  Certified Shorthand Reporter, do hereby certify that

 5  prior to the commencement of the examination,

 6  HEATHER A. SHOVEN, was duly remotely sworn by me to

 7  testify to the truth, the whole truth, and nothing but

 8  the truth.

 9        I DO FURTHER CERTIFY that the foregoing is a

10  verbatim transcript of the testimony as taken

11  stenographically by me at the time, place, and on the

12  date hereinbefore set forth, to the best of my

13  ability.

14        I DO FURTHER CERTIFY that I am neither a

15  relative nor an employee nor attorney nor counsel of

16  any of the parties to this action, and that I am

17  neither a relative nor employee of such attorney or

18  counsel, and that I am not financially interested in

19  the action.

20

21

22  _____
    Carol A. Kirk, RMR, CSR
23  Notary Public

24
```