# Exhibit N

```
 1              UNITED STATES DISTRICT COURT

 2             EASTERN DISTRICT OF MICHIGAN

 3                  SOUTHERN DIVISION

 4    _____

                                    |

 5                                  |  Civil Action No.

                                    |  5:16-cv-10444

 6    In re:  FLINT WATER CASES     |

                                    |  Hon, Judith E. Levy

 7    _____|  Mag. Mona K. Majzoub

 8

 9                  HIGHLY CONFIDENTIAL

10             Thursday, January 13, 2022

11                    Volume I

12

13         Remote videotaped deposition of

14    ROBERT KAPLAN, conducted at the location of the

15    witness, commencing at 9:04 a.m., on the above date,

16    before Carol A. Kirk, Registered Merit Reporter,

17    Certified Shorthand Reporter, and Notary Public.

18

19

20

21

22

23            GOLKOW LITIGATION SERVICES

          877.370.3377 ph | 917.591.5672 fax

24              deps@golkow.com
```

```
 1          R E M O T E   A P P E A R A N C E S
 2                        - - -
 3   On behalf of the Class and Burgess Plaintiffs:
 4          JULIE H. HURWITZ, ESQUIRE
            GOODMAN, HURWITZ & JAMES, P.C.
 5          1394 East Jefferson Avenue
            Detroit, Michigan  48207
 6          313-567-6170
            jhurwitz@goodmanhurwitz.com
 7
            CARY S. MCGEHEE, ESQUIRE
 8          PITT MCGEHEE PALMER BONANNI & RIVERS, PC
            117 West Fourth Street, Suite 200
 9          Royal Oak, Michigan  48067
            cmcgehee@pittlawpc.com
10
            LESLIE M. KROEGER, ESQUIRE
11          COHEN MILSTEIN SELLERS & TOLL PLLC
            11780 U.S. Highway 1 North, Suite N500
12          Palm Beach Gardens, Florida  33408
            561-515-1400
13          lkroeger@cohenmilstein.com
14
     On behalf of Individual Plaintiffs:
15
            DONALD H. DAWSON, JR., ESQUIRE
16          ALEC E. OHRYN, ESQUIRE
            FIEGER LAW
17          19390 West Ten Mile Road
            Southfield, Michigan  48075-2463
18          248-355-5555
            d.dawson@fiegerlaw.com
19          a.ohryn@fiegerlaw.com
20
21
22
23
24
```

```
 1      R E M O T E   A P P E A R A N C E S  (CONT'D)
 2                         - - -
 3   On behalf of Individual Plaintiffs:
 4          PATRICK LANCIOTTI, ESQUIRE
            NAPOLI SHKOLNIK PLLC
 5          400 Broadhollow Road, Suite 305
            Melville, New York  11747
 6          631-224-1133
            planciotti@napolilaw.com
 7
 8   On behalf of the People of the State of Michigan:
 9          CHARLES A. CAVANAGH, ASSISTANT ATTORNEY GENERAL
            MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
10          525 West Ottawa Street, 6th Floor
            Lansing, Michigan  48909
11          517-335-7664
            cavanaghc2@michigan.gov
12
13   On behalf of Defendants Veolia Water North America
     Operating Services, LLC, Veolia North America, LLC,
14   and Veolia North America, Inc.:
15          CHRISTOPHER R. HOWE, ESQUIRE
            CAMPBELL CONROY & O'NEIL, P.C.
16          1 Constitution Wharf, Suite 310
            Boston, Massachusetts  02129
17          617-241-3000
            chowe@campbell-trial-lawyers.com
18
            SARAH E. BALKISSOON, ESQUIRE
19          MAYER BROWN, LLP
            Two Palo Alto Square
20          3000 El Camino Real
            Palo Alto, California  94306
21          650-331-2000
            sbalkissoon@mayerbrown.com
22
23
24
```

```
 1      R E M O T E   A P P E A R A N C E S  (CONT'D)
 2                        - - -
 3   On behalf of Defendants Leo A. Daly Company and
     Lockwood, Andrews & Newnam, Inc.:
 4
             PHILIP A. ERICKSON, ESQUIRE
 5           PLUNKETT COONEY, P.C.
             325 East Grand River
 6           City Center, Suite 250
             East Lansing, Michigan  48823
 7           517-333-6598
             perickson@plunketcooney.com
 8
 9   On behalf of McLaren Regional Medical Center:
10           SUSAN E. SMITH, ESQUIRE
             BEVERIDGE & DIAMOND, P.C.
11           456 Montgomery Street, Suite 1800
             San Francisco, California  94104
12           1-415-262-4000
             ssmith@bdlaw.com
13
14   On behalf of the United States of America:
15           MICHAEL L. WILLIAMS, ESQUIRE
             JASON T. COHEN, ESQUIRE
16           U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
             175 N. Street, N.E.
17           Washington, D.C.  20002
             202-307-3839
18           michael.l.williams@usdoj.gov
             jason.t.cohen@usdoj.gov
19
20                        - - -
21   Also Present:
22           Francis X. Ferrara, Veolia
             Jeff Sindiong, Videographer
23
24                        - - -
```

Highly Confidential - Robert Kaplan

```
 1          A.    The person I dealt with most was
 2   Tom Poy.  I can't give you his official title.
 3   I'd have to look back and see from his
 4   deposition, but that's the person I dealt with
 5   with regard to enforcement and safe drinking
 6   water.
 7          Q.    Okay.  As an acting regional
 8   administrator from 2016 -- January of 2016 to
 9   January 2018, would it be fair to say that you
10   were responsible for implementing federal
11   environmental programs within Region 5?
12          A.    Yes.
13          Q.    Could you please describe for me
14   generally the job duties and responsibilities of
15   the deputy regional administrator to the extent
16   they're any different than the regional
17   administrator.
18          A.    It varies from regional
19   administrator to regional administrator greatly,
20   I'd say.
21                The DRA or deputy regional
22   administrator is the highest level career person
23   in the regional office.  So that person usually
24   has administrative supervision of all of the
```

```
 1   employees that report to the regional

 2   administrator.

 3              So there are about 1,000 employees

 4   in Region 5.  So all of those would be under the

 5   administrative purview of the DRA.  So it's

 6   basically implementation and budget execution

 7   with supervisory responsibility as well.

 8              When I say it varies with regional

 9   administrators, some regional administrators

10   focus on just a couple of substantive areas and

11   leave the rest to the DRA.  Some have a quite

12   expansive interpretation of their role and leave

13   a small amount, making the trains run on time,

14   for example, to the DRA.  It expands and

15   contracts based on the person who occupies that

16   position.

17        Q.    Okay.  And as a deputy regional

18   administrator for Region 5, from -- you served

19   as deputy regional administrator for Region 5

20   from January 2015 to January 2016; is that

21   right?

22        A.    I believe that's right, before I

23   became acting regional administrator.

24        Q.    And as deputy regional
```

Highly Confidential - Robert Kaplan

1   administrator for Region 5, would it be fair to

2   say that you assisted the regional administrator

3   and supervised the day-to-day operations of the

4   region staff?

5           A.    Generally, that statement is true.

6           Q.    Okay.  Prior to serving as deputy

7   regional administrator, what position did you

8   hold?

9           A.    I was the regional counsel.

10          Q.    And for what period of time did

11  you serve as regional counsel?

12          A.    I was brought in in 2007 in an

13  acting capacity, and I believe 2008 was my

14  official start date as the appointed regional

15  counsel in Region 5.

16          Q.    Okay.  And so it would be fair to

17  say that you've served in various positions for

18  Region 5 beginning in February 2007?

19          A.    I believe that's right.

20          Q.    You've served as a deputy --

21  you've served as deputy counsel -- I'm sorry.

22                You've served as regional counsel,

23  deputy regional administrator, and acting

24  regional administrator, correct?

Highly Confidential - Robert Kaplan

1    VNA's subpoena to the EPA.

2              What did you do to prepare

3    yourself to testify with respect to that topic,

4    topic number 46, as it relates to the EPA's

5    Emergency Administrative Order?

6        A.    I reviewed the order.  I reviewed

7    the testimony that I already indicated.  I

8    reviewed the timeline.  And I also spoke with

9    Cynthia Giles, who was the assistant

10   administrator for OECA at the time.

11             I spoke with Susan Hedman, former

12   regional administrator.  And I spoke with Mark

13   Pollins, who was the division director of the

14   water enforcement division at headquarters.

15       Q.    And what was the -- based on your

16   discussions with those individuals that you just

17   identified, what was the reason -- what was the

18   reason for EPA's decision to issue an Emergency

19   Administrative Order for the City of Flint?

20       A.    It was multi-part and several

21   different reasons, but I'll enumerate some of

22   them.

23             The first and probably most

24   pressing reason was there had been a lack of

1    cooperation over time with Michigan.  What

2    started out to be a partnership where we made a

3    request and Michigan executed it, gradually grew

4    into a more fractious relationship where

5    Michigan and Flint were both not complying with

6    our requests.  That became more evident from

7    December into January.

8              I'd say that was the primary

9    reason for it.  It's always a strategic call

10   when to issue such an order.  And as I was

11   talking to all the actors involved, they all

12   said the same thing, which is they wanted all

13   the things that needed to happen in Flint to

14   proceed as quickly as possible.  They wanted to

15   choose the most effective tool to ensure that

16   they happened as quickly as possible.

17             The balance shifted from December

18   and on into January, especially with regard to

19   the cooperation and lack thereof of the City of

20   Flint and the State of Michigan.

21        Q.   You indicated in your answer that

22   the state agency was not complying with EPA's

23   requests, correct?

24        A.   Correct.

```
 1              Q.     What specifically are you

 2    referring to there?

 3              A.     So I should have also included

 4    myself in the person I spoke with to prepare,

 5    because I was in some sense a witness to this.

 6    I headed up what was called at the time the

 7    Flint Task Force.

 8                     And the Flint Task Force was a

 9    group of scientific professionals that were

10    brought together to provide advice to Flint on a

11    number of matters from sampling to treatment and

12    operation of the facility.

13                     And in order to do our work, we

14    needed to make certain requests to Flint, and

15    those requests needed to be answered timely.

16                     And it became increasingly clear

17    to me that Flint was either unwilling or

18    uncapable of providing that information to us as

19    we proceeded into January.

20                     There were a number of instances

21    where we requested things like placement of lead

22    lines, where the lead lines were, that they were

23    unable or unwilling to provide as far as

24    information.
```

```
 1              There were other times where we
 2   made requests and were provided with information
 3   that seemed to border on incompetence.  So, for
 4   example, we made a request to them about
 5   chlorine residuals.  And they said -- the plant
 6   operator who was on the phone said, "You know,
 7   we ordered that pump a while ago and I'm not
 8   sure where it is."
 9              And that rang alarm bells for us
10   that the plant at the time -- on collateral
11   issues, on issues that weren't before us, lead
12   and copper necessarily, was not being run in
13   such a way that would assure us confidence going
14   forward.
15              So those requests and the
16   responses that were inadequate or perhaps
17   incompetent to our requests guided our
18   determination that Flint and MDEQ were not being
19   responsive.
20        Q.    And as a result of that, those
21   discussions, a determination was made to issue
22   an Emergency Administrative Order?
23        A.    There was -- that's correct.
24   Those are the principal reasons, but there are
```

```
 1   others.  If I can add --

 2         Q.    Yeah.  What are the others that

 3   you're referring to?

 4         A.    One other reason was, as we've

 5   spoken about, there was a -- this was the first

 6   of another second contemplated water switch.

 7   And the first one had been mismanaged in many

 8   respects.  And the system and the people of

 9   Flint couldn't afford another mismanaged water

10   switch.

11               A water switch, as we all know, is

12   a very complicated endeavor in the best of times

13   for a city of this size and with a treatment

14   plant of this age, and we wanted to assure that

15   going forward, this water switch was managed in

16   an appropriate way.

17               That was another reason that we

18   thought prospectively it was very important to

19   make sure that the water switch proceeded in a

20   way that would give us confidence that the

21   people of Flint would be protected.

22               Another reason had to do with

23   chlorine.  And, again, as part of the work of

24   the task force, we started to get increasing
```

 1   concerns that there was not adequate chlorine

 2   residual in the City of Flint.

 3             And even though the testing as

 4   required by regulation was coming up that there

 5   was adequate chlorine residual during this time

 6   period, we had our doubts going forward.

 7             And in talking to some of the

 8   scientists on my task force, we were very

 9   concerned as we proceeded in January.  Chlorine

10   dissipates with warm water.  As we headed into

11   spring, we wanted to make sure that we were

12   prepared for all the disinfection that needed to

13   happen in Flint.  So we included a provision on

14   chlorine and disinfection.

15             We also became concerned, as I

16   indicated, about the technical, managerial, and

17   financial capabilities of the City of Flint to

18   get the job done.  And we decided that at this

19   point, we needed to ensure that Flint had the

20   TMF, technical, managerial, and financial

21   ability to do all the things that they needed to

22   do.  And the order was intended to guide that

23   effort.

24             Q.   And the order was issued pursuant

Highly Confidential - Robert Kaplan

```
 1                    Do you see that?

 2          A.    I do.

 3          Q.    And she responded that she did

 4   consider him an expert, correct?

 5          A.    Yes.

 6          Q.    And then she's asked why -- if she

 7   received information in September, including the

 8   fact that children had elevated blood lead

 9   levels, why she didn't act until January 21,

10   2016.

11                    Do you see that?

12          A.    I do.

13          Q.    And she disputes that and says

14   that the rep was incorrect in stating that the

15   EPA did not act, correct?

16          A.    That's right.

17          Q.    And aside from the emergency order

18   that EPA issued in January 2016 requiring MDEQ

19   and/or the City of Flint to immediately install

20   corrosion control treatment in Flint, what did

21   the EPA -- what actions did the EPA take prior

22   to January 2016 to require corrosion control

23   treatment in the City of Flint?

24                    MR. WILLIAMS:  Objection; asked
```

Highly Confidential - Robert Kaplan

```
 1         and answered.
 2         A.    There were a number of them,
 3   starting with Miguel Del Toral's work.  There
 4   were a whole series of actions that EPA took
 5   that got elevated through the chain as a request
 6   MDEQ to change course on corrosion control.  And
 7   ultimately we were successful in getting them to
 8   change course on corrosion control faster than
 9   any other mechanism available to us.  By
10   August 17, they had changed course on corrosion
11   control.
12              And then if you look to the end of
13   September -- and that's the time period that's
14   referenced by the representative -- there was a
15   10-point plan that came out by the State of
16   Michigan.  That 10-point plan was worked in
17   coordination with EPA at every step, with EPA
18   urging and amending action in close consultation
19   with headquarters.
20              And then, of course, the most
21   important thing was to get the water source
22   switched back.  So in terms of corrosion
23   control, it factors in because the Flint River
24   would be a very difficult river or source of
```

1   water to come up with a plan for corrosion

2   control.

3           The fact that it was switched

4   earlier than any other mechanism available to us

5   and more surely in mid October, and then for

6   better odds on corrosion control.

7           So I would agree that the

8   administrator answered that question correctly.

9       Q.    On page 32 of her congressional

10  testimony, Ms. McCarthy is asked whether the EPA

11  did anything wrong.

12          Do you see that?

13      A.    I do.

14      Q.    And in response, she testified, "I

15  don't know whether we did everything right.

16  That's the challenge that I'm facing."

17          Do you see that?

18      A.    I do.

19      Q.    And then after that, Chaffetz

20  follows up and says, "And my question is:  Did

21  the EPA do anything wrong?"

22          Do you see that?

23      A.    I do.

24      Q.    And Ms. McCarthy responds, "I

```
 1              Q.    And so under Section 1431 of the
 2    SDWA, those two conditions were met, correct?
 3              A.    You're asking whether
 4    jurisdictionally we could have issued it?
 5              Q.    Yes.
 6              A.    We could have issued it at many
 7    different times, including --
 8              Q.    When do you think -- when was the
 9    earliest that you believe that the EPA could
10    have issued an emergency order under
11    Section 1431 of the SDWA?
12              A.    So it's always a balance in terms
13    of litigation risk, because you want the order
14    to be complied with and defensible in court.
15    And if you look at what was happening at the
16    time, if you go back to July, the evidence
17    before the agency was we had a reading of
18    6 parts per billion in January, and then we had
19    a reading in July of 11 parts per billion.  So
20    those two things -- those two readings are below
21    the action level.
22                    We also had an indication that
23    there was extremely high lead in a house in
24    Flint.  We also had an indication in that report
```

Highly Confidential - Robert Kaplan

```
 1   that there was construction on the street at the

 2   time, and there were a number of different

 3   photos of construction in the street.

 4              And according to Miguel Del Toral,

 5   it's well-known that construction can release

 6   particulate lead, which leads to the sorts of

 7   high lead levels that you'd expect to see in

 8   that one home.  So we know that they're not

 9   doing appropriate corrosion control or any

10   corrosion control at that time period too.

11              So you add all that up together,

12   and it looks like a number of different

13   jurisdictions that had levels below the action

14   level.  So there are tens of thousands of those

15   across the country.

16              The LCR itself, when you do LCR

17   sampling, allows for up to 10 percent of the

18   homes to be above the action level and still you

19   have no action level exceedance.  You don't

20   invoke all the protections of the act.

21              So my sense was in July, it would

22   not have been appropriate to issue the order.  I

23   couple that with what the order would have

24   required.  The order would have required MDEQ
```

Highly Confidential - Robert Kaplan

```
 1   and the City of Flint to go forward with

 2   corrosion control.  That corrosion control would

 3   have been to treat a source that's notoriously

 4   difficult to treat.

 5            And we thought the best thing to

 6   do was as quickly as possible, get the city to

 7   go back on Detroit Water, which was beyond our

 8   order authority.

 9            So you add all that up together,

10   and we have a compelling case for doing exactly

11   what we were doing as opposed to issuing that

12   order.

13       Q.    My original question to you,

14   though, was, what was the -- what is EPA's

15   position with respect to the earliest date that

16   it could have issued an emergency administrative

17   order under Section 1431 of the SDWA?

18       A.    Could have.  I'll underscore that

19   in your question.  And I think the health data

20   that came to the fore in September of 2015 would

21   have made for an administrative record finding

22   that there were health impacts beyond what we

23   saw in the sampling data.

24       Q.    And is this the data that was
```

```
 1    necessary steps at the time pursuant to the

 2    10-point plan.

 3         Q.    Okay.  This is the State of

 4    Michigan's 10-point plan that you've referenced

 5    multiple times earlier in your deposition?

 6         A.    That's correct.

 7         Q.    Okay.

 8         A.    One thing I want to make clear,

 9    though, is that EPA was very involved in the

10    issuance of that 10-point plan to the extent we

11    negotiated many of the parts of it.

12              So when people like Dr. Edwards

13    says we should take immediately -- should

14    immediately take decisive action to protect the

15    public, one of the things that we did was work

16    to make sure that that plan got implemented --

17    announced and implemented as quickly as

18    possible.

19         Q.    I believe that you testified, if I

20    understood you correctly, earlier that the

21    earliest that you believe that the EPA could

22    have issued an Emergency Administrative Order

23    was in September after it had received the

24    results of the testing that had been conducted
```

Highly Confidential - Robert Kaplan

```
 1                     CERTIFICATION

 2

 3          I, Carol A. Kirk, Registered Merit Reporter and

 4   Certified Shorthand Reporter, do hereby certify that

 5   prior to the commencement of the examination,

 6   ROBERT KAPLAN, was duly remotely sworn by me to

 7   testify to the truth, the whole truth, and nothing but

 8   the truth.

 9          I DO FURTHER CERTIFY that the foregoing is a

10   verbatim transcript of the testimony as taken

11   stenographically by me at the time, place, and on the

12   date hereinbefore set forth, to the best of my

13   ability.

14          I DO FURTHER CERTIFY that I am neither a

15   relative nor an employee nor attorney nor counsel of

16   any of the parties to this action, and that I am

17   neither a relative nor employee of such attorney or

18   counsel, and that I am not financially interested in

19   the action.

20

21

22   _Carol A Kirk_____

     Carol A. Kirk, RMR, CSR

23   Notary Public

     Dated:  January 28, 2022

24
```

```
 1              UNITED STATES DISTRICT COURT
 2             EASTERN DISTRICT OF MICHIGAN
 3                  SOUTHERN DIVISION
 4     _____
                                      |
 5                                    |  Civil Action No.
                                      |  5:16-cv-10444
 6     In re:  FLINT WATER CASES      |
                                      |  Hon, Judith E. Levy
 7     _____  |  Mag. Mona K. Majzoub
 8
 9                HIGHLY CONFIDENTIAL
10             Friday, January 14, 2022
11                   Volume II
12
13         Remote videotaped deposition of
14     ROBERT KAPLAN, conducted at the location of the
15     witness, commencing at 9:06 a.m., on the above date,
16     before Carol A. Kirk, Registered Merit Reporter,
17     Certified Shorthand Reporter, and Notary Public.
18
19
20
21
22
23            GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
24                deps@golkow.com
```

Highly Confidential — Robert Kaplan

```
 1          R E M O T E   A P P E A R A N C E S
 2                    - - -
 3    On behalf of the Class and Burgess Plaintiffs:
 4          JULIE H. HURWITZ, ESQUIRE
            GOODMAN, HURWITZ & JAMES, P.C.
 5          1394 East Jefferson Avenue
            Detroit, Michigan  48207
 6          313-567-6170
            jhurwitz@goodmanhurwitz.com
 7
            CARY S. MCGEHEE, ESQUIRE
 8          PITT MCGEHEE PALMER BONANNI & RIVERS, PC
            117 West Fourth Street, Suite 200
 9          Royal Oak, Michigan  48067
            cmcgehee@pittlawpc.com
10
            LESLIE M. KROEGER, ESQUIRE
11          COHEN MILSTEIN SELLERS & TOLL PLLC
            11780 U.S. Highway 1 North, Suite N500
12          Palm Beach Gardens, Florida  33408
            561-515-1400
13          lkroeger@cohenmilstein.com
14
      On behalf of Individual Plaintiffs:
15
            DONALD H. DAWSON, JR., ESQUIRE
16          ALEC E. OHRYN, ESQUIRE
            FIEGER LAW
17          19390 West Ten Mile Road
            Southfield, Michigan  48075-2463
18          248-355-5555
            d.dawson@fiegerlaw.com
19          aohryn@fiegerlaw.com
20
21
22
23
24
```

```
 1      R E M O T E   A P P E A R A N C E S (CONT'D)
 2                      - - -
 3   On behalf of Individual Plaintiffs:
 4          PATRICK LANCIOTTI, ESQUIRE
            NAPOLI SHKOLNIK PLLC
 5          400 Broadhollow Road, Suite 305
            Melville, New York  11747
 6          631-224-1133
            planciotti@napolilaw.com
 7
 8   On behalf of the People of the State of Michigan:
 9          CHARLES A. CAVANAGH, ASSISTANT ATTORNEY GENERAL
            MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
10          525 West Ottawa Street, 6th Floor
            Lansing, Michigan  48909
11          517-335-7664
            cavanaghc2@michigan.gov
12
13   On behalf of Defendants Veolia Water North America
     Operating Services, LLC, Veolia North America, LLC,
14   and Veolia North America, Inc.:
15          CHRISTOPHER R. HOWE, ESQUIRE
            CAMPBELL CONROY & O'NEIL, P.C.
16          1 Constitution Wharf, Suite 310
            Boston, Massachusetts  02129
17          617-241-3000
            chowe@campbell-trial-lawyers.com
18
            SARAH E. BALKISSOON, ESQUIRE
19          MAYER BROWN, LLP
            Two Palo Alto Square
20          3000 El Camino Real
            Palo Alto, California  94306
21          650-331-2000
            sbalkissoon@mayerbrown.com
22
23
24
```

```
 1      R E M O T E   A P P E A R A N C E S  (CONT'D)
 2                        - - -
 3   On behalf of Defendants Leo A. Daly Company and
     Lockwood, Andrews & Newnam, Inc.:
 4
            PHILIP A. ERICKSON, ESQUIRE
 5          PLUNKETT COONEY, P.C.
            325 East Grand River
 6          City Center, Suite 250
            East Lansing, Michigan  48823
 7          517-333-6598
            perickson@plunketcooney.com
 8
 9   On behalf of McLaren Regional Medical Center:
10          SUSAN E. SMITH, ESQUIRE
            BEVERIDGE & DIAMOND, P.C.
11          456 Montgomery Street, Suite 1800
            San Francisco, California  94104
12          1-415-262-4000
            ssmith@bdlaw.com
13
14   On behalf of the United States of America:
15          MICHAEL L. WILLIAMS, ESQUIRE
            JASON T. COHEN, ESQUIRE
16          U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
            175 N. Street, N.E.
17          Washington, D.C.  20002
            202-307-3839
18          michael.l.williams@usdoj.gov
            jason.t.cohen@usdoj.gov
19
20   Also Present:
21          Francis X. Ferrara, Veolia
            Jeff Sindiong, Videographer
22
23                        - - -
24
```

1    have much higher lead levels than the compliance

2    results indicated?

3                   MR. ERICKSON:   Object to the form.

4         A.    I think after Dr. Edwards finished

5    his sequential sampling in September, the fact

6    that there were high lead levels in Flint was

7    borne out.

8         Q.    So, in fact, the answer to my

9    question is yes, correct?  Mr. Del Toral was

10   correct?

11                  MR. ERICKSON:   Object to the form.

12                  MR. WILLIAMS:   Objection as to

13        time frame.

14        Q.    You can answer the question,

15   Mr. Kaplan.

16        A.    So, again, Miguel says he's

17   concerned that the whole town may have much

18   higher lead levels than the compliance samples

19   indicate.

20                  I know that Miguel was concerned

21   about the LCR sampling in general.  And it's

22   always a concern that you can have much higher

23   lead levels than the compliance results

24   indicate.

```
 1                   Again, if we get into knowledge

 2    about what the United States knew, after the

 3    sample was completed by Dr. Edwards, it became

 4    clear that there were high lead levels in Flint

 5    as opposed to not just a single home.

 6                   I'd also point out that

 7    Mr. Del Toral's e-mail was from April 25, and

 8    four days later at a state director's meeting,

 9    EPA did bring these concerns to the primacy

10    agency.

11         Q.    And would you agree -- I want to

12    ask about the communications between Region 5

13    and MDEQ with respect to the requirement to use

14    corrosion control.

15                   In Exhibit --

16                   MS. HURWITZ:  I don't remember the

17           exhibit number.  The 2018 OIG report,

18           what exhibit number was that?

19                   Can someone -- whatever exhibit

20           number it was.

21         A.    I'm familiar with the OIG report.

22         Q.    The OIG -- at the end of the --

23                   MR. WILLIAMS:  I'm sorry to

24           interrupt.  I believe the 2000 OIG
```

```
 1    sometime in July; is that right?

 2            A.    There was a series of meetings.

 3    First, there was a call from Susan Hedman to the

 4    mayor.  Then there was a call on June 21st with

 5    the head of our Office of Water -- or water

 6    division director to her counterpart at MDEQ.

 7            Q.    Was that June 21st or July 21st?

 8            A.    That was July 21st.

 9            Q.    Right.

10            A.    And then after that, what followed

11    in short order was MDEQ's commitment to flow

12    corrosion control, to order corrosion control.

13                  What Miguel Del Toral has

14    testified to and is of record is that if you

15    order corrosion control, you need to do a

16    corrosion control study because it might affect

17    the parameters in the water adversely and

18    actually compound the problem.

19                  So it's not something you do

20    immediately.  You do it in considered fashion.

21    In fact, those are the steps that were skipped

22    in Flint in the first place, and he didn't want

23    that to happen again.

24            Q.    And so, in fact, corrosion control
```

Highly Confidential - Robert Kaplan

1    from that synergy.

2         Q.    So when you say "five days later,"

3    you're saying by September 27 was when the state

4    of emergency was declared?

5         A.    No.  It was -- there was a

6    10-point plan.  I don't have it in front of me.

7    But during the relevant time period,

8    Susan Hedman was working with high levels in

9    MDEQ and the governor's office on a number of

10   fronts.

11             First, the 10-point plan, which

12   was discussed in conjunction with EPA.  And then

13   the most important thing -- and I need to stress

14   the importance of it -- was to switch back to a

15   finished water source from the Flint River.

16   That was something that could not be

17   accomplished by enforcement means and needed to

18   be accomplished by negotiation means.

19             Miguel Del Toral, when he wrote

20   the e-mail, had no knowledge of that switch and

21   had no knowledge of the 10-point plan.  So I

22   fully agree that there are disconnects between

23   the two, but you need to read the two things

24   together in terms of a complete time frame.

Highly Confidential - Robert Kaplan

```
 1   control as quickly as possible.
 2              So the urgency that we're speaking
 3   of was about a potential violation.  And I think
 4   the phrase I used yesterday was the fact of the
 5   agreement to flow corrosion control as quickly
 6   as possible meant that the finding of violation
 7   was overtaken by events.
 8              The urgency around it was really
 9   about ensuring that corrosion control happened
10   as quickly as possible, and that, in fact, was
11   an agreement with MDEQ, and MDEQ did honor that
12   agreement.
13        Q.    So if I'm understanding your
14   testimony correctly, by July, your testimony is
15   that MDEQ backed off of its position that
16   corrosion control was not required and agreed to
17   order it?
18        A.    Yes.  So EPA and MDEQ reached an
19   agreement that meant corrosion control treatment
20   as soon as possible on July 21st, in an MDEQ and
21   Region 5 call that was memorialized in a
22   August 17 letter back to us.
23        Q.    Isn't it also true, though, by
24   July of 2015, MDEQ was still taking the position
```

1    Mr. Del Toral's mind.

2              I'm asking, based on the plain

3    language of this e-mail, one could read --

4    anyone could understand or reach the conclusion

5    or have concerns that the EPA is more interested

6    in maintaining or more committed to maintaining

7    a partnership with the state than protecting

8    children?

9         A.    It's an interpretation.  I don't

10   think it's the most reasonable.

11        Q.    Okay.  Thank you.

12              So I assume -- I take it you do

13   not agree -- well, strike that.

14              By July of 2015, the EPA did have

15   the authority to take action.  Would you agree

16   with that?  Take further action than they took?

17        A.    I don't know what you mean by

18   "action."

19        Q.    They could have issued a TT and

20   started the process of moving toward

21   intervention under 1414 or 1431?

22        A.    So I think there's an improper

23   conflating of the word "action" and enforcement

24   in terms of formal enforcement.  EPA did take

```
1    action, and it was appropriate action.  It was

2    to get corrosion control.  The TT, as you

3    referred to it, would have been a violation, and

4    a violation would have led to an order to

5    correct the violation.

6              If you add up the time frames in

7    1414 and discount all the litigation risk, it

8    would have been long after EPA could have

9    accomplished the same thing by getting an

10   agreement with DEQ.

11             So EPA did take action, but EPA in

12   its considered discretion chose not to take a

13   treatment technique enforcement, 1414 violation

14   action.

15        Q.   And would you agree that

16   Mr. Del Toral strongly disagreed with that?

17        A.   I don't think Mr. Del Toral knew

18   what it was that we were doing.  Again, I

19   testified earlier, and I incorporate by

20   reference my comments, about the disconnect in

21   communications and how that led to unfortunate

22   misperceptions at high levels of management and

23   at Mr. Del Toral's level.

24        Q.   Who's Ed Moriarty?
```

1    specifically with water, we get everything from

2    citizen complaints to information in our SDWIS

3    database.

4            All I can say is that we handle it

5    appropriately.  We send it to staff who

6    investigate all complaints no matter where they

7    come from and all evidence no matter where they

8    come from.

9        Q.    Okay.  Switching topics -- and

10   this is the last topic.  You mentioned yesterday

11   that the timing of the emergency order was in

12   January 2016 because the relationship with both

13   the city and DEQ became fractious at that point;

14   is that correct?

15       A.    Yes.

16       Q.    Okay.  And then you had listed

17   examples where the city had failed to deliver

18   information or testing results, sampling

19   results, to the task force.

20            I was wondering what, if any,

21   omissions or actions specifically attributed to

22   the DEQ factored into the EPA's timing of the

23   issuance of the emergency order.

24       A.    I'd rely on the statement of

1   findings of fact that are within the order.

2   Some of the information that was available was

3   also available via MDEQ, and we needed MDEQ's

4   help in getting it from Flint.  It was a joint

5   effort.  I know both MDEQ and Flint were

6   involved.

7              I know that there were some delays

8   in the issuance of a permit with regard to the

9   flowing of orthophosphate, and we were

10  increasingly concerned that MDEQ needed to move

11  more quickly.

12             Up to that point, by which I mean

13  December, early December or on into January, the

14  relationship had been cooperative.  When we

15  started to ask for further information, we found

16  that Flint principally, but also in some part

17  MDEQ, was not either providing the information

18  or assisting in getting Flint to provide the

19  information as quickly as we would have liked.

20             MR. CAVANAGH:  Okay.  That's all

21        the questions I have.  Thanks for your

22        time.

23             THE WITNESS:  Thank you.

24             MR. WILLIAMS:  I'd like to ask you

```
 1          a couple of questions, Mr. Kaplan.  This
 2          is Mike Williams.
 3                    - - -
 4               REDIRECT EXAMINATION
 5   BY MR. WILLIAMS:
 6          Q.    In 2015, EPA did consider issuing
 7   a 1431 order, didn't it?
 8          A.    Yes.  At all relevant times we had
 9   1431 in front of mind at all levels, so -- go
10   ahead.
11          Q.    And in EPA's deliberations about
12   whether or not to proceed with a 1431 order, did
13   Dr. Hedman or others within EPA have the view
14   that EPA would be prohibited from doing so based
15   on a jurisdictional bar?
16          A.    No.  That's not the case.  In
17   conversations with Dr. Hedman, both
18   contemporaneously and then confirmed by my
19   recent conversation with her, the phrase
20   "jurisdictional bar" never came up.
21               Instead, I think the OIG used that
22   phrase improperly when it came from
23   Susan Hedman's congressional written testimony.
24   And what she was talking about was her fear,
```

Highly Confidential - Robert Kaplan

```
 1   since justified, that if EPA did issue a 1431,
 2   Michigan would raise jurisdictional bars, in
 3   other words, would challenge EPA's evidence
 4   specifically with regard to state's failure to
 5   protect human health.
 6              So that jurisdictional bar
 7   language from her testimony was not in context.
 8   In fact, it was the opposite of what she
 9   intended.
10              What she did raise, and was raised
11   at all relevant times, was elements in order to
12   plead the case and have it defensible, have it
13   defended by the Department of Justice and
14   prevail, we needed administrative record that
15   satisfied all elements of 1431.
16              Jurisdictional elements are
17   completely different than jurisdictional bar,
18   and the OIG was mistaken in their conclusion
19   with regard to jurisdictional bar.
20         Q.   And so I believe this testimony
21   pertains to 30(b)(6) topic number 46, but
22   turning to topics 52(b) and (d), if either the
23   Office of the Inspector General of the United
24   States EPA or Governor Snyder's Flint Water
```

1   the LCR at some length and the issue of whether

2   or not a violation of the LCR occurred based on

3   the Flint water system not maintaining corrosion

4   control treatment after the water source switch

5   in April 2014.

6           My question is, did EPA make a

7   finding that a violation of the LCR occurred

8   based on the Flint water system not maintaining

9   corrosion control treatment after the water

10  source switch in April 2014?

11          A.    "Finding" is a term of art in the

12  statute, and it's controlled by delegations.

13  And it's specifically not equated with

14  knowledge, but rather those delegated with

15  authority must make a finding in order to

16  proceed with a violation.

17          And the lowest level official that

18  was delegated with that authority was Tinka Hyde

19  as water division director, and she did not make

20  that finding.

21          Q.    And to the extent, again --

22  turning to topics 52(b) and (d) -- if either of

23  the Office of the Inspector General of the

24  United States EPA or Governor Snyder's Flint

Highly Confidential - Robert Kaplan

```
 1    Water Advisory Task Force had concluded that the

 2    EPA made such a finding, you would disagree as

 3    contemplated by these topics; is that right?

 4          A.    Correct.

 5                MR. WILLIAMS:  Thank you.  I have

 6          no further questions at this time.

 7                I will pause to inquire if other

 8          counsel have further questions for this

 9          witness.

10          A.    I'm sorry to interrupt.  I did

11    have one further comment with regard -- that I

12    didn't finish with regard to 1431.  It's my

13    fault.  I should have included it.

14          Q.    Oh, please do explain.

15          A.    So the question was with regard to

16    discretion, and I did talk about two people who

17    had delegation, but I didn't say who they were.

18    And I should have clarified that one was

19    Dr. Hedman who was at the time regional

20    administrator of EPA.

21                Another was Cynthia Giles who was

22    the assistant administrator for OECA.  Those

23    were the people that were exercising discretion

24    and had it in mind throughout the whole time.  I
```

```
 1   should say that I did talk to both of them, and

 2   both of them are officials of long experience

 3   and had issued between them many, many, many

 4   orders.

 5             Susan, in particular, was

 6   especially prescriptive in terms of her style.

 7   She issued many public health orders in other

 8   matters and orders to states.

 9             And Cynthia Giles, I'd say the

10   same thing, had long experience in enforcement,

11   had also issued many orders.

12             And they certainly knew about and

13   were very familiar with, at all times, both the

14   1431 authority and their ability to effect

15   change with 1431.

16             They made a considered judgment

17   between them that the best course of action

18   throughout the summer and into December was to

19   continue to accomplish all their objectives

20   without use of 1431 until the balance shifted in

21   December, at which point they both decided that

22   1431 was the best course of action to accomplish

23   the remaining objectives.

24             MR. WILLIAMS:  Thank you for that
```

```
 1                    CERTIFICATION

 2

 3         I, Carol A. Kirk, Registered Merit Reporter and

 4    Certified Shorthand Reporter, do hereby certify that

 5    prior to the commencement of the examination,

 6    ROBERT KAPLAN, was duly remotely sworn by me to

 7    testify to the truth, the whole truth, and nothing but

 8    the truth.

 9         I DO FURTHER CERTIFY that the foregoing is a

10    verbatim transcript of the testimony as taken

11    stenographically by me at the time, place, and on the

12    date hereinbefore set forth, to the best of my

13    ability.

14         I DO FURTHER CERTIFY that I am neither a

15    relative nor an employee nor attorney nor counsel of

16    any of the parties to this action, and that I am

17    neither a relative nor employee of such attorney or

18    counsel, and that I am not financially interested in

19    the action.

20

21

22    _Carol A Kirk_____

      Carol A. Kirk, RMR, CSR

23    Notary Public

      Dated:  January 28, 2022

24
```