UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

*In re* FTCA Flint Water Cases,

_____/

This Response Relates to:
ALL CASES

Civil No. 4:17-cv-11218

Linda V. Parker
United States District Judge

Curtis Ivy, Jr.
United States Magistrate Judge

_____

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION PURSUANT TO THE FEDERAL TORT CLAIMS ACT'S DISCRETIONARY FUNCTION EXCEPTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iv

I.      INTRODUCTION ...................................................................... 1

     1.     The Factual Record Continues to Support the Denial of Defendant's
          Motion to Dismiss ......................................................... 5

     2.     There is No Development in the Jurisprudence that Should Alter this
          Court's Decision to Deny Defendant's Motion to Dismiss .......................... 7

     3.     Defendant has not Asserted Any New Policy Arguments ............................ 7

II.     STATEMENT OF FACTS .................................................. 10

III.    ARGUMENT

     1.     Constitutional Violations are not within the Range of Discretionary
          Functions that Shield an Agency from Liability under the Federal
          Tort Claims Act ........................................................... 15

         A.     There Is No Discretion to Violate The Constitution Within the
              Meaning of the FTCA ................................................... 15

         B.     Plaintiffs' Substantive Due Process Rights to Bodily Integrity
              Are Established Under Both Federal and State Constitutional
              Law ..................................................................... 20

         C.     The Facts of this Case Support A Claim Of Constitutional
              Violations ................................................................ 21

     2.     Section 1414 Imposes a Mandatory Duty upon EPA to Enforce the
          SDWA, which EPA Failed to do Despite Knowledge of Violations,
          Notice to the State & the State's Failure to Timely Cure .......................... 23

         A.     Section 1414 was Amended to Remove EPA Discretion and
              Ensure Mandatory Enforcement of Violation .......................... 23

B.    The Failure to Maintain Corrosion Control upon Switching the Water Source was a Violation of the SWDA's Lead and Copper Rule .......................................................................................... 25

C.    The Lead and Copper Rule was Clear and EPA had the Responsibility to Enforce the Federal Rules as Written .................. 31

D.    EPA was on Notice of Other Violations that Should have Triggered Enforcement ........................................................ 35

3.    EPA Failed to Comply with the Mandatory Obligations of the Safe Drinking Water Act Public Notification Rule ................................................. 37

4.    Even if the EPA's Obligations under Sections 1414 and 1431 are not Found to be Mandatory, its Actions were not Premised on the SWDA's Social, Economic or Public Policy Goals ..................................... 41

A.    Defendant's Failure to Enforce §§1431 and 1414 was not Grounded in Policy .............................................................. 44

B.    Defendant's Failure to Warn Flint Residents Cannot be Justified by any Permissible Exercise of Policy Judgment ............................ 50

C.    No Public Policy Justifies the Lack of Response to Citizen Complaints .......................................................................... 54

IV.   CONCLUSION ....................................................................... 56

# TABLE OF AUTHORITIES

## CASES

*Abbott v. United States*, 78 F. 4th 887 (6th Cir. 2023) ........................................................... 29

*Andrulonis v United States,* 952 F.2d 652 (2nd Cir 1991) ...................................................... 47

*Anestis v. United States* 749 F.3d 520 (6th Cir. 2014) ............................................................ 48

*AO Smith Corp v. U.S.* 774 F.3d 359 (6th Cir. 2014) ......................................................42, 46, 51

*Berkovitz v United States,* 486 US 531 (1988) .........................................................3, 4, 31, 41

*Burgess v. EPA*, 375 F.Supp.3d 769 (2019) ...................................................................21, 28, 46

*C.M. v. United States*, 2023 WL 3261612 (W.D. Texas 2023) ......................................... 4, 17

*Carthan v. Earley*, et al.960 F.3d 303 (6th Cir. 2020) .....................................15, 20, 21, 22

*Fond du Lac Band of Lake Superior Chippewa v. Wheeler*, 519 F.Supp.3d 549 (2021) . 28

*GATX/Airlog Co v. United States*, 286 F.3d 1168 (9th Cir. 2015) ...................................... 49

*Gotha v. U.S.*, 115 F.3d 176 (3rd Cir. 1997) ........................................................................... 42

*Graves v. United States* 872 F.2d 133 (6th Cir. 1989) ...................................................42, 52

*Guertin v. State of Michigan*, 912 F.3d 907 (2019) .......................................................passim

*Heckler v. Chaney*, 470 U.S. 821 (1985) ................................................................................. 30

*Hill v. Le*, 2021 WL 4391706 (U.S. D.C. Oregon 2021) ............................................... 17, 19

*Huntress v. United States*, 810 Fed Appx. 74 (2nd Cir. 2020) .......................................... 16

*In re FEMA Trailer Formaldehyde Product Liability Litigation*, 583 F.Supp.2d 758 (E.D. La. 2008) ................................................................................................................................ 55

*In re Flint Water Cases*, 482 F.Supp.3d 601 (2020) ..............................................10, 28, 30

*In re Yosemite Nat'l Park*, 2016 WL 758671 (N.D. Cal. 2016) ................................... 43, 51

*Jude v. Comm'r of Social Security*, 908 F.3d 152 (6th Cir. 2018) ...............................43, 46

*Kiiskila v. United States,* 466 F.2d 626 (7th Cir. 1972) ....................................................... 19

*Limone v. United States*, 579 F.3d 79 (1st Cir. 2009) .......................................................... 16

*Loumiet v. United States*, 828 F.3d 935 (D.C. Cir. 2016) ............................................passim

*Martinez v. United States*, 822 Fed Appx 671 (10th Cir. 2020) ....................................... 18

*Mays v. Michigan*, 506 Mich 157 (2020) ........................................................15, 20, 21, 23

*Medina v. United States*, 259 F.3d 220 (4th Cir. 2009) ...................................................... 17

*Myers & Myers, Inc., v. U.S. Postal Service*, 527 F.2d 1252 (2nd Cir.  1975) ......16, 28, 31

*Mynatt v U.S.*, 45 F. 4th 889 (6th Cir. 2022) ........................................................................ 7, 43

*Nieves Martinez v. United States*, 997 F.3d 867 (9th Cir. 2021) ....................................... 18

*Range v. Douglas,* 763 F.3d 573 (6th Cir. 2014) ......................................................ii, 15, 21

*Raz v. United States*, 343 F.3d 945 (8th Cir. 2003) .............................................................. 17

*Rosebush v. United States,* 119 F.3d 438 (6th Cir. 1997) ...................................................... 3

*Save the Valley, Inc. v. U.S. EPA*, 99 F.Supp.2d 981 (2000) ................................................. 31

*Sivers v. United States,* 1 F.4th 924 (11th Cir. 2021) ....................................................... 19

*SRP ex rel ABunabba v. United States*, 675 F.3d 329 (3rd Cir. 2012)............................... 51

*Torres-Estrada v. Cases*, 88 F.4th 14 (1st Cir. 2023) ......................................................... 16

*United States v Gaubert* 499 US 315 (1991)...................................................................passim

*U.S.* v *Varig,* 467 U.S. 797 (1984)...................................................................................... 41

*Whisnant v. United States*, 400 F.3d 1177 (9th Cir. 2005) .....................................47, 48, 49

*Xi v. Haugen*, 68 F.4th 824 (3rd Cir. 2023) ........................................................................ 16

## STATUTES

28 U.S.C. §2680(a)..........................................................................................................1, 3

28 U.S.C. §1346(b)(1)........................................................................................................ 2

42 U.S.C. 300(g)-3(B) ...................................................................................................... 31

42 U.S.C. 300g-2; § 1414(a)(1)(A)................................................................................... 24

## OTHER AUTHORITIES

Safe Drinking Water Act §1413 ........................................................................................ 12

Safe Drinking Water Act §1414...................................................................................passim

Safe Water Drinking Act §1431 ...................................................................................passim

## REGULATIONS

40 C.F.R §141(a) ................................................................................................................ 6

40 C.F.R. §141.201 ........................................................................................................... 52

40 C.F.R. §141.202 ........................................................................................................... 52

40 C.F.R. §141.81(b)2 ...................................................................................................... 37

40 C.F.R. §141.82(g)................................................................................................25, 37, 50

40 C.F.R. §142 .................................................................................................................. 12

40 C.F.R. §142.15 ............................................................................................................. 12

40 C.F.R. §142.17 ............................................................................................................. 12

40 C.F.R.§ 141(Q) .......................................................................................................37, 50

## I.    INTRODUCTION

On March 2, 2018, Defendant United States filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction, primarily arguing that this Court should hold the Environmental Protection Agency ("EPA") immune from liability for its failures resulting in the widespread lead poisoning of the Flint community by contaminated drinking water. (ECF No. 37). Defendant argued that the discretionary function exception (DFE) under the Federal Tort Claims Act, 28 U.S.C. §2680(a) should apply to absolve EPA of any responsibility. (*Id.*). On April 18, 2019, this Court denied Defendant's Motion, (ECF No. 76).[1]

This Court's Opinion and Order Denying Defendant's Motion to Dismiss rejected Defendant's argument for immunity, concluding that the determination of "whether Flint's water system complied with EPA regulations and, when it did not, whether the State's response was sufficient to rectify the violations, involved only the performance of professional and scientific analysis and reasoning" rather than policy considerations, and therefore, was not the type of conduct the DFE was intended to shield. (ECF 76, PageID 2649-50). This Court further properly held that the "EPA's failure to warn Flint residents of the severe health risks the City's water supply posed to them cannot be justified by any

---

[1] On June 19, 2019, Defendant filed a Motion for Certification of Interlocutory Appeal, pursuant to 28 U.S.C. § 1292(b), reprising its argument for application of the DFE (ECF No. 79). On September 27, 2019, this Court denied Defendant's motion. (ECF. 85).

permissible exercise of policy judgment," and the "obvious danger imperiling a city's nearly 100,000 residents" distinguished the facts of this case from every case Defendant cited. (*Id.*, PageID 2650-51). This Court relied on the Sixth Circuit's analysis in *Guertin*,[2] which concluded that there was, "no legitimate governmental objective for this violation of the Plaintiffs' [bodily] integrity," to find that there was no public policy consideration that could be "legitimately balanced against the need to warn and protect an entire community from involuntary and continued poisoning." (*Id.* 2651-52).

Defendant's current motion renews its argument that the EPA should bear no responsibility under the FTCA for its negligent actions and inactions during the Flint Water Crisis by erroneously attempting to apply the DFE so broadly that, if accepted by this Court, would completely eviscerate the goals of the FTCA. As this Court previously and properly found, that exception does not apply here.

The United States has waived its sovereign immunity from suit for injury caused by negligent or wrongful acts or omissions of government employees if a private person would be liable for those actions. 28 U.S.C. §1346(b)(1). The "very purpose of the [Federal] Tort Claims Act was to waive the Government's traditional all-encompassing immunity from tort actions and to establish novel and unprecedented governmental liability." *Rayonier Inc. v. United States*, 352 U.S. 315, 319 (1957).

Congress enacted such a broad waiver for a clear policy reason: to relieve injured

---

[2] *Guertin v. State of Michigan*, 912 F.3d 907 (2019).

parties' burdens and diffuse the costs among the taxpayers because the public as a whole benefits from the services performed by government employees. *Rayonier*, 352 U.S. at 319–20. Congress did, however, include several exceptions to the waiver of immunity. Relevant here is the discretionary function exception which provides that the FTCA's waiver does not apply to "any claim…based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused." 28 U.S.C. §2680a.

This exception only applies to "acts that are discretionary in nature, acts that involve an element of judgment or choice." *United States v Gaubert* 499 US 315, 322 (1991). Thus, the exception is not applicable where a "federal statute, regulation or policy specifically prescribes a course of action for the employee to follow." *Berkovitz v United States,* 486 US 531, 536 (1988). A mandatory course of conduct can also derive from the agency's general policy, a statute authorizing emergency action, and the agency's possession of data indicating that emergency action is appropriate. *See Id*.

The Supreme Court set forth a two-part test to determine whether the DFE immunizes the Government's negligence. *Rosebush v. United States,* 119 F.3d 438, 441 (6th Cir. 1997). The first part requires a determination of whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or choice." *Id*., at 441. Thus in situations in which the employee "has no rightful option but to adhere

3

to the directive" the DFE will not apply. *Berkovitz, supra* at 533. In this case, the Defendant was subject to statutory and constitutional mandatory duties, the breach of either subject it to liability under the FTCA.

The conduct at issue here is Defendant's failure to: timely intervene in the Flint Water Crisis; timely investigate; to provide technical assistance; and/or obtain compliance or commence a civil action pursuant to §§ 1414 and 1431 of the Safe Drinking Water Act. Additionally, Defendant failed to timely warn Flint Water users about the contaminated water and health risks and failed to properly respond to citizen complaints. Moreover, Defendant's conduct amounted to violations of Plaintiffs' substantive due process 5th and/or 14th Amendment[3] right to bodily integrity, for which there is no discretion and therefore subjects it to FTCA liability.

The second part of the test, under *Gaubert,* provides that even if the conduct is found to be discretionary, the DFE does not apply if the "actions are not the kind of conduct that can be said to grounded in the policy of the regulatory regime." *Gaubert*,  499 U.S. at 325. Defendant focuses the bulk of its argument on the second prong of the *Gaubert* test–policy analysis–and urges this Court to reverse its prior analysis and conclusion, despite there

---

[3] All references to the Fourteenth Amendment due process violations in this brief encompass both the Fifth and Fourteenth Amendments for purposes of this analysis of the discretionary function under the FTCA.  As the court in *C.M. v. United States,* 2023 WL 3261612 (W.D. Texas 2023), held in applying this analysis to the FTCA, "…when applying due process caselaw, it does not matter whether the caselaw arises in the context of the 5th or 14th Amendment." *Id.,* at *35.

4

being no meaningful facts revealed during discovery conducted since Defendant brought

its original motion nor any change in the applicable law to justify doing so.

### 1.   The Factual Record Continues to Support the Denial of Defendant's Motion to Dismiss.

Defendant asserts that there is now a "more robust factual record," listing twelve

EPA employee depositions to support its proffer of new, factual developments warranting

reversal of this Court's ruling. (ECF 262, PageID 5010). However, this assertion is

misleading. All but four of the depositions relied on by Defendant in this motion were taken

*prior* to Defendant's first motion to dismiss.[4]   Moreover, as set forth below, none of

Defendant's "new" testimony changes either the facts of this case or has any impact on this

Court's analysis or holdings from its 2019 Opinion. In fact, the depositions reinforce the

evidence that the EPA knew that the State of Michigan ("State") and City of Flint ("City")

were in violation of the SDWA and the Lead and Copper Rule ("LCR") at least as early as

April of 2015.[5]   Notably, Miguel Del Toral, EPA's recognized expert on the LCR, was

explicitly told that there was no corrosion control treatment of the Flint River water after

the State and City switched to that water source in April of 2014. The failure to maintain

---

[4] Heather Shoven, Susan Hedman, Stanley Meiburg and Cynthia Giles.  Defendant cites to other employee depositions noticed in 2022 in the Veolia case, however these depositions were originally taken in *this* matter prior to 2018.  The new depositions Defendant cites to are all EPA employee depositions.

[5] The rules clearly required maintenance of corrosion control upon the switch of the public water source from Lake Huron to the "more highly corrosive" Flint River Water.  (**Ex. 1**, Expert Report of Larry Russell, 02/23/24, p. 17).

corrosion control treatment made it inevitable that lead would leach into the community's drinking water at unsafe levels: "You have lead lines.  You have no corrosion control.  And that—it's as simple as that.  So these are—these other issues or this other—this information certainly is relevant for any number of reasons.  But with respect to diagnostics, all you have to tell me is, 'I have lead service lines and I have no corrosion control.'"  (**Ex. 2,** Del Toral Dep. 06/12/2020, pp. 527-28). And, yet, EPA failed to intervene or warn the community, despite knowing that the failure to maintain corrosion control violated the SDWA and that the toxic water had been flowing into resident homes without required treatment for over a year.

The SDWA includes a mandatory public notification rule to ensure that consumers are alerted to problems with their drinking water to enable them take steps to protect their health.  40 C.F.R §141(a). Any time a water system provides water that has not been treated properly, the water system, "must notify its customers as soon as possible, but within 30 days of the violation." Despite the mandatory nature of this rule, no notification was provided or ordered by EPA. Instead, EPA stood by while State and City officials asserted publicly that the water was safe.  After failing in its oversight and supervision, EPA failed to take further mandatory and/or discretionary steps to  stop the  poisoning of the community until January 21, 2016, when it finally issued an Administrative Emergency Order acknowledging the ongoing "substantial and imminent risk to the public health." (**Ex. 3**, EPA Administrative Emergency Order, 01/21/2016).

### 2.   There is No Development in the Jurisprudence that Should Alter this Court's Decision to Deny Defendant's Motion to Dismiss.

Defendant fails to cite any new law that would compel this Court to reverse its decision on the second part of the test. Defendant's list of the "controlling or most appropriate authority" (ECF 262, PageID 5002) all predate Defendant's original briefs on this issue.[6]  Indeed, the only cases subsequent to June 2019, other than *Mynatt v U.S.*, 45 F. 4th 889 (6th Cir. 2022), which rejected the argument for a discretionary function exception, are referenced in footnotes 33, 36 and 50 and are distinguishable.

### 3.   Defendant Has Not Asserted Any New Policy Arguments.

Defendant also raises no new policy arguments here that were not previously and properly rejected by this Court.  (*See* for comparison ECF 56, PageID 2280 and ECF 79, PageID 2683 (listing a litany of alleged policy-based considerations)). Despite the absence of any meaningful new development in the evidentiary record, legal or policy landscape, Defendant now argues that the "fastest pathway to restoring safe drinking water" was to stop using the Flint River as the source of the drinking water and return to the Detroit public drinking water system. (ECF 252, PageID 5008, 5020, 5030).[7] Defendant, while admitting it knew of the imminent harm to the community from lead, asserts that it made a policy

---

[6] Defendant's Motion to Dismiss (ECF 37); Defendant's Reply (ECF 56) and Defendant's Motion for Interlocutory Review (ECF 79).

[7] Of course this does not explain why, knowing that the water was unsafe and concluding that the fastest way to *restore* safe drinking water was to return to the Detroit system, EPA failed to warn the community that the water was not safe.

decision to work with the primacy agency to obtain compliance because EPA had no authority to order the City to reconnect to the Detroit drinking water system with a §1431 Emergency Order. Relying on deposition excerpts from EPA employees, Defendant argues that returning to Detroit water was the best solution but, "not one EPA could order MDEQ or Flint to take because EPA does not possess the authority to direct the use of a particular water source." (ECF 252, PageID 5019).[8]  In addition to the fact that delaying nine months to issue a 1431 order to achieve the 'fastest' solution for reintroducing corrosion control into the system, is hardly defensible, EPA's alleged basis for this "policy" choice is simply not true.

And at least one person Defendant relies upon in their brief, Tinka Hyde, Director of the Water Division for Region 5, told the OIG during her February 29, 2016 interview, when asked what Region 5 could have done differently:

> A:  TH: I would take it back to April when the State indicated they had not done corrosion control.  I would have issued the order then…I still don't know if we can order a community water system to use a different source.
> Q:  KW: Was that ordered?
> A:  TH No. **We didn't ask that question.**

(**Ex. 4,** Tinka Hyde OIG Meeting, 02/25/16) (Emphasis added).

---

[8]  In footnote 27, Defendant cites to testimony of six employees that  believed EPA lacked authority to order a source water switch as part of a 1431 order.  Yet, none of these deponents could provide a basis for this understanding.  No authority is cited, and when pressed to identify the basis for this understanding no one could identify a document or source. In fact, the EPA's own guidance provides that the EPA can order the switch in water source.

Had anyone bothered to ask this critical question and consult EPA's own guidelines, the broad sweep of EPA's authority under 1431 would have been clear.  EPA's guidelines explicitly provide that the EPA can require a public water system to relocate its water source[9] and issue an order requiring a public water system to connect to an existing public water source. (**Ex. 5**, EPA Memorandum, Final Guidance, 09/27/91). EPA's Final Guidance explicitly provides that the "EPA may even use Section 1431 to reach parties that are not responsible for the endangerment" and issue an order that is the "most appropriate means to protect or mitigate the endangerment."  (*See* **Ex. 5**, p. 11).  Plaintiffs' SDWA expert, who is a former EPA employee, explained in his declaration that, "a 1431 Order provides EPA with broad sweeping powers to protect the public health and EPA could have either ordered Flint to begin immediate corrosion control in mid-2015 or ordered Flint to reconnect to the Detroit water distribution system as early as April 2015." (**Ex. 6**, Declaration of Erik Olson, 02/23/24).

EPA employees are either  unfamiliar with their own enforcement authority  or the proffered deposition testimony is simply an after-the-fact attempt to justify the EPA's failure to act. Neither explanation supports Defendant's assertion that this was a legitimate policy decision providing immunity for  its failure to act.

Finally, following this Court's Opinion and Order,  Judge Levy issued an Opinion

---

[9] The House report in passing the 1986 amendments to the Safe Drinking Water Act also specifically mentions this authority.  (*See* H.R. Report 1185, pp. 35-36).  Note the 1991 Final Order was in effect until 2018 when a revised guidance was issued.

and Order in response to Defendant's Motion to Dismiss in a related case and also rejected

Defendant's discretionary function argument, ruling that Defendant's attempt to explain its

reason for delaying the issuance of orders of compliance, does not change the fact that,

"The EPA's continued inaction in the face of an environmental crisis is not the kind of

conduct grounded in the policy requirements of the SDWA." *In re Flint Water Cases*, 482

F.Supp.3d 601, 633 (2020). Agreeing with this Court's prior ruling, Judge Levy concluded

that:

> The EPA's actions and inactions – after learning that the City of Flint and the
> MDEQ were severely out of compliance, MDEQ and Flint officials were
> lying to EPA staff and Flint's water was poisoning Flint's citizens – cannot
> be said to be grounded in or calculated to address, the policies of the SDWA
> or any reasonable or legitimate public policy.

*In re Flint Water Cases*, 482 F.Supp.3d at 634.

No new facts have been uncovered other than learning how early EPA knew that

there were violations of the SDWA that should have  triggered a mandatory duty to act

under §1414 and the Public Notice Rule and their abysmal failure of oversight and false

assurances to the community regarding the water.

## II.    STATEMENT OF FACTS

Plaintiffs rely upon the detailed factual background of the EPA's role in the Flint

Water Crisis set forth in this Court's Opinion and Order Denying Defendant's prior Motion.

ECF No. 76. Plaintiffs also rely on and incorporate the factual statement contained in their

brief in opposition to Defendant's first motion to Dismiss.  ECF No. 53.  Further, Plaintiffs

set forth relevant facts from subsequent discovery throughout this brief in support of their arguments. Here, Plaintiffs briefly address additional facts revealed in subsequent discovery and rebut allegations in Defendant's current Motion to Dismiss.

In 1967, the City of Flint abandoned the use of the Flint River as its drinking water source, and joined the Detroit water system (DWSD), which sourced its water primarily from Lake Huron.  The DWSD had in place an optimized corrosion control treatment program by adding orthophosphates to prevent lead from leaching into the public drinking water. (*See* **Ex. 6**, Olson Decl., §§27-8)

On April 25, 2014, the City of Flint, under the unilateral governance of an Emergency manager appointed by Governor  Snyder,  switched its water source back to the Flint River without any corrosion control treatment.   Within a month, EPA, by its own description, was "inundated" with complaints regarding the quality of the water. (**Ex. 7,** EPA Office of Inspector General (OIG) Report, Management Weaknesses Delayed Response to Flint Water Crisis Report No. 18-P-0221, 7/19/18, at 34; **Ex. 8**, Email from Thomas Poy, EPA Region 5 Chief, Groundwater and Drinking Water Branch, to Jennifer Crooks, EPA and Mike Prysby, MDEQ, 5/29/14 and Email from Jennifer Crooks, EPA Region 5, to Mike Prysby, MDEQ, 5/28/14; **Ex. 9**, Crooks Dep., 11/16/17, pp. 29, 30-32, 48, 70).

EPA argues that the State was the primacy agency responsible for ensuring that regulations were followed when the public water system was switched to the Flint River

in April of 2014.  However, a state granted primacy status must provide to the EPA regular quarterly reports of violations, timely water quality monitoring reports and annual reports under 40 C.F.R. §142.15. EPA rules also require that the agency "shall" complete an annual review of the state's compliance with EPA's primacy regulations, including the adequacy of state actions with respect to responding to violations, in order to retain primacy status. 40 C.F.R. §142.17. If EPA determines that a primacy state has failed to comply with its obligations under EPA's rules at 40 C.F.R. §142, the agency is required to initiate proceedings to withdraw the state's primacy status under SDWA §1413 and 40 C.F.R §142.17. Michigan failed to meet the requirements of a primacy state, but EPA took no action.

The EPA became aware of the violation of the LCR at the latest in April 2015 when the primacy agency informed them that Flint had not been practicing corrosion control since the source switch a year earlier.  (*See* **Ex. 6**, Olson Decl.).

Once EPA knew Flint was in violation by April 2015, if not earlier, and that Michigan had failed to effectively and timely resolve the violation, the agency was obligated to initiate an enforcement action under the mandatory provisions of SDWA §1414. (*See* **Ex. 6**, Olson Decl.).

Defendant attempts to defend its failure to act, in the face of this knowledge and a clear violation of their own regulations, claiming in part due a lack of clarity of its own regulations. Defendant argues that it had to obtain a clarifying memo to convince the State

that their failure to add corrosion control treatment in April 2014 was a violation that needed to be corrected.

Yet the Region 5 experts and the Chief of the Water Division knew that the regulation was clear, that a violation existed requiring enforcement at least by April 2015, and that there was no need for a "clarifying memo." Nonetheless, Defendant delayed getting the "clarifying memo" until November 2015. The Memo, (**Ex. 10**, Peter Grevatt Clarifying Memorandum, 11/03/15), when it did arrive, confirmed that the LCR rule required maintenance of corrosion control; yet it also included a sentence that referenced "ambiguity" within the corrosion control requirement, when it was unanimously agreed among those who were the experts on the LCR, that there was no ambiguity at all. This Memo was viewed  by all of those who were experts on the LCR at EPA as a "CYA" document that the EPA officials, at the most senior level, created to "justify" its own failure to exercise its regulatory duty to enforce the law and protect the people of Flint. (*See*, e.g., **Ex. 11,** Mark Pollins Deposition, 08/09/23, p. 145;  **Ex. 12**, Carol King Deposition, 04/17/23, pp. 203-04; **Ex. 13**, Robert Kaplan Deposition, 01/14/22, p. 466; **Ex. 14**, 2016 OIG Report, 10/20/16; *See* **Ex. 7**, 2018 OIG Report; and **Ex. 15**, Flint Water Advisory Task Force, 03/21/16, pp. 49-52).

As set forth *infra*, the 2018 EPA OIG report, issued after the filing of Plaintiffs' prior briefing, concluded it was not based on sound policy but rather that management weakness delayed EPA's response to the Flint Water Crisis. It was "implementation and oversight

lapses," lack of "effective communication," absence of "risk assessment procedures," failure to "establish clear roles and responsibilities" and failure to take "enforcement action" to obtain compliance that were at the root of EPA's failure.  (*See* **Ex. 7**). The OIG found that EPA lacked a sense of urgency and failed to recognize citizen complaints as a "critical indication of potential problems," resulting in the disastrous failure to enforce the central requirement to prevent lead from leaching into the public's drinking water.

The OIG report disclosed that EPA Region 5 had condoned years of the State's failure to provide timely monitoring results of the water system and tap samples, a failure to submit lead sampling forms without issuing any violations and allowed extensive 'divestments' from reporting requirements even after they found that the State primacy agency had lied to them about maintaining corrosion control. (*Id.,* 2018 OIG Report, pp. 18-19).[10]

OIG concluded that, "the Flint Water Crisis demonstrates that public health is not protected when EPA regional staff – with multiple warning signs – do not use the agency's SDWA authority in conjunction with EPA oversight tools."  *Id.* p 26.

As set forth herein, this failure was not rooted in balancing any policy concerns, but rather a disregard for the public health of a vulnerable community resulted in its poisoning.

---

[10] Meiburg testified that divestments are to be temporary based on emerging circumstances and was unsure why Region 5 had allowed Michigan to divest for years in required monitoring and reporting. (**Ex. 16**, Stanley Meiberg Deposition, 07/11/23, p. 107).

### III.   ARGUMENT

**1.    Constitutional Violations are not within the Range of Discretionary Functions that Shield an Agency from Liability under the Federal Tort Claims Act.**

    A.    There Is No Discretion to Violate The Constitution Within the Meaning of the FTCA.

Plaintiffs have both alleged and presented facts that would support a finding that Defendant, acting through its agents, engaged in conduct that violated Plaintiffs' substantive due process rights to bodily integrity, in violation of the Fourteenth Amendment to the United States Constitution and the Due Process clause of the 1963 Michigan Constitution, art. 1, §17.  The harms that befell the Plaintiffs have already been adjudicated to have been in violation of their clearly established substantive due process rights to bodily integrity under both federal and state constitutional law. *See*, e.g., *Guertin v. State of Michigan*, 912 F.3d 907, 921, 934 (6th Cir. 2019); *Carthan v. Earley, et al*., 960 F.3d 303, 323 (6th Cir. 2020); *Mays v. Michigan*, 506 Mich. 157, 192-93 (2020).

While the Sixth Circuit has not ruled on whether the federal Constitution limits agencies' permissible range of discretion, the majority of circuits— including the EPA's home D.C. circuit -- have held that it does. *Loumiet v. United States*, 828 F.3d 935 (D.C. Cir. 2016). Indeed, it is now well accepted in most circuits throughout the country that when facts alleged under the FTCA establish conduct amounting to constitutional violations, the DFE does not apply.

While the constitutional claims asserted in *Guertin*, *Carthan* and *Mays* were alleged

against the State and local governments, Plaintiffs have alleged facts supported by the evidence, that would plausibly support a finding that the EPA, acting through its agents and officials, knowingly and deliberately disregarded its own authority – and duty – to act, by failing to act or otherwise intervene, when it knew that the residents of Flint were being exposed to the toxic water from the Flint River without any corrosion control treatment in place to protect them,  in violation of the SDWA.

The majority of courts around the country have agreed that a plaintiff who, "…plausibly alleges conduct that was unconstitutional," *Torres-Estrada v. Cases*, 88 F.4th 14 (1st Cir. 2023), satisfies the *Gaubert* element of non-discretionary conduct. See, *e.g.*: *Loumiet* 828 F.3d 943-45; *Torres-Estrada* 88 F.4th 14 ("'It is elementary that the discretionary function exception does not…shield conduct that transgresses the Constitution.' *Limone v. United States*, 579 F.3d 79 (1st Cir. 2009), at 101…[O]ur precedent is clear.  If the [United States'] conduct violated the Constitution, then the discretionary function exception does not apply, and sovereign immunity is waived." *Id.*, at 21); *Myers & Myers, Inc., v. U.S. Postal Service*, 527 F.2d 1252 (2nd Cir.  1975) ("It is, of course, a tautology that a federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority.)  In accord, *Huntress v. United States*, 810 Fed Appx. 74, 77 (2nd Cir. 2020), citing/relying on *Myers & Myers, supra*.

The court in *Xi v. Haugen*, 68 F.4th 824, 838 (3rd Cir. 2023) recently confirmed the

16

near unanimity of the circuits on this point, stating: "…[W]e—and nearly every circuit to have considered the issue—have held that 'conduct cannot be discretionary if it violates the Constitution' because '[f]ederal officials do not possess discretion to violate constitutional rights." *See* also, *Medina v. United States*, 259 F.3d 220, 225 (4th Cir. 2009) ("…[W]e begin with the principle that 'federal officials do not possess discretion to violate constitutional rights...'" *U.S. Fid. & Guar. Co.* [*supra*]); *C.M. v. United States,* 2023 WL 3261612 (WD Tex 2023) ("The fact the FTCA does not encompass constitutional claims does not mean that a constitutional violation cannot be a conduit for overcoming the discretionary function exception... Moreover, because it is well-accepted that a violation of a statute, regulation, or policy may remove discretion and render the discretionary function exception inapplicable, the same rationale can apply to a constitutional violation; *Raz v. United States*, 343 F.3d 945, 948 (8th Cir. 2003) ("[T]he FBI's alleged surveillance activities fall outside the FTCA's discretionary-function exception because [the plaintiff] alleged they were conducted in violation of his First and Fourth Amendment rights."); *Hill v. Le*, 2021 WL 4391706 (U.S. D.C. Oregon 2021) (Even though a claim brought under the FTCA "…is necessarily not a constitutional tort because constitutional torts are not cognizable under the FTCA, (citations omitted)…[n]evertheless…, that does not preclude a plaintiff from arguing that the United States may not assert the FTCA's discretionary function exception to jurisdiction…when the plaintiff argues that the conduct…was egregious enough to be…a constitutional violation. 'The discretionary function

17

exception…does not shield decisions that exceed constitutional bounds, even if such decisions are imbued with policy considerations.'; *Nieves Martinez v. United States*, 997 F.3d 867, 877 (9th Cir. 2021) ("Even if the agents' actions involved elements of discretion, agents do not have discretion to violate the Constitution. (citations omitted)"); *Martinez v. United States*, 822 Fed Appx 671, 676 (10th Cir. 2020) ("Most circuits…have held conduct is not discretionary when it 'exceeds constitutional bounds').

In *Loumiet, supra,* an attorney sued the Treasury Department under the FTCA for having maliciously prosecuted him, allegedly in violation of the First and Fifth Amendments. *Id*. at 939.   Despite the court noting that prosecutorial discretion is "quintessentially discretionary" and "therefore ordinarily would appear to qualify for the discretionary-function exception," *Id*. at 942, it rejected the lower court's holding that the FTCA's exception shields even prosecutorial decisions that violate the Constitution. *Id*. at 940, 942–43. The *Loumiet* court held that "there is no blanket exception for discretion that exceeds constitutional bounds" because "the policy discretion of federal personnel acting in their official capacity is necessarily circumscribed by the rules that limit the bounds of their authority." *Id.* at 944 (internal quotation marks omitted).

> Indeed, the absence of a limitation on the discretionary-function exception for constitutionally ultra vires conduct would yield an illogical result: the FTCA would authorize tort claims against the government for conduct that violates the mandates of a statute, rule, or policy, while insulating the government from claims alleging on-duty conduct so egregious that it violates the more fundamental requirements of the Constitution.

*Id.* at 944-45. Thus, "[t]he discretionary-function exception...does not shield decisions that

exceed constitutional bounds, even if such decisions are imbued with policy considerations." *Id*. at 944.

It would defy logic for any federal agency to be accountable in tort for violations of its policy, yet to enjoy immunity from more serious conduct that violates the Constitution. Here, the EPA had no lawful discretion to make decisions to neglect its emergency powers that resulted in the violation of Plaintiffs' constitutional guarantee of bodily integrity. Consequently, the DFE does not shield the EPA's decisions and/or conduct that exceeded constitutional bounds.[11]

In this case, Plaintiffs have alleged, and the evidence obtained through discovery has established, conduct by the EPA, that, but for the fact that constitutional torts are not cognizable under the FTCA, would establish a federal and/or state constitutional tort; *see Hill*, *supra*.[12]

---

[11] It is noteworthy that *Loumiet* was issued by a unanimous panel of the D.C. Circuit. Although the sister circuit does not bind this Court, it does have general personal jurisdiction over the EPA. It is unseemly for the EPA to contest this point of law so vigorously in the Sixth Circuit when it is accustomed to accepting and abiding by it as settled law in its home circuit. Indeed, of the twelve Circuit Courts of Appeals, (including the D.C. Circuit), only two have held otherwise, the 7th Circuit and the 11th Circuit. *See Kiiskila v. United States,* 466 F.2d 626, 627-28 (7th Cir. 1972); and *Sivers v. United States,* 1 F.4th 924, 933 (11th Cir. 2021).

[12] Contrary to any anticipated suggestion by Defendant that by asserting the unconstitutional conduct of the EPA – acting through its agents – Plaintiffs are improperly invoking a constitutional tort akin to a *Bivens* claim, the Court in *Loumiet, supra*, addressed this directly by noting that such an argument erroneously:

> …miscast[s] the relationship between FTCA state-law torts and Bivens constitutional claims. The state-law substance of an FTCA claim is unchanged by courts' recognition of constitutional bounds to the legitimate discretion that the

B.   Plaintiffs' Substantive Due Process Rights to Bodily Integrity Are Established Under Both Federal and State Constitutional Law

In this case, Flint residents sought the EPA's immediate help to bring city drinking water into compliance with the SDWA. By at least February 2015, the EPA was aware of the extraordinary public health crisis being created by use of the untreated Flint River water. The substantive due process right to bodily integrity under the Fourteenth Amendment of the U.S. Constitution and the Michigan Constitution, have been fully adjudicated to have been violated by what happened in Flint. *Carthan, supra* at 323-24; *Guertin, supra* at 926, 934; *Mays, supra* at 192-95. And, this Court has already properly determined, in its previous ruling on Defendant's first Motion to Dismiss (ECF No. 28):

> The *Guertin* court could "'conceive of no legitimate governmental objective for this violation of [the] plaintiffs' [bodily] integrity.'" *Id.* (quoting *Mays v. Snyder*, 916 N.W.2d 227, 262 (Mich. Ct. App. 2018)). This Court similarly cannot conceive of a public policy consideration that could be legitimately balanced against the need to warn and protect an entire community from involuntary and continued poisoning. See *Guertin*, 912 F.3d at 925.

ECF 76 , PageID 2651-52.

Just as this Court properly found that there was no legitimate "policy consideration" that could be balanced against "the need to warn and protect*," id*., the identical reasoning

---

FTCA immunizes…A plaintiff who identifies constitutional defects in the conduct underlying her FTCA tort claim—whether or not she advances a *Bivens* claim against the individual official involved—may affect the availability of the discretionary-function defense, but she does not thereby convert an FTCA claim into a constitutional damages claim against the government; state law is necessarily still the source of the substantive standard of FTCA liability.
*Loumiet*, 828 F.3d at 945–46 (internal citations omitted).

applies directly to the issue of Defendant EPA's deliberate indifference to Plaintiffs' constitutional right to bodily integrity.  The EPA knew that Flint's water was hazardous and that state officials were manipulating evidence and misleading the public. Nevertheless, despite having ample time to deliberate and take necessary and appropriate steps to protect and/or warn the Flint community, EPA took neither action, knowingly disregarding the excessive risk to their health and/or safety. See *Guertin, supra* at 919.

> C.     The Facts of this Case Support A Claim Of Constitutional Violations

The *Burgess* Complaint [ECF No. 75, Second Amended Complaint], states facts that establish conduct that was unconstitutional, as there is no dispute that the right not to be subjected to toxic water by the government is a constitutionally protected right to bodily integrity. *Carthan, supra* at 323; *Guertin, supra* at 921; *Mays, supra* at 262. To establish liability there must be a showing of deliberate indifference which "shocks the conscience." The basic elements of a constitutional tort, under both the U.S. and Michigan Constitutions in a claim for substantive due process violation of the right to bodily integrity, are:

1) That government officials, while acting under color of law, "knew of facts from which they could infer a 'substantial risk of serious harm';
2) That they did infer it;
3) That they knowingly decided not to act to reduce or minimize the known risk of harm, despite their duty to do so; and
4) That as a proximate cause of their failure to act in the face of the known risk of harm, Plaintiffs suffered harm.

*Carthan, supra* at 323-24; *Guertin, supra* at 924-25; *Mays, supra* at 193.  *See* also *Range v. Douglas,* 763 F.3d 573, 591 (6th Cir. 2014).

In this case, both as alleged in Plaintiffs' Complaint and as established through

21

discovery, the EPA, while acting under color of law, engaged in conduct that endangered and threatened Plaintiffs fundamental liberty interest to bodily integrity.

As detailed in the Statement of Facts and throughout this brief, the EPA failed to act pursuant to their authority and duty to do so, despite its knowledge of the risk of harm, with catastrophic consequences to Plaintiffs and the Flint community.  (ECF No. 75, at ¶¶ 117, 120).

Nonetheless, in abrogation of its duty to protect the people of Flint, including Plaintiffs herein, the EPA took no action and continued to defer to, protect and cover for the State MDEQ, falsely reporting to the residents as late as March 2015, that "…MDEQ has been working closely with the … City of Flint's Water Treatment plant to ensure that the citizens of Flint are provided drinking water that meets health standards." (**Ex. 17**, Tinka Hyde Letters to Comer (3/2/15) and Pumfrey (2/28/15); *see also*, **Ex. 18**, emails sent by Jennifer Crooks to MDEQ and others in the EPA on 2/26/15, indicating that the EPA was aware of extremely high levels of iron and lead that required EPA action; and EPA receipt of water samples taken by Flint officials that confirmed the extremely high levels of lead on March 18, 2015. (ECF No. 75, ¶¶ 28, 33, 42)).

Both state and federal appeals courts have already found that the residents of Flint, including Plaintiffs herein, were subjected to conduct that was in violation of their right to bodily integrity when the various government agencies created and/or failed to protect them from the known risk of serious harm as a result of the Flint Water Crisis. *Carthan*,

*Guertin*, *Mays*. As set forth above, Plaintiffs in this FTCA action have plausibly alleged and established that the EPA engaged in conduct that was unconstitutional within the meaning of *Carthan*, *Guertin* and *Mays*. As such, the EPA will not be able to rely on the discretionary function to avoid liability here.

> **2.    Section 1414 Imposes a Mandatory Duty upon EPA to Enforce the SDWA, which EPA Failed to do Despite Knowledge of Violations, Notice to the State & the State's Failure to Timely Cure.**

> > A.    Section 1414 was Amended to Remove EPA Discretion and Ensure Mandatory Enforcement of Violation.

As discussed above, the OIG concluded that EPA Region 5's management weaknesses were the cause of a delayed response to the Flint Water Crisis and the resultant failure to ensure the safety of the Flint public drinking water.  Contrary to Defendant's attempt to divert blame to the State based on the EPA's assignment of primacy regulation authority to the State, the OIG recognized that:

> The EPA retains the authority and responsibility to oversee states with primacy over their drinking water programs. The EPA is empowered and required to intervene when states do not fulfill their responsibilities.

*See* **Ex. 7,** 2018 OIG Report #18,P-0221, p. 17.

The OIG identified the  EPA's failure to utilize their authority under the SDWA §1414. (*Id.,* p. 24). As amended in 1986, §1414 makes EPA's enforcement responsibilities mandatory when it becomes aware of violations of the SDWA.  Section 1414 states, in relevant part:

> Whenever the Administrator finds during a period during which a State has

primary enforcement responsibility for public water systems that any public water system…does not comply with any applicable requirement…he **shall** so notify the State and such public water system and provide such advice and technical assistance as may be appropriate to bring the system into compliance with the requirement by the earliest feasible time.

42 U.S.C. 300g-2; § 1414(a)(1)(A) (emphasis added).

After the mandatory notice, § 1414 creates another mandatory duty on EPA to act if the system is not brought into compliance by the "earliest foreseeable time," which is defined by the statute, as no later than 30 days, stating:

If, beyond the thirtieth day after the Administrator's notification under subparagraph (A), the State has not commenced appropriate enforcement action, the Administrator **shall issue an order** under subsection (g) requiring the public water system to comply with such applicable requirement or the Administrator **shall** commence a civil action under subsection (b).

*Id*. (emphasis added).

Congress inserted the mandatory language in 1986 after documentation of widespread violations of the SDWA, followed by EPA's repeated failure to take enforcement action. The amended language from "may" to "shall" *requires* EPA to begin enforcement actions when violations occur and are not corrected within 30 days by the primacy agency.  Simply put, Congress responded to the EPA's history of failure to take action on violations by removing EPA's enforcement discretion and making enforcement action mandatory. (**Ex. 19,** Senate Report S. Rep. No 99-56 ("the bill makes EPA enforcement actions mandatory"); *See also* the history of the 1986 amendment to SDWA, set forth in the Declaration of Erik Olson, ¶¶ 53-59, **Ex. 6**).

B.  The Failure to Maintain Corrosion Control upon Switching the Water Source was a Violation of the SDWA's Lead and Copper Rule.

While the EPA knew or should have known that Flint lacked the required optimized corrosion control treatment shortly after the water switch in April 2014, EPA knew for certain that the Flint water system was in violation of the SDWA within the meaning of Sec. 1414(a), no later than April 25, 2015.[13]  Defendant now argues that either the failure to maintain corrosion control was not a violation of the SDWA or if it was a violation, the Administrator or her designee, did not make the necessary determination of a violation. Both arguments are refuted by the testimony and facts of this case.

The LCR is explicit with regard to the maintenance of optimized corrosion control treatment for a system such as Flint that was previously operating under optimized corrosion control. When there is a source switch the rules specifically state that "all systems optimizing corrosion control shall continue to operate and maintain optimal corrosion control treatment, including maintaining water quality parameters…". 40 C.F.R.§§ 141.81(b)(2) and 141.82(f) and (g).

The rules recognize that switching from one source of water to another cannot be

---

[13] There is no dispute that EPA inquired and was assured by the State in February 2015 that optimized corrosion control was implemented at the time of the switch and that EPA learned in April 2015 that this representation was false. *See* Def.'s Brf., ECF 262, PageID 5012-13. This was also the conclusion of the EPA's OIG; *see* **Ex. 7**, 2018 OIG Report (concluding that Flint was noncompliant within the meaning of the statute, requiring EPA response).

done safely without maintaining existing parameters for corrosion control to prevent water from corroding pipes and the resultant leaching of lead into the public drinking water. This was especially true where EPA was aware that Flint was switching to a source water (the Flint River) that was more corrosive than the water from Lake Huron. (*See*, **Ex. 8**, Poy, Crooks and Prysby emails.)

After this Court's 2019 Opinion was issued, depositions of Miguel Del Toral, and Region 5 Administrator, Susan Hedman, were taken, confirming that a violation of the LCR was found by EPA in April 2015:

> Q:   And so at that point in time when you learned that there was no corrosion control in issue at the City of Flint, you determined in your own mind, at that time that the City was in violation of the Lead and Copper Rule, correct?
> A:   Yes.

*See* **Ex. 2**, Del Toral Dep. p. 83, 6/11/20.[14]   The consensus of the *entire* Ground Water Drinking Water Branch at Region 5 was that making a source switch without maintaining corrosion control was a violation of the LCR: "We were in agreement there was a violation.

---

[14] The violation actually occurred a year earlier, in April 2014, when the City switched the water source from Detroit/Lake Huron water to the Flint River without maintaining **any** corrosion control. ("USEPA should have insisted that in accordance with their regulations that an Optimized Corrosion Control Treatment (OCCT) strategy be developed on the City's behalf before switching water sources from Detroit to the Flint River, as is required by the USEPA Lead and Copper Rule Regulations." (*See* **Ex. 1**, Russell Report, 02/23/24) EPA is responsible for ensuring compliance and supervising the primary agency to ensure safe drinking water, yet apparently, no one at EPA reviewed the water quality or treatment when notified of the switch in source water to ensure the LCR requirement to maintain corrosion control was being followed.

The question was, what do you want to do about it?" *Id*. at 729.

Carol King, Branch Manager of the Water Enforcement Division at EPA headquarters, acknowledged this consensus at both Region 5 and above:

> [T]hey violated the rule when they switched sources; everyone at that point all agreed:  up to Tom Poy's level, maybe above.  The folks from OGWDW (Eric Burneson's group) everyone seemed on board that this was a violation, there was noncompliance, and something needed to be done in short order.

**Ex. 20,** Carol King OIG Interview*, 03/10/16.

Susan Hedman testified that she became aware on June 30, 2015 of the failure to maintain corrosion control after the switch, learning that the State's previous representation that the Flint River Water was fully optimized with corrosion control was false.  As soon as the Administrator became aware of the violation in April 2015, she determined that notice to the State and compliance at the earliest foreseeable time was required.  She testified that, as the Administrator, she advised the primacy agency that, "[Y]ou need to order corrosion control as soon as possible" and "you must issue the order to Flint to do corrosion control."  (**Ex. 21**, Susan Hedman Deposition, 07/16/20, p. 40).

Thus, upon being advised of the lack of corrosion control, the Administrator determined it to be a violation and took the first mandatory steps under §1414, by notifying the State of the violation, and telling them that the violation must be corrected "as soon as possible."  (*See* **Ex. 21**, Hedman Dep., pp. 37-40).

Clearly, the Administrator determined that the lack of corrosion control was a violation as she immediately ordered the State to order Flint to cure the violation by

beginning corrosion control.[15]  The Administrator would not have acted if having no CCT was not a recognized violation requiring immediate correction.[16]

This Court, in its prior Opinion and Order, expressed concern that even upon finding a violation, EPA retained an element of choice in how to respond and, therefore, §1414 did not necessarily require mandatory action.  *Burgess v. EPA*, 375 F.Supp.3d 769, 812-813 (2019).

However, a review of legislative history, substantial case law and recent factual admissions clarify that all of the condition precedents occurred in this case triggering EPA's mandatory enforcement duty.[17]  Where EPA recognized that a violation of the SDWA had occurred **and** acknowledged that the State did not take appropriate enforcement actions to

---

[15] Defendant argues that there was no 'finding' of a violation when EPA learned that the State had been lying and had not maintained corrosion control after the switch to more corrosive water.  It would be odd, to say the least, to create a loophole to congressionally mandated enforcement of violations, by arguing that EPA was aware of a violation impacting public health, but by deciding not to make a formal "finding" that there is such a violation, they could avoid their duty to enforce the regulation.

[16] EPA would not be shielded from liability even if it had negligently determined that the Flint water system *was* in compliance.  Failure to notice serious risks to the public safety is not action shielded by the DFE because these safety determinations are meant to be "the product of …objective criteria" not policy determinations.  *Myers v. United States*, 17 F.3d 890, 897 (6th Cir. 1994)(had inspectors of the mine "actually found safety violations…but then failed to take the required action," a discretionary function defense clearly could not apply, as failure to act in the face of statutory duty, could never be "a protected exercise of policy discretion.")  In accord, *In re Flint Water Cases*, 627 F.Supp.3d 734 (2022).

[17] The fact that there may be some judgment involved does not render the action discretionary and preclude judicial review.  *Fond du Lac Band of Lake Superior Chippewa v. Wheeler*, 519 F.Supp.3d 549, 565 (2021) ("Almost everything an agency does involves a degree of discretion…the crucial question is whether the statute supplies any meaningful standard against which, to judge the agency's discretion.")

cure the violation, the preconditions for mandatory enforcement of the regulations by EPA were met.[18]  Section 1414 requires that, after 30 days of the State failing to take adequate enforcement action, the Administrator **shall** issue an order or shall commence a civil action. Here, the State took no enforcement action.

While this Court must determine whether a violation occurred and whether the State was notified, once this is established, this Court must find that the EPA is bound by the mandatory language of §1414 and was required to choose one of two enforcement actions, if the State failed to act within 30 days.  *Abbott v. United States*, 78 F. 4th 887 (6th Cir. 2023).  Here the administrator found the City to be in violation and ordered the primacy agency to bring the City into compliance. But neither the City nor the State made any effort to correct the violation. This satisfies the pre-condition that triggered EPA's mandatory obligation to issue its own enforcement order or initiate civil action after 30 days.  As a result of the EPA's inaction, the Flint community continued to cook, bathe in and drink lead contaminated water for nearly a year, without being warned of the hazards, without

---

[18] EPA told the State to begin corrosion control treatment as early as April 2015.  The administrator testified that the Region 5 Water Division Director (Tinka Hyde) had told MDEQ to require Flint to implement corrosion control in late April.  According to the OIG timeline findings, the State did not take this step until August 17, 2015.  The statute sets the timeline for appropriate enforcement action at thirty days, and the State's failure to act within that timeframe triggered EPA's duty to enforce.  Even in August, the State did not seek compliance within the shortest foreseeable time, but rather, gave the City of Flint six more months to begin to comply, or until February 2016. Ultimately, CCT was not administered until December of 2015.  (*See*  **Ex. 7**, 2018 OIG Report, p. 35; *see also,* **Ex. 22**, Susan Hedman Testimony before the House Oversight and Government Reform, 03/15/16).

opportunity to take steps to protect themselves, and without any intervention or warning by EPA.

As Judge Levy recognized, in denying Defendant's Motion to Dismiss based on the DFE, in *In re Flint Water Cases*, 482 F.Supp.3d 601 (2020):

> [H]ere Congress set forth two options for the EPA to take upon finding that a State was not complying with the Safe Drinking Water Act. According to Plaintiffs, the EPA chose neither of these two options. That was not a permissible choice, and the discretionary function exception cannot be manufactured to protect a non-prescribed choice in the face of a congressional mandate.

*Id.,* at 629.

When a regulation mandates a particular course of conduct and the agency obeys, the governmental action will be protected as they acted in furtherance of the policy that led to promulgating the regulation. *U.S. v. Gaubert*, 499 U.S. 315, 323 (1991). But here, where the regulation was not followed, despite a mandatory choice of only two courses of conduct, then the United States is not protected from liability for actions contrary to policy.

Defendant's reliance on *Heckler v. Chaney*, for the assertion that a decision not to take enforcement action is presumed to be immune from judicial review is misplaced in this case where Congress explicitly amended §1414 to require mandatory enforcement by EPA 30 days after the precondition of finding a violation and notice are met. *Heckler v. Chaney*, 470 U.S. 821, 834-35 (1985) (If [Congress] has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, there is "law to apply" under § 701(a)(2), and courts may require

that the agency follow that law.); *Save the Valley, Inc. v. U.S. EPA*, 99 F.Supp.2d 981, 984-85 (2000) (legislative history and the language of the Clean Water Act Standards requires that EPA "shall so notify the State" of widespread problem, and if the State does not bring its program into compliance, triggers enforcement actions following the "well-accepted rule of statutory construction that a legislature's use of the word "shall" is generally interpreted as imposing a mandatory duty.)

EPA found noncompliance, notified the state and was aware that Flint had not been brought back into compliance within the statutory 30-day period.  Under these facts, EPA was required either to initiate an action or issue an enforcement order.  42 U.S.C. 300(g)-3(B).  EPA failed to perform "its clear duty under the federal law" and did neither.  *Cf. Berkovitz*, 486 U.S. 531, 543 (1988).  The discretionary function exception "obviously" does not shield such failures to follow a clear statutory directive.  *Myers v. U.S.*, 17 F. 3d 890, 897 (6th Cir. 1994); *In re Flint Cases*, 627 F. Supp. 3d 734, 742 (2022).

> C.     The Lead and Copper Rule was Clear and EPA had the Responsibility to Enforce the Federal Rules as Written.

Defendant attempts to defend their failure to enforce the LCR, by claiming an ambiguity in the rule. Defendant asserts that the State raised the issue of the ambiguity which required a clarifying memo before enforcement action.  This two-page 'clarifying memo,' took five months (or until November 3, 2015) to issue, and purportedly "clarified"

a regulation no one had ever viewed as ambiguous.[19]  (*See* **Ex. 10**, Clarifying Memo).

As Carol King, Branch Manager of the Water Enforcement Division at EPA headquarters, advised the OIG in her interview:

> The LCR can be confusing.  *But the irony is that this corrosion control plan required for source switch is one issue that wasn't.*  It was not on the table for long term revisions because *this part is actually quite clear*…that was where things started to seem weird…it seemed like upper management – maybe in the region – was trying to introduce confusion to potentially give cover.

*See* **Ex. 20**, King OIG Interview, 03/10/16 (emphasis added).

EPA's Director of Water Enforcement Division, Office of Civil Enforcement Mark Pollins was also clear that the corrosion control requirements of the LCR were not ambiguous.  Pollins expressed great remorse in his own failure to ensure that the LCR requirements were properly enforced in Flint.  He told the OIG, that his assessment of the November 3 memo  – in which the sentence was inserted reading, "…it appears that there are differing possible interpretations of the LCR with respect to how the rule's optimal corrosion control treatment procedures apply to this situation…" – was that:

> The memo was issued without our [Pollins and Carol King] approval.  I look at that as a memo designed to cover Hedman's butt.  Look at the construct: it starts by saying 'it's confusing' and ends by saying 'it's crystal clear.' Here's the 30 second explanation:  LCR is about water chemistry, what could cause a greater change in water chemistry than switching the source water?

---

[19] Robert Kaplan, Interim Director of Region 5 (after Susan Hedman's resignation), testified, "It was unanimous within Region 5 that the Lead and Copper Rule should be interpreted in the way that required the City of Flint to have used corrosion control from the very beginning." (*See* **Ex. 13**, Kaplan Dep., 01/14/2022, p. 466; and **Ex. 6**, Olson Decl., 02/23/24, ¶¶ 50-52).

**Ex. 23**, Mark Pollins OIG Interview, 03/08/16.

OIG also interviewed Heather Shoven, the Drinking Water Enforcement Team

Leader, who confirmed that:

> Staff level consensus was that the regulations were written clearly enough to
> be implemented and understood in a way that was unambiguous and an
> indictment of Michigan's failure with Flint.

**Ex. 24**, Heather Shoven OIG Interview, 01/09/2017, ¶9A.

Thomas Poy, the Chief of the Ground Water and Drinking Water Branch for Region

5, prepared a memo and letter to the State months earlier than the November 3, 2015

'clarification memo' which clearly stated:

> As a large PWS serving greater than 50,000 persons, Flint PWS was required
> to install and operate optimal corrosion control treatment per 40 CFR
> §141.80(d)(1).
>
> [W]hen the City of Flint switched to the Flint River as their water source on
> April 25, 2014, the orthophosphate treatment for lead and copper control
> which has been provided by Detroit through the purchased water source was
> not continued. In the absence of the phosphate treated water purchased from
> Detroit, Flint PWS failed to maintain corrosion control treatment per 40 CFR
> §141.82(g).
>
> [F]lint PWS has been in violation of 40 CFR §141.82(e) since the switch
> occurred on April 30, 2014.

**Ex. 25**, Draft memorandum and letter from Thomas Poy to MDEQ.

Nor did the Administrator of Region 5, Susan Hedman, raise any ambiguity in the

rule when she ordered the State to require the City to begin corrosion control treatment in

June 2015.  Instead, she notified the State of the violation and offered technical assistance

but failed in EPA's duty to enforce when months passed without compliance.[20]   In her

testimony before the House Committee on Oversight and Government Reform,

Administrator Hedman, stated:

> I first learned that Flint was not implementing corrosion control treatment on
> June 30, 2015 -- approximately fourteen months after the City started using
> Flint River water that was not treated with orthophosphate.  The very next
> day I offered technical assistance to Flint's Mayor -- assistance from EPA
> experts on lead and drinking water distribution systems.
>
> On July 21st , three weeks after I first learned about this problem, the
> Michigan Department of Environmental Quality (MDEQ) agreed with
> EPA's recommendation to require Flint to implement corrosion control as
> soon as possible -- a recommendation that my staff had been making since
> late April, when they first found out that corrosion control was not being
> implemented.
>
> That should have solved the problem – but it did not. During the weeks and
> months that followed, MDEQ was slow to deliver on the agreement we
> reached on July 21st and the City of Flint was hampered by a lack of
> institutional capacity and resources.

*See* **Ex. 22**, Testimony of Susan Hedman, 03/15/2016.

At the time EPA was delaying for months taking any enforcement action to cure the

violation related to the absence of corrosion control, it was aware of the public health

consequences of delay.  Miguel Del Toral, alerted Region 5 in a June 25, 2015 email that,

---

[20] The OIG specifically found that:  Region 5, could have but, failed to take "enforcement
actions under SDWA §1414 which would have required Flint to install corrosion control
treatment after notifying the State."  (*See* **Ex. 7**, 2018 OIG Report, p. 26).  The OIG also
noted that Hedman was clearly the enemy of herself:  "Letting fear and politics get in the
way of good judgment for the sake of public health."  (**Ex. 26**, Susan Hedman OIG
Meeting, 04/19/16)

absent corrosion control, lead leaching into the Flint public drinking water was inevitable. (**Ex. 27**, Miguel Del Toral Email, 06/25/15).

> D.   EPA was on Notice of Other Violations that Should have Triggered Enforcement.

The discovery of the violation of the LCR was not the first red flag for EPA regarding the deficiencies in the treatment of the Flint River water, violation of the SDWA and its impact on public health.  Throughout 2014 and 2015, Defendant was aware of the poor water quality of the Flint River and the City and State's  inadequate response to water quality issues. The Michigan Program Manager of the Ground Water and Drinking Water Branch, Jennifer Crooks, responded to Plaintiff Jan Burgess' October 23, 2014, complaint as follows:

> [Y]our email refers to the poor quality of the Flint drinking water.  The source of drinking water for the City of Flint was changed from Detroit (which comes from Lake Huron) to the flint River at the end of April this year. T*he Flint River raw water is a different quality than the Lake Huron raw water; and requires additional treatment to ensure an acceptable quality drinking water.* The *MDEQ has been working* closely with the Operator-in-Charge at the Flint Water Treatment plant *to ensure a palatable drinking water is provide to the citizens of Flint.*

**Ex. 28**, Jennifer Crooks Email, 10/23/2014 (emphasis added).

From the very beginning of the switch, when water test reports were reviewed, as Darren Lytle, EPA's Supervisory Environmental Engineer, Acting Branch Chief, testified, EPA was "very aware of what was going on once we got a hold of that data," and that  the problem they were having maintaining chlorine residue to control micro bacteria –

resulting in two boil water advisories in 2014, was due to the lack of corrosion control. (**Ex. 29**, Darren A. Lytle Deposition, 11/04/20, p. 192).

Flint had ongoing violations of contaminant parameters including TTHM and E.coli and sampling, monitoring and reporting deficiencies as well as violations of the quarterly reporting requirements and required water quality parameter reports all within the first year of switching the water source. In addition, EPA was aware of the lower quality of the Flint River water, the record number of citizen complaints and the inadequacies of the water treatment plant. As Plaintiffs' regulatory expert declared:

> EPA failed to intervene with a careful review of Flint's ongoing compliance problems and to provide technical assistance, which would have disclosed the lack of corrosion control treatment in 2014. EPA should have been aware of the potential link between coliform violations, TTHM violations, and possible lead/corrosion control issues after its past experience with, for example, Washington D.C., which experienced coliform violations and later very high lead levels that were triggered in the early 2000's by a switch in water disinfection practices intended to reduce TTHM levels. An audit or careful evaluation of the treatment and conditions in Flint, particularly in light of the known switch in water source, the strong citizen complaints about water quality immediately after the switch, and the lack of provided water quality parameter monitoring reports would have identified the lack of effective corrosion control immediately.

*See* **Ex. 6**, Olson Decl., 02/23/24, p 12-13, ¶62c.

Yet, despite all of this information, EPA delayed until January 21, 2016 before issuing any enforcement order. This in the face of their own expert Michael Schock advising that the deterioration of the protective film, built up by years of corrosion control treatment with DWSD's provision of water, began within days of the source switch without

continuation of continued corrosion control, subjecting Flint residents to the substantial harm that EPA knowingly failed to recognize or prevent for 18 months.

### 3.   EPA Failed to Comply with the Mandatory Obligations of the Safe Drinking Water Act Public Notification Rule.

The purpose of the public notification rule (PN) of the SDWA is simply to ensure that consumers know if there is a problem with their drinking water.  Notice is required if there is a risk to public health.  The regulations require that a public water system **must** notify their customers when they violate EPA or State drinking water regulations or they provide drinking water that may pose a risk to consumer's health.  40 C.F.R.§ 141(Q).

EPA admits that they were aware in April 2015 that  Flint had failed to maintain corrosion control when it switched the water source to the Flint River in April  2014, which is a violation of the LCR. (40 C.F.R. §§141.81(b)2; 141.82(g)). The LCR also required Flint to notify the State in writing of any source change and change in water treatment before it is implemented. The State also must ensure that the system maintains corrosion control treatment in the distribution system under the LCR. The EPA Regional Administrator may review corrosion control treatment determinations by the State and issue federal treatment determinations where it finds that a State has failed to issue a treatment determination by the applicable deadlines contained in §141.81. 40 C.F.R. §141.82.

By April 2015, the EPA was aware that the State lied to them in February 2015 when it represented that the Flint River water had optimized corrosion control. This lie also meant

that no treatment determination had been issued by the State in violation of the LCR. Thus, beginning in April, EPA advised the State that they must issue an order for corrosion control treatment to Flint.

On June 25, 2015, the Region 5 Administrator became aware of both violations of the LCR:  the failure to maintain optimized corrosion control treatment since April 2014 and the failure to issue any corrosion control order to the City for two months, despite being told to do so in April 2015.  EPA was also aware that the absence of corrosion control treatment made lead in the drinking water inevitable after 14 months of distributing corrosive water without any treatment.[21] Thus there was a high potential that human health was being affected.

The PN requirement of the SDWA, establishes three tiers for when notice must be given to the public, and the method for delivery of the notice.  Tiers are as follows:

| | Required Distribution Time | Notification Delivery Method |
|---|---|---|
| **Tier 1** (Immediate Notice) | Any time a situation occurs where there is the potential for human health to be immediately impacted, water suppliers have 24 hours to notify people who may drink the water about the situation. | Water suppliers must use media outlets such as television, radio, and newspapers, post their notice in public places, personally deliver a notice to their customers, or an alternative method approved by the primacy agency. |
| **Tier 2** (Notice as soon as possible) | Any time a water system provides water with levels of a contaminant that exceed EPA or state standards or that hasn't been treated properly, but that doesn't pose an immediate risk to human health, the water system must notify its customers as soon as possible, but within **30 days** of the violation. | Notice may be provided via the media, posting, or through the mail. |
| **Tier 3** (Annual Notice) | When water systems violate a drinking water standard that does not have a direct impact on human health (for example, | Tier 3 PN must be delivered the same way as Tier 2 PN. The extra time gives water suppliers the opportunity to consolidate these notices and |

---

[21] **Ex. 30**, Miguel Del Toral Memorandum, 6/24/15, and *see* also, **Ex. 27**, email of 6/25/15.

| | Required Distribution Time | Notification Delivery Method |
|---|---|---|
| | failing to take a required sample on time) the water supplier has up to a year to provide a notice of this situation to its customers. | send them with Annual Water Quality Reports (Consumer Confidence Reports). |

The EPA did not provide notice either immediately or within 30 days of its April 2015 knowledge of a treatment violation nor require the State or City to provide notice despite clear knowledge that the water had not "been treated properly," and posed a risk to public health.  This was a clear violation of the PN rules.

The EPA, through their Chief of the Ground Water and Drinking Water Branch, acknowledged the violation and that Tier 2 public notice was required to be given.  In a letter drafted to the State requiring immediate action to address the LCR violation, Mr. Poy stated, inter alia, that:

> Flint PWS has been in violation of 40 CFR §141.82(e) since the switch occurred on April 30, 2014.

> This LCR treatment technique violation requires Tier 2 public notice (PN). Given that the violation began in April 2014, we request that the public be notified immediately of this violation.

*See* **Ex. 25**, Draft letter from Thomas Poy to Liane Shekter Smith.[22]

Instead, EPA stood by while the State and City publicly drank the water and assured the community that the was safe.

On July 10, 2015, EPA released a press status which read:

EPA continues to work closely with the Michigan Department of

---

[22] This letter drafted in September 2015 was apparently never sent nor was any action taken by EPA.

Environmental Quality and the City of Flint to ensure that Flint residents are provided with safe drinking water. EPA conducted limited drinking water sampling for lead in Flint in response to a citizen complaint. The initial results and staff recommendations to management were documented in an internal memorandum, which was cited in the ACLU article. EPA will work with Michigan DEQ and the City of Flint to verify and assess the extent of lead contamination issues and to ensure that Flint's drinking water meets federal standards.

Flint residents who are concerned about lead in their drinking should contact the utility and may request that their water be sampled. Additional information about lead in drinking water is available at http://water.epa.gov/drink/contaminants/basicinformation/lead.cfm.

**Ex. 31**, EPA Press Status Email, 07/10/15.

The press release was wholly noncompliant with the PN rule which sets strict requirements on the form, manner and content of a required public notice. There are 10 elements that a public notice must contain, including: A description of the violation that occurred; the potential health effects (including standard required language); the population at risk; whether alternate water supplies need to be used; actions consumers can take; when the system expects a resolution to the problem; and how to contact the water system for more information.

EPA failed to inform the residents of Flint of the violations, misrepresented the number of citizen complaints they had received, implied that they were not sure that any federal standards were violated and advised residents to contact "the utility" if concerned, and "may request that their water be sampled."[23] And then, referred people to a basic EPA

---

[23] There was no program in place for anyone to do water testing upon request by "the utility."

webpage with a link to the LCR.

As OIG determined, the State and City failed to disclose the risk of potential lead exposure to the public. (**Ex. 32**, OIG Findings, 07/12/16, US_Flint149044). OIG further found that, "The EPA Region 5 failed to protect the citizens of Flint and serve as the last resort for oversight as required by law," (*Id.,* US_Flint0149047), and that, "SDWA enforcement provisions, if taken by the EPA sooner than July 2015, could have mitigated the human health impacts in Flint." (*Id.*, US_Flint0149053).

EPA's failure to, at the very least, notify the public of the potential dangers of the ingestion of water laced with lead was unconscionable and a violation of the mandatory SDWA public notification requirements for which there is no defense, let alone immunity.

**4.    Even if the EPA's Obligations under Sections 1414 and 1431 are not Found to be Mandatory, its Actions were not Premised on the SWDA's Social, Economic or Public Policy Goals.**

The discretionary function exception protects only governmental actions and decisions that are based on considerations of public policy. *Berkovitz*, 486 U.S. at 537. Public policy has been understood to include decisions "grounded in social, economic, or political policy." US v *Varig,* 467 U.S. 797, 814 (1984). When "the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime," the DFE is inapplicable. *Gaubert*, 499 U.S. at 325.

Courts have warned against giving this provision too broad a construction or the exception would completely nullify the goal of the FTCA. *Gotha v. U.S.*, 115 F.3d 176,

41

179 (3rd Cir. 1997) ("susceptibility is not a toothless standard that the government can satisfy merely by associating a decision with a regulatory concern"). The analysis depends heavily on the facts of each case. *Graves v. United States* 872 F.2d 133, 137 (6th Cir. 1989). Applying these standards  EPA's arguments, this Court properly found that the DFE is not applicable because the actions of the EPA are not the "of the nature and quality that Congress intended to shield from tort liability."

Defendant has renewed its argument that its actions, with regard to the Flint Water Crisis, were policy decisions covered by the DFE. EPA's argument had no merit then and it has less merit now.  There is no basis for reversing this Court's prior decision resolving these same issues.

Defendant argues that its conduct need only be theoretically susceptible to policy analysis, even if it never actually considered the hypothetical policy it now espouses to justify its actions.[24] (Def.'s Brf., ECF 262, PageID 5028). However, the cases cited by Defendant are both non supportive, and easily distinguishable. In *AO Smith Corp v. U.S.* 774 F.3d 359 (6th Cir. 2014), the court held that the analysis must start with an understanding of the objectives or policies behind the statute or regulation which controls the challenged actions. In that case, there were conflicting and competing policies which had to be balanced. Similarly in *Jude v. Comm'r of Social Security*, 908 F.3d 152 (6th Cir.

---

[24] Defendant's argument, if accepted, would allow the government to invent some hypothetical policy argument after the fact as an excuse for its actions. Clearly, that was not the intent of Congress in enacting the FTCA.

2018) the court had to weigh competing goals of fiscal concerns of the agency with the payment of benefits to qualified individuals.[25] Here there are no conflicting policies inherent in the SDWA. The undisputed goal of the SDWA is to provide safe drinking water to the public through oversight and supervision of public water systems. This policy relates solely to the safety and health of the public and there was no hypothetical or theoretical policy which would or should be prioritized over health and safety. It simply is not susceptible to policy analysis.

The various "policy considerations" proffered by Defendant are that it was not the primary regulator, that MDEQ should not be allowed to abdicate its regulatory responsibilities, that EPA's approach was the most expeditious way to proceed and a more confrontational approach would have slowed down progress. (ECF 262, PageID 5033).[26] In essence, Defendant argues that it was more important to play nice with the State of Michigan and abdicate its oversight responsibilities than to prevent or ameliorate the poisoning of the water supplied to the City of Flint.  Defendant cited these same "policy"

---

[25] Nor does *Mynatt v United States*, 45 F.4th 889 (6th Cir. 2022) support Defendant's position as the court found that the DFE was not applicable because perjury is not conduct grounded in social, economic or political policy. Likewise, the EPA's abdication of its obligation to ensure safe drinking water in Flint is not a discretionary action insulated from liability by the DFE.

[26] Another theoretical policy consideration floated by Defendant is "budgetary concerns."(Def.'s Brf., ECF 262, PageID 5028). However, "only if a statute, regulation or policy requires the government to balance expense against other desiderata" are budgetary considerations protected by DFE. *In re Yosemite Nat'l Park*, 2016 WL 758671 (N.D. Cal. 2016); *Whisnant, v. United States*, 400 F.3d 1177, 1184 (9th Cir. 2005). Nothing in the SDWA provides for that balancing.

excuses for its actions in prior motions. This Court and Judge Levy found them lacking.

Defendant has offered no reason to reverse those decisions.

A.   Defendant's Failure to Enforce §§1431 and 1414 was not Grounded in Policy.

Defendant's lack of regulatory action under §1414 and delayed action under §1431 of the SDWA are not the type of conduct that "can be said to be grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at 325. The goal of the EPA is to "ensure that all Americans are protected from significant risks to human health and the environment where they live and work," including exposure to lead in public drinking water.  As required by the SDWA, the EPA established drinking water regulations in 1974 and undertook an obligation to monitor and protect drinking water quality since. Although EPA grants primacy to states which adopt regulations as stringent as federal regulations with adequate procedures for the enforcement of those regulations, that grant is not a complete delegation of authority. The EPA maintains full authority over the states as well as supervisory and enforcement responsibilities to ensure the safety of public drinking water. (*See* **Ex 6**, Olson Decl.). In fact, the EPA is empowered and required to intervene if a state is in violation of or fails to act to enforce federal drinking water standards. The fact that Michigan had primacy is no excuse for the EPA's failure to exercise its statutory and regulatory obligation of oversight and enforcement.

As part of its oversight responsibilities and obligations under the SDWA, the EPA has the authority and obligation to issue notices of violations, provide technical assistance,

issue §1414 administrative orders of compliance and/or orders imposing penalties, initiate civil actions under §1414 or issue a §1431 emergency order or bring a civil action. Section 1431 provides the EPA with authority to do whatever is needed to bring a water system into compliance and to protect the health of users of a public water system.[27] The EPA can issue a 1431 order even if there is no violation of SDWA rules. Yet, in this case, it chose not to act as lead leached in the Flint drinking water for 19 months.

As this Court correctly stated in response to the Defendant's earlier motion to dismiss:

> In passing the SDWA, Congress intended to leave the primary responsibility for overseeing public water systems with the States. However, Congress sought to set national standards for compliance "to assure that water supply systems serving the public meet minimum national standards for protections of public health" and to empower the federal government to intervene if States fail in their primary responsibilities. Federalism and the efficient use of federal and state resources were policy considerations that factored into devising the regulatory scheme and establishing conditions for the federal government's intervention. Nevertheless, Congress expressly directed the EPA to intervene under specified conditions. In other words, having weighed varying policy interests, Congress decided when federal intervention was

---

[27] Defendant argues that it delayed taking action because it could not order Flint to reconnect with Detroit as its water source. However, the EPA's authority under 1431 is broad. The final guidance on 1431 promulgated by the EPA was issued to encourage a more widespread use of §1431 authority. In that guidance, the EPA explicitly acknowledged that it can issue orders requiring provision of alternate water supplies including connection to an existing PWS. The EPA could even use its § 1431 authority to reach parties that are not responsible including the relocation of a water source to a non-responsible party. The EPA's witnesses who claimed that it could not require Flint to reconnect to DWSD either intentionally ignored their agencies own regulations or were incompetent. Either way, given its broad authority, delay caused by trying to cajole the City of Flint into returning to DWSD provided water rather than ordering it done is not a legitimate policy reason for not issuing a 1431 order earlier.

necessary.

*Burgess,* 375 F.Supp.3d at 815. Thus, unlike *Jude* and *AO Smith,* the EPA here had no authority to weigh conflicting or competing policy goals as that was already done by Congress  in establishing the requirements for intervention when the primacy state failed to protect public health by providing safe drinking water.

As the EPA's OIG concluded, "the Flint water crisis demonstrates that public health is not protected when EPA regional staff – with multiple warning signs – do not use the agency's SDWA authorities in conjunction with EPA oversight tools." (*See* **Ex. 7,** 2018 OIG Report). Moreover, the OIG found that "while Flint residents were being exposed to lead in drinking water, the federal response was delayed, in part, because the EPA did not establish clear roles and responsibilities, risk assessment procedures, effective communication and proactive oversight tools." (*Id.,*). As Judge Levy concluded in the related case, "there is a genuine issue of material fact that the EPA's inaction during crucial moments in the Flint Water Crisis was not due to policy considerations, but rather due to mismanagement and a breakdown in communication." (*Walters v. Flint*, 17-cv-10164, ECF 318, PageID 12723).

EPA's own OIG found that despite having the authority to issue a §1414 enforcement order, and the complaints from April 2014 to June 2015, which "indicated a growing corrosion problem with the drinking water system."  that "EPA intervention was delayed. (*See* **Ex. 32**, OIG Findings). These situations should "generate a greater sense of

urgency." (*See* **Ex. 14,** 2016 OIG Report, p. 8). And, the delay in intervention was not a policy decision but was  caused by EPA not understanding their authority,  a lack of clarity and training of the staff and failure to adequately oversee MDEQ management of their drinking water program, as well as specifics pertaining to City of Flint corrosion control treatment of the new source water and the sampling requirements of LCR.  (*See* **Ex. 7**, 2018 OIG Report, and **Ex. 32** OIG Findings).  The OIG identified the primary causes of the EPA Region 5's failure to protect the citizens as, inadequate oversight; inadequate workforce training; an external culture of participating in the State that blinded EPA from appropriate oversight; and failure to understand its own regulatory tools. *Id.* None of these causes include any of the policy positions Defendant now proffers as the basis for a failure to act.

Courts have concluded that "matters of scientific and professional judgment- particularly judgments concerning safety – are rarely considered to be susceptible to social, economic or political policy." *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005). In *Andrulonis v United States,* 952 F.2d 652 (2nd Cir 1991) a laboratory technician contracted rabies while conducting an experiment under the supervision of a scientist employed by the Center for Disease Control. The scientist failed to warn the technician about the obviously dangerous condition. The Second Circuit concluded that the supervising scientist's action did not implicate policy considerations because "it is hardly conceivable that the CDC would ever have a policy to keep silent about obvious, easily

correctable dangers in experiments using drugs supplied by the CDC." *Id* at 655. The court noted that the government's attempt to "sweep all of the …acts under the rug of broad CDC policy would effectively insulate virtually all actions of a government agent from liability." *Id*.

Likewise, in *Whisnant, supra* the plaintiff alleged that he was exposed to mold which the government allowed to colonize in the commissary's meat department over a three-year period. The Ninth Circuit found that the failure to maintain safe and healthy premises was not a decision susceptible to considerations of social, economic or political policy. *Id.,* at 1179. The Court concluded that "Because removing an obvious health hazard is a matter of safety and not policy, the government's alleged failure to control the accumulation of toxic mold in the Bangor commissary cannot be protected under the discretionary function exception." *Whisnant, supra* at 1183.

The Sixth Circuit reached the same conclusion in *Anestis v. United States* 749 F.3d 520 (6th Cir. 2014), in which a veteran who sought treatment at a VA hospital. was sent away because no one was  available to assess his eligibility for treatment. The court refused to apply the discretionary exception because determination of the emergency state of a patient did not involve questions of public policy but simply an objective scientific and professional judgment regarding his health, *Id* at 529. Citing these and similar cases, this Court found that the EPA's inaction under §§1414 and 1431 involved matters of scientific

and professional judgment that simply were not susceptible to policy analysis.[28]

Applying a similar analysis, this Court, in denying the Defendant's earlier motion to dismiss, found that it could not "conceive of a public policy consideration that could be legitimately balanced against the need to warn and protect an entire community from involuntary and continued poisoning." (citing to *Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019). Opinion, ECF 76 PageID 2651. The scope of the Flint Water Crisis required decisive and immediate action.

The EPA knew before June 2015 that lead was leaching into the water due to the switch to the highly corrosive water from the Flint River, that the MDEQ and Flint officials lied about whether corrosion control was being used and that corrosion control was absolutely necessary.  Defendant has not identified any public policy which would trump this blatant safety hazard in which an entire city was being poisoned by corrosive water and the city and state failed to take immediate action to ameliorate the ongoing crisis.

---

[28] Despite the many cases cited by Plaintiffs and the Court, Defendant challenge this Court's finding that matters of scientific and professional judgment are not susceptible to policy analysis by attempting to distinguish a single case, *Whisnant*, supra. However, the cases relied upon by Defendant are not applicable. In *GATX/Airlog Co v. United States*, 286 F.3d 1168, 1178 (9th Cir. 2015), the court applied the DFE because the FAA regulations required it to "weigh a variety of concerns" and consider a number of alternatives in formulating a solution to a safety problem.  Additionally, the FAA regulations did not prescribe which technical data on which to rely in making its decision. Here Michigan failed to provide timely and accurate data. The EPA failed to enforce its regulatory obligations and then asserted a lack of data necessary to begin enforcement actions. (*See* **Ex. 6**, Olson Decl., §49). The court did not reject the premise that scientific judgment is not susceptible to policy analysis.

B.     Defendant's Failure to Warn Flint Residents Cannot be Justified by
       Any Permissible Exercise of Policy Judgment.

Should this Court find that EPA's obligation to inform the Flint community was not mandatory under the public notification regulations, Defendant is still not entitled to immunity for its failure to warn the community of the potential dangers.

Defendant proffers policy reasons such as the constraints of the available data; the need to provide residents information on lead in drinking water; the need to make that information understandable; and the need not to duly alarm" as excuses for the delay of 18 months in providing notice to the community. (Def.s' Brf., ECF 262, PageID 5040). And yet, all these considerations were resolved by the SDWA requirements to notify affected individuals when their drinking water poses a risk to their health. 40 CFR §141(Q).

EPA admits that they were aware in April 2015 that the City of Flint had failed to maintain corrosion control when they switched the water source to the Flint River in April 2014 in violation of the LCR, as well as the implications of failure to maintain corrosion control. 40 C.F.R. §141.81(b)2; §141.82(g). Throughout its brief, Defendant states that its goal was to *restore safe drinking* in the fastest amount of time. EPA knew that the drinking water was not safe and yet completely failed to provide any warnings to the community. Further, EPA stood by while their primacy agency provided false assurances of safety at a time when the community could have taken steps to protect itself if they had only been provided with the basic information set forth in the Public Notification Rules.

50

The rules themselves provide information on how to protect against the potential of lead in the water, how to handle the absence of full data and how to balance providing information to warn and protect. It was not a policy decision to fail to follow the public notification rules and provide the community with the information that EPA possessed. Yet, (as determined by the OIG) EPA sacrificed community health and safety because of weak management and an ill-advised desire to protect a relationship with the state.

The EPA's failure to timely notify the citizens of Flint of their exposure to lead and risk of that exposure is not barred by the discretionary function exception. As the Court found in *In re Yosemite National Park Hantavirus Litigation,* 2016 WL 758671 (ND Cal 2016), the decision to delay notification to individuals exposed to the virus after staying at the National Park could not be justified by any legitimate policy decision. *Id.* at *22. Likewise, the Third Circuit stated that federal officials could be aware of a safety hazard so blatant that its failure to warn the public could not reasonably be said to involve policy considerations. *SRP ex rel ABunabba v. United States*, 675 F.3d 329, 340 n. 6 (3rd Cir. 2012).

Repeating the same arguments already rejected by this Court, Defendant again argues that there is a strong presumption that EPA's decision on when and how to warn the people of Flint is a discretionary policy decision of the type that is shielded from liability, relying on the case of *A.O. Smith, supra.*.  However the *Smith* court made clear that:

> To the extent these opinions may be read to suggest that failure-to-warn claims categorically satisfy the discretionary function exception, *we decline*

51

*to endorse that position.* This Court must analyze each of Appellants' claims under the two-prong *Gaubert* test. See *Graves v. United States*, 872 F.2d 133, 137 (6th Cir. 1989) ("This analysis is basically ad hoc, and depends on the facts of each case.")

*Id.*, at 369 (emphasis added).

Unlike and distinct from the cases relied upon by Defendant, in this case the SDWA has specific rules on the form, manner, content and frequency of the public notices that must be given which is the result of already balanced risk and exposure to contaminants in drinking water, resulting in a strong favoring of early public notice . 40 C.F.R. §141.201 *et seq*; 40 C.F.R. §141.202; SDWA §1414(c)(1), (c)(2)(c).  EPA has the responsibility for overseeing the primacy state programs to ensure that notice is provided and the public informed in accordance with federal regulations that EPA is required to enforce. (*See* **Ex. 6**, Olson Decl., p. 14, ¶66. ("If the water system does not perform its public notification and public education responsibilities, the primacy state is to do so.  And if the primacy state agency fails, it is incumbent upon EPA…and as part of its responsibility for overseeing primacy state programs to provide notice and inform the public.")).

EPA's Public Notification Handbook (PNH) (rev. 2010) identifies the types of concerns and violations that fall within which Tier for public notification.  Treatment technique violations of the Lead and Copper Rule, including failure to maintain corrosion control, are specifically classified  as a Tier 2 violation.  A Template is provided setting forth the content and form of what a public notification should include. For  Tier 2 violations: "you must provide public notice as soon as practical but within 30 days after

you learn of the violation. 141.203(b)," and that notice should include the following language:

> This is a treatment violation, but it does not mean there is lead in your drinking water.  However, it is important that you take measures to control lead levels in the water, because ingesting lead can cause serious consequences.

**Ex. 33**, EPA Public Notification Handbook, p. 81.

Importantly, EPA requires the delineation of what a public water consumer can do with this information, including running water 15-30 seconds to flush lead from your pipes before using it; not cooking with or using hot water for drinking as lead dissolves easier in hot water, and warning not to boil your water to remove lead—it makes it more concentrated. *See* **Ex. 33**, Template 2-8 p. 82.[29]

Public notice should have gone out no later than May, after EPA learned that there is no corrosion control treatment.  Instead as late as July, the water provider and the primacy agency were reassuring the public there was no need for concern and EPA's 'press statement' complied with none of the form, content, manner or method of distribution requirements of the Public Notification regulation. Had the public had this information, in May 2015, months of toxic exposure to the community-from lead in their water could have

---

[29] The mother of Juan Mireles, who was a year old when the water was switched, testified that she continued using the water for Juan and her other children past March 2015. She did not start getting bottled water until September 2015. Ms. Rodriguez-Chimal also began boiling water used for cooking, drinking and bathing at some point after March 2014  as she had heard that boiling the water would make it safer for her children.  (**Ex. 34**, Affidavit of Amy Rodriguez-Chimal, 02/15/24, ¶¶ 6-8.)

been prevented.[30]

Under the facts of this case, the balancing of risk of exposure with Defendant's expressed concern of "unduly alarming" the public, was done as part of the issuance of the Public Notification Rule.  The rules provide that the overriding concern is to ensure that the public is alerted to a possible risk in their drinking water so they may take necessary steps to protect themselves. There is nothing 'unduly alarming' in the content of the notice that is set forth at Template 2-8, which was developed for public notification of potential lead in drinking water but it allows the public to take steps to limit ingestion of water by themselves and their children. Yet the EPA denied Flint residents that opportunity by failing to warn them of the potential risk of harm.

Defendants simply failed to enforce or take any steps to ensure the public knew what the EPA knew and could then take steps to protect themselves.

      C.      No Public Policy Justifies the Lack of Response to Citizen Complaints.

Without any citation to caselaw, Defendant again argues that discretionary function exception applies to Plaintiffs' claims regarding the EPA's conduct in responding to citizen complaints. This Court has already rejected Defendant's argument. Since Defendant has not provided any new reason for the application of the exception, this Court should again

---

[30] In light of the regulation setting forth the manner of public notification, this case is distinguishable from those cited by Defendant in which there were no rules and regulations regarding the form, manner or timing of public warnings.

reject Defendant's argument and find that the EPA's glaringly dishonest response to citizen complaints was not grounded in policy.

The facts demonstrate that within a month of the water switch, the EPA began receiving citizen complaints about the water. Jennifer Crooks, the EPA manager responsible for receiving and responding to complaints, reported that she had never received as many citizen complaints in her 27-year career with the EPA. She estimated receiving over 100 complaints. EPA responded to some complaints in an untimely manner, and with only a form letter telling citizens to resolve their concerns with the state or city, it downplayed the urgency of the crisis by stating the City of Flint, despite earlier violations, was in compliance with the SDWA.

As the court found in *In re FEMA Trailer Formaldehyde Product Liability Litigation*, 583 F.Supp.2d 758 (E.D. La. 2008), the government could be responsible for failing to take any actions in response to concerns and complaints from citizens regarding formaldehyde in the temporary housing made available after Katrina. The Court held:

> FEMA's duty to quickly and adequately respond to concerns and complaints of formaldehyde was not a policy choice of the type that the discretionary function exception shields…FEMA's response to formaldehyde concerns involved decisions of professional and scientific judgment; it did not involve decisions of social, economic or political policy.

*Id.*, at 783-4.

The Court denied the motion to dismiss because:

> FEMA, once it had adequate notice of a potential hazard, has not shown how failing to test these trailers for formaldehyde level or failing to immediately

remove occupants from the EHU's implicated political, social or economic decisions of the sort that the discretionary function exception was designed to protect.

*Id*., at 784.

Here, a "specific, known and knowable hazard" existed and the EPA both knew of the hazard and knew that the State  and City  had totally failed in their response to the hazard by providing either no or inaccurate responses to citizen complaints. This failure to accurately respond to citizen complaints involving a large-scale public health crisis cannot possibly be grounded in policy decisions of the sort that exception was intended to shield. Thus, Defendant's attempt to evade responsibility for its actions and inactions in response to the Flint Water Crisis by hiding behind the discretionary function exception should be rejected again.

## IV.    CONCLUSION

For all reasons given and authorities cited above, Defendant's Motion should be denied.

Respectfully submitted,

By: *s/ Deborah LaBelle*
Deborah A. LaBelle (P31595)
LAW OFFICES OF DEBORAH A. LABELLE
221 N. Main Street, Suite 300
Ann Arbor, MI 48104 (734) 996-5620
deblabelle@aol.com

Cary S. McGehee (P42318)
Beth M. Rivers (P33614)
PITT McGEHEE PALMER & RIVERS, PC
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
(248) 398-9800
cmcgehee@pittlawpc.com
brivers@pittlawpc.com

Julie H. Hurwitz (P34720)
GOODMAN HURWITZ & JAMES, PC
1394 E. Jefferson Avenue
Detroit, MI 48207
(313) 567-6170
jhurwitz@goodmanhurwitz.com

*Attorneys for Plaintiffs*

By: */s/ Paul J. Napoli*
Paul J. Napoli
NAPOLI SHKOLNIK PLLC
270 Munoz Rivera Avenue, Suite 201
Hato Rey, Puerto Rico 00918
(787) 493-5088
PNapoli@NSPRlaw.com

*Co-Lead Counsel for the FTCA Plaintiffs*

Dated: April 9, 2024

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was filed with the U.S. District Court through the ECF filing system and that all parties to the above cause was served via the ECF filing system on April 9, 2024.

*/s/Betsy L. Lewis*
221 N Main St., Ste 300
Ann Arbor, MI 48104
734-996-5620
betsyllewis@gmail.com

57