UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| *In re* FTCA Flint Water Cases | Civil No. 4:17-cv-11218 (Consolidated) |
| This Motion Relates to:<br>THE FIRST BELLWETHER PROCEEDINGS | Linda V. Parker<br>United States District Judge |
| | Curtis Ivy, Jr.<br>United States Magistrate Judge |

_____/

**DEFENDANT UNITED STATES OF AMERICA'S REPLY BRIEF
IN SUPPORT OF ITS MOTION TO DISMISS FOR LACK OF
SUBJECT-MATTER JURISDICTION PURSUANT TO THE FTCA'S
<u>DISCRETIONARY FUNCTION EXCEPTION</u>**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................... i

INTRODUCTION ............................................................................................. 1

ARGUMENT ..................................................................................................... 2

   I.   Policy Makers At the Highest Level Of The EPA Engaged In Policy Analysis In Responding To The Flint Water Crisis............................................................. 2

      A.  EPA Balanced Competing Policy Considerations Over Time...................... 2

      B.  Decisions Related To Public Warnings Implicate Policy Considerations.... 8

   II.  No Specific And Mandatory Statute, Rule, Or Regulation Removed EPA's Discretion In Deciding How To Respond To The Issues In Flint......................... 10

      A.  SDWA Section 1414 Did Not Eliminate EPA's Discretion. ...................... 10

      B.  The Public Notification Rule Is Inapplicable. ............................................ 13

   III. There Has Been No Constitutional Violation That Overcomes The DFE..... 14

# INTRODUCTION

The Flint Water Crisis presented EPA policy makers with a challenging set of decisions layered with unique federalism implications. The complete factual record[1] demonstrates that EPA policy makers at the highest levels of the agency balanced difficult and competing social, economic, environmental, public health, and federalism factors in responding to this crisis, which satisfies the second prong of the discretionary function exception (DFE). Moreover, as this Court has already found, the first prong of the DFE is satisfied because the Safe Drinking Water Act (SDWA) affords EPA significant discretion in responding to water system issues. Finally, as a matter of law, the United States did not violate Plaintiffs' right to bodily integrity.

---

[1] The United States' previous DFE motion was based on a limited discovery record from 2017 that included only seven three-hour EPA depositions. *See Burgess v. United States*, No. 17-11218, 2019 WL 4734686, at *1 (E.D. Mich. Sept. 27, 2019) (noting that "facts remain to be developed and future discovery may impact the Court's analysis" regarding application of the DFE). This Motion draws upon twenty additional EPA depositions, including two-day depositions of high-level EPA employees not previously deposed—most importantly, Regional Administrator Susan Hedman, Assistant Administrator Cynthia Giles (responsible for nation-wide enforcement), Director of the OECA Water Enforcement Division Mark Pollins, Deputy Administrator Stan Meiburg, and Director of EPA's Office of Groundwater and Drinking Water Peter Grevatt. The parties also participated in more comprehensive depositions of important witnesses who were deposed initially in 2017, including Tinka Hyde, Robert Kaplan, Thomas Poy, Miguel Del Toral, Rita Bair, and Jennifer Crooks. Additionally, the record now includes the Fed. R. Civ. P. 30(b)(6) testimony of EPA witness Robert Kaplan.

1

# ARGUMENT

### I. Policy Makers At the Highest Level Of The EPA Engaged In Policy Analysis In Responding To The Flint Water Crisis.

When, as in this case, there is no mandatory and specific directive under DFE prong one, the United States is entitled to a "'strong presumption' that the second condition is met as well." *Jude v. Comm'r of Soc. Sec.*, 908 F.3d 152, 159 (6th Cir. 2018) (quoting *United States v. Gaubert*, 499 U.S. 315, 324 (1991)). The complete and robust factual record demonstrates that EPA faced an extraordinarily challenging situation in determining which regulatory and enforcement approach would best protect the public, and that its enforcement decisions were not only susceptible to policy considerations but were in fact grounded in a multi-faceted policy analysis that included social, economic, environmental, public health, and federalism considerations by high-level policy makers vested with that authority.

### A. EPA Balanced Competing Policy Considerations Over Time.

EPA policy makers implemented different strategies over time, all of which implicated competing policy considerations. The opposition brief does not address the passage of time and associated context for EPA's decisions about how to best respond to the water issues. Decisions at three important junctures reflected EPA's policy choices implicated changing, competing concerns and involved judgment calls by EPA's leadership and delegated decision-makers. Because EPA's balancing

of competing policy considerations informed its SDWA determinations, its decisions regarding how to respond to the Flint crisis satisfy DFE prong two.

First, in July 2015, the most pressing issue was finding the quickest and most effective way of having the Michigan Department of Environmental Quality (MDEQ) and Flint implement corrosion control.[2] In attempting to convince MDEQ and Flint to quickly re-institute corrosion control, Director Tinka Hyde decided to engage in informal enforcement with leading Michigan public water officials. That decision implicated competing policy considerations, including: (1) a balancing of environmental federalism and primacy concerns because MDEQ was the primary regulator and enforcer of water regulations in Michigan; (2) choosing the most effective method that would lead to corrosion control implementation as quickly as possible, while recognizing that MDEQ and Flint were in the best position to address

---

[2] Plaintiffs argue that Flint water issues were matters of scientific judgment that could not have been susceptible to a policy analysis. Opp. at 37–38. In *Gaubert*, however, the Supreme Court rejected an argument that actions fell "outside the discretionary function exception because they involved the mere application of technical skills and business expertise." 499 U.S. at 331. When regulators may "choose from various courses of action" that also involve policy considerations, those actions are protected by the DFE. *Id.* at 331–32; *see GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1178 (9th Cir. 2002) ("Simply because technical data is at issue does not mean that the decisions are stripped of their policy implications."); *see also Slappey v. U.S. Army Corps of Engineers*, 571 Fed. Appx. 855, 861 (11th Cir. 2014); *U.S. Dept. of Hous. & Urban Dev.*, 236 F.3d 756, 764 (D.C. Cir. 2001) (agency's "national audit of lead-based paint contracting activities" implicates public policy considerations).

3

those issues, assisted by the re-offered technical assistance from EPA's Office of Research and Development (ORD); (3) most efficiently deploying Region 5's limited resources given its oversight of 42,000 public water systems throughout six states, including 10,000 systems in Michigan alone;[3] and (4) avoiding costs and delays associated with legal challenges to an Section 1431 order (whether an imminent and substantial endangerment was known to exist and whether state and local actors were addressing any potential endangerment given system-wide sampling below the LCR action level of 15ppb) or a Section 1414 order (competing interpretations of the LCR).[4] These "judgment calls" are the "'public policy' discretionary judgments Congress intended to shield from liability under section 2680(a)." *Lockett v. United States*, 938 F.2d 630, 639 (6th Cir. 1991).[5]

---

[3] Binding precedent establishes that budgetary concerns may be considered in determining whether safety decisions are susceptible to policy analysis. *Compare* Opp. at 34 n.25, *with Varig Airlines*, 467 U.S. 797, 820 (1984), *Lockett*, 938 F.2d at 639, and *Jude*, 908 F.3d at 159. Plaintiffs' reliance on out-of-circuit cases where the federal government was neither a primary nor secondary regulator is unpersuasive.

[4] Motion at 35–40.

[5] The SDWA "Emergency Powers" provision states that the EPA Administrator "may take such actions as he may deem necessary" when a water system "present[s] an imminent and substantial endangerment to the health of persons, and [when] appropriate State and local authorities have not acted to protect the health of such persons." 42 U.S.C. § 300i(a). The Administrator may "consult" with the State and local authorities in order to confirm the correctness of the information on which action proposed to be taken under this subsection is based and to ascertain the action which such authorities are or will be taking." *Id*. Because the SDWA requires a finding of imminent and substantial endangerment *and* a finding that the State and local authorities were not responding to that endangerment, the statute required

Second, in October 2015, EPA Assistant Administrator Cynthia Giles specifically considered entering a Section 1431 order and decided instead to rely on informal enforcement first, because a Section 1431 order risked making Flint and MDEQ "much more contentious," and would be "distracting and counterproductive to the purpose of everyone applying 100 percent of the attention and authority to fixing this problem." Motion at 24–25. In reaching this conclusion, EPA considered that enforcement objectives—getting MDEQ and Flint to accept EPA ORD's technical assistance regarding corrosion control and the enactment of the 10-Point Plan to provide public notice about lead in the water and free bottled water, pre-mixed formula, and water filters to Flint residents—were already being met on the ground in Flint.[6] Assistant Administrator Giles reconfirmed with Regional Administrator Susan Hedman that the State's 10-Point Plan and collaboration with EPA ORD to accelerate implementation of corrosion control for Flint covered everything EPA might otherwise put in a Section 1431 order at that time.[7]

The DFE prong two inquiry is *not* whether Assistant Administrator Giles

---

informal enforcement before the issuance of a Section 1431 order. Indeed, EPA ensured correctness of the corrosion control information through the LCR clarifying memorandum and obtained assurances that State and local authorities were responding to the water issues through the 10-Point Plan. EPA, therefore, proceeded under SDWA's federalism framework.

[6] *See* Motion at 23.
[7] See Exh. AO.

5

*should have* entered a Section 1431 order at this point in time but, instead, whether that decision was subject to policy considerations. The only relevant consideration is "'whether those choices are authorized to be made on the basis of 'social, political or economic policy.'" *Myers v. United States*, 17 F.3d 890, 896 n.5 (6th Cir. 1994) (quoting *Dalehite v. United States*, 346 U.S. 15, 33 (1953)).

Against a backdrop of seemingly successful informal enforcement efforts in October 2015, EPA continued to weigh various policy considerations in evaluating whether SDWA's formal 1431 and 1414 tools had a better chance of securing EPA's objectives than informal enforcement. Those policy considerations included: (1) the value of pushing the State to revert its water source to the Detroit system, an outcome that, in the view of senior EPA enforcement officials, fell outside the scope of a Section 1431 order;[8] (2) the fact that the remedy for a Section 1414 violation would be an assessment of civil penalties that would further divert necessary financial resources from Flint; (3) the risk of having to litigate a primacy state's rights and the risk of impeding important progress that appeared to be occurring at that time; and (4) the potential diversion of EPA's limited resources from assisting implementation of corrosion control through technical and scientific support.[9] EPA's enforcement

---

[8] EPA successfully persuaded Flint to return to Detroit water on October 16, 2015. *See* Exh. AI at 219:6-20; 269:5-271:12; 518:17-519:4.
[9] Motion at 40–42.

decisions involved policy considerations that senior level employees were entitled to make, and which the DFE protects.

Third, by January 21, 2016, EPA's re-balancing of competing policy considerations yielded a different result. Assistant Administrator Giles testified that in January 2016, "the city and state were becoming more resistant, less responsive to the advice that they were getting from outside experts, . . . it was very apparent that they did not have the capacity on their own to deal with this emergency situation," and the litigation risks "were lower." Motion at 26–27. Assistant Administrator Giles determined that "the balance shifted in favor of doing the [Section 1431] order" because "the downside risks were lower [and] the upside need was higher." *Id*.[10] EPA's re-balancing to account for new information is protected by the DFE because the decision implicated a judgment call that required the Administrator to navigate competing policy considerations. These policy judgments were now coupled with statements from elected State and Federal officials demanding formal enforcement action[11] that specifically implicated policy considerations regarding the federal-state relationship, making an Emergency Order

---

[10] *See also* Exh. AK at 49:19-50:8.
[11] *See Burgess v. United States*, 375 F. Supp. 3d 796, 808 (E.D. Mich. 2019) ("On December 14, 2015, the City declared an emergency. On January 14, 2016, Michigan's Governor requested emergency disaster assistance. Two days later, President Obama declared a federal emergency in the City.").

7

more likely to be effective. *See* 42 U.S.C. § 300i(a), *supra* n.5[12]

Contrary to Plaintiffs' suggestion, the SDWA does not resolve all conflicting policy issues, leaving no further policy consideration for EPA. Opp. at 33–34. EPA's *enforcement* of the SDWA is subject to the DFE if the statute and regulation "allow[s] room for implementing officials to make independent policy judgments," and, "protects the acts taken by those officials in the exercise of this discretion." *Berkovitz v. United States*, 486 U.S. 531, 546 (1988). EPA had various enforcement tools, among them informal enforcement, from which to choose to best protect the public, and it had discretion in choosing which tools to use, and when to use them. Asking whether EPA *should* have refrained from employing informal procedures and whether it *should* have issued a formal enforcement order sooner second-guesses discretionary decisions imbued with multiple policy considerations.[13]

## B. Decisions Related To Public Warnings Implicate Policy Considerations.

EPA's decision as to whether, when, and how to warn the public about the Flint water issues was susceptible to policy analysis. The Sixth Circuit has repeatedly

---

[12] Section 300i(a) specifically requires that EPA "consult with the State and local authorities" prior to the issuance of any emergency orders "to ascertain the action which such authorities are or will be taking." 42 U.S.C. § 300i(a).

[13] Plaintiffs rely on 2016 and 2018 OIG reports that analyze how EPA could have used its oversight tools. Opp. at 37. Reliance on such retrospective assessment constitutes improper second-guessing. *See, e.g.*, *Huntress v. United States*, 810 Fed. Appx. 74, 76 (2d Cir. 2020) ("[D]ecision to prosecute or enforce" are the "quintessential examples of governmental discretion.").

"observed that the government is 'generally shielded from tort liability' in deciding whether to warn of potential dangers." *A.O. Smith Corp. v. United States*, 774 F.3d 359, 369 (6th Cir. 2014) (quoting *Edwards v. Tenn. Valley Auth.*, 255 F.3d 318, 324 (6th Cir. 2001)). "Specifically, [a decision whether to warn] is the type of decision that 'fit[s] within the second prong of the discretionary function test.'" *Id.* (quoting *Bell v. United States*, 238 F.3d 419, at *5 (6th Cir. 2000)). In determining whether to warn of a potential danger, the government is inundated with policy considerations, including "'what type of warnings [are] effective and cost-justified.'" *Id.* at 370 (quoting *Graves v. United States*, 872 F.2d 133, 137 (6th Cir. 1989)).

In determining whether and when to issue public notices, EPA weighed necessity and effectiveness in light of (1) MDEQ's assurances regarding public education in August 2015; (2) the City and County's issuance of public health advisories in September 2015;[14] and (3) MDEQ's announcement of a 10-Point Plan in October 2015. Based on these public statements from local officials, EPA's decisions regarding whether, when, and how to warn were susceptible to policy analysis.[15]

---

[14] Exh. AF & AG.
[15] *See* Motion at 44–45.

## II. No Specific And Mandatory Statute, Rule, Or Regulation Removed EPA's Discretion In Deciding How To Respond To The Issues In Flint.

The Court's earlier finding that DFE's prong one is satisfied should stand because Plaintiffs have not identified any mandatory and specific statute, rule, or regulation that eliminated EPA's discretion in responding to the Flint water issues.

### A. SDWA Section 1414 Did Not Eliminate EPA's Discretion.

Section 1414 does not impose any specific and mandatory directive regarding enforcement responsibilities. As Plaintiffs acknowledge,[16] Section 1414 hinges on a threshold determination by the EPA "Administrator" that a water system is non-compliant. 42 U.S.C. § 300g-3(a).[17] Because Section 1414 leaves the threshold determination of non-compliance to the exclusive discretion of the Administrator, as the agency head, prong one of the DFE is satisfied.[18] Plaintiffs' emphasis on the "consensus of the entire Ground Water Drinking Water Branch at Region 5," the views of subordinates such as Mr. Del Toral,[19] and the opinions of their retained

---

[16] Opp. at 20, 24–25.
[17] *See* 42 U.S.C. § 300g-3(a) ("When the Administrator finds . . . ."); *id*. § 300f(7) ("'Administrator' means the Administrator of the Environmental Protection Agency.").
[18] *See Jude*, 908 F.3d at 159 ("The decision whether the 'predicate condition exists'" satisfies the DFE "even though th[at] outcome . . . mandate[s] specific corresponding next steps."); *Myers*, 17 F.3d at 896 (language that affords choice in determining existence of a condition satisfies DFE prong one).
[19] Mr. Del Toral's deposition testimony reflects that he: (1) first discovered that Flint was not implementing corrosion control on April 24, 2015, after being misled by MDEQ that corrosion control was being implemented; (2) documented potential

10

witness, Erik Olson, *see* Opp. at 21–22, are not relevant to DFE prong one. Only the non-compliance determinations of Regional Administrator Hedman and Director Hyde—the two officials within Region 5 delegated the authority to determine SDWA violations[20]—could have triggered any Section 1414 obligations.

Plaintiffs misconstrue Regional Administrator Hedman's informal prodding of the State on June 30, 2015 as a non-compliance determination and notification. Regional Administrator Hedman testified that she implored MDEQ, via informal enforcement procedures, to expedite corrosion control treatment.[21] In balancing various considerations, she believed Flint and MDEQ were in the best position to correct the corrosion control issues.[22] These actions reflect EPA's efforts to expeditiously resolve the Flint water issues **outside** SDWA's formal enforcement process. Further, Director Hyde never found that a violation of the LCR occurred. During a July 21, 2015 call between EPA Region 5 and MDEQ leadership, Director Hyde agreed with MDEQ's request for an EPA Headquarters opinion resolving the

---

widespread lead concerns throughout Flint's water system in an Interim Report on June 24, 2015 (which served as the foundation for EPA getting MDEQ to agree on July 21, 2015, to direct Flint to implement corrosion control), and thereafter provided technical assistance to MDEQ and Flint through the end of 2015 and into 2016 along with EPA scientists; and (3) EPA persuaded MDEQ to revert Flint's water supply back to Detroit. *See* Motion at 16–19.

[20] Exh. N at 519:6-20; Exh. B at 168:11-169:5; Exh. W; Exh. X.
[21] Motion at 19–21.
[22] Exh. T at 274:22-275:5, 284:9-17.

LCR interpretation issue, rather than insisting that a violation existed.[23] As this Court found, EPA issued "a policy memorandum on November 2, 2015, clarifying how the LCR should be interpreted on a prospective basis." *Burgess*, 375 F. Supp. 3d at 807 n.4. Legal interpretation of the LCR was, for EPA's purposes, unnecessary at that time because the informal means of gaining compliance appeared to be working.[24] Decisions to use informal enforcement tools were well within EPA's discretion.

Plaintiffs allude to statements by Erik Olson, their retained witness, that "EPA should have issued an administrative order or initiated a civil suit no later than May of 2015 . . . to ensure that corrosion control was immediately commenced." Pl. Ex. 5 ¶ 48; *see also id.* ¶ 9 ("The agency should have taken enforcement action . . . ."); *id.* ¶ 11 ("EPA should have known . . . ."). But differing opinions as to what EPA should have done, whether it should have acted sooner, or even whether EPA acted wrongfully (which it did not), are not determinative, since the DFE applies "whether or not the discretion involved [is] abused." 28 U.S.C. §2680(a); *Rosebush v. United States*, 119 F.3d 438, 442 (6th Cir. 1997) (quoting *Dalehite*, 346 U.S. at 33). The only question under DFE prong one is whether a "federal statute, regulation, or policy . . . "specifically prescribe[d]" a course of action." *Berkovitz*, 486 U.S. at 536.

---

[23] Exh. L at 191:22-23, 213:10-17; Exh. A at 364:2-9, 415:3-7; Exh. N at 465:13-22; Exh. B at 212:11-20; *Burgess*, 375 F. Supp. 3d at 807.
[24] Motion at 21–27.

Plaintiffs' arguments that EPA should have taken enforcement action and "should have alerted [Flint residents] to the lack of effective corrosion control much earlier," Opp. at 29, "collapse the discretionary function inquiry into a question of . . . negligen[ce]." *Kohl v. United States*, 699 F.3d 935, 941 (6th Cir. 2012). The arguments do not provide any basis to disturb the Court's finding that the SDWA grants EPA significant discretion at DFE prong one.

### B. The Public Notification Rule Is Inapplicable.

The SDWA public notification rule, 40 C.F.R. pt. 141, subpt. Q, is inapplicable, as it did not impose any notice obligations or any specific and mandatory enforcement responsibilities on EPA. Section 141.201(a) only identifies the "***owner or operator*** of a public water system" as the party required to give "notice for all violations of national primary drinking water regulations." 40 C.F.R. § 141.201(a) (emphasis added). Section 141.210 clarifies that "***the primacy agency*** may give the notice required by this subpart on behalf of the owner and operator of the public water system if the primacy agency complies with the requirements of [Subpart Q]." 40 C.F.R. § 141.210(a)–(b) (emphasis added).

By its plain text, Subpart Q's public notice requirements apply only to the City of Flint, as owner and operator of the Flint water system, and MDEQ, as primacy agency. Plaintiffs even explicitly acknowledge that "*a public water system* **must** notify their customers when they violate EPA or State drinking water

13

regulations . . . ." Opp. at 29 (italics added). The notice provisions do not apply to EPA and cannot serve as a mandatory and specific directive at DFE prong one.[25]

### III. There Has Been No Constitutional Violation That Overcomes The DFE.

EPA's conduct could not have violated Plaintiffs' substantive due process right to bodily integrity because, as this Court has already found, EPA was not involved in the decision to switch to the Flint River or to forego corrosion control.[26]

The Sixth Circuit, in addressing the role of State and City actors, concluded that "a government actor violates individuals' right to bodily integrity by knowingly and intentionally introducing life-threatening substances into individuals without their consent, especially when such substances have zero therapeutic benefit." *Guertin v. State*, 912 F.3d 907, 921 (6th Cir. 2019). However, the *Guertin* panel held that "the Due Process Clause is a limitation only on government action," so an alleged failure to act does not violate this right. *Id.* at 930 (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)). Accordingly, the panel found that this right was violated only by those State and City officials who

---

[25] As the Court recognized, EPA exercised discretion in determining if and how to communicate with local citizens about local water quality issues. *Burgess*, 375 F. Supp. 3d at 813–14; *see also A.O. Smith*, 774 F.3d at 369 (prong one is satisfied where "no directives . . . require the Corps to warn downstream residents."); *Rosebush*, 119 F.3d at 442 (determining no regulations required the Forest Service to warn of the dangers of a fire pit).

[26] *See Burgess*, 375 F. Supp. 3d at 803; Exh. A at 206:12-210:14, 340:13-341:20.

14

decided to switch to the Flint River or instructed Flint not to implement corrosion control, including those who "then intentionally attempted to cover-up their grievous decision." 912 F.3d at 926–28. By contrast, the panel refused to find the right violated by those State officials who: (1) were aware of the switch but did not "personally ma[k]e decisions regarding the water-source switch," *id.* at 929; or (2) were not involved in the decision to "switch to the Flint River or the decision not to treat the water," *id.* at 930.[27]

For the same reasons, EPA's alleged failures to take regulatory action are not violations of the Due Process Clause. *Id.* at 932 (dismissing Due Process claims based on failure to warn). Moreover, neither the Due Process Clause nor case law interpreting the right to bodily integrity "specifically prescribes a course of action for an [EPA] employee to follow" in deciding whether and how to intervene in Flint. *Berkovitz*, 486 U.S. at 536. This Court should not expand the right to bodily integrity in this context, through the FTCA waiver of sovereign immunity.

## CONCLUSION

Plaintiffs' claims against the United States are barred by the DFE and should be dismissed.

---

[27] The Court also found that there was "no fundamental right to water service and [that] the Constitution does not guarantee a right to live in a contaminant-free, healthy environment." *Guertin*, 912 F.3d at 921–22 (citations and quotations omitted).

15

Dated: May 20, 2024   Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

CHETAN A. PATIL
Acting Deputy Assistant Attorney General
Torts Branch

J. PATRICK GLYNN
Director

CHRISTINA FALK
Assistant Director

*/s/Heidy L. Gonzalez*
Heidy L. Gonzalez (FL Bar #1025003)
Michael L. Williams (DC Bar #471618)
Eric Rey (DC Bar # 988615)
United States Department of Justice
Environmental Torts Litigation Section
1100 L Street, NW
Washington, DC 20005
E-mail: heidy.gonzalez@usdoj.gov
Phone: 202-307-6469

*Counsel for United States of America*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 20, 2024, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system.

*/s/Heidy L. Gonzalez*
Heidy L. Gonzalez

16