UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| *In re* FTCA Flint Water Cases | Civil No. 4:17-cv-11218 (Consolidated) |
| This Motion Relates to: | Linda V. Parker United States District Judge |
| THE FIRST BELLWETHER PROCEEDINGS | Curtis Ivy, Jr. United States Magistrate Judge |

---

## United States of America's Motion to Dismiss for Lack of Subject-Matter Jurisdiction Pursuant to the Federal Tort Claims Act's Analogous Private Liability Requirement and Misrepresentation Exception

---

The United States moves to dismiss the 11 Bellwether Plaintiffs' claims for lack of subject-matter jurisdiction. For the reasons discussed in the accompanying Memorandum in Support, (1) these Plaintiffs' claims do not satisfy the Federal Tort Claims Act's (FTCA) requirement that a private person would be liable under Michigan's Good Samaritan doctrine under similar circumstances, 28 U.S.C. §§ 1346(b)(1) & 2674, and (2) to the extent these claims arise from the United States' communications or miscommunications, the FTCA's misrepresentation exception (28 U.S.C. § 2680(h)) deprives this Court of subject-matter jurisdiction over such claims.

1

This motion is submitted pursuant to the briefing schedule in the Court's August 5, 2024 Stipulated Order to Extend Briefing Deadlines. ECF 296 at PageID.6862. Pursuant to Local Rule 7.1(a), the parties conferred on September 24, 2024, and October 2, 2024, and Plaintiffs indicated that they oppose this motion.

Dated:  October 16, 2024                    Respectfully submitted,


BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General, Civil Division

CHETAN PATIL
Deputy Assistant Attorney General
Torts Branch

J. PATRICK GLYNN
Director

CHRISTINA FALK
Assistant Director

*/s/ Eric Rey*
ERIC REY (DC Bar # 988615)
JASON COHEN
MARIANNE KIES
Trial Attorneys
United States Department of Justice
Civil Division, Torts Branch
Environmental Tort Litigation
1100 L St., NW
Washington, DC 20005
Phone: 202-606-4224
E-mail: eric.a.rey@usdoj.gov

*Attorneys for the United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2024, I electronically filed the foregoing and accompanying Memorandum in Support and Exhibits using the Electronic Case Filing ("ECF") system of this Court. The ECF system will send a "Notice of Electronic Filing" to the attorneys of record.

*/s/ Eric Rey*
Eric Rey

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| *In re* FTCA Flint Water Cases | Civil No. 4:17-cv-11218 (Consolidated) |
| This Motion Relates to: | Linda V. Parker United States District Judge |
| THE FIRST BELLWETHER PROCEEDINGS | Curtis Ivy, Jr. United States Magistrate Judge |

**United States of America's Memorandum in Support of its
Motion to Dismiss for Lack of Subject-Matter Jurisdiction Pursuant to the
Federal Tort Claims Act's Analogous Private Liability Requirement and
Misrepresentation Exception**

## ISSUES PRESENTED

1. Whether the 11 Bellwether Plaintiffs' tort claims against the United States satisfy the Federal Tort Claims Act's (FTCA) analogous private liability requirement, 28 U.S.C. §§ 1346(b)(1) & 2674, for subject-matter jurisdiction.


2. Whether the FTCA's misrepresentation exception, 28 U.S.C. § 2680(h), bars this Court's subject matter jurisdiction over the Bellwether Plaintiffs' claims arising from communications related to the Flint Water Crisis.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

**Cases**

*1200 Sixth St., LLC v. U.S. ex rel. Gen. Servs. Admin.*, 848 F. Supp. 2d 767 (E.D. Mich. 2012)

*Abbey v. United States*, 112 F.4th 1141 (9th Cir. 2024)

*Abbott v. United States,* 78 F.4th 887 (6th Cir. 2023)

*Ashbrook v. Block*, 917 F.2d 918 (6th Cir. 1990)

*Block v. Neal*, 460 U.S. 289 (1983)

*In re FEMA Trailer Formaldehyde Prod. Liab. Litig. (Louisiana Plaintiffs)*, 713 F.3d 807 (5th Cir. 2013)

*Good v. Ohio Edison Co.*, 149 F.3d 413 (6th Cir. 1998)

*Halsey v. Townsend Corp. of Ind.*, 20 F.4th 1222 (8th Cir. 2021).

*Hart v. Ludwig*, 79 N.W.2d 895 (Mich. 1956)

*Howell v. United States,* 932 F.2d 915 (11th Cir. 1991).

*Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016 (7th Cir. 2018)

*Mays v. City of Flint, Mich.*, 871 F.3d 437 (6th Cir. 2017)

*McAtee v. Fluor Constructors Int'l, Inc.*, 188 F.3d 508, 1999 WL 685928 (6th Cir. 1999) (unpublished table decision)

*Merrill v. Arch Coal, Inc.*, 118 F. App'x 37 (6th Cir. 2004)

*Myers v. Muffler Man Supply Co.*, No. 277542, 2008 WL 4330240 (Mich. Ct. App. Sept. 23, 2008)

*Myers v. United States*, 17 F.3d 890 (6th Cir. 1994)

*Ohio Pub. Int. Rsch. Grp., Inc. v. Whitman*, 386 F.3d 792 (6th Cir. 2004)

*Raymer v. United States,* 660 F.2d, 1136 (6th Cir. 1981)

*United States v. Neustadt*, 366 U.S. 696 (1961)

*United States v. Olson*, 546 U.S. 43 (2005)

**Statutes**

28 U.S.C. § 1346(b)(1)

28 U.S.C. § 2674

28 U.S.C. § 2680

## TABLE OF CONTENTS

ISSUES PRESENTED................................................................................ ii

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................. iii

INDEX OF EXHIBITS........................................................................... vi

INTRODUCTION .................................................................................1

STATEMENT OF FACTS ........................................................................3

I.   EPA Was Not Involved in MDEQ's and the City's Decisions to Switch to the Flint River and to Forego Corrosion Control. ....................................................4

II.  EPA Recommends MDEQ Start Corrosion Control and Return the City to Detroit Water. ................................................................................5

III. Prior to the Section 1431 Order, None of the Bellwether Plaintiffs Communicated with EPA or Forwent Precautions Due to EPA's Actions. .........8

RELEVANT PROCEDURAL BACKGROUND ...................................................9

STANDARD OF REVIEW ......................................................................10

ARGUMENT ....................................................................................11

I.   The Bellwether Plaintiffs Have Not Satisfied the FTCA's Analogous Private Liability Requirement. ........................................................................12

A.  EPA's Undertaking Must Be Tied to the Specific Acts It Undertook and Not Painted Broadly. ..........................................................................15

1.  The "Oversight and Monitoring of Flint's Water System" Undertakings. ……………………………………………………………………..17

2.  The Communications Undertaking Is Irrelevant to the Bellwether Plaintiffs' Claims. ....................................................................22

B.  Whether EPA Negligently Performed Its Undertakings. ...........................24

C.  The Bellwether Plaintiffs Have Not Satisfied the Additional, Alternative Bases for Section 324A Liability..................................................26

1.  The Bellwether Plaintiffs, MDEQ, and the City Did Not Detrimentally and Justifiably Rely Upon EPA's Undertakings. .........................26

2.  EPA Did Not Supplant MDEQ or the City from Their Responsibilities, and Therefore Section 324A(b) Is Not Met.................................29

3.  EPA Did Not Increase the Bellwether Plaintiffs' Risk of Physical Harm, and Therefore Section 324A(a) Is Not Met.................................32

II.  The FTCA's Misrepresentation Exception Bars Claims Arising Out of EPA's Communications Related to the Flint Water Crisis .............................36

CONCLUSION ..................................................................................40

# INDEX OF EXHIBITS

**Exhibit A:** Deposition of Heather Shoven, September 15, 2022, excerpted

**Exhibit B:** Deposition of Jennifer Crooks, July 6 and 7, 2020, excerpted

**Exhibit C:** Deposition of Jennifer Crooks, November 16, 2017, excerpted

**Exhibit D:** Email from Jennifer Crooks (October 23, 2014)

**Exhibit E:** Email from Mike Prysby (September 17, 2014)

**Exhibit F:** Email from Stephen Busch (October 16, 2014)

**Exhibit G:** Email from Jennifer Crooks (March 03, 2015)

**Exhibit H:** Deposition of Miguel Del Toral, June 11 and 12, 2020

**Exhibit I:** Email from Pat Cook (April 28 2015)

**Exhibit J:** Deposition of Thomas Poy, June 22 and 23, 2020, excerpted

**Exhibit K:** Miguel Del Toral's Interim Report (June 24, 2015)

**Exhibit L:** Rule 30(b)(6) Deposition of Thomas Poy, December 7, 2021, excerpted

**Exhibit M:** Deposition of Tinka Hyde, May 28 and 29, 2020, excerpted

**Exhibit N:** Briefing Paper for Call with MDEQ on July 21, 2015

**Exhibit O:** Rule 30(b)(6) Deposition of Robert Kaplan, January 13 and 14, 2022, excerpted

**Exhibit P:** Email from Thomas Poy (September 21, 2015)

**Exhibit Q:** Email from Marc Edwards (September 21, 2015)

**Exhibit R:** City of Flint, City of Flint Issues Lead Advisory (September 25, 2015)

**Exhibit S:** Genesee County Board of Commissioners, Public Health Advisory for People Using the Flint City Water Supply, September 29, 2015

**Exhibit T:** Email from Susan Hedman (September 29, 2015), excerpted

**Exhibit U:** Deposition of Richard Snyder, June 25 and 26, 2020, excerpted

**Exhibit V:** Deposition of Susan Hedman, July 16 and 17, 2020, excerpted

**Exhibit W:** Deposition of Stanley Meiburg, July 11 and 12, 2023, excerpted

**Exhibit X:** Deposition of Amy Rodriquez-Chimal, May 19, 2023, excerpted

**Exhibit Y:** Deposition of S.J., May 23, 2023, excerpted and redacted

**Exhibit Z**: Deposition of LaShawn Johnson, May 22, 2023, excerpted and redacted

**Exhibit AA:** Deposition of Vivian Anderson, May 1, 2023, excerpted

**Exhibit AB:** Deposition of John Campbell, December 1, 2022, excerpted

**Exhibit AC:** Deposition of Terry Crews, January 23, 2023, excerpted

**Exhibit AD:** Deposition of William Daly, April 17, 2023, excerpted

**Exhibit AE:** Deposition of Anthony Vance, April 7, 2023, excerpted

**Exhibit AF:** Deposition of Karen Vance, September 13, 2023, excerpted

**Exhibit AG:** Deposition of Stanley Langston, April 21, 2023, excerpted

**Exhibit AH:** Deposition of Jason Keys, February 6, 2023, excerpted

**Exhibit AI:** Deposition of Margie McClain, January 25, 2023, excerpted

**Exhibit AJ:** Deposition of Leo McClain, April 24, 2023, excerpted

**Exhibit AK:** Deposition of Lawrence Cooley, April 4, 2023, excerpted

**Exhibit AL:** Consumer Notice of Lead & Copper Results in Drinking Water

# INTRODUCTION

The Flint Water Crisis was a tragic and unprecedented situation that began in April 2014 when, to save money, the City of Flint stopped purchasing its drinking water from the City of Detroit and instead switched to using the Flint River for its drinking water. Per the direction of the Michigan Department of Environmental Quality (MDEQ), which regulated drinking water within the State, the City did not treat the Flint River water with corrosion control—a process to prevent lead and other substances from leaching from pipes into the water—and instead undertook over a year of sampling to determine whether corrosion control would be needed.

The U.S. Environmental Protection Agency (EPA) was not involved in the City's and MDEQ's decisions to switch to the Flint River and forego corrosion control. That is because the City was responsible for operating the water system, and under the Safe Drinking Water Act (SDWA), MDEQ had primary enforcement responsibility over the system. It was not until April 2015, a year after the switch, that EPA employees first learned that the Flint River water was not being treated for corrosion. After engaging in informal enforcement efforts to push MDEQ and the City to institute corrosion control, in January 2016, EPA issued an administrative order under SDWA Section 1431 requiring the City and MDEQ to, *inter alia*, do so.

Plaintiffs' theory in this Federal Tort Claims Act (FTCA) case is that Michigan's Good Samaritan doctrine imposed a duty on EPA to issue this SDWA

Section 1431 order sooner or to take additional action under SDWA. In 2019, this Court held "that Plaintiffs [sufficiently] plead state-law liability" under the Good Samaritan doctrine, *Burgess v. United States*, 375 F. Supp. 3d 796, 818 (E.D. Mich. 2019) (Parker, J.) ("2019 Op."), but also held that "facts remain to be developed and future discovery may impact the Court's analysis," 2019 WL 4734686, at *1 (E.D. Mich. Sept. 27, 2019). Since then, the parties have completed fact and expert discovery for the 11 Bellwether Plaintiffs' cases.

The United States moves to dismiss the Bellwether Plaintiffs' claims for lack of subject-matter jurisdiction in two respects. First, the facts developed during discovery do not establish that a private person would be liable pursuant to Michigan's Good Samaritan doctrine under similar circumstances, as required to invoke the FTCA's wavier of sovereign immunity, 28 U.S.C. §§ 1346(b)(1) & 2674 (also known as the FTCA's analogous private liability requirement). Although the Court previously found that Plaintiffs adequately pleaded liability under the Good Samaritan doctrine, discovery has revealed that the doctrine is inapplicable to the Bellwether Plaintiffs' claims, including because: (1) several of the EPA actions that the Court's 2019 opinion relied upon are inapplicable to the Bellwether Plaintiffs (*e.g.*, none communicated with EPA prior to the SDWA Section 1431 order); (2) none of the Bellwether Plaintiffs, MDEQ, or the City forwent "other remedies or precautions against the risk" from the Flint River water based on EPA's actions—

*i.e.*, they cannot show "justifiable detrimental reliance," 2019 Op. at 818; (3) prior to the Section 1431 order, EPA did not supplant MDEQ or the City from their responsibilities to regulate and operate, respectively, the Flint water system; and (4) EPA did not cause a change in conditions that created or increased the Bellwether Plaintiffs' risk of harm, such as causing or approving the City's switch to the Flint River without corrosion control treatment. Second, the FTCA's misrepresentation exception (28 U.S.C. § 2680(h)) retains the United States' sovereign immunity for claims arising from EPA's communications related to the Flint Water Crisis.

The Flint Water Crisis was a tragedy. However, it was one in which EPA (1) did not operate the water system, (2) was not involved in the decisions to switch to the Flint River and forgo corrosion control, and (3) was not the primary regulator. To impose liability on EPA for its actions short of issuing the SDWA Section 1431 order "might have the perverse effect of forcing the EPA to remain silent about areas where improvement was needed in a state's [environmental] program, lest it risk having to assume full responsibility for state environmental programs . . . ." *Ohio Pub. Int. Rsch. Grp., Inc. v. Whitman*, 386 F.3d 792, 798 (6th Cir. 2004).

## STATEMENT OF FACTS

The United States focuses below on the facts relevant to the Good Samaritan and misrepresentation analyses and incorporates the Court's prior factual analysis and SDWA background discussion. 2019 Op. at 801-09 (Sections II & III).

## I.  EPA Was Not Involved in MDEQ's and the City's Decisions to Switch to the Flint River and to Forego Corrosion Control.

EPA was not involved in MDEQ's and the City's decisions to switch to the Flint River in April 2014 and to forgo using corrosion control treatment.[1] MDEQ and the City were not required to seek EPA's advice or approval for these decisions because MDEQ bears primary responsibility for SDWA enforcement within the State (*i.e.*, primacy). 2019 Op. at 802.

After the switch, EPA Region 5 (which oversees 42,000 public water systems throughout six states, including 10,000 within Michigan alone[2]) began receiving complaints from Flint residents about their water. When Region 5 received a complaint, Jennifer Crooks (EPA Program Manager) generally would: (1) forward it to MDEQ, which would investigate and provide a response; and (2) then provide MDEQ's response and other information back to the citizen.[3] In these exchanges, MDEQ did not notify EPA that Flint lacked corrosion control. Exh. B at 421:18-23.

In February 2015, a Flint resident (Lee-Anne Walters) contacted Ms. Crooks

---

[1] *Mays v. City of Flint, Mich.*, 871 F.3d 437, 446 (6th Cir. 2017) ("EPA was not involved in the key action underlying the Plaintiff's complaint—approval of the decision to switch Flint's water supply to the Flint River."); 2019 Op. at 803 ("MDEQ and Flint did not, and were not required to, notify the EPA of the changing water sources for Flint. . . . MDEQ approved Flint's water source change, but did not require Flint to begin corrosion control prior to the switch.").

[2] Exh. A at 23:13-17, 42:13-21, 278:8-11.

[3] Exh. B at 227:8-24; 420:23-421:23; Exh. C at 24:4-25:8, 90:2-92:17 (explaining Ms. Crooks' response to Mrs. Burgess' complaint, which is Exh. D); Exh. E & F.

regarding test results indicating that there were high lead levels in the water at her home. In response, Ms. Crooks and Miguel Del Toral (EPA Region 5's Regulations Manager for the Groundwater and Drinking Water Branch) asked MDEQ what Flint was doing for corrosion control following the switch to the Flint River. 2019 Op. at 804-05; Exh. G at 4. MDEQ responded in pertinent part: "Flint '[h]as an Optimized Corrosion Control Program.'" 2019 Op. at 805; Exh. G at 1. Mr. Del Toral understood this to mean that the City "ha[d] the [corrosion control] treatment in place and [was] doing the water quality parameter monitoring." Exh. H at 345:21-346:1.

## II.  EPA Recommends MDEQ Start Corrosion Control and Return the City to Detroit Water.

On April 23, 2015, MDEQ informed Mr. Del Toral that the City in fact was "not practicing" corrosion control. 2019 Op. at 805. MDEQ then argued that, because the Flint River was a new drinking water source, the SDWA did not require the City to implement corrosion control immediately, but rather the City first had to conduct two 6-month rounds of lead and copper sampling to determine whether the treatment was needed. Exh. I at 4. The results of the first round of systemwide sampling (collected July – December 2014, Exh. I at 4) were 6 parts per billion (ppb) for lead—well below SDWA's 15 ppb action level that, if triggered, would have required the City to undertake mandatory public notification and corrective action. Exh. J at 46:12-16; 40 C.F.R. § 141.80(c)(1), (e)-(g) (effective Dec. 10, 2007 to Dec. 15, 2021). Although, in Region 5's experience, high lead results at some homes were

not uncommon in water systems with lead service lines (like Flint) and did not necessarily indicate a systemwide issue, *e.g.*, Exh. J at 316:10-17, Mr. Del Toral investigated and sampled Mrs. Walters' residence and issued a June 24, 2015 interim report, which also addressed samples collected at two of Mrs. Walters' neighbors. Exh. K. Mr. Del Toral then provided the report to Mrs. Walters, who then provided it to the press, and it then became public. Exh. H 696:19-23, 698:18-24.

After EPA learned that Flint lacked corrosion control, it urged MDEQ to order the City to begin this treatment. In a June 10, 2015 teleconference, MDEQ declined to do so (and EPA's offer of technical assistance), noting that the City was almost finished with the second round of 6-month sampling. Exh. L at 185:9-186:15. On July 21, 2015, EPA and MDEQ discussed Flint's water issues again in light of the recent second round results (11 ppb—again below the 15 ppb action level).[4] On the call, MDEQ insisted that the SDWA did not require corrosion control upon switching sources to the Flint River, but finally agreed to order Flint to start corrosion control.[5] "On August 17, 2015, MDEQ instructed Flint to implement corrosion control as soon as possible, but no later than January 1, 2016 . . . ." 2019 Op. at 807. "On September 3, 2015, Flint's Mayor announced that the City would implement corrosion control treatment and invited EPA corrosion control experts" to assist. *Id.* at 808.

---

[4] Exh. M at 191:22-23; *see also* Exh. N at 1.
[5] Exh. J at 364:2-9, 415:3-7; Exh. O at 465:13-22; Exh. L at 212:11-20; Exh. M 213:10-17; 2019 Op. at 807.

Within weeks, that plan changed considerably as new information became available. On September 20, 2015, Dr. Edwards (a citizen scientist) informed EPA and others that the City's two rounds of lead sampling did not comply with the SDWA (including because the City failed to sample homes with lead service lines), and therefore the City's lead data were not reliable. Exh. A at 244:5-14; Exh. P. The next day, Dr. Edwards informed EPA of a local physician's recent study of elevated blood lead levels in children in Flint. Exh. Q; 2019 Op. at 807-08. On September 25 and 29, 2015, the City of Flint and Genesee County, respectively, issued public health advisories. Exh. R & S. On October 2, 2015, the State publicly released a 10-Point Plan (which EPA Region 5 Administrator Susan Hedman assisted with) to address Flint's water problems, including accelerating implementation of corrosion control.[6] On October 16, 2015, per Governor Snyder's order, the City returned to Detroit water. Exh. U at 219:6-20; 269:5-271:12; 518:17-519:4.[7] Then, as detailed in the United States' discretionary function exception motion (ECF No. 262), EPA decided in January 2016 to issue the SDWA Section 1431 order because MDEQ and the City had proven themselves to be incapable or unwilling to complete the remaining work needed to fully remedy the City's water problems and safely manage

---

[6] Exh. T; Exh. U at 753:23-758:12; Exh. V at 426:15-24; Exh. O at 213:8-18.

[7] This solution—returning to Detroit water—was one that Region 5 persuaded the State to implement (despite the cost concerns) and which several witnesses testified EPA could not have ordered Flint to do through formal enforcement. Exh. V at 42:11-22; 44:2-16; *see also* ECF No. 262 PageID.5019-20.

the City's plans to switch water sources again in the near future. 2019 Op. at 808.[8]

### III.   Prior to the Section 1431 Order, None of the Bellwether Plaintiffs Communicated with EPA or Forwent Precautions Due to EPA's Actions.

Discovery has revealed that, prior to EPA issuing the January 2016 SDWA Section 1431 order (the relevant period), none of the Bellwether Plaintiffs communicated with EPA regarding Flint's water[9] or forwent precautions in reliance upon EPA's actions regarding Flint's water. Indeed, only one Bellwether Plaintiff, Mr. Keys, testified that he was aware of anybody else who may have communicated with EPA during this period. Specifically, Mr. Keys believed that another individual (Mr. Woodson) "may have" communicated with EPA, but Mr. Keys did not "know of any conversation [Mr. Woodson] had with them." Exh. AH 272:15-273:7. After the Section 1431 order, Mr. Vance is the only Bellwether Plaintiff who communicated with EPA and that was by way of an April 28, 2016 letter from EPA to Mr. Vance regarding an April 8, 2016 sampling event at his home.[10]

During discovery, most of the Bellwether Plaintiffs admitted that they did not know of EPA,[11] or did not recall reading or seeing anything about EPA's

---

[8] Exh. O at 116:15-121:23; 514:7-19; Exh. A at 252:3-253:16; Exh. W at 63:13-64:4.
[9] Exh. X 186:12-187:12; Exh. Y 96:10-23; Exh. Z 135:20-136:5; Exh. AA 82:1-16; Exh. AB 125:13-24; Exh. AC 37:19-38:16; Exh. AD 83:13-84:19; Exh. AE 106:7-107:8; Exh. AF 174:6-20, 175:11-18; Exh. AG 21:21-22:10; Exh. AH 272:3-14; Exh. AI 105:15-106:2; Exh. AJ 47:17-48:2; Exh. AK 71:20-23.
[10] Exh. AE 106:7-107:8, 129:16-130:16; Exh. AL at AV000013.
[11] Exh. AA 81:14-24; Exh. AJ 47:17-48:2.

involvement in the Flint Water Crisis.[12] Mr. Keys—who, along with Mrs. McClain asserts business loss damages in this case[13]—recalled hearing about EPA on television, but he did not recall the specifics and took no steps in response to what he heard about EPA. Exh. AH 272:15-274:8. Mr. Vance recalled reading an article about Mr. Del Toral's June 2015 interim report and—although he could not "recall specifically" whether he took any steps in response to this report—testified that it was "probably around that time that [he] took steps to get filters for the faucets" in his home. Exh. AE 109:21-112:12.

## RELEVANT PROCEDURAL BACKGROUND

Of the fourteen Bellwether Plaintiffs originally selected for discovery, ECF No. 172 PageID.3511, eleven remain.[14] Discovery was completed on these Bellwether Plaintiffs' claims on September 13, 2023, ECF No. 219 PageID.4434 (fact), and September 9, 2024, ECF No. 282 (expert). Pursuant to the Court's Orders, on February 9, 2024, the United States moved to dismiss the Bellwether Plaintiffs' claims pursuant to the FTCA's discretionary function exception (ECF No. 262), and now files this motion on its remaining subject-matter jurisdiction arguments after the completion of expert discovery. ECF 296 at PageID.6862. Since the Court's 2019

---

[12] Exh. X 186:12-187:12, Exh. Y 96:10-23; Exh. Z 125:9-10; Exh. AB 126:1-7; Exh. AI 106:7-107:3.

[13] Exh. AH 36:4-14; Exh. AI 19:15-20:1.

[14] *See* ECF Nos. 231 (dismissing P.F.), 253 (removing E.M. from the bellwether process), and 288 (dismissing Haniya Johnson).

decision, Judge Levy denied the United States' motion to dismiss for lack of subject-matter jurisdiction in the *In re Flint Water Cases*. 482 F. Supp. 3d 601 (E.D. Mich. 2020) ("*FWC* MTD Op."). This decision—like this Court's 2019 decision—was prior to any plaintiff-specific discovery and evaluated plaintiffs' Good Samaritan claims based on the sufficiency of the allegations in the complaint. *Id.* at 617.

## STANDARD OF REVIEW

The United States incorporates the Court's prior standard for a Rule 12(b)(1) factual attack. 2019 Op. at 801. Plaintiffs have the burden of establishing subject-matter jurisdiction. *Id.* "'[N]o presumptive truthfulness applies to the [plaintiff's] factual allegations' and the 'court has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts.'" *Id.* (quoting *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). In a Rule 12(b)(1) factual attack, "the district court must . . . weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist." *Ohio Nat. Life*, 922 F.2d at 325. The same applies to this factual Rule 12(h)(3) motion to dismiss. *Cohan v. MGM Hosp., Inc.*, No. 20-CV-10981, 2021 WL 4478744, at *1 (E.D. Mich. Sept. 30, 2021).

Unlike the discretionary function exception, ECF No. 262 at PageID.5024-25, the FTCA's analogous private liability requirement and misrepresentation exception "also implicate[] an element of the [Plaintiffs'] cause of action," and so the Court

resolves factual disputes under a Rule 12(b)(6) or a Rule 56 standard. *Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) (citation omitted)).[15] For this motion, since discovery has been completed, the Court should apply a Rule 56 standard to any factual disputes. *FWC* MTD Op. at 616.

Under Rule 56, "[s]ummary judgment is appropriate where the movant demonstrates that there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Clabo v. Johnson & Johnson Health Care Sys., Inc.*, 982 F.3d 989, 992 (6th Cir. 2020) (quoting Rule 56(a)). "[S]ummary judgment must be entered where the nonmovant 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "[F]or the non-movant to defeat a summary-judgment motion, there must be evidence on which the [fact finder] could reasonably find for the [non-movant]." *Id.* (second alteration in the original).

## ARGUMENT

The FTCA provides subject-matter jurisdiction only for those suits "where the United States, if a private person, would be liable to the claimant in accordance with

---

[15] *See also Brownback v. King*, 592 U.S. 209, 217-18 (2021) (explaining that the FTCA's analogous private liability requirement (28 U.S.C. § 1346(b)(1)) involves both a merits determination and subject-matter jurisdiction).

the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).[16]

This is known as the FTCA's analogous private liability requirement. *E.g.*, 2019 Op. at 809. In this case, the "law of the place" means Michigan law. *FDIC v. Meyer*, 510 U.S. 471, 478 (1994). Even if the analogous private liability requirement is satisfied, a court may still lack subject-matter jurisdiction due to one or more of the FTCA's exceptions in 28 U.S.C. § 2680, *see Myers v. United States*, 17 F.3d 890, 899 (6th Cir. 1994), including the misrepresentation exception, 28 U.S.C. § 2680(h).

As detailed below, the Court should dismiss the Bellwether Plaintiffs' claims for failure to satisfy the FTCA's analogous private liability requirement and under the misrepresentation exception, including because discovery has shown that none of the Bellwether Plaintiffs communicated with, or detrimentally relied upon, EPA.

## I. The Bellwether Plaintiffs Have Not Satisfied the FTCA's Analogous Private Liability Requirement.

Fundamentally, Plaintiffs claim that they suffered personal injury and property damages because EPA failed to (1) intervene sooner in the Flint Water Crisis, including failing to issue a SDWA Section 1431 order until January 2016; and (2) comply with other SDWA requirements. *Burgess*, Sec. Am. Compl. (ECF No. 73) at 2 (introduction) & ¶¶ 97-126 (asserting a negligence claim for "[f]ailure to take mandatory actions required by SWDA [*sic*]"); *Thomas*, Compl. (ECF No. 1)

---

[16] *See also* 28 U.S.C. § 2674 ("The United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances").

¶¶ 2-3 & 89-116 (same).[17] But "there is no private right of action for damages arising from a violation of the SDWA or" its regulations. *Mays v. City of Flint, Mich.*, 871 F.3d 437, 450 (6th Cir. 2017). "Nor does the FTCA provide a means of enforcing federal statutory duties," such as those under SDWA. *Myers*, 17 F.3d at 901.

Thus, Plaintiffs invoke Michigan's Good Samaritan doctrine to try to establish the analogous private liability requirement. 2019 Op. at 817; *e.g.*, *Burgess*, Sec. Am. Compl. (ECF No. 73) ¶¶ 101-02, 124-25, 129, 134-35. But the Sixth Circuit has rejected similar efforts to use the FTCA to create a private cause of action for violating a federal statute when Congress refused to do so. *Myers*, 17 F.3d at 905 ("Where Congress has intended to compensate harm in these areas, it has expressly provided a right of action under the relevant regulatory scheme. Where Congress has not so acted, [an] FTCA [Good Samaritan claim] is not a proper substitute."); *accord id.* at 901. As explained below, Plaintiffs' Good Samaritan claims are not "a proper substitute" for what are in essence claims that EPA violated SDWA, and they do not satisfy the FTCA's analogous private liability requirement.

Michigan "has adopted the [Good Samaritan] doctrine as expressed in Section 324A of the Restatement of Torts, 2d." 2019 Op. at 817. Section 324A provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the

---

[17] The *Thomas* complaint is identical to the other, non-*Burgess* complaints in the *In re FTCA Flint Water Cases* consolidated cases, and therefore for simplicity, the United States cites only the *Burgess* and *Thomas* complaints in this motion.

protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

> (a) his failure to exercise reasonable care increases the risk of such harm, or

> (b) he has undertaken to perform a duty owed by the other to the third person, or

> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

*Id.* at 817-18 (quoting Restatement (Second) of Torts § 324A (1965)).[18]

One is **not** obligated to continue an undertaking "indefinitely, or even until he has done everything in his power to aid and protect the other." *Myers v. Muffler Man Supply Co.*, No. 277542, 2008 WL 4330240, at *2 (Mich. Ct. App. Sept. 23, 2008) (quoting comment c to Restatement (Second) of Torts § 323 (1965)). Instead:

> *The actor may normally abandon his efforts at any time unless, by giving the aid, he has put the other in a worse position than he was before the actor attempted to aid him.* His motives in discontinuing the services are immaterial. . . . *He may without liability discontinue the services through mere caprice,* or because of a personal dislike or enmity toward the other.

> *Where, however, the actor's assistance has put the other in a worse position than he before,* either because the actual danger of harm has been increased by the partial performance, or because the other, in

---

[18] Although "'[i]t is a fundamental rule of American tort law that the fact that an actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action,'" "'[t]he common law recognizes . . . that an actor, by his affirmative acts, can create or assume a duty where none otherwise would have existed.'" 2019 Op. at 818 (quoting *Myers*, 17 F.3d at 901). This is the Good Samaritan doctrine—*i.e.*, Section 324A.

14

> reliance upon the undertaking, has been induced to forego other opportunities of obtaining assistance, *the actor is not free to discontinue his services where a reasonable man would not do so.* He will then be required to exercise reasonable care to terminate his services in such a manner that there is no unreasonable risk of harm to the other, or to continue them until they can be so terminated.

*Id.* at \*2 (quoting comment c to Section 323) (emphasis in the original); *accord Haaksma v. City of Grand Rapids*, 634 N.W.2d 390, 393 (Mich. Ct. App. 2001). This same rule applies to Section 324A. *Muffler Man*, 2008 WL 4330240 at \*3.

In sum, to establish liability under Section 324A, Plaintiffs must prove three elements: (1) the United States undertook "to render services to another"; (2) the United States negligently performed that undertaking; and (3) one of the three bases for liability found in Section 324A(a)-(c) exists. *Myers*, 17 F.3d at 902; 2019 Op. at 818. As detailed below, the Bellwether Plaintiffs have not established Section 324A liability for EPA's actions related to Flint's drinking water, including because the additional discovery since the Court's 2019 opinion has revealed that: (1) none of the Bellwether Plaintiffs communicated or interacted with EPA regarding Flint's water during the relevant period; and (2) none of the Bellwether Plaintiffs, MDEQ, or the City forwent "other remedies or precautions against the risk" from the Flint River water in justifiable detrimental reliance on EPA's actions.

### A. EPA's Undertaking Must Be Tied to the Specific Acts It Undertook and Not Painted Broadly.

"In an action under § 324A, '[t]he threshold issue is typically whether the

[defendant] undertook to render services . . . to the plaintiffs or for the benefit of plaintiffs.'" *Merrill v. Arch Coal, Inc.*, 118 F. App'x 37, 44 (6th Cir. 2004) (quoting *Good v. Ohio Edison Co.*, 149 F.3d 413, 420 (6th Cir. 1998) and citing *McAtee v. Fluor Constructors Int'l, Inc.*, 188 F.3d 508, 1999 WL 685928 at *6 (6th Cir. 1999) (unpublished table decision)).

The Sixth Circuit has rejected efforts "to broadly paint" the scope of a Section 324A undertaking, and instead has required that an undertaking be tied to the specific acts performed. *McAtee*, 1999 WL 685928, at *6. For example, in *McAtee*, the Sixth Circuit rejected Plaintiff's proposed undertaking of "plant safety," instructing instead that "Plaintiff must present evidence that [the defendant] specifically undertook to render safety services with respect to Plaintiff's work near the wire" that caused Plaintiff's electric-shock injuries. *Id.* In *Merrill*, the Sixth Circuit held that defendant's "general corporate-wide safety program, safety awards and general safety guidelines [were] insufficient to create a" Section 324A undertaking. 118 F. App'x at 44. Instead, the court found an undertaking through the more specific acts of the defendant's Director of Safety visiting the mine, inspecting the roof that caused the decedent's death, and advising that the "roof system was adequate." *Id.*; *see also id.* at 46 (remanding on the remaining two Section 324A elements). This required level of specificity is consistent with the "foundation" of Section 324A liability—*i.e.*, "the defendant has specifically undertaken to perform the task that he

16

or she is charged with performing negligently." *McAtee*, 1999 WL 685928, at *6 (quoting *Patentas v. United States*, 687 F.3d 707, 716 (3d Cir. 1982)).

This Court previously found that EPA's alleged undertakings were: (1) "oversight and monitoring of Flint's water system" and (2) "EPA's communications with Flint residents in response to their complaints about the [Flint] water." 2019 Op. at 818; *accord FWC* MTD Op. at 618. Especially now that discovery has finished, Section 324A and its case law require a more specific analysis (including a Bellwether Plaintiff-specific analysis) of these alleged undertakings.

### 1. The "Oversight and Monitoring of Flint's Water System" Undertakings.

The Court's broad conception of the first undertaking as the general "oversight and monitoring of Flint's water system," 2019 Op. at 818, conflicts with the requirement under Section 324A to analyze individual actions and not "broadly paint" the undertaking. *McAtee*, 1999 WL 685928, at *6. As such, EPA's generalized oversight efforts "are not sufficient under § 324A" to establish an undertaking. *Id.*; *see also supra* at 15-17.

The *In re Flint Water Cases* court pointed to several actions over a nine-month span as an undertaking: (1) on April 27, 2015, EPA "conduct[ed] independent water testing" at Mrs. Walters' and her two neighbors' residences; (2) beginning in April 2015, EPA "email[ed] back and forth with the MDEQ staff regarding Flint's worrisome lack of corrosion control and high lead levels"; (3) "[t]hroughout the

17

summer of 2015, EPA continued to ask MDEQ for updates regarding the much-needed corrosion control for the public water system," including "offer[ing] technical assistance in responding to water quality issues" in "June 2015"; and (4) in January 2016, EPA issued the SDWA Section 1431 order. *FWC* MTD Op. at 618.

The United States agrees that the first three specific actions satisfy the first of Section 324A's three elements (*i.e.*, whether an undertaking),[19] but not EPA's issuance of the SDWA Section 1431 order. For one, Plaintiffs do not allege that EPA negligently performed under the order, but instead that EPA failed to issue it sooner. *See supra* at 12-13. Moreover, such alleged failure to act cannot be a Section 324A undertaking. *See Ashbrook v. Block*, 917 F.2d 918, 926 (6th Cir. 1990) (affirming dismissal of a Good Samaritan claim based on allegations that an agency "*failed* to act" because a Good Samaritan claim "requires that the defendant undertake to act") (emphasis in the original); *McAtee*, 1999 WL 685928, at *6 ("the 'foundation of [324A] is that the defendant has specifically undertaken to perform the task that he or she is charged with performing negligently.'") (quoting *Patentas*, 687 F.3d at 716); 2019 Op. at 818 (Section 324A "'recognizes . . . that an actor, *by his affirmative acts*, can create or assume a duty where none otherwise would have existed.'") (quoting *Myers*, 17 F.3d at 901) (emphasis added). The *In re Flint Water Cases* court

---

[19] As detailed below, the United States does not have Section 324A liability arising from these three acts because Section 324A's remaining two elements are not met.

characterized EPA's alleged failure to act as part of a broader undertaking of EPA's "response to the Flint Water Crisis." *FWC* MTD Op. at 619. But, in doing so, the court described the supposed undertaking too broadly, contrary to the requirement that a Section 324A undertaking be closely linked to the specific acts that the defendant performed. *McAtee*, 1999 WL 685928, at *6 ("plant safety" too broad for a Section 324 undertaking).

The *In re Flint Water Cases* court reasoned that a failure to act could be in the course of an undertaking because the "distinction between action and nonaction" is "slippery." *FWC* MTD Op. at 619 (quoting *Hart v. Ludwig*, 79 N.W.2d 895, 898 (Mich. 1956)). The *Hart* court noted in *dicta* that in "borderland cases . . . an incident of nonfeasance" can occur "in the course of an undertaking." 79 N.W.2d at 898. However, in "each" scenario the *Hart* court discussed, the alleged tortfeasor created a "peril" during a *specific* act (*e.g.*, the performance of surgery, the filling of a ditch) in which the incident of nonfeasance occurred.[20] Here, however, EPA did not create the peril (*i.e.*, switching to the Flint River without corrosion control), and the alleged inaction did not occur during a *specific* act, but in the much broader context of a nine-month "response to the Flint Water Crisis." *FWC* MTD Op. at 619. Accordingly, the *Hart* reasoning is inapposite in this case.

---

[20] *Hart*, 79 N.W.2d at 898 ("*in each a situation of peril has been created, with respect to which a tort action would lie without having recourse to the contract itself*. . . . Before us, however, we have no such case.") (emphasis added).

Additionally, this broadly constructed "response to the Flint Water Crisis" undertaking—sewing together various acts over the course of a nine-month span (April 2015 to January 2016)—conflicts with several other legal doctrines. First, it conflicts with Section 324A's limitation that makes clear that EPA was not required to act "indefinitely, or even until [it] has done everything in [its] power to" respond to the Flint Water Crisis. *Muffler Man*, 2008 WL 4330240, at *2 (citation omitted). Instead, EPA could have ceased further action after, for example, Mr. Del Toral sampled Mrs. Walters' home in April 2015, since this sampling did not place Plaintiffs in a worse position. *See supra* at 14-15. In contrast, the court's broad undertaking effectively requires EPA to have acted "until [it] ha[d] done everything in [its] power to" resolve the Flint Water Crisis, including issuing the Section 1431 order sooner. This exceeds what the Good Samaritan doctrine requires.[21]

Second, this broad undertaking is effectively indistinguishable from a duty to enforce SDWA (*e.g.*, EPA must have used SDWA Section 1431 sooner), which cannot be a basis for FTCA liability. *Myers*, 17 F.3d at 894 ("Nor does the FTCA provide a means of enforcing federal statutory duties."). Moreover, there is no private cause of action for damages for failure to enforce the SDWA. *Mays*, 871 F.3d at 450. Therefore, as in *Myers*, Section 324A should not be used to create, in effect,

---

[21] It also exceeds the scope of the traditional duty under American tort law. *See* fn. 18 (citing 2019 Op. at 818 and *Myers*, 17 F.3d at 901).

a private cause of action for alleged regulatory inaction where Congress has made the decision not to create that very cause of action. 17 F.3d at 905.

Third, this undertaking defies the FTCA's analogous private liability requirement because "a private person under like circumstances," 28 U.S.C. § 2674, could not take action under SDWA Section 1431. *See* 2019 Op. at 809 ("the FTCA does not waive the Government's sovereign immunity *unless* a private person under similar circumstances would be liable under Michigan law to Plaintiffs for the EPA's alleged conduct"); *United States v. Olson*, 546 U.S. 43, 46 (2005) ("Our cases have consistently adhered to this 'private person' standard"—*i.e.*, the FTCA "requires a court to look to the state-law liability of *private entities*, not to that of public entities, when assessing the Government's liability under the FTCA") (emphasis added). EPA's unique ability to take action under SDWA Section 1431 permeates the *In re Flint Water Cases* court's overly broad painting of EPA's undertaking.

Fourth, in effect, such a broad undertaking would render the United States "an insurer for every private party's violation of a federal regulatory scheme"— something numerous courts have refused to endorse. *Myers*, 17 F.3d at 901; *see also Varig Airlines*, 467 U.S. 797, 821 (1984) ("In rendering the United States amenable to some suits in tort, Congress could not have intended to impose liability for the regulatory enforcement activities of the FAA challenged in this case. The FAA has a statutory duty to promote safety in air transportation, not to insure it."); *Garbarino*

*v. United States*, 666 F.2d 1061, 1066 (6th Cir. 1981) ("The effect of holding that the FTCA authorizes suits in these situations would be to make the Government a joint insurer of all activity subject to safety inspection."); *accord Zabala Clemente v. United States*, 567 F.2d 1140, 1151 (1st Cir. 1977). Indeed, such a broadly defined undertaking might create perverse incentives, as the Sixth Circuit recognized in a comparable case regarding EPA's alleged failure to take enforcement action. *Ohio Pub. Int. Rsch. Grp., Inc. v. Whitman*, 386 F.3d 792, 798 (6th Cir. 2004) ("[T]o demand that [EPA] initiate its full enforcement authority every time it noted areas that required improvement" "might have the perverse effect of forcing the EPA to remain silent about areas where improvement was needed in a state's [environmental] program, lest it risk having to assume full responsibility for state environmental programs . . . .").

In conclusion, although the United States agrees that the first three delineated categories of "oversight and monitoring" actions satisfy Section 324A's first of three elements, the alleged failure to issue a Section 1431 order sooner does not, and EPA's undertaking should not be broadly painted as responding to the Flint Water Crisis. Rather, the Court's analysis of the remaining Section 324A elements should be limited to the specific acts that constitute EPA's undertakings.

### 2. The Communications Undertaking Is Irrelevant to the Bellwether Plaintiffs' Claims.

While the Court's 2019 opinion determined that, based on the pleadings,

Plaintiffs adequately alleged that EPA's responses to Flint residents' water complaints was an undertaking, 2019 Op. at 818, subsequent discovery has revealed that none of the Bellwether Plaintiffs (1) submitted such complaints to EPA; (2) were aware of the content of EPA's communications with anyone else who did; or (3) otherwise communicated with EPA prior to the SDWA Section 1431 order. *See supra* at 8-9. In addition, discovery has shown that EPA's responses to non-Bellwether Plaintiffs were based on information MDEQ supplied to EPA, Exhs. E & F, which EPA then relayed to non-Bellwether Plaintiffs and did not distribute generally. *E.g.*, Exh. H (Ms. Crooks' response to non-Bellwether, Mrs. Burgess).

Therefore, EPA's one-on-one communications with third parties were not done "for the protection of a [Bellwether Plaintiff] or his things," Restatement (Second) of Torts § 324A (1965), and do not constitute an "undertaking" vis-à-vis the Bellwether Plaintiffs that could be a basis for imposing Section 324A liability. *Compare Fox v. Amazon.com, Inc.*, 930 F.3d 415, 427 (6th Cir. 2019) (concluding that an email sent to the plaintiff constituted an undertaking as to plaintiff and her family), *with Nichols v. McNeilab, Inc.*, 850 F. Supp. 562, 569 (E.D. Mich. 1993) (concluding that, in contrast to a public advertisement, a statement to the media cannot be the basis for Section 324A liability when the issuer "has little or no control over whether its message reaches the public," as it depends on the media disseminating it). Simply put, others who submitted a complaint to EPA may be able

to assert that EPA's response was a Section 324A undertaking, but not the Bellwether Plaintiffs who had no such communications with EPA.[22]

**B. Whether EPA Negligently Performed Its Undertakings.**

The United States maintains that it did not negligently perform any undertakings, but—for purposes of this motion only—the United States does not contend that there is a lack of genuine issue of material fact as to Section 324A's second element, with two exceptions. *See Myers*, 17 F.3d at 902-04 (assuming the second element was met, but still finding no Section 324A liability).

First, even assuming *arguendo* that the Court were to find that not issuing the SDWA Section 1431 order sooner constituted an undertaking (*contra* at 18-22), EPA's decision to try to persuade MDEQ and the City to action and to fulfill their SDWA responsibilities before EPA issued this order was not negligent. As this Court has held, EPA was not required to issue the SDWA Section 1431 order. 2019 Op. at 812; *see also FWC* MTD Op. at 627 ("EPA's conduct under Section 1431 was discretionary"). Moreover, as detailed in the United States' pending motion to dismiss pursuant to the FTCA's discretionary function exception, EPA personnel had several reasons to believe that persuasion and other informal enforcement (as opposed to a Section 1431 order) was the better path forward. For example, such an

---

[22] The United States reserves any and all arguments regarding whether and the extent to which such responses to non-Bellwether Plaintiffs constituted an undertaking as to such non-Bellwether Plaintiffs.

order risked injecting delay and being counterproductive by distracting MDEQ and the City from resolving Flint's water concerns and instead turning to contest the order. ECF No. 262 PageID.5019-22, 5031-38. Moreover, EPA's informal enforcement efforts persuaded Flint to return to Detroit water, a solution that several witnesses testified EPA could not have ordered Flint to do.

Second, EPA's sampling at residences of non-Bellwether Plaintiffs (Mrs. Walters and her neighbors) was not negligently performed. The Bellwether Plaintiffs have not presented any expert testimony that this sampling failed to conform to the relevant standards of care. Because such standards are beyond a layperson's common knowledge, Plaintiffs have not satisfied their burden of proof that this sampling was negligently performed. *Elher v. Misra*, 878 N.W.2d 790, 796 (Mich. 2016) ("we reject plaintiff's contention that this is a case in which the breach of the standard of care is so obvious to a layperson that no expert testimony is required."); *Broz v. Plante & Moran, PLLC*, 951 N.W.2d 64, 76 (Mich. Ct. App. 2020) (dismissing claim on summary judgment because plaintiffs "failed to present expert testimony on the standard of care and whether defendant breached that standard.").

In conclusion, the Bellwether Plaintiffs cannot establish a genuine issue of material fact that EPA negligently performed when: (1) sampling Mrs. Walters' or her neighbors' homes; or (2) issuing the SDWA Section 1431 order (even if the Court were to find that failing to issue the order sooner was an undertaking).

## C. The Bellwether Plaintiffs Have Not Satisfied the Additional, Alternative Bases for Section 324A Liability.

Even if the Court were to find that EPA negligently performed one or more undertakings, "[n]egligence alone . . . is not sufficient under Section 324A because a plaintiff must also demonstrate that one of the three alternative bases for the imposition of a duty also existed." *Myers*, 17 F.3d at 902. Those three alternatives are: (1) EPA's negligent undertaking "increase[d] the risk of [physical] harm" to the Bellwether Plaintiff; (2) EPA's negligent undertaking was "a duty owed by" another to the Bellwether Plaintiff; or (3) the Bellwether Plaintiff suffered "harm . . . because of reliance on the other or the third person upon the undertaking." Section 324A(a)-(c). In its prior order, this Court only addressed the reliance basis (Section 324A(c)), 2019 Op. at 818, and so the United States addresses that basis first below.

### 1. The Bellwether Plaintiffs, MDEQ, and the City Did Not Detrimentally and Justifiably Rely Upon EPA's Undertakings.

For the reliance basis, the Bellwether Plaintiffs must "show justifiable, detrimental reliance" on the undertaking EPA negligently performed. *Myers*, 17 F.3d at 903. This reliance "must have induced" the Bellwether Plaintiffs, MDEQ, or the City "'to forgo other remedies or precautions against the risk'"—*i.e.*, detrimental reliance. *Id.* (quoting Restatement (Second) of Torts § 324A cmt. e (1965)). The Bellwether Plaintiffs also "must show 'physical manifestation of [such detrimental] reliance.'" *Id.* (quoting *Howell v. United States*, 932 F.2d 915, 917 (11th Cir. 1991)).

26

Discovery has revealed that the Court's previous reasons for finding that Plaintiffs sufficiently pleaded Section 324A(c) do not apply to the Bellwether Plaintiffs. First, none of these Plaintiffs communicated with EPA regarding their water complaints. *Compare* 2019 Op. at 818 (citing "EPA's communications with Flint residents"), *with supra* at 8-9. Second, none of the Bellwether Plaintiffs (except arguably Mr. Vance) testified that they relied on EPA, and most were unaware of EPA or its role. *See supra* at 8-9; *compare Good v. Ohio Edison Co.*, 149 F.3d 413, 421 (6th Cir. 1998) (holding there was no detrimental reliance when "there is no evidence that [plaintiff] was even aware of the existence" of the allegedly inaccurate information provided by the Coast Guard). This is unsurprising since the City and MDEQ remained responsible for operating and regulating the water system.

The sole Bellwether Plaintiff (Mr. Vance) who testified that he may have taken steps in response to EPA's actions testified that, after reading about Mr. Del Toral's interim report in the news, he did not "recall specifically" if he took any steps in response, but "it's probably around that time that [he] took steps to get filters for the faucets" in his home. Exh. AE 112:1-12; *see also id.* at 109:21-111:24. Therefore, at most, Mr. Vance undertook precautions in response to learning of Mr. Del Toral's memo—the opposite of the detrimental reliance required for imposing Section 324A(c) liability. *Myers*, 17 F.3d at 903 (Section 324A(c) requires "forgo[ing] other remedies or precautions against the risk'") (citation omitted).

The *In re Flint Water Cases* opinion cites the lack of formal EPA enforcement prior to the January 2016 SDWA Section 1431 order as the basis for detrimental reliance by MDEQ, the City, and Plaintiffs. *FWC* MTD Op. at 623. But the Sixth Circuit has rejected such an argument. *Myers*, 17 F.3d at 903 ("plaintiffs allege that the absence of citations or other enforcement methods by the MSHA inspectors was taken by the miners to mean that there were no violations and that the mine was safe. *These allegations are insufficient to show justifiable, detrimental reliance and, therefore, plaintiffs' complaints must fail*.") (emphasis added).

Additionally, discovery does not support this alleged detrimental reliance. None of the Bellwether Plaintiffs testified that they relied on the lack of EPA enforcement in this respect. *See supra* at 8-9. Neither MDEQ nor the City forwent "other remedies or precautions against the risk" of untreated Flint River water based on EPA's actions. *Myers*, 17 F.3d at 903. For example, it is not as though MDEQ or the City consulted with EPA in advance on whether to switch to the Flint River and EPA advised them to forego corrosion control. Rather, neither consulted with EPA in advance, and it was MDEQ that instructed the City not to implement corrosion control. *See supra* at 4. Similarly, it is not the case that, in the summer of 2015, MDEQ or the City were planning to use corrosion control or return to Detroit water and EPA told them to hold off. To the contrary, it was EPA that urged MDEQ and the City to resume corrosion control and return to Detroit water. *See supra* at 6.

In conclusion, the Bellwether Plaintiffs, MDEQ, and the City did not detrimentally and justifiably rely on EPA's undertakings. If anything, EPA's acts caused Mr. Vance, MDEQ, and the City to take—not forego—precautions against the risks posed by the City distributing Flint River water without corrosion control.

### 2. EPA Did Not Supplant MDEQ or the City from Their Responsibilities, and Therefore Section 324A(b) Is Not Met.

For the second alternative basis (Section 324A(b)), the Bellwether Plaintiffs must establish that EPA "has undertaken to perform a duty owed by" another to the Bellwether Plaintiffs. Section 324A(b). "To be liable under § 324A(b), the defendant 'must supplant the duty it undertakes from the party that originally held the duty, not merely assist or supplement the service provided by the other.'" *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1024 (7th Cir. 2018) (citation omitted); *Myers*, 17 F.3d at 903 (no Section 324A(b) liability because the inspectors did not "supplant[]" the mine owners' duties); *accord Howell*, 932 F.2d at 919; *Halsey v. Townsend Corp. of Ind.*, 20 F.4th 1222, 1229 (8th Cir. 2021).

Prior to the January 2016 SDWA Section 1431 order (the relevant period), EPA did not supplant MDEQ or the City in the regulation or operation, respectively, of the Flint water system. The City continued to operate the water treatment plant and the water system. As the Sixth Circuit already has held, MDEQ continued to have SDWA primacy in the State, including over Flint's water system. *Mays*, 871 F.3d at 447 (under SDWA, "the state retains the freedom to enforce its own safe-

29

drinking-water laws and regulations. *Michigan was so governing itself when the alleged actions and inactions giving rise to the Plaintiffs' claims occurred*") (emphasis added); *accord* 2019 Op. at 803-04.

Moreover, as in *Myers*, Section 324A(b) is not met because the SDWA's plain language places the primary duty for regulating and operating the Flint water system on MDEQ and the City, respectively. 42 U.S.C. § 300g-2 (effective Aug. 6, 1996, to Oct. 22, 2018) (state primary enforcement responsibility); 40 C.F.R. § 141.80 (effective Dec. 10, 2007, to Dec. 15, 2021) (imposing requirements regarding lead on water systems); 2019 Op. at 814 (the SDWA imposes a duty to warn "on public water systems" and not EPA); *Myers*, 17 F.3d at 903 (Section 324A(b) was not satisfied where the Mine Safety Act placed "the primary duty of ensuring safety would be on the mine owners and the miners" and the U.S. Government's inspections "are for the purpose of ensuring that [they] comply with their duties, not for the purpose of relieving them of those duties"), *and Howell*, 932 F.2d at 919 (same regarding a Federal Aviation Administration (FAA) inspection).

The *In re Flint Water Cases* court attempted to distinguish *Myers* by contending that the Mine Safety Act does not allow the federal regulator to seize a mine (whereas, the SDWA allows EPA to revoke Michigan's SDWA primacy). *FWC* MTD Op. at 622. But the theoretical scope of EPA's potential enforcement powers is irrelevant to the Section 324A(b) inquiry since EPA did not in fact revoke

primacy or otherwise supplant MDEQ prior to issuing the January 2016 SDWA Section 1431 order. *Hutchison*, 910 F.3d at 1024 ("To be liable under § 324A(b), the defendant 'must supplant the duty it undertakes from the party that originally held the duty . . . . '") (citation omitted); *accord Myers*, 17 F.3d at 903. In any event, the court's analogy is inapt. Even if EPA had revoked Michigan's SDWA primacy (it did not), EPA simply would have become the primary SDWA regulator, but still would not have operated the Flint water system.[23] In this hypothetical scenario, the City—like the mine owners in *Myers*—would have remained responsible for operations, precluding Section 324A(b) liability as to EPA. 17 F.3d at 903.

EPA's actions in this case (*e.g.*, sampling at Mrs. Walters' residence; recommending to MDEQ and the City that they implement corrosion control or switch back to the Detroit water) "merely assist[ed] or supplement[ed]" MDEQ and the City and did not supplant them from their duties to regulate and operate, respectively, the Flint water system. *Hutchison*, 910 F.3d at 1024. Indeed, for months, MDEQ refused to follow EPA's advice (*see supra* at 6-7), evidencing that EPA had not supplanted it from its responsibilities of regulating the system. *See,*

---

[23] *See* 40 C.F.R. § 142.17 (procedures for withdrawing state SDWA primacy). Under the hypothetical of EPA revoking Michigan's SDWA primacy, EPA's enforcement powers would be analogous to those under the Mine Safety Act, including issuing citation orders and having the authority to compel compliance, such as seeking judicial intervention. 30 U.S.C. §§ 814 & 818. For this additional reason, the *In re Flint Water Cases* court's attempt to distinguish *Myers* is unpersuasive.

*e.g.*, *Halsey*, 20 F.4th at 1230 (a parent corporation "did not completely subsume or supplant the duty to provide a safe workplace for" the subsidiary's employee when the parent "did provide safety recommendations and safety consulting services to [the subsidiary], but [the subsidiary] was responsible for the safety of its own employees and for implementing safety rules and guidelines"); *Catalano v. GWD Mgmt. Corp.*, No. CV 403-167, 2005 WL 5519861, at \*14 (S.D. Ga. Mar. 30, 2005) (no Section 324A(b) liability where "there is no evidence that McDonald's *completely* took over the provisions of security for GWD. McDonald's supplied advice to GWD on security, . . . ; however, GWD was still responsible for many aspects of security."), *aff'd* 199 F. App'x 803 (11th Cir. 2006).

### 3. EPA Did Not Increase the Bellwether Plaintiffs' Risk of Physical Harm, and Therefore Section 324A(a) Is Not Met.

Lastly, to satisfy Section 324A(a), the Bellwether Plaintiffs "must show that the [United States] through affirmative actions caused 'some physical change to the environment or some other material alteration of circumstances'" that increased their risk. *Good v. Ohio Edison Co.*, 149 F.3d 413, 421 (6th Cir. 1998) (quoting *Patentas,* 687 F.2d at 717). "'[T]he test is not whether the risk was increased over what it would have been if the defendant had not been negligent,' but rather whether 'the risk [wa]s increased over what it would have been had the defendant not engaged in the undertaking at all.'" *Id.* (quoting *Myers*, 17 F.3d at 903).

Accordingly, in *Myers*, the Sixth Circuit rejected plaintiffs' argument that

Section 324A(a) was satisfied "by [the United States] failing to detect safety violations in the mine," and thereby "the dangerous conditions were allowed to continue over time." 17 F.3d at 902. Instead, the *Myers* court required plaintiffs to prove "that the governmental actor affirmatively either made, or caused to be made, a change in the conditions which change created or increased the risk of harm that befell the miners." *Id.* at 903. For example, the Sixth Circuit explained that "liability for increasing the risk would be proper had it been a MSHA inspector who lit a cigarette and caused the explosion, rather than a miner." *Id.* at 903 n.15

EPA did not take any action that increased the risk of harm beyond what it would have been had EPA never been involved.  The risk of harm to the residents of Flint arose from the change of Flint's water source to the Flint River and the City and MDEQ's decision to forego corrosion control treatment. EPA neither required the City or MDEQ to take or forego these actions, nor did it approve such decisions.[24] Thus, Section 324A(a) has not been met, as EPA neither "affirmatively . . . made, or caused to be made, a change in the conditions which change created or increased the risk of harm that befell the" Bellwether Plaintiffs. *Myers*, 17 F.3d at 903.

---

[24] *Mays v. City of Flint, Mich.*, 871 F.3d 437, 446 (6th Cir. 2017) ("EPA was not involved in the key action underlying the Plaintiff's complaint—approval of the decision to switch Flint's water supply to the Flint River."); 2019 Op. at 803 ("MDEQ and Flint did not, and were not required to, notify the EPA of the changing water sources for Flint. . . . MDEQ approved Flint's water source change, but did not require Flint to begin corrosion control prior to the switch.").

Nevertheless, the *In re Flint Water Cases* court found Section 324A(a) satisfied because EPA allegedly was aware of the potential risks from the switch and did not issue the Section 1431 order sooner. *FWC* MTD Op. 620-21. This conflicts with Section 324A(a) case law. For example, in *Raymer v. United States*, federal mine inspectors knew in advance that the frontend loader involved in a fatal crash was defective, including providing the owner multiple extensions to correct it. 660 F.2d, 1136, 1138 (6th Cir. 1981). Nevertheless, the Sixth Circuit held that this knowledge and extensions were not grounds for Section 324A(a) liability because it was "clear" that the extension of time in which to abate the safety violations "granted by the mine inspectors . . . did not increase the danger of harm." *Id.* at 1143. Likewise, in *Howell v. United States*, no 324A(a) liability was found even when an FAA inspector knew two days before a fatal plane crash that the plane's fuel was contaminated (the cause of the crash) and took no further action. 932 F.2d 915, 917 (11th Cir. 1991). The Eleventh Circuit held that this knowledge and failure to take further action were not grounds for Section 324A(a) liability because "[t]he FAA inspector's failure to ground the plane, issue a notice, or initiate an investigation did not increase the risk of harm" since "[t]he FAA inspector caused no change in the condition of this plane or its fuel." *Id.* at 918-19; *see also Maier v. Green Eyes USA, Inc.*, 845 F. App'x 869, 877 (11th Cir. 2021) ("failing to take all possible actions to prevent an occurrence is not the same as increasing the risk of the occurrence"). So

34

too here—the EPA's decision not to issue a Section 1431 order before January 2016 did not change the condition of Flint water or increase the risk to Flint residents.

The *In re Flint Water Cases* court's analysis reflects a "fundamental misconception regarding Section 324A(a)" by mistakenly analyzing whether the risk of harm was higher than if EPA had issued the SDWA Section 1431 order sooner. *Myers*, 17 F.3d at 903 ("[t]he test is not whether the risk was increased over what it would have been if the defendant had not been negligent," but rather whether "the risk was increased over what it would have been had the defendant not engaged in the undertaking at all").[25] The same misconception is reflected in the *In re Flint Water Cases* court's effort to distinguish *Myers* on the ground that *Myers* involved a "constant harm," but in Flint there was "an increased risk of harm to Plaintiffs as each day passed." *FWC* MTD Op. at 621. Even assuming *arguendo* this were a basis for factually distinguishing *Myers*, it is irrelevant to the Section 324A(a) inquiry, which instead turns on whether "the risk was increased over what it would have been had the defendant not engaged in the undertaking at all." *Myers*, 17 F.3d at 903. Moreover, the risks in *Myers* (methane gas buildup), *Raymer* (continuing to use a defective front loader), and *Howell* (plane with contaminated fuel inspected on the

---

[25] *See also Turner v. United States*, 736 F.3d 274, 281 (4th Cir. 2013) ("the thrust of the plaintiff's case is that the [Coast Guard] should have done something to [rescue plaintiffs] sooner," but the Coast Guard's search efforts did not "worsen[] their position," and so Section 324A(a) was not met).

tarmac that later crashed) all arguably increased over time, but the Courts of Appeals nonetheless held that Section 324A(a) was not met in these cases.[26]

In conclusion, Section 324A(a) is not met because EPA did not cause "some physical change to the environment" that increased the Bellwether Plaintiffs' risk; rather, it was MDEQ and the City that made the consequential decisions to switch Flint's water source and to forego corrosion control. *Compare Myers*, 17 F.3d at 903 n.15 ("liability for increasing the risk would be proper had it been a MSHA inspector who lit a cigarette and caused the explosion, rather than a miner."). For all these reasons, the Bellwether Plaintiffs have not proven Section 324A's three elements, and thus have not established that Michigan law would impose liability on "a private person under like circumstances." 28 U.S.C. § 2674. The Court therefore lacks subject-matter jurisdiction over the Bellwether Plaintiffs' claims.

## II.  The FTCA's Misrepresentation Exception Bars Claims Arising Out of EPA's Communications Related to the Flint Water Crisis.

Even if the Court were to hold that the Bellwether Plaintiffs have established analogous private liability, the FTCA's misrepresentation exception (28 U.S.C. § 2680(h)) retains the United States' sovereign immunity from and bars the Bellwether Plaintiffs' claims arising out of EPA's communications or alleged miscommunications, including: (1) the Bellwether Plaintiffs' failure-to-warn claim

---

[26] *See also Myers*, 17 F.3d at 902 (rejecting the argument that, if "the probability of harm increased with the passage of time," then Section 324A(a) was satisfied).

(Count III); and (2) any claims arising out of EPA's communications (hereinafter, collectively referred to as "Plaintiffs' Communication-Based Claims").[27]

The misrepresentation exception "precludes any claim against the government 'arising out of . . . misrepresentation . . . .'" 2019 Op. at 817 (quoting 28 U.S.C. § 2680(h)). "The exception extends to a wide range of communicative activity (including failures of communication)." *Muniz-Rivera v. United States*, 326 F.3d 8, 13 (1st Cir. 2003). In addition, "[t]his exception encompasses 'claims arising out of negligent, as well as willful, misrepresentation.'" 2019 Op. at 817 (quoting *United States v. Neustadt*, 366 U.S. 696, 702 (1961)). As the Ninth Circuit recently held, the exception's "arising out of" language is given "a broad construction" of "originating from," "growing out of," or "incident to, or having connection with." *Abbey v. United States*, 112 F.4th 1141, 1146 (9th Cir. 2024) (citations omitted). "So by its plain text, section 2680(h) does not merely preclude claims *for* misrepresentation. Rather, it bars any claim 'arising out of' misrepresentation." *Id.*

"This reading of the FTCA's 'arising out of' language dovetails with [FTCA] case law providing that courts should determine whether the government's misrepresentation constitutes the 'essence' or 'gravamen' of a plaintiff's complaint." *Id.* In other words, "[t]he test in applying the misrepresentation exception is whether

---

[27] In addition, the FTCA's discretionary function exception bars all the Bellwether Plaintiffs' claims. *See* ECF No. 262.

the essence of the claim involves the government's failure to use due care in obtaining and communicating information." *1200 Sixth St., LLC v. U.S. ex rel. Gen. Servs. Admin.*, 848 F. Supp. 2d 767, 774 (E.D. Mich. 2012) (quoting *JBP Acquisitions, LP v. United States*, 224 F.3d 1260, 1264 (11th Cir. 2000)).

The misrepresentation exception bars Plaintiffs' Communication-Based Claims because the essence of these claims is that EPA failed to use due care in communicating information to the public-at-large (*e.g.*, the failure-to-warn claim) or in response to individual inquiries. *E.g.*, *Abbey*, 112 F.4th at 1144, 146-67 (the exception barred claims arising out of alleged misrepresentations regarding hazardous substances at a property); *In re FEMA Trailer Formaldehyde Prod. Liab. Litig. (Louisiana Plaintiffs)*, 713 F.3d 807, 812 (5th Cir. 2013) (the exception barred claims arising from "FEMA's failure to publicize and take action on information it received relating to formaldehyde levels and occupant risk").

Unlike *Abbott v. United States*, in which the Sixth Circuit upheld the district court's opinion that "Plaintiffs' failure-to-warn claim sounds in negligence, and not in misrepresentation," 78 F.4th 887, 903 (6th Cir. 2023), Plaintiffs' Communication-Based Claims are predicated on their alleged reliance on EPA's communications (or lack thereof), *compare* 2019 Op. at 818 (noting Plaintiffs' allegations of reliance on EPA's communications), *with Reed v. United States*, No. 3:18-CV-201, 2022 WL 601924, at *7 (E.D. Tenn. Feb. 28, 2022) ("Plaintiffs are not arguing that they relied

on information from Defendant or that Defendant expected Plaintiff to rely on that information," but "that Defendant had a duty to notify others of fire management activities."), *remanded sub nom. Abbott*, 78 F.4th 887. At that time, SDWA did not impose a duty to warn on EPA.[28] The United States also does not contend that the misrepresentation exception bars all of Plaintiffs' claims—just the Communication-Based Claims. For these reasons, the *Abbott* reasoning does not apply here.

Lastly, the misrepresentation exception applies to Plaintiffs' Communication-Based Claims, even though not all the alleged damages are commercial or financial in nature. *Contra* 2019 Op. at 817; *FWC* MTD Op. at 638. Although various courts in this district have so limited the misrepresentation exception, "[t]he Sixth Circuit has not yet spoken on whether the exception is so limited." *FWC* MTD Op. at 638 (citing, *inter alia*, 2019 Op. at 817). This limitation finds no basis in the exception's plain language, *see* 28 U.S.C. § 2680(h), but instead derives from extrapolating the Supreme Court's discussion of the traditional tort of negligent misrepresentation in *United States v. Neustadt*, 366 U.S. 696, 702 (1961) and *Block v. Neal*, 460 U.S. 289, 296 n.5 (1983), *see* 2019 Op. at 817. But the Supreme Court's discussion of "the traditional tort of negligent misrepresentation" in *Neustadt* and *Block* does not override the exception's plain language. *E.g., Abbey*,

---

[28] 2019 Op at 813-14 ("neither Section 1414 nor Section 1431 set forth a mandatory obligation for the EPA to issue warnings. . . . The regulations in fact impose this requirement on public water systems. *See* 40 C.F.R. § 141.85.").

112 F.4th at 1147-49 (rejecting a similar argument regarding the inclusion of detrimental reliance in this traditional definition).[29] Consequently, numerous courts have applied the exception in personal injury cases such as this. *E.g.*, *Kim v. United States*, 940 F.3d 484, 492-93 (9th Cir. 2019); *In re FEMA Trailer*, 713 F.3d at 812; *Schneider v. United States*, 936 F.2d 956, 958 (7th Cir. 1991). The Court should do the same here.[30]

## CONCLUSION

For all these reasons (in addition to those in the United States' pending motion to dismiss pursuant to the FTCA's discretionary function exception, ECF No. 262), the Court lacks subject-matter jurisdiction over the Bellwether Plaintiffs' claims and the claims should be dismissed.

Dated:      October 16, 2024          Respectfully submitted,

                                      *s/ Eric Rey*
                                      ERIC REY
                                      Trial Attorney, Torts Branch
                                      Environmental Tort Litigation Section
                                      U.S. Department of Justice

---

[29] *Id.* at 1149 ("plaintiffs pluck out language from *Neustadt* and *Block* . . . . But 'the language of an opinion is not always to be parsed as though we [are] dealing with [the] language of a statute.' . . . Rather, as the Supreme Court has stressed, 'opinions dispose of discrete cases and controversies[,] and they must be read with a careful eye to context' and the specific facts at bar. . . . . We thus reject the plaintiffs' reading of *Block* and *Neustadt* as requiring detrimental reliance by the plaintiff for the FTCA's misrepresentation exception to apply.") (citations omitted).

[30] At a minimum, the Court should hold that the exception bars Bellwether Plaintiffs Keys and McClain from recovering their alleged business losses under their Communication-Based Claims.