EXHIBIT 2

Page 1

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF MICHIGAN

3                   SOUTHERN DIVISION

4

5     In re FTCA Flint Water Cases,

6

7                         Civil No. 4:17-cv-11218

8                         (Consolidated)

9                         Linda V. Parker

10                        United States District Judge

11

12

13

14

15        The Videotaped Deposition of JENNIFER HUFFMAN, Ph.D.,

16        Taken at 221 North Main Street, Suite 300,

17        Ann Arbor, Michigan,

18        Commencing at 1:00 p.m.,

19        Monday, September 9, 2024,

20        Stenographically Reported By

21        Wendy M. Taylor, CSR-6922.

22

23

24

25

Page 2

1  APPEARANCES:
2
3  DEBORAH A. LABELLE
4  Law Office of Deborah Labelle
5  221 North Main Street
6  Suite 300
7  Ann Arbor, Michigan  48104
8  (734) 996-5620
9  deblabelle@aol.com
10     Appearing on behalf of the Plaintiffs.
11
12  CARY S. McGEHEE
13  Pitt McGehee Palmer Bonanni & Rivers, PC
14  117 West Fourth Street
15  Suite 200
16  Royal Oak, Michigan  48067
17  (248) 398-9800
18  cmcgehee@pittlawpc.com
19     Appearing on behalf of the Plaintiffs.
20
21
22
23
24
25

Page 3

1  JASON T. COHEN
2  US Department of Justice
3  1100 L Street NW
4  Washington, DC  20005
5  (202) 514-0335
6  jason.t.cohen@usdoj.gov
7     Appearing on behalf of Defendant.
8
9  ALSO PRESENT:
10  Chris Delacruz - Video Technician
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 4

2 (Pages 2 - 5)



Page 42

8  Q.  Okay.  Let me go back to what you list as, research
9      experience.  The neuropsychology consultant for a
10     grant on examining the human health effects of PCB
11     exposure from contaminated fish among adolescent --
12     Asian adolescents in the Fox River Basin.  What did
13     you do in that?
14 A.   Provide consultation services regarding selection of
15     neuropsychological tests along with their
16     administration and interpretation.
17 Q.  Okay.  An[ ]do you recall the findings of that
18     research?
19 A.  No.
20 Q.  Do you recall that researchers found neurobehavioral
21     and development problems, such as impaired
22     responsiveness, short-term memory problems, and
23     reduced mental abilities in infants and children of
24     mothers exposed prior to and during pregnancy?
25 A.  I'm not aware of the findings.

Page 43

1  Q.  Did you ever read it?
2  A.  I'm sure I did.
3  Q.  Okay.  Do you recall that the findings were -- that
4      the youth had three times the chance of having lower
5      IQ scores and twice the chance of flagging, at least
6      two years with cognitive deficits?
7  A.  I don't recall the research findings.
8  Q.  Did you not contribute to the final papers?
9  A.  I did not.  I provided the consultation regarding a
10     selection of the test and their administration and
11     interpretation.
12 Q.  Okay.  And what tests do you recall?
13 A.  I don't recall.
14 Q.  Do you have any documents or would that be in the
15     findings, do you think?
16 A.  I'm sure it's in the findings.
17 Q.  Do you understand whether they accepted or rejected
18     your recommendation for tests?
19 A.  I do not know.
20 Q.  Okay.  So you -- do you understand that that research
21     was among -- was among the Mung community?
22 A.  I am aware, yes.
23 Q.  And do you know whether or not there was a blood study
24     conducted with the EPA in that case?
25 A.  I'm unaware.

Page 44

1  Q.  Were you named as a researcher in the papers, do you
2      think?
3  A.  I don't think so, not to my knowledge.

12 (Pages 42 - 45)



Page 62

Page 63

9   Q.  And how did you do -- you never met any of them,
10      right?
11   A.  That's correct.
12   Q.  You never evaluated them in person?
13   A.  Correct.
14   Q.  You never interviewed them?
15   A.  Correct.

12   Q.  Are there any rules about evaluating people without
13      formally meeting them in your profession?
14   A.  I didn't perform an evaluation of the individuals.  I
15      performed a review of the available records.
16   Q.  So your opinions are limited to the review of the
17      available records, is that correct?
18   A.  Correct.
19   Q.  So when you said -- let's just take Mr. Campbell for a
20      moment.  You said, concluded there was no evidence of
21      clinically-impairing levels of emotional distress
22      related to the distribution of water during this time
23      period for Mr. Campbell.
24          Do you recall that?
25   A.  I'm turning to the report now.

17 (Pages 62 - 65)

Page 90

1 Q. Okay. Did you -- are you familiar with the CASPER
2 reports?
3 A. Yes, I am.
4 Q. Tell me what they are?
5 A. Surveys of mental health. I haven't read them in
6 detail and they weren't resources I relied on.
7 Q. Who performed the CASPER studies?
8 A. I don't -- I don't know.
9 Q. So do you know anything about why CASPER surveys are
10 done?
11 A. No.
12 Q. So you're not even aware that it's done by the CDC?
13 A. I was aware that there's a governmental agency that is
14 responsible but I couldn't have said it was the CDC.
15 Q. Okay. And you are unaware then of what the protocol
16 is for why a CASPER study is done?
17 A. I'm unaware.



Golkow Technologies,
A Veritext Division
877-370-3377                                         www.veritext.com

Page 110



12 Q. Have you ever done work on community mental health?
13 A. To the extent that mental health problems occur in the
14    community, certainly. I've been involved with seeing
15    patients who've been in community mental health. I
16    guess you need to be more specific about what you're
17    saying.

19 A. I haven't conducted community research, if that's what
20    you're talking about?
21 Q. I'm asking what your expertise is in community trauma
22    or community mental health?
23 A. Just in understanding the impacts and reviewing
24    literature, reviewing research in the area.
25 Q. Are you aware of the methodology that's utilized in



Page 114

1    assessing community mental health?
2  A.  Yes.
3  Q.  What would that be?
4  A.  Well, there's a variety of ways, it can be knocking on
5    doors and administering questionnaires or interviews
6    of individuals, it can be making random phone calls
7    within a community, it can be assessing all comers
8    within an emergency room, for example, in a particular
9    community, there can be a variety of ways of looking
10   at community mental health.
11 Q.  Have you been involved in any of those?
12 A.  Not directly, no.
13 Q.  Indirectly?
14 A.  Through reading or research.
15 Q.  Have you been involved in doing any of that
16   assessment?
17 A.  No.

22 Q.  Okay.  Were you asked to look the impact of the water
23   conditions on the community's mental health and
24   emotional wellbeing?
25 A.  Insomuch as these individuals within the case are part

Page 117

1    of the community, it was definitely something that I
2    considered.
3  Q.  Did you do any questionnaires to other members of the
4    community?
5  A.  No.
6  Q.  Did you knock on any doors?
7  A.  No.
8  Q.  Okay.  Did you talk to any community leaders?
9  A.  No.
10 Q.  Did you do interviews with mental health experts in
11   the community?
12 A.  Other than informal conversations, no.
13 Q.  Who did you talk to, mental health experts, in the
14   Flint community, even informally?
15 A.  At various points I know Kirk Stucky.
16 Q.  And you spoke to him?
17 A.  Very generally and vaguely, not anything in
18   particular.
19 Q.  How many times did you speak to him?
20 A.  He and I are colleagues so I don't know.  I couldn't
21   give you an exact number.
22 Q.  More than three?
23 A.  Nothing specific about this case.
24 Q.  Well, about the Flint water crisis?
25 A.  Correct.

30 (Pages 114 - 117)

Page 118

1 Q. And what was the substance of those discussions?
2 A. I don't recall.
3 Q. Nothing?
4 A. As I said, it was just general reactions and
5 discussions about the experiences.
6 Q. Did he feel that there was community trauma?
7 A. I would not be able to characterize his opinions about
8 it based on our conversations.
9 Q. Did he offer you any insight into the Flint water
10 crisis's impact on the community?
11 A. I'm sure he did but they were general conversations
12 that happened years ago so I couldn't tell you about
13 them or the substance of those conversations today.
14 Q. So you don't recall any of it?
15 A. Right.
16 Q. Anyone else you spoke to?
17 A. I may have but I couldn't tell you a specific person
18 or name.
19 Q. Well, did you speak to any of the mental-health
20 experts about the --
21 A. Not related to this case, no.
22 Q. Or the Flint water crisis?
23 A. I may have.
24 Q. I'm asking you for their names?
25 A. I -- as I said, I couldn't tell you their names.

Page 119

1 Q. Did you speak to any Flint community leaders?
2 A. Not to my knowledge.
3 Q. Did you review the available research with regard to
4 the Flint water crisis and the community mental
5 health?
6 A. Yes.
7 Q. Okay. I'm going to show you what's been marked as
8 Exhibit 4 and I'll ask you to look through this and
9 tell me which of those, which of that literature you
10 reviewed?
11     MR. COHEN: Do you have additional copies
12 of that?
13     MS. LABELLE: Sorry, these are the -- and
14 if it helps at all, those are some of the source
15 materials relied upon by Dr. Reicherter.
16 BY MS. LABELLE:
17 Q. Can you tell me -- if you can tell me which ones you
18 reviewed as you're going through it, just shout it
19 out. Any on page 1?
20 A. I mean, I'm certainly familiar with the Diagnostic and
21 Statistical Manual of Mental Disorders, 5 TR.
22 Q. Right, that's a general citation, but any of the
23 others that are specific to Flint?
24 A. As far as research that I reviewed in detail?
25 Q. Yes.

Page 120

1 A. I'm not seeing any jump out at me.
2 Q. Let me know.
3 A. I know I've looked at some of the work by Dr. Attisha.
4 Q. What did you review? Did you review the report from
5 the American Journal of Public Health on Elevated
6 Blood Levels in Children Associated With the Flint
7 water crisis?
8 A. I don't know if it was that one specifically. I don't
9 know if she's written more than one article. I would
10 imagine she has.
11 Q. But you don't recall if you read this one?
12 A. I don't recall.
13 Q. Any others that you think seem vaguely familiar to
14 you?
15 A. I may have, whether they're on my resources relied on,
16 I don't know. I read Vonnie McLoyd's declaration.
17 Q. That's our expert. You read her declaration?
18 A. Right. I've looked at the National Center for PTSD
19 website. I've looked at some of the work by Sneed.
20 Q. Did you review The Behavior Health Concerns During the
21 Flint water crisis of Community from the community
22 mental health?
23 A. Is that the Sneed article?
24 Q. That's the one cited here?
25 A. I may have.

Page 121

1 Q. Anything else?
2 A. I may have, nothing that stands out.
3 Q. Do you recall reading the article in JAMA by Reuben,
4 Cohen, and Friedman on the Prevalence of Depression of
5 Posttraumatic Stress Disorders in Flint, Michigan,
6 Five Years After the Onset of the Water Crisis?
7 A. I don't recall.
8 Q. What journals do you get regularly?
9 A. Journals in Neuropsychology.
10 Q. Which ones?
11 A. Like the Clinical Psychologists.
12 Q. Clinical Psychologist?
13 A. Archives of Clinical Neuropsychology.
14 Q. Anything else?
15 A. Those are the two main that I receive.
16 Q. Do you get the Journal of Community Psychology?
17 A. No.
18 Q. So did you -- you don't recall reading Toxic Trauma,
19 Household Water Quality Experience, Posttraumatic
20 Stress Disorder Symptoms During the Flint, Michigan,
21 Water Crisis?
22 A. No.
23 Q. Do you get the Journal of Urban Health?
24 A. No.
25 Q. So do you recall reading Community Perceptions of the

31 (Pages 118 - 121)

Page 122

1      Flint water crisis?
2  A.  No.
3  Q.  How about the Journal of Ecological Society, do you
4      get that?
5  A.  No.
6  Q.  So you don't recall reading Conceptualized Trust and
7      Distrust Lessons from the Flint water crisis?
8  A.  No.
9  Q.  So when you talked about you did some literature
10     review with regard to the community, can you cite to
11     me anything that you reviewed?
12  A.  Not off the top of my head, no.



Page 138

Page 140

do

at

| 17 | (The deposition was adjourned at 5:05 p.m. |
| 18 | Signature of the witness was not requested by |
| 19 | counsel for the respective parties hereto.) |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 141

CERTIFICATE OF NOTARY

2 STATE OF MICHIGAN   )

3                               ) SS

4 COUNTY OF LIVINGSTON)

5

6        I, WENDY M. TAYLOR, certify that this

7   deposition was taken before me on the date

8   hereinbefore set forth; that the foregoing questions

9   and answers were recorded by me stenographically and

10  reduced to computer transcription; that this is a

11  true, full, and correct transcript of my stenographic

12  notes so taken; and that I am not related to, nor of

13  counsel to, either party nor interested in the event

14  of this cause.

15

16

17

18

19

20

21

22        WENDY M. TAYLOR, CSR-6922

23        Notary Public,

24        Livingston County, Michigan

25 My Commission expires:  1-10-29



36 (Pages 138 - 141)

Page 142

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF MICHIGAN

3                   SOUTHERN DIVISION

4

5     In re FTCA Flint Water Cases,

6

7                          Civil No. 4:17-cv-11218

8                          (Consolidated)

9                          Linda V. Parker

10                         United States District Judge

11

12

13    VOLUME II

14

15         The Continued Videotaped Deposition of

16         JENNIFER HUFFMAN, Ph.D.,

17         Taken at 221 North Main Street, Suite 300,

18         Ann Arbor, Michigan,

19         Commencing at 1:00 p.m.,

20         Tuesday, September 10, 2024,

21         Stenographically Reported By

22         Wendy M. Taylor, CSR-6922.

23

24

25

Page 143

1  APPEARANCES:
2
3  DEBORAH A. LABELLE
4  Law Office of Deborah Labelle
5  221 North Main Street
6  Suite 300
7  Ann Arbor, Michigan  48104
8  (734) 996-5620
9  deblabelle@aol.com
10      Appearing on behalf of the Plaintiffs.
11
12  CARY S. McGEHEE
13  Pitt McGehee Palmer Bonanni & Rivers, PC
14  117 West Fourth Street
15  Suite 200
16  Royal Oak, Michigan  48067
17  (248) 398-9800
18  cmcgehee@pittlawpc.com
19      Appearing on behalf of the Plaintiffs.
20
21
22
23
24
25

Page 144

1  JASON T. COHEN
2  US Department of Justice
3  1100 L Street NW
4  Washington, DC  20005
5  (202) 514-0335
6  jason.t.cohen@usdoj.gov
7      Appearing on behalf of Defendant.
8
9  ALSO PRESENT:
10  Chris Delacruz - Video Technician
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25





Page 163

Page 165

1   length of time it would take for you to be exposed to
2   certain levels of lead to have an IQ detriment?
3 A.   I would defer to a toxicologist or an epidemiologist.
4 Q.   Well, that's my point, you're not an expert in
5   toxicology, are you?
6 A.   I'm not.
7 Q.   And you're not an expert in epidemiology?
8 A.   I'm not.

Page 164

So I'm not asking for the literature.  I'm
3   asking for your opinions as an expert on the impact of
4   lead exposure in cognitive development.
5        What is the level of lead, over what period
6   of time, that results in cognitive injury to a child?
7 A.   So if we're talking about the kind of cognitive injury
8   that can be measured using our tests, let's say an IQ
9   test, I think the blood lead levels would need to be
10   close to 20 or 30 micrograms per deciliter before we
11   can really, in an individual child, measure
12   demonstrable change.
13 Q.   20 to 30 over what period of time?
14 A.   Over -- for whatever period there was.  I
15   mean, I'm not sure what you mean.  It would have to be
16   more than a day, you know.
17 Q.   Okay.  How much longer than a day?
18 A.   I don't think I can, based on my knowledge of the
19   literature, give an answer to that question.
20 Q.   I'm asking you based on your asserted expertise in the
21   impact of lead exposure in cognitive development,
22   would 24 hours be sufficient to show an IQ detriment?
23 A.   I have no opinion on the length of time required.
24 Q.   How can you be an expert on the impact of lead
25   exposure and cognitive development and not know the

Golkow Technologies,
A Veritext Division
877-370-3377                                      www.veritext.com



Page 175

Page 177

1    expert in epidemiology, correct?
2  A.   Correct.
3  Q.   You're not an expert in public health?
4  A.   Correct.
5  Q.   You've never done any studies or participated in
6    studies or designed studies or had any experience with
7    assessing the health of a community?
8  A.   Correct.
9  Q.   You're not familiar with the methodologies related to
10    the assessment of public health in a community, is
11    that correct?
12  A.   No.
13  Q.   That's not correct?
14  A.   It's not correct.
15  Q.   Was that because that's the door knocking and the
16    putting out questionnaire methodology questions that
17    we talked about?
18  A.   Yes.
19  Q.   Could you be more specific about that?  What is the
20    number of individuals in a community of 90,000 that
21    would -- you would have to survey or provide
22    questionnaires for to have a valid public community
23    health survey?
24  A.   I can't give that number.
25  Q.   Why, because you don't know it?

Page 178

1  A.   I don't know the specifics on how many would be
2    required.
3  Q.   You don't know the methodology for that, do you?
4  A.   Not to that level of detail.
5  Q.   Does your knowledge of methodology in assessing
6    community public health stop at you sending out
7    questionnaires, you knocking on doors, or making phone
8    calls?
9  A.   Yes.
10  Q.   You've not testified in the past about public health
11    or community health in a court of -- court of law?
12  A.   Correct.
13  Q.   You've not reviewed any academic scholarship, I'm
14    correct?
15  A.   Correct.
16  Q.   Not public -- any article on public health or
17    community health?
18  A.   Correct.
19  Q.   Do you have any degrees in this area?
20  A.   No.
21  Q.   And just to be clear, you've not published in this
22    area of community public health?
23  A.   That's correct.
24  Q.   Let's go over -- and that would be the same for
25    community trauma, you haven't published any opinions

10 (Pages 175 - 178)

Page 179

1     about community trauma?
2  A.  That's correct.
3  Q.  You have no publications and you've not done a review
4     of academic scholarship and have no prior reports or
5     testimony in this area?
6  A.  That's correct.
7  Q.  Okay.  Have you done any work as a researcher in the
8     last 20 years?
9  A.  We already covered this yesterday.  I would refer you
10    to my previous responses.
11 Q.  Okay.  Have you ever directed research into areas of
12    impact on race or economics in a community?
13 A.  No.
14 Q.  Have you ever directed research into areas of the
15    impact of race or economics on children?
16 A.  No.
17 Q.  Have you ever directed research into areas of impact
18    of race or economics on an individual?
19 A.  No.
20 Q.  Have you had any training in this area?
21 A.  Training on racial information?
22 Q.  Yes, the impact of race or economics in community on
23    children?
24 A.  I've attended seminars on racial disparities.
25 Q.  Who presented those seminars?

Page 180

1  A.  I don't recall.
2  Q.  Do you recall the last one you attended?
3  A.  No.
4  Q.  Do you recall any that you attended?
5  A.  No.
6  Q.  Have you ever heard of the Society For Research and
7     Child Development?
8  A.  No.
9  Q.  So I can assume you're not a member?
10 A.  Correct.
11 Q.  Have you heard about the National Adolescent Health
12    Survey?
13 A.  I don't know anything specific about it.
14 Q.  Have you heard of the Society For Research in Child
15    Development?
16 A.  I've heard of it.
17 Q.  Are you a member?
18 A.  No.
19 Q.  Do you get the Journal of Research on Adolescents?
20 A.  No.
21 Q.  Do you get the Journal of Black Psychology and Child
22    Development?
23 A.  No.
24 Q.  Are you a member of the National Academy of Science?
25 A.  No.

Page 181

1  Q.  Have you ever received a grant for research in your
2     own name?
3  A.  No.
4  Q.  Have you ever directed a research product involving
5     child development?
6  A.  No.
7  Q.  Have you ever published in the area of impact of race
8     or economics on community mental health?
9  A.  No.
10 Q.  Have you ever taught a class on research?
11 A.  Not specifically on research, no.
12 Q.  What is, not specifically?  What kind of class have
13    you taught that is somewhat related to research
14    techniques?
15 A.  I've taught basic classes in abnormal psychology and
16    in human sexuality --
17 Q.  When did you --
18 A.  -- that would have touched on those topics.
19 Q.  And when is the last time you taught a class?
20 A.  I would refer you to my CV.  I can look.
21 Q.  Yes, please.
22 A.  1997.
23 Q.  What was the name of that class?
24 A.  Human Sexuality.
25 Q.  Where did you teach it?

Page 182

1  A.  Wayne State University.
2  Q.  And were you the sole instructor?
3  A.  I was, yes.
4  Q.  And was it one semester?
5  A.  It was.
6  Q.  Was it an undergraduate class?
7  A.  Yes, sorry, I misspoke, the most recent course I
8     taught was abnormal psychology in 1999.
9  Q.  So 25 years ago?
10 A.  Yes.
11 Q.  Where was that?
12 A.  Jackson Community College.
13 Q.  Was that one semester?
14 A.  Yes.
15 Q.  You were the sole instructor?
16 A.  Yes.
17 Q.  But you've never taught a class specifically on
18    research techniques?
19 A.  Correct.
20 Q.  Have you ever taught a class on childhood policy and
21    development?
22 A.  No.
23 Q.  What about a class in adolescent development and
24    poverty?
25 A.  No.

11 (Pages 179 - 182)

Page 183

1 Q. Have you ever offered any opinions in court or
2    testified with regard to adolescent development,
3    poverty, or racial impacts?
4 A. No.
5 Q. I think we talked about the journals you subscribe to
6    and none of those focus on the effects of trauma, do
7    they?
8 A. The journals themselves aren't specific to the topic
9    of trauma. Certainly trauma may be presented as a
10   research study within those journals.

███████████████████████████████
██    ███████████████
██  ███████
██████████████████████████
███████████████████
██████████████████████████
██████████████████████████████████
██  ██████████████
████████████████
███████████████████████████████████
██  ████████
██████████

24 Q. Have you ever published in the area of trauma impact
25    stressors, how to assess trauma, treat trauma, or

Page 184

1    identify the consequences of trauma?
2 A. No.
3 Q. Have you ever reviewed any scholarly articles for
4    purposes of peer review related to trauma, trauma
5    impact, stressors, how to assess trauma, treat trauma,
6    or identify the consequences of trauma?
7 A. No.
8 Q. You don't have any specialized expertise in trauma and
9    its impact, do you?
10 A. I do not.
11 Q. I believe you testified that you treated in your
12    clinical practice a handful of adults in your career
13    for trauma-related symptoms.
14       Have you ever diagnosed someone with PTSD?
15 A. Yes.
16 Q. How many?
17 A. I don't recall.
18 Q. How many have you treated?
19 A. That question was asked and answered.
20 Q. As a result of the diagnosis of PTSD?
21       And your counsel can make objections.
22 A. You started this line of questioning by stating how
23    many people I said I treated in my clinical practice
24    specifically for trauma, that would be the same answer
25    here.

Page 185

1 Q. A handful?
2 A. Right.
3 Q. But did you treat any of them for PTSD?
4 A. That was the response to how many people I treated.
5 Q. Okay. Have you ever worked in developing a curriculum
6    for training on how to handle victims of trauma or
7    people suffering from trauma?
8 A. No.
9 Q. You mentioned that you worked with combat veterans as
10    an intern.
11       Can you tell me when that was, what year?
12 A. From September 1999 to August 2000.
13 Q. So less than a year?
14 A. One year.
15 Q. What were your duties and responsibilities?
16 A. I conducted psychological and neuropsychological
17    assessments, report writing, psychotherapy, case
18    conferences, interdisciplinary grounds, presentations,
19    attended seminars, special rotations in geriatric
20    neuropsychology, and multidisciplinary pain management
21    involving assessment and treatment of patients from --
22    suffering from chronic pain.
23 Q. How many combat veterans did you do assessments on?
24 A. I don't recall.
25 Q. Did you have a supervisor?

Page 186

1 A. I did.
2 Q. Who was that?
3 A. My supervisors at the time were Ken Adams, Lenard
4    Spielhaus (phonetic), Gus Bucktal (phonetic), there
5    were others whose names I can't recall.
6 Q. Since that time have you ever worked with combat
7    veterans?
8 A. Yes.
9 Q. And in what context?
10 A. Performing evaluations.
11 Q. How many in your private practice?
12 A. In my practice at the hospital.
13 Q. How many would you say?
14 A. I don't know.



Golkow Technologies,
877-370-3377        A Veritext Division        www.veritext.com

Page 187

1 Q. Did you look at her CV?

2 A. Some time ago.

3 Q. Okay. Did you have any other responsibilities as a

4     co -- like a coinvestigator, did you collaborate on

5     the development and evaluation of any

6     psychotherapeutic treatment protocol while you were an

7     intern?

8 A. No.

9 Q. Okay. Did you supervise anyone yourself for the

10     therapeutic treatment of traumatized combat veterans?

11 A. No.

12 Q. Have you ever worked on any research involving trauma

13     victims?

14 A. Not directly.

15 Q. Well, what would be your indirect work?

16 A. They may have been trauma victims as part of the

17     research studies I've conducted.

18 Q. Which one?

19 A. Any one.

20 Q. Well, can you point me to that, your research that

21     might involve trauma victims?

22 A. There could have been a trauma victim in any research

23     study as part of the participant.

24 Q. Right. But was your research specifically directed to

25     working with trauma victims?

Page 188

1 A. No.

2 Q. Okay. Have you ever published or reviewed for any

3     journal focused on trauma?

4 A. No.

5 Q. And I think you said you heard of the Journal of

6     Traumatic Stress?

7 A. I may have.

8 Q. You don't get it, do you?

9 A. No.

10 Q. Okay. Have you ever provided individual or group

11     treatment of traumatized adults for clinical or

12     research purposes?

13 A. No.

14 Q. Have you ever developed any courses in trauma for any

15     university?

16 A. No.

17 Q. Have you ever taught any graduate level course in

18     trauma or response and recovery?

19 A. No.

20 Q. Have you presented any papers on trauma at any

21     conferences, meetings, associations, events, or

22     symposiums?

23 A. No.

24 Q. Have you ever run any workshops on trauma?

25 A. No.

Page 189

1 Q. Have you ever testified as an expert in court on

2     trauma?

3 A. I have not.

4 Q. Have you ever presented expert testimony on trauma

5     through a report in your forensic work, other than

6     what you're presenting here today?

7 A. Sorry, could you repeat the question?

8 Q. Have you ever presented what you -- testimony on

9     trauma through a report? Have you ever prepared a

10     report on trauma in your forensic work --

11 A. Yes.

12 Q. -- other than what you've done here today?

13 A. Yes.

14 Q. And where -- where was that, the expert reports on

15     trauma?

16 A. I have conducted evaluations of individuals exposed to

17     trauma as part of my forensic practice.

18 Q. Okay. And you've made opinions based upon the trauma

19     as a result of that in your cases?

20 A. Correct.

21 Q. How many cases did you do that in?

22 A. I cannot recall.

23 Q. One?

24 A. More than one.

25 Q. More than three?

Page 190

1 A. More than three.

2 Q. More than five?

3 A. More than five.

4 Q. Over the last 20 years?

5 A. Yes.

6 Q. Between 5 and 10?

7 A. More than 10.

8 Q. None of those resulted in your testifying in court?

9 A. Correct.

10 Q. In all of those cases did you examine the individual?

11 A. I'm sure there were other instances where I conducted

12     just record reviews of the cases.

13 Q. Do you recall them?

14 A. Not directly.

15 Q. Can you name a case in which you did an exam on an

16     individual and you prepared a report, other than this

17     case?

18 A. Yes.

19 Q. What case would that be?

20 A. I cannot recall.

21 Q. Well, I'm asking you if you can name a case?

22 A. Oh, I'm sorry. I can't name a case, as I sit here

23     today.

24 Q. What was your dissertation on?

25 A. Predictors of Treatment Adherence and the Relationship

13 (Pages 187 - 190)

Page 191

1   Between Adherence and Treatment Outcome Among Migraine

2   Headache Patients.

3   Q.   Did you see yourself as an expert in migraine

4   headaches?

5   A.   I completed a dissertation on it at the time and I'm

6   not a neurologist.  I was really studying the

7   treatment adherence and focusing on those predictors.

8   Q.   Do you see yourself as an expert in that area?

9   A.   No.

10  Q.   Okay.  Dr. Lebowitz had an opinion that the emotional

11  and psychological suffering, emotional and

12  psychological suffering was experienced by all members

13  of the cohort.  We're talking about the adults whose

14  records you reviewed.

15        Do you disagree with that opinion?

16  A.   I don't think I would qualify or define the

17  experiences they had as suffering or clinically

18  impairing experienced distress.

19  Q.   Well, there's no clinical -- I'm sorry.

20        So she doesn't say, clinically impairing.

21  She just said her opinion is that they suffered

22  emotional and psychological suffering was experienced

23  by all members of the cohort.  I'm asking if you

24  disagree with that?

25  A.   I can't agree with it not knowing exactly what she

Page 192

1   means by suffering and the definition of that.

2



20  Q.   Okay.  What were you asked to do with regard to Vonnie

21  McLoyd's opinion in this case?

22  A.   Review the documents and comment on any opinions I

23  had.

24  Q.   Did you advise anyone that you didn't have an

25  expertise in the areas of racial disparity, social and

Page 194

1   economic research?

2  A.   I was never asked whether I had that expertise.

14 (Pages 191 - 194)

Golkow Technologies,
A Veritext Division

Page 199



23  Q.   What else have you read besides Craft and Trejo?

24  A.   I did a lot of reading on this.  I can't name a

25       specific citation of it than these that I relied on.



Page 203

1 Q.   Okay.  So whatever is marked in Exhibit 5, that's what
2     you read?
3 A.   No.
4 Q.   You read more?
5 A.   Correct.
6 Q.   Okay.  Could you tell me what else you read?
7 A.   I just said I can't.
8 Q.   Do you have any notes or anything that would help you
9     remember what you read?
10 A.   No.

9 Q.   Did you have any chance to read Dr. McLoyd's book, New
10     Directions For Child Development, Economic Stress
11     Effects on Family Life and Child Development?
12 A.   No.
13 Q.   How about her book, Studying Minority Adolescents,
14     Conceptual and Methodological Issues, did you read
15     that?
16 A.   No.
17 Q.   Have you taken any classes or gotten any training on
18     multicultural psychology?
19 A.   Multicultural psychology is frequently incorporated
20     within most areas in most classes, in fact, even
21     presentations today often include such comments.
22 Q.   Have you read her APA handbook of multicultural
23     psychology?
24 A.   No.
25 Q.   Do you recall -- do you recall any classes or

17 (Pages 203 - 206)

Page 283



15      (The deposition was adjourned at 5:13 p.m.
16      Signature of the witness was not requested by
17      counsel for the respective parties hereto.)
18
19
20
21
22
23
24
25

Page 284

1           CERTIFICATE OF NOTARY
2   STATE OF MICHIGAN   )
3                  ) SS
4   COUNTY OF LIVINGSTON)
5
6          I, WENDY M. TAYLOR, certify that this
7   deposition was taken before me on the date
8   hereinbefore set forth; that the foregoing questions
9   and answers were recorded by me stenographically and
10  reduced to computer transcription; that this is a
11  true, full, and correct transcript of my stenographic
12  notes so taken; and that I am not related to, nor of
13  counsel to, either party nor interested in the event
14  of this cause.
15
16
17
18
19
20
21
22          WENDY M. TAYLOR, CSR-6922
23          Notary Public,
24          Livingston County, Michigan
25  My Commission expires:  1-10-29

37 (Pages 283 - 284)

**Page 1**

ROUGH DRAFT/UNCERTIFIED TRANSCRIPT

(REALTIME ROUGH DRAFT AND UNCERTIFIED

TRANSCRIPT:

This realtime draft is unedited

and uncertified and may contain

untranslated stenographic symbols,

an occasional court reporter note,

a misspelled proper name and/or

unusual word combinations.)

**Page 2**

ROUGH DRAFT/UNCERTIFIED TRANSCRIPT

THE FOLLOWING FILE IS NOT AN OFFICIAL

TRANSCRIPT. IT IS INTENDED ONLY TO AID

IN CASE PREPARATION. THE FINAL TRANSCRIPT

WILL BE DIFFERENT, BOTH IN FORM AND SUBSTANCE,

FROM THIS ROUGH DRAFT TRANSLATION.

YOU MAY SEE ERRORS AND OMISSIONS DURING

THE REALTIME TRANSLATION THIS IS NOT

AN UNUSUAL PROCESS AND THESE ERRORS AND

OMISSIONS WILL BE CORRECTED ON THE FINAL

TRANSCRIPT. PLEASE DO NOT TRY TO BRING THESE

DISCREPANCIES TO THE ATTENTION OF THE REPORTER

DURING THE COURSE OF THE DEPOSITION.

UNOFFICIAL DRAFT TRANSCRIPT

THIS IS AN UNOFFICIAL DRAFT TRANSCRIPT!

This transcript has not been checked, proofread or

corrected. It is a draft transcript, NOT a certified

transcript. As such, it may contain

computer-generated mistranslations of stenotype code,

resulting in inaccurate or nonsensical word

**Page 3**

ROUGH DRAFT/UNCERTIFIED TRANSCRIPT

combinations, or untranslated stenotype symbols which

cannot be deciphered by non-stenotypists. Corrections

will be made in the preparation of the certified

transcript, resulting in differences in page and line

numbers, punctuation, and formatting.

THIS DRAFT TRANSCRIPT IS SUPPLIED TO YOU ON THE

CONDITION THAT UPON RECEIPT OF THE CERTIFIED

TRANSCRIPT, THIS DRAFT AND ANY COPIES THEREOF (IN

CONDENSED FORMAT OR OTHERWISE) WILL BE DESTROYED. THE

CERTIFIED TRANSCRIPT IS THE ONLY OFFICIAL TRANSCRIPT

WHICH MAY BE RELIED UPON FOR PURPOSES OF VERBATIM

CITATION OF TESTIMONY.

THE VIDEOGRAPHER: We are now on the record. My

name is David Lane, videographer for Golkow Litigation

Services.

Today's date is October 4th, 2024. Our

time on the record is 3:00 p.m. Eastern Standard Time.

This remote video deposition is being held

In the Matter of Flint Water Cases.

Our deponent today is Dr. Jennifer

Huffman, Ph.D.

All parties to this deposition are

appearing remotely and have agreed to the witness

**Page 4**

ROUGH DRAFT/UNCERTIFIED TRANSCRIPT

being sworn in remotely. Due to the nature of remote

reporting, please pause briefly before speaking to

ensure all parties are heard completely.

Counsel, please introduce yourselves and

state who you represent.

MS. LABELLE: Deborah Labelle on behalf of the

plaintiffs.

MR. COHEN: Good afternoon. Jason Cohen on

behalf of the United States.

THE VIDEOGRAPHER: Our court reporter today is

Juliana Zajicek, and will now swear in our witness.

MS. LABELLE: Could we have Cary McGehee who has

joined put in her appearance as well.

MS. MCGEHEE: Thanks, Deb.

Hello everybody. Good afternoon. Cary

McGehee appearing on behalf of the plaintiffs.

(WHEREUPON, the witness was duly

sworn.)

THE VIDEOGRAPHER: Please begin.

JENNIFER HUFFMAN, PH.D.,

called as a witness herein, having been first duly

sworn, was examined and testified as follows:

EXAMINATION



41

43

15:58:36 **10**   Q.   If you can go to Page 14 of your -- oh,
15:58:53 **11** actually Page 13 of your April 11, 2024, report.
15:59:07 **12**       In Paragraph 18, you say, the role that
15:59:09 **13** the media played in creating mass hysteria is
15:59:13 **14** important to consider, as outlined in Roy.
15:59:20 **15**       Can you define what you mean by mass
15:59:23 **16** hysteria?
15:59:34 **17**   A.   It's the reaction to the Flint residents
15:59:38 **18** had to being repeatedly told that this he were
15:59:40 **19** poisoned, even when the average level of exposure
15:59:43 **20** indicated that any associated effects could not be
15:59:46 **21** reliably or validly measured and were not clinically
15:59:49 **22** meaningful.
15:59:52 **23**   Q.   And where do you get your evidence that
15:59:56 **24** there was such mass hysteria?

44

**1**       ROUGH DRAFT/UNCERTIFIED TRANSCRIPT
16:00:00 **2**   A.   As described in Roy 2023.
16:00:04 **3**   Q.   So is it anything else other than you're
16:00:08 **4** relying upon Roy's report?
16:00:10 **5**   A.   That's the source of that statement.
16:00:13 **6**   Q.   And you believe, based upon that, that
16:00:17 **7** there was mass hysteria in the City of Flint over the
16:00:21 **8** Flint Water Crisis?
16:00:24 **9**   A.   That's as report -- according to the
16:00:26 **10** information provided by Roy.
16:00:28 **11**   Q.   I'm asking for your opinion now.  Do you
16:00:30 **12** believe there was mass hysteria in the City of Flint
16:00:34 **13** over the Flint Water Crisis?
16:00:36 **14**   A.   Yes, I agree.

69

**ROUGH DRAFT/UNCERTIFIED TRANSCRIPT**

1
2      THE FOLLOWING FILE IS NOT AN OFFICIAL
3      TRANSCRIPT.  IT IS INTENDED ONLY TO AID
4      IN CASE PREPARATION.  THE FINAL TRANSCRIPT
5      WILL BE DIFFERENT, BOTH IN FORM AND SUBSTANCE,
6          FROM THIS ROUGH DRAFT TRANSLATION.
7      YOU MAY SEE ERRORS AND OMISSIONS DURING
8      THE REALTIME TRANSLATION  THIS IS NOT
9      AN UNUSUAL PROCESS AND THESE ERRORS AND
10     OMISSIONS WILL BE CORRECTED ON THE FINAL
11     TRANSCRIPT.  PLEASE DO NOT TRY TO BRING THESE
12     DISCREPANCIES TO THE ATTENTION OF THE REPORTER
13          DURING THE COURSE OF THE DEPOSITION.
14
15
16          UNOFFICIAL DRAFT TRANSCRIPT
17     THIS IS AN UNOFFICIAL DRAFT TRANSCRIPT!
18
19
20     This transcript has not been checked, proofread or
21     corrected.  It is a draft transcript, NOT a certified
22     transcript.  As such, it may contain
23     computer-generated mistranslations of stenotype code,
24     resulting in inaccurate or nonsensical word

70

**ROUGH DRAFT/UNCERTIFIED TRANSCRIPT**

1
2      combinations, or untranslated stenotype symbols which
3      cannot be deciphered by non-stenotypists.  Corrections
4      will be made in the preparation of the certified
5      transcript, resulting in differences in page and line
6      numbers, punctuation, and formatting.
7          THIS DRAFT TRANSCRIPT IS SUPPLIED TO YOU ON THE
8      CONDITION THAT UPON RECEIPT OF THE CERTIFIED
9      TRANSCRIPT, THIS DRAFT AND ANY COPIES THEREOF (IN
10     CONDENSED FORMAT OR OTHERWISE) WILL BE DESTROYED.  THE
11     CERTIFIED TRANSCRIPT IS THE ONLY OFFICIAL TRANSCRIPT
12     WHICH MAY BE RELIED UPON FOR PURPOSES OF VERBATIM
13     CITATION OF TESTIMONY.
14
15
16
17
18
19
20
21
22
23
24