UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

*In re* FTCA Flint Water Cases

This Motion Relates to:

THE FIRST BELLWETHER
PROCEEDINGS

Civil No. 4:17-cv-11218
(Consolidated)

Linda V. Parker
United States District Judge

Curtis Ivy, Jr.
United States Magistrate Judge

---

**United States of America's Response in Opposition to
"Plaintiffs' Amended Motion to Exclude Certain Opinions of Jennifer
Huffman Based on Lack of Qualifications" [ECF No. 304]**

---

## ISSUES PRESENTED

1. Whether Dr. Jennifer Huffman is qualified to offer her opinions in this non-jury

   FTCA matter under the flexible analysis set forth by *Daubert* and FRE 702.

   United States' Answer: Yes.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

**Cases**

*Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994)

*Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171 (6th Cir. 2009)

*Cason-Merenda v. Detroit Med. Ctr.*, 2013 WL 1721651 (E.D. Mich. Apr. 22, 2013)

*Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547 (E.D. Mich. 2022)

*Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993)

*Deal v. Hamilton Cty. Bd. of Ed.*, 392 F.3d 840 (6th Cir. 2004)

*First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319 (6th Cir. 2001)

*Ferguson v. Lear Siegler Servs., Inc.*, No. 1:09CV635-MHT, 2012 WL 1058983 (M.D. Ala. Mar. 28, 2012)

*Gaines-Hanna v. Farmington Pub. Sch.*, No. 04-CV-74910-DT, 2006 WL 932074 (E.D. Mich. Apr. 7, 2006)

*Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419 (6th Cir. 2009)

*In re E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 348 F. Supp. 3d 698 (S.D. Ohio 2016)

*In re Flint Water Cases*, No. 5:16-CV-10444, 2024 WL 3495377 (E.D. Mich. July 22, 2024)

*In re Flint Water Cases*, No. 17-10164, 2021 WL 5356295 (E.D. Mich. Nov. 17, 2021)

*In re Scrap Metal Antitrust Litigation*, 527 F.3d 517 (6th Cir.2008)

*Jahn v. Equine Servs., PSC*, 233 F.3d 382 (6th Cir. 2000)

*Kanellakopoulos v. Unimerica Life Ins. Co.*, No. 15-CV-04674-BLF, 2018 WL 984826 (N.D. Cal. Feb. 20, 2018)

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)

*Kushner v. Lehigh Cement Co.*, 572 F. Supp. 2d 1182 (C.D. Cal. 2008)

*Mannino v. Int'l Mfg. Co.*, 650 F.2d 846 (6th Cir. 1981)

*Mich. State A. Philip Randolph Inst. v. Johnson*, No. 16-CV-11844, 2018 WL 1180886 (E.D. Mich. Mar. 7, 2018)

*Mod. Holdings, LLC v. Corning, Inc.*, No. 513CV00405GFVTEBA, 2022 WL 710174 (E.D. Ky. Mar. 9, 2022)

*Phillips v. Cohen*, 400 F.3d 388 (6th Cir. 2005)

*Sanford v. Russell*, 387 F. Supp. 3d 774 (E.D. Mich. 2019)

*Schlagenhauf v. Holder*, 379 U.S. 104 (1964)

*Stonebridge Operating Co., LLC v. Antero Res. Corp.*, No. 2:19-CV-1714, 2022 WL 2643354 (S.D. Ohio July 7, 2022)

*United States v. LaVictor*, 848 F.3d 428 (6th Cir. 2017)

*U.S. v. Sanders*, 59 F.App'x 765 (6th Cir. March 7, 2003)

*Zuzula v. ABB Power T & D Co.*, 267 F. Supp. 2d 703 (E.D. Mich. 2003)

**Statutes**

Federal Rule of Evidence 702

## TABLE OF CONTENTS

ISSUES PRESENTED........................................................................... ii

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................. iii

TABLE OF CONTENTS ...................................................................v

INDEX OF EXHIBITS ................................................................. vi

INTRODUCTION ...........................................................................1

BACKGROUND ...........................................................................2

STANDARD OF REVIEW ..................................................................6

ARGUMENT ...........................................................................9

**I.    Dr. Huffman is Qualified and Has a Sufficient Basis to Opine on the Adult Bellwether Plaintiffs' Emotional Distress Claims**......................................9

    A. Dr. Huffman is Qualified to Opine on the Adult Bellwether Plaintiffs' Claims of Emotional Distress .........................................................10

    B. Dr. Huffman Had Sufficient Basis for Her Opinions Regarding the Adult Bellwether Plaintiffs' Emotional Distress Claims.........................................13

**II.    Dr. Huffman is Qualified and Has a Sufficient Basis to Opine on Plaintiffs' Experts' Reliance on the Report and Opinions of Dr. Reicherter** ..16

**III.    Dr. Huffman is Qualified and Has a Sufficient Basis to Opine on Plaintiffs' Experts' Reliance on the Report and Opinions of Dr. McLoyd**......20

CONCLUSION ...........................................................................26

# INDEX OF EXHIBITS

**Exhibit A:** Expert Report of Dr. Jennifer Huffman re: J.M., Apr. 11, 2024 (redacted)

**Exhibit B:** Expert Report of Dr. Jennifer Huffman re: S.J., Apr. 11, 2024 (redacted)

**Exhibit C:** Expert Report of Dr. Jennifer Huffman re: John Campbell, Apr. 11, 2024 (redacted)

**Exhibit D:** Expert Report of Dr. Jennifer Huffman re: Vivian Anderson, Apr. 11, 2024 (redacted)

**Exhibit E:** Expert Report of Dr. Jennifer Huffman re: Carolyn Daly, Apr. 12, 2024 (redacted)

**Exhibit F:** Expert Report of Dr. Jennifer Huffman re: Patricia Crews, Apr. 11, 2024 (redacted)

**Exhibit G:** Expert Report of Dr. Jennifer Huffman re: Anthony Vance, Apr. 11, 2024 (redacted)

**Exhibit H:** Expert Report of Dr. Jennifer Huffman re: Jason Keys, Apr. 11, 2024 (redacted)

**Exhibit I:** Expert Report of Dr. Jennifer Huffman re: Lawrence Cooley, Apr. 11, 2024 (redacted)

**Exhibit J:** Deposition of Dr. Jennifer Huffman, Vol. I-III, Sept. 9, 10, & Oct. 4, 2024, and Errata Sheets (names of minors redacted)

**Exhibit K:** Plaintiffs' Disclosure of Expert Witnesses Pursuant to FRCP 26(a)(2)(B), Feb. 23, 2024

**Exhibit L:** Plaintiffs' Disclosure of Expert Opinions Pursuant to FRCP 26(a)(2)(C), Feb. 23, 2024

**Exhibit M:** Plaintiffs' Supplemental/Rebuttal Disclosure of Expert Opinions Pursuant to FRCP 26(a)(2)(C), May 13, 2024

**Exhibit N:**  Expert Report of Vonnie C. McLoyd, Ph.D., Feb. 22, 2024

**Exhibit O:**  Deposition of Vonnie C. McLoyd, Ph.D., June 26, 2024 (excerpts)

**Exhibit P:**  Expert Report of Dr. Geoffrey Kanter, Feb. 23, 2024 (redacted excerpts)

**Exhibit Q:**  Expert Report of Dr. Nancy Parson, Feb. 23, 2024 (redacted excerpts)

**Exhibit R:**  Deposition of Daryn Reicherter, M.D., July 1, 2024 (excerpts)

**Exhibit S:**  Declaration of Jennifer L. Huffman, Dec. 16, 2024

**Exhibit T:**  Deposition of Leslie Lebowitz, Ph.D., June 28, 2024 (excerpts)

**Exhibit U:**  Plaintiffs' Response to the United States of America's First Set of Requests for Admission, Jan. 4, 2023

## INTRODUCTION

Plaintiffs argue that Dr. Jennifer Huffman, a licensed psychologist in the State of Michigan who is board certified in Clinical Neuropsychology and Pediatric Clinical Neuropsychology and who has been providing neuropsychological assessments to individuals of all ages for over 20 years, is not qualified and did not have a sufficient basis to assess general emotional distress of adults or to review and critique Plaintiffs' specific causation psychology experts' reliance on the opinions of certain general causation trauma experts. Plaintiffs' arguments are not supported by law or fact, and their motion to exclude should be soundly rejected by the Court.

Dr. Huffman produced expert reports pertaining to nine bellwether plaintiffs: two minor bellwether plaintiffs (J.M. and S.J.) and seven adult bellwether plaintiffs (Campbell, Anderson, Daly, Crews, Vance, Keys, and Cooley). *See* Huffman Reports attached as Exhs. A-I.[1] It appears that Plaintiffs are not seeking to exclude Dr. Huffman's opinions as they relate to her neuropsychological evaluations and reports pertaining to minor bellwether plaintiffs J.M. and S.J. *See* Plfs' Brief at 1.[2]

---

[1] Personal identifying information, including names of minors, dates of birth, and home addresses, educational record information, and sensitive medical information was redacted from Dr. Huffman's expert reports (Exhibits A-I) as well as the excerpts from Dr. Kanter's (Exhibit P) and Dr. Parson's (Exhibit Q) expert reports and is not pertinent to the Court's consideration of the Response.

[2] Although Plaintiffs' Motion includes unsupported ad hominem attacks directed at Dr. Huffman's neuropsychological evaluations of the minor bellwether plaintiffs, such comments are irrelevant to the Motion and need not be responded to here.

Plaintiffs do appear to be seeking to exclude parts or all of Dr. Huffman's reports pertaining to the adult and minor bellwether plaintiffs that critique and respond to the reports of Plaintiffs' experts Dr. Leslie Lebowitz, Dr. Daryn Reicherter, and Dr. Vonnie McLoyd.[3] Plaintiffs' requests and arguments ignore the actual substance and context of Dr. Huffman's comments, misrepresent Dr. Huffman's background and experience, and run contrary to controlling case law.

## BACKGROUND

Dr. Huffman is a fully licensed psychologist and a Diplomate with the American Board of Professional Psychology in Clinical Neuropsychology who, for over 20 years, has owned and managed an independent psychology practice in East Lansing, Michigan, that provides neuropsychological assessments to individuals of all ages. Huffman CV, ECF No. 304-2, PageID.9343-44. Dr. Huffman has extensive experience assessing emotional distress and trauma associated with a wide range of causes and disorders, including intellectual disabilities, psychiatric problems, and traumatic brain injuries. *Id*.; *see also* Exh. J, Huffman Dep. at 13:15-20, 18:3-20.[4]

---

[3] Despite moving to exclude certain of Dr. Huffman's opinions, Plaintiffs failed to provide Dr. Huffman's expert reports to the Court or to precisely specify the opinions to which they object.

[4] Because this Response and Plaintiffs' Brief include numerous cites to the deposition of Dr. Huffman, the full deposition transcript, consisting of Volumes I, II, and III, as well as the Errata Sheets signed by Dr. Huffman, are consolidated and attached as Exhibit J (with names of minors redacted).

Between 1998 and 2003, her training included conducting individual therapy at Wayne State University with adults presenting wide-ranging problems, such as depression, eating disorders and relationship difficulties, multidisciplinary pain management involving assessment and treatment of patients suffering from chronic pain at the Ann Arbor VA Medical Center, and record review and technical assistance for complex legal cases involving exposure to neurotoxic substances. Huffman CV, ECF 304-2 at PageID.9344-45. Between 2003 and 2016, Dr. Huffman also served as staff neuropsychologist and manager at the Henry Ford Jackson Hospital, where she managed the neuropsychology department and conducted outpatient and inpatient neuropsychological assessments for individuals of all ages with a variety of conditions, including combat veterans. *Id*. at PageID.9343; Exh. J, Huffman Dep. at 186:6-12.

The parties in this case completed fact discovery by December 15, 2023, followed by service of Plaintiffs' expert reports on February 23, 2024, and service of Defendant's expert reports on April 12, 2024. *See* CMO 4, ECF No. 172; ECF No. 259; and ECF No. 268.

On February 23, 2024, Plaintiffs disclosed fifteen FRCP 26(a)(2)(B) witnesses, for which they provided expert reports, as well as fourteen FRCP

26(a)(2)(C) witnesses.[5] *See* Exh. K, Plfs' Disclosure of Expert Witnesses Pursuant to FRCP 26(a)(2)(B), Feb. 23, 2024, and Exh. L, Plfs' Disclosure of Expert Opinions Pursuant to FRCP 26(a)(2)(C), Feb. 23, 2024. Among the February disclosures was the report of Dr. Leslie Lebowitz, a licensed clinical psychologist. *See* Lebowitz Report, ECF No. 293-2 and 304-8. Dr. Lebowitz evaluated a six-member "cohort of adult plaintiffs" (consisting of adult Bellwether Plaintiffs Campbell, Crews, Daly, Anderson, Vance, and Keys) via unstructured and semi-structured interviews. In forming her opinions, Dr. Lebowitz reviewed and relied upon, *inter alia*, depositions of the six adult Bellwether Plaintiffs and a declaration/report by Vonnie C. McLoyd, Ph.D. The report by Dr. McLoyd, a professor of psychology, highlighted and reviewed the findings from two studies, Sneed *et al*. (2020) and Trejo *et al*. (2021), and provided opinions about how those two studies describe generally the effects of the Flint Water Crisis on the Flint community. *See* Exh. N, McLoyd Report.[6] Dr. McLoyd did not communicate with any bellwether plaintiffs, conduct any independent bellwether examinations, review any records or documents pertaining

---

[5] Plaintiffs added a fifteenth "rebuttal" FRCP 26(a)(2)(C) witness on May 13, 2024. *See* Exh. M, Plfs' Supplemental/Rebuttal Disclosure of Expert Opinions Pursuant to FRCP 26(a)(2)(C), May 13, 2024.

[6] Dr. McLoyd also completed a second report that was served on September 26, 2024, and which is the subject of a separately-filed motion to strike. *See* ECF No. 305, United States' Motion to Strike Belated "Supplemental" Expert Reports of Drs. Larry R. Russell and Vonnie C. McLoyd.

to the bellwether plaintiffs, or perform any independent data analysis. Exh. O, McLoyd Dep. at 44:2-16.

Plaintiffs also disclosed, on February 23, 2024, the reports of neuropsychologists Geoffrey Kanter and Nancy Parsons, each of which examined and evaluated one of the minor bellwether plaintiffs. *See* Exh. P, Kanter Report; Exh. Q, Parsons Report. Dr. Kanter noted that he reviewed and relied upon the reports of Dr. Vonnie McLoyd and Dr. Daryn Reicherter in forming his opinions (Kanter Report at 5), and Dr. Parsons specifically cited and stated that she relied upon Dr. Reicherter's report (Parsons Report at 16). In Dr. Reicherter's opinion, the Flint Water Crisis created a traumatic stressor capable of causing deleterious psychological outcomes. *See* Reicherter Report, ECF No. 304-5, at 35.[7] Dr. Reicherter did not evaluate any of the bellwether plaintiffs, review any of their depositions, or review any records related to the bellwether plaintiffs. Exh. R, Reicherter Dep. at 64:4-21 & 88:15-89:22.

In responding to the plaintiff-specific reports of Drs. Lebowitz, Kanter, and Parsons, Dr. Huffman commented upon and critiqued Plaintiffs' experts' reliance on

---

[7] Plaintiffs attached Dr. Reicherter's Declaration/Report as Exhibit 4 and Dr. Reicherter's list of references as Exhibit 6 to their Motion, *see* ECF Nos. 304-5 & 304-7. However, Plaintiffs did not include this list of references with their February 23, 2024, report disclosures and only provided it to the United States after Dr. Reicherter's deposition, which took place well after the deadlines for all expert reports. *See* Exh. R, Reicherter Dep. at 63:4-64:1; *see also* Exh. S, Huffman Decl. at ¶10.

the general-causation reports of Drs. McLoyd and Reicherter. Each of Dr. Huffman's reports includes a short section summarizing the reports of Dr. McLoyd and Dr. Reicherter, respectively, and pointing out how each general-causation report relates to the specific experiences or conditions of the bellwether plaintiffs and how the general-causation report should be relied upon in assessing each individual plaintiff.

## STANDARD OF REVIEW

A court examines expert witness testimony, under Rule 702 of the Federal Rules of Evidence, for reliability and relevance. Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Under *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 597 (1993), the trial judge serves as a "gatekeeper" to determine whether an expert's testimony is reliable and relevant. While the Supreme Court set out general factors and considerations that may affect relevance and reliability of expert testimony, "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case," and is "only of limited help in assessing technical or

experiential expertise." *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 334-35 (6th Cir. 2001) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999), and *Berry v. City of Detroit*, 25 F.3d 1342, 1349 (6th Cir. 1994)). Accordingly, "[t]he trial judge has considerable leeway in deciding how to go about determining whether particular expert testimony is reliable." *United States v. Sanders*, 59 F. App'x 765, 767 (6th Cir. March 7, 2003) (citing *Kumho Tire*, 526 U.S. at 152); *see also Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000) ("Experts are permitted a wide latitude in their opinions, including those not based on firsthand knowledge, so long as 'the expert's opinion [has] a reliable basis in the knowledge and experience of the discipline.'" (quoting *Daubert*, 509 U.S. at 592)). The guidelines for assessing expert testimony strike a balance between "a liberal admissibility standard for relevant evidence," and the policy goal of protecting the jury from "misleading 'junk science.'" *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176-77 (6th Cir. 2009).

However, the Sixth Circuit has noted that "[t]he 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial." *Deal v. Hamilton Cty. Bd. of Ed.*, 392 F.3d 840, 852 (6th Cir. 2004); *see also League of Women Voters of Mich. v. Benson*, No. 2:17-CV-14148, 2019 WL 8106155, at *1 (E.D. Mich. Jan. 15, 2019). This is because "there is less danger that a trial court will be unduly impressed by the expert's testimony or opinion in a bench trial." *Fed.*

*Trade Comm'n v. BurnLounge, Inc.*, 753 F.3d 878, 888 (9th Cir. 2014) (internal citations omitted); *see also Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."). "The proper course of action . . . , therefore, is to admit the evidence and then afford it whatever weight the Court deems appropriate." *Mich. State A. Philip Randolph Inst. v. Johnson*, No. 16-CV-11844, 2018 WL 1180886, at *2 (E.D. Mich. Mar. 7, 2018). Furthermore, the Sixth Circuit is "not in the business of dictating to district courts the amount of weight they must give to certain expert opinions." *Deal*, 392 F.3d at 852. Accordingly, *Daubert* is less of a concern when the trial judge is the trier of fact.[8]

"[R]ejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 530 (6th Cir.2008) (quotations and citations omitted). Indeed, any "doubts" about the admissibility of expert testimony "should be resolved in favor of admissibility." *In re E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 348 F. Supp. 3d 698, 709 (S.D. Ohio 2016) (citing *Daubert*, 509 U.S. at 594). Challenges that go merely to the weight, and not the admissibility, of proposed expert testimony should be left for the trier of fact to resolve. *Cason-Merenda v. Detroit Med. Ctr.*, 2013 WL 1721651, at *5-6 (E.D. Mich. Apr. 22,

---

[8] But the Court "is still required to rely only on admissible and reliable expert testimony, even while conducting a bench trial." *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 635 (6th Cir. 2000).

2013). Moreover, a disagreement between experts is not a sufficient basis to support exclusion. *See In re Flint Water Cases*, No. 17-10164, 2021 WL 5356295, at *7 (E.D. Mich. Nov. 17, 2021) (noting that a "battle of the experts is properly fought at trial") (citing and quoting *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005) for the proposition that "competing expert opinions present a 'classic battle of the experts,' and it is up to a jury to 'evaluate the credibility of each expert'").

## ARGUMENT

### I.   Dr. Huffman is Qualified and Has a Sufficient Basis to Opine on the Adult Bellwether Plaintiffs' Emotional Distress Claims.

Plaintiffs argue that Dr. Huffman's background and experience is not sufficiently specialized to "opine on the trauma or the emotional impact of the Flint Water Crisis on the six adult Bellwether Plaintiffs who[m] she did not meet and did not evaluate." Plfs' Brief at 12. These arguments are belied by the facts. First, as a licensed psychologist and board-certified clinical neuropsychologist who treats and assesses both children and adults, Dr. Huffman is well qualified to opine on the emotional and behavioral effects of the adult Bellwether Plaintiffs' exposure to contaminated Flint water. Second, comprehensive records reviews are generally recognized as a valid technique and are particularly appropriate where, as here, plaintiffs do not concede that their mental condition is in controversy and do not allege more than garden-variety emotional distress.

**A.     Dr. Huffman is Qualified to Opine on the Adult Bellwether Plaintiffs' Claims of Emotional Distress**

The Sixth Circuit has emphasized that the "exclusion of a medical doctor's professional opinion, rooted in that doctor's extensive relevant experience, is rarely justified[.]" *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 427 (6th Cir. 2009) (internal quotation marks and citations omitted). Licensed clinical psychologists generally have the training and experience necessary to evaluate emotional distress and the effects of trauma exposure. *See, e.g.*, *Sanford v. Russell*, 387 F. Supp. 3d 774, 778-79, 782-83 (E.D. Mich. 2019) (finding that a licensed clinical and forensic psychologist is qualified to present expert testimony on emotional distress and trauma due to his academic training and licensed experience); *see also Elat v. Ngoubene*, 993 F. Supp. 2d 497, 515-17 (D. Md. 2014) (holding that former licensed therapist who was not a licensed psychologist or therapist was unqualified to give expert testimony regarding the plaintiff's emotional injuries); *Cano v. 245 C & C, LLC*, No. 19-21826-CIV, 2021 WL 684188, at *5 (S.D. Fla. Feb. 19, 2021) (finding therapist and counselor with only master's degree in psychology did not have the education and experience to give opinions regarding the plaintiff's psychological, emotional, or personal distress).[9]

---

[9] Notably, Plaintiffs did not provide citations to any cases finding a professional psychologist with qualifications equivalent to Dr. Huffman's to be unqualified to opine upon and assess emotional distress claims.

Plaintiffs argue that only an "expert in trauma" can opine on the emotional and psychological impacts of the adult Bellwether Plaintiffs' exposure to water distributed by the City of Flint after April 25, 2014. They can point to no case law or authority to support their position. There is no specialized licensure or board certification within the psychological profession specific to trauma-related disorders or to lead exposure. *See* Huffman Decl. at ¶4, Exh. S; *see also* Lebowitz CV, ECF No. 304-8 (notable for the absence of any board certification or specialization at all, or any experience, training, or research of any type assessing or treating the aftermath of exposure to lead contamination or toxic substances) and Exh. T, Lebowitz Dep. at 53:20-22 ("Q: What is your experience evaluating adults with lead poisoning or who allege lead poisoning? A: I have none, other than this case."). Nor is there any requirement to publish trauma-related research studies, belong to certain trauma organizations, subscribe to particular trauma journals, or teach trauma courses to diagnose and treat trauma-related disorders in the field of clinical neuropsychology.

As a fully licensed and board-certified Clinical Psychologist, Dr. Huffman is well qualified to opine on the emotional and behavioral effects of all types of traumatic experiences. To be accepted as a specialist in the field of Clinical Neuropsychology, Dr. Huffman was evaluated (both written and oral) on neuropathology, neurophysiology, and neurocognitive problems primarily in adults.

Exh. S, Huffman Decl. at ¶2. In order to obtain her doctorate degree in Clinical Psychology, Dr. Huffman undertook an intensive study of the assessment and treatment of mental illness, abnormal behavior, and psychological problems, as well as education in research methodology and clinical training and experience. *Id.* at ¶4. Given that clinical psychology involves developing an understanding of trauma because of how common and impactful trauma-related symptoms are within the general population, Dr. Huffman's comprehensive training and experience in the scientific study of brain-behavior relationships makes her well qualified to evaluate emotional distress and the effects of trauma exposure. *Id.* (citing Benjet et al., 2016, and Breslau & Kessler, 2001). Moreover, investigations of the trauma response are a regular part of Dr. Huffman's clinical and forensic evaluation practice, and she has conducted numerous evaluations where assessment of trauma reactions and subsequent adjustment was the primary goal of the evaluation in both clinical and forensic contexts. *Id.* at ¶5; *see also* Exh. J, Huffman Dep. at 189:16-190:7.

It should also be noted that the emphasis on trauma expertise set forth by Plaintiffs is essentially a 'straw man' argument. The adult Bellwether Plaintiffs have not made claims of trauma-related diagnoses, and Dr. Lebowitz did not provide diagnoses of trauma disorders as part of her report or opinions. *See* Exh. T, Lebowitz Dep. at 123:6-10 (confirming that Dr. Lebowitz did not do a diagnosis of any of the bellwether plaintiff cohort that she evaluated). As a clinical psychologist,

Dr. Huffman is well-qualified to assess the effects of emotional distress and symptoms of trauma and to employ objective psychometric tools with established reliability and validity when conducting such an assessment. But here, the adult Bellwether Plaintiffs allege merely standard, garden-variety type emotional distress.

Furthermore, Dr. Huffman's expertise is not "almost entirely limited to pediatric neuropsychology." Plfs' Brief at 1. Typically, just slightly more than half of Dr. Huffman's private practice involves evaluations of minor patients. Exh. S, Huffman Decl. at ¶3; Exh. J, Huffman Dep. at 10:14-19. Dr. Huffman is a lifespan clinical neuropsychologist, meaning that she regularly evaluates individuals of all ages, including children, adults, and geriatric patients. Exh. S, Huffman Decl. at ¶4; *see also* Huffman CV, ECF No. 304-2. Contrary to Plaintiffs' claims, Dr. Huffman has the training, expertise, and experience to evaluate both children and adults.

### B.    Dr. Huffman Had Sufficient Basis for Her Opinions Regarding the Adult Bellwether Plaintiffs' Emotional Distress Claims

Plaintiffs argue, without citation to authority, that Dr. Huffman's opinions with respect to the adult Bellwether Plaintiffs lacked a proper basis because Dr. Huffman relied on records review rather than an in-person examination.

In fact, records reviews are basic and commonly used in the field of neuropsychology because patients' statements are often unreliable or misleading and therefore should be verified with records. Exh. S, Huffman Decl. at ¶10 (citing Chapter 3 in Strauss, Sherman, & Spreen (2006)). The records review is used to

establish a baseline of objectively obtained facts, which is especially important in litigated cases where a party's self-report is subject to bias. *See* Huffman Decl. at ¶9 (citing Iverson *et al*., 2010, and Loftus (1997)). Courts recognize that methodology that involves review of medical records, without an in-person examination, is not unreliable; rather, if anything, lack of an in-person examination goes to the weight of the testimony, not its admissibility. *See Kanellakopoulos v. Unimerica Life Ins. Co.*, No. 15-CV-04674-BLF, 2018 WL 984826, at *2 (N.D. Cal. Feb. 20, 2018); *see also Kushner v. Lehigh Cement Co.*, 572 F. Supp. 2d 1182, 1192 (C.D. Cal. 2008) ("Plaintiff's position is further undermined by the wide acceptance in ERISA and disability cases of record reviews by psychiatrists and other doctors, without in person examinations, to uphold the propriety of claims decisions based on such reviews.") (collecting cases); *Ferguson v. Lear Siegler Servs., Inc.*, No. 1:09CV635-MHT, 2012 WL 1058983, at *5-7 (M.D. Ala. Mar. 28, 2012) (admitting expert testimony that relied on studies conducted by others and scientific literature).

Here, it is particularly anomalous for Plaintiffs to criticize the lack of in-person examinations given that they would not consent to Rule 35 examinations of the adult Bellwether Plaintiffs and would not agree that the mental condition of the adult Bellwether Plaintiffs was in controversy. *See* Rule 35 Protocol at ¶4, ECF No. 214, PageID.4355-56; *see also* Exh. U, Plfs' Response to United States' First Set of Requests for Admission, Jan. 4, 2023. Generally, Rule 35 examinations of a

14

plaintiff are permitted only where a defendant can show good cause for the examination and the plaintiff's mental condition is in controversy in the action. *Schlagenhauf v. Holder*, 379 U.S. 104, 118-19 (1964); *see also Gaines-Hanna v. Farmington Pub. Sch.*, No. 04-CV-74910-DT, 2006 WL 932074, at *9 (E.D. Mich. Apr. 7, 2006) (noting that the majority rule is that a court will not find good cause to require a plaintiff to undergo a medical examination unless, in addition to a claim of emotional distress damages, one or more of the following factors is also present: (1) a cause of action for intentional or negligent infliction of emotional distress; (2) an allegation of a specific mental or psychiatric injury or disorder; (3) a claim of unusually severe emotional distress; (4) plaintiff's offer of expert testimony to support a claim of emotional distress; and (5) plaintiff's concession that his or her mental condition is 'in controversy' within the meaning of Rule 35(a)). Here, the adult Bellwether Plaintiffs do not claim a cause of action for intentional or negligent infliction of emotional distress, do not allege unusually severe emotional distress or any specific mental or physical injury or disorder,[10] would not concede that their mental condition was in controversy, and did not disclose that they would offer expert testimony to support their emotional distress claims until February 23, 2024,

---

[10] *See, e.g.*, Exh. J, Huffman Dep. at 96:8-12 (Plaintiff Attorney Deborah Labelle: "[T]he individuals were not complaining about a, you know, a diagnosable necessarily claim of injury, but they're claiming anxiety, emotional distress, and harm, as a result of the Flint Water crisis.").

after fact discovery had closed. Plaintiffs appear to now want to use the Rules as both a shield to avoid in-person examinations during fact discovery and a sword to argue after-the-fact that in-person examinations were required. Such tactics should not be condoned.

## II.   Dr. Huffman is Qualified and Has a Sufficient Basis to Opine on Plaintiffs' Experts' Reliance on the Report and Opinions of Dr. Reicherter

Plaintiffs move to "preclude Dr. Huffman from testifying or offering any opinions regarding community behavioral and mental health or community trauma or critiques of Dr. Reicherter's opinions in this matter." Plfs' Brief at 10.

In her expert reports, Dr. Huffman summarized Dr. Reicherter's expert report[11] and made the following five comments about it:

1. Dr. Reicherter did not review individual medical records, present individual cases, or administer any structured interviews of the bellwether plaintiffs.

2. His report recognized the unique vulnerabilities of the Flint population but then compared the rates of self-reported behavioral health problems in 2017 to the general United States population.

3. According to SAMHSA (2023), PTSD "develops when a person has experienced or witnessed a scary, shocking, terrifying, or dangerous event." It is difficult to make direct comparisons of Flint residents to

---

[11] The summary constitutes necessary background information that is presumably non-objectionable and not part of the motion to exclude. *See Smith v. Old Dominion Freight Line, Inc.*, No. 3:15-CV-560-CRS, 2016 WL 7422683, at *5 (W.D. Ky. Dec. 22, 2016) ("It should be obvious that if one of Defendants' experts disagrees with the opinions set forth by one of Plaintiff's experts, then he or she will preface the rebuttal report with background information.").

studies involving violence (such as war and combat), natural disasters (such as hurricanes, tornados, or tsunamis), or mass violence (such as terrorism).

4. Psychological trauma exposure is very common, with surveys indicating that more than 70% of people in the world (Benjet et al., 2016) and 90% of people in the Detroit primary metropolitan area (Breslau & Kessler, 2001) reporting exposure to at least one traumatic event. At the same time, most people who experience traumatic events demonstrate remarkable resilience, with only a very small percentage (6%) developing posttraumatic stress disorder (PTSD) at some point in their lives according to the National Center of PTSD website (www.ptsd.va.gov). Thus, while trauma exposure is common, PTSD is relatively rare.

5. Dr. Reicherter's comments do not provide information specific to the bellwether plaintiffs and lack specificity to this circumstance.

*See, e.g.*, Exh. C, Campbell Report at 4 (Dr. Huffman included identical comments in all her reports).

Plaintiffs argue that Dr. Huffman lacks sufficient expertise in public health, behavioral health, or community trauma to opine in those areas and that her opinions are based on unsupported speculation and beliefs. Plfs' Brief at 6-10. Nowhere in Plaintiffs' motion do they specifically address the five points about Dr. Reicherter's work raised by Dr. Huffman.

Generally, "[d]efense experts are permitted to critique the opinions of the plaintiffs' experts and 'have no burden to produce models or methods of their own.'" *Mod. Holdings, LLC v. Corning, Inc.*, No. 513CV00405GFVTEBA, 2022 WL 710174, at *27 (E.D. Ky. Mar. 9, 2022) (quoting *In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007)), *reconsideration denied*, No. 5:13-CV-

00405-GFVT, 2022 WL 2760751 (E.D. Ky. July 14, 2022). Moreover, it is permissible for experts to "offer their own opinions based on their own expertise and analysis, which may include reference to reliable studies on which 'experts in the particular field would reasonably rely.'" *In re Flint Water Cases*, No. 5:16-CV-10444, 2024 WL 3495377, at *12 (E.D. Mich. July 22, 2024) (quoting Fed. R. Evid. 703).

Here, Dr. Huffman's first, second, and fifth comments are factual, and Plaintiffs do not dispute their accuracy in their Motion. By highlighting these facts, Dr. Huffman emphasizes their applicability and relevancy to the individual psychological assessments at issue. *See United States v. LaVictor*, 848 F.3d 428, 442 (6th Cir. 2017) (noting that evidence is relevant for purposes of Rule 702 when there is a "factual issue in dispute that expert testimony can clarify"); *see also Stonebridge Operating Co., LLC v. Antero Res. Corp.*, No. 2:19-CV-1714, 2022 WL 2643354, at *5 (S.D. Ohio July 7, 2022) (holding "criticism of which facts were selected or relied upon" goes to the weight of the testimony, not its admissibility). Given that both Drs. Kanter and Parsons reviewed and relied upon Dr. Reicherter's report in forming their opinions, Dr. Huffman's comments and facts are particularly helpful to the trier of fact in evaluating those opinions. *See, e.g.*, Exh. Q, Parsons Report at 16 ("Dr. Reicherter outlines the many ways in which families were traumatized, as was the community, by the Flint MI Water Crisis; and this community trauma

18

interacts with the experience of lead exposure. . . . [J.M.] and his community have internalized the trauma and 'learned helplessness' together, and this does NOT have a bearing on his Blood Lead Level and his exposure to lead as a young child. While [J.M.] has experienced the multiple stressors that Dr. Huffman describes in his past, these stressors do not diminish his lead exposure, and, in fact, *they provide additional secondary explanations for his emotional issues on top of his lead exposure*.") (emphasis in original). Dr. Huffman's third and fourth comments cite and rely upon peer-reviewed articles (*e.g.*, Benjet et al., 2016; Breslau & Kessler, 2001) and established authorities (*e.g.*, SAMHSA (2023); the National Center of PTSD website) about PTSD and trauma exposure that demonstrate the difficulty in applying Dr. Reicherter's general-causation analysis to the individual plaintiffs. Moreover, Dr. Huffman, as a Doctor of Psychology with clinical expertise in both adult and child assessment of a diverse range of disorders, including traumatic brain injuries, and training experience at the Ann Arbor VA Medical Center, is well qualified to make precisely this type and kind of analysis.

It should also be noted that Plaintiffs' characterization of Dr. Huffman's experience is inaccurate. Dr. Huffman has prior research experience: Dr. Huffman conducted research while at Henry Ford Jackson Hospital Neuropsychology, which involved predicting the Wide Range Achievement Test Word Reading Score from the Hopkins Adult Reading Test, and presented the results in two different reviewed

and accepted posters in 2016. *See* Exh. J, Huffman Dep. at 40:14-41:15; Huffman CV, ECF 340-2, PageID.9348. In addition, Dr. Huffman served as a neuropsychology consultant on a research project examining the human health effects of PCB exposure from contaminated fish in 2004. Dr. Huffman also has extensive contacts with and knowledge of Flint: Dr. Huffman has had conversations with members of the Flint community, including other mental health professionals practicing in the Flint community, throughout the period of time referenced in the litigation. Huffman Dep. at 117:12-25. Also, Dr. Huffman has experience evaluating similar lead exposure allegations: as discussed in her deposition, Dr. Huffman evaluated three other children from Flint involved in litigation against the Michigan Department of Education related to exposure to contaminated Flint water and conducted clinical interviews and record reviews as part of that case; has conducted evaluations regarding lead poisoning as a result of lead paint ingestion; and has worked on several clinical cases where children have been exposed to lead. *Id*. at 154:4-7, 158:8-15, 159:13-16, 161:20-21, 162:8-10, 336:17-337:23; *see also* Exh. S, Huffman Decl. at ¶11.

### III. Dr. Huffman is Qualified and Has a Sufficient Basis to Opine on Plaintiffs' Experts' Reliance on the Report and Opinions of Dr. McLoyd

Lastly, Plaintiffs request that the Court exclude Dr. Huffman's testimony regarding Dr. McLoyd's work. Plfs' Brief at 19.

After briefly summarizing Dr. McLoyd's expert report findings and opinions,

Dr. Huffman set forth the following nine comments:

1. As Dr. McLoyd noted, these studies do not present data from similar surveys of mental health functioning in Flint residents outlining the base rates of psychological distress before the change in water distribution to the Flint River in April 2014.

2. The Sneed et al. (2020) study relies on self-reporting without any symptom validity tests or records to document the accuracy of the report.

3. Data from Trejo et al. (2024) point to psychosocial processes rather than lead exposure as accounting for noted math achievement declines. This is important as other researchers have pointed out the iatrogenic impact of negative media attention and adult distress regarding their perceptions of the water situation on educational outcomes (for example, Roy et al. 2023).

4. Review of Trejo et al. (2024) raises certain methodological questions, such as questions about the standard error of measurement for the tests (in other words, the normal variance that occurs when students take tests on two different occasions), the potential differential impact of absenteeism on the lowest socioeconomic group, comparability of the comparison groups to children exposed to water distributed by the City of Flint, and the potential for methodological problems related to comparing two different achievement measures across time. Trejo et al. (2024) described the challenges of finding an appropriate control group for the Flint Community Public School District, noting that "Flint is at the 99th percentile in terms of fraction Black and fraction economically disadvantaged" students in Michigan. Additionally, Michigan switched from the Michigan Educational Assessment Program (MEAP) to the Michigan Student Test of Educational Progress (M-STEP) in 2015, which is not referenced in the article. The change involved a transition from a paper-and-pencil format to an online format, and the M-STEP has been described as having fewer multiple-choice questions than the previous MEAP assessment and more questions that require problem solving and critical thinking skills. The differential impact of this conceptual shift in testing on such a uniquely racially diverse and economically disadvantaged population of children needs to be fully explored given meaningful differences in education quality compounded with long-standing and robust findings of race-based

differences on cognitive ability tests that are not controlled for in these achievement tests.

5. According [to] Dr. McLoyd, math achievement was described as declining by 0.14 standard deviation (Trejo et al., 2021), which is about two Standard Score points on a math achievement test (for example, a drop from a Standard Score of 98 to 96). To put this change in perspective, consider that the average height of a woman in the United States is 63.5 inches with a standard deviation of about 5 (Center for Disease Control, 2021). A 0.14 standard deviation decrease in height results in a decline of less than ¾ inch (about 0.7 inches). In addition to the standard error of measurement, one must consider potential sources of measurement error (which is unrelated to the standard error of measurement), such as errors in instrumentation, inconsistent technique, variability in height due to factors like posture, or environmental conditions such as lighting when interpreting this finding. A 0.14 effect size is smaller than a small effect size of 0.2, which is difficult to see with the naked eye (such as the height difference between 15- and 16-year-old girls).

6. While Dr. McLoyd argues that the 0.14 effect size is "moderate and large enough to have practical significance and meaning in the real world," a two-point decline in performance on a standardized test is not detectable within a reasonable degree of confidence at the individual level and does not imply impairment in functioning.

7. Of significance, social science research has long used the conventional approach outlined by Cohen when interpreting effect sizes (0.2 - small, 0.5 = medium, and 0.8 = large). While Trejo et al. (2024) relies on Kraft (2020) in describing the 0. 14 effect size as "medium" or even "large," Kraft specifies that the new schema for interpreting effect sizes he proposed provided "new baseline benchmarks for one class of studies: causal research that evaluates the effect of education interventions on standardized student achievement." Here Kraft is referring *only* to studies measuring the effectiveness of a given educational intervention through prospective longitudinal research and experimental design. The quasi-experimental design of Trejo et al. (2024) involving retrospective research does not meet this important criterion and cannot be used to interpret the nonsignificant findings.

8. Trejo et al. (2024) referenced a "1.2 percentage point (8%) increase in the proportion of students with special educational need" described by McLoyd as increasing "markedly (i.e., by 9%)." While any increase indicates that more students received special education services, this rate change does not mean more children had disabilities, it does not explain the cause of the change, and it does not explain the type of disabilities the children had. Other researchers have provided nuanced interpretations of the rise in special education enrollment in Flint (see Roy, et al., 2023).

9. While Dr. McLoyd's statement describes generalities, it does not describe the experience of individual bellwether plaintiffs.

*See, e.g.*, Exh. C, Campbell Report at 5-6 (Dr. Huffman included identical comments in all her reports).

Plaintiffs argue that Dr. Huffman lacks sufficient expertise in socioeconomic stressors and their impact on emotional and behavioral health, and child psychology and socioeconomic and racial impacts, to opine upon or critique Dr. McLoyd's report and opinions. Plfs' Brief at 15-19. Again, Plaintiffs do not specifically address in their motion any of the nine comments raised by Dr. Huffman.

"The court's investigation of qualifications should not be onerous or inordinately exacting, but rather must look to underlying competence, not labels." *Zuzula v. ABB Power T & D Co.*, 267 F. Supp. 2d 703, 713 (E.D. Mich. 2003). "[T]he expert need not have complete knowledge about the field in question, and need not be certain. [S]he need only be able to aid the jury in resolving a relevant issue." *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 850 (6th Cir. 1981); *see also Berry*, 25 F.3d at 1350 (noting an aeronautical engineer would qualify as an expert to testify

about how a bumblebee can fly, "even if he had never seen a bumblebee," so long as he was familiar with relevant components of flight principles); *Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547, 568 (E.D. Mich. 2022) ("Courts do not require experts to be a specialist in every subject to which their testimony might relate— they must simply have expertise that would help a jury understand the expert's testimony.").

Dr. Huffman's first, second, and ninth comments are factual. The remaining comments: highlight an important point about alternative causes of math achievement declines and supporting peer-reviewed research (comment three); point out methodological issues in the Trejo et al (2024) study, including failure to account for achievement test changes (comment four); and discuss effect size description discrepancies (comments five, six, seven, and eight). Dr. Huffman's focus on psychology research methodology and educational record review issues comports with her educational background, professional expertise, and clinical experience. *See* Exh. S, Huffman Decl. at ¶4 ("My training required intensive education in research methodology as well as clinical training and experience."); ¶13 ("My training and experience in clinical neuropsychology, as well as my specific forensic experience in evaluating multiple individuals residing in Flint during the water source change to the Flint River, qualifies me as an expert to provide opinions on the educational and mental health impact of the at-issue events on the Bellwether Plaintiffs.").

Indeed, Dr. Huffman is board certified by the American Board of Professional Psychology in both Clinical Neuropsychology and Pediatric Clinical Neuropsychology, which requires, *inter alia*, demonstrated foundational competency in the "[u]nderstanding of research, research methodology, techniques of data collection and analysis, biological bases of behavior, cognitive-affective bases of behavior, and development across the lifespan." American Board of Professional Psychology, Competency Requirements, at

https://abpp.org/application-information/competency-requirements/.

Plaintiffs also criticize Dr. Huffman for focusing on two articles—Sneed et al. (2020) and Trejo et al. (2021)). Plfs' Brief at 17. Dr. McLoyd herself specifically references and focuses on those two articles, stating, "In this report, I highlight findings from two investigations that overcome some of the limitations in prior investigations." Exh. N, McLoyd Report at 2. As Dr. McLoyd explained,

> …the vast majority of studies examining the psychological, behavioral, and physical health of adults and children who experienced the Flint water crisis are limited in important ways. For example, most studies (a) report correlations (between exposure to the water crisis and psychological outcomes), but correlation does not imply causation; (b) are based on data collected at a single point in time and therefore lack information about outcomes over time; (c) do not compare rates of mental health problems among Flint residents before versus after the water crisis or compare rates of mental health problems among Flint residents versus individuals residing outside Flint (Brooks & Patel, 2020).

*Id*. Dr. Huffman concurred that the limitations described by Dr. McLoyd apply to a large majority of studies that do not offer sufficient evidence on which to form

evidence-based opinions at a level of psychological certainly required to be useful in a forensic context. As such, Dr. Huffman naturally limited her comments and critique of the research in this area to the two studies that Dr. McLoyd identified as the most scientifically sound and relevant. While Plaintiffs may disagree with that approach, if anything, their criticism implicates the weight, not the admissibility, of Dr. Huffman's testimony. *See Phillips*, 400 F.3d at 399; *Stonebridge Operating Co., LLC*, 2022 WL 2643354, at *5.

## CONCLUSION

For the reasons set forth above, Defendant United States respectfully requests that the Court deny "Plaintiffs' Amended Motion to Exclude Certain Opinions of Jennifer Huffman Based on Lack of Qualifications" (ECF No. 304).

Dated: December 16, 2024          Respectfully submitted,

*/s/ Jason T. Cohen*
Jason T. Cohen (CA Bar #214438)
Heidy L. Gonzalez (FL Bar #1025003)
Timothy B. Walthall (MA Bar #515460)
Eric Rey (DC Bar #988615)
Daniel C. Eagles (DC Bar #1035048)
Jewel M. Lightfoot IV (TX Bar #24138965)
Michelle T. Domingue II (TX Bar #24134407)
Trial Attorneys
United States Department of Justice
Civil Division, Torts Branch
Environmental Tort Litigation
1100 L Street, N.W.
Washington, DC 20005
E-mail: Jason.T.Cohen@usdoj.gov
Phone: 202-514-0335/Fax: 202-616-4473

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 16, 2023, a copy of the foregoing

Response and accompanying exhibits was filed electronically via the Court's

CM/ECF system and served on counsel of record through the CM/ECF system.


*/s/ Jason T. Cohen*
Jason T. Cohen
Trial Attorney, Department of Justice
Counsel for the United States