# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

*In re* FTCA Flint Water Cases,

_____/

This Motion Relates to:

ALL CASES

Civil No. 4:17-cv-11218

Linda V. Parker
United States District Judge

Curtis Ivy, Jr.
United States Magistrate Judge

---

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION PURSUANT TO THE FEDERAL TORT CLAIMS ACT'S ANALOGOUS PRIVATE LIABILITY REQUIREMENT AND MISREPRESENTATION EXCEPTION [ECF NO. 291]

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ........................................................................... iii

INTRODUCTION ...........................................................................................1

STATEMENT OF FACTS ...............................................................................3

ARGUMENT

I.     PLAINTIFFS HAVE INTRODUCED EVIDENCE SUFFICIENT TO
ESTABLISH EACH ELEMENT OF A MICHIGAN GOOD
SAMARITAN CLAIM.............................................................................12

      A. The EPA Undertook to Render Services to Another ...........................15
      B. Evidence Establishes that the EPA Failed to Exercise Reasonable
         Care in its Undertakings .....................................................................22
      C. Plaintiffs Satisfied the Requirements of Good Samaritan Doctrine
         by setting forth sufficient evidence on each of the alternative bases
         to support the imposition of liability under the Restatement ..............26
         1.     The EPA's actions increased the risk of harm to Plaintiffs .......26
         2.     The EPA undertook to perform a duty owed by another
               to the Plaintiffs ..........................................................................30
         3.     Plaintiffs relied on the EPA to their detriment .........................33

II.    DEFENDANT HAS FILED AN UNTIMELY MOTION FOR
RECONSIDERATION OF THIS COURT'S PRIOR OPINION AND
ORDER DENYING THEIR MOTION TO DISMISS UNDER THE
FTCA'S MISREPRESENTATION EXCEPTION, WITHOUT ANY
NEW FACTS OR LAW WARRANTING THIS COURT'S
ATTENTION OR RECONSIDERATION.................................................37

CONCLUSION .............................................................................................40

# INDEX OF AUTHORITIES

## Cases

*Burgess v. U.S.*, 375 F.Supp.3d 796 (2019)....................................................... passim

*Estate of Rideout by and through Woods v. United States*, 677 F.Supp.3d 1112 (S.D. Cal. 2023).............................................................................37

*FDIC v. Meyer*, 510 U.S. 471, 478 (1994)...............................................................12

*Fox v. Amazon, Inc.*, 930 F.3d 415 (6th Cir. 2019) ....................................................22

*Gaines v. Excel Industries, Inc.*, 667 F.Supp. 569 (M.D. Tenn. 1987) ....................17

*Gill v. U.S.*, 429 F.2d 1072, (5th Cir. 1970) ...............................................................20

*Hart v. Ludwig*, 347 Mich. 559; 79 N.W.2d 895 (1956)............................................19

*Howell v. United States*, 932 F.2d 915 (11th Cir 1991) .............................................27

*In re Flint Water Cases*, 482 F.Supp.3d 601 (2020) ........................................ passim

*Indian Towing Co. v. U.S.*, 350 U.S. 61 (1955).................................................. 12, 21

*Kohl v. United States*, 699 F.3d 935 (6th Cir. 2012) ..................................................23

*Lutz v. U.S.*, 685 F.2d 1178 (9th Cir. 1982).................................................................13

*Maier v. Green Eyes, USA, Inc.*, 845 Fed. Appx. 869 (11th Cir. 2021) ....................27

*Mays v. City of Flint*, 871 F.3d 437, 447 (6th Cir. 2017) ..........................................32

*McAtee v. Fluor Constructors Intern., Inc.*, 188 F.3d 508 (6th Cir. 1999) ...............16

*Merrill ex rel Estate of Merrill v. Arch Coal*, 118 Fed. Appx. 37 (6th Cir. 2004) ....18

*Monk v. United States*, 2024 WL 1344712 (D. Conn. Mar. 24, 2024) ...................21

*Myers v. Muffler Man Supply Co.*, 2008 WL 4330240 (Mich. Ct. App.
Sept. 23, 2008) ............................................................................. passim

*Neal v. Bergland*, 646 F.2d 1178 (6th Cir. 1981) .......................................14

*Nichols v. McNeilab, Inc.*, 850 F.Supp. 562 (E.D. Mich. 1993) .............................22

*Ohio PIRG, Inc. v. Whitman*, 386 F.3d 792 (6th Cir. 2004).....................................21

*Raymer v. United States*, 660 F.2d 1136 (6th Cir. 1981)..........................................27

*Sagan v. United States*, 342 F.3d 493 (6th Cir 2003).................................................27

*Smith v. Allendale*, 410 Mich. 685; 303 NW2d 702 (1981)....................................14

*Talucci v. Archambault*, 20 Mich. App. 153; 173 N.W.2d 740 (1969) ...................19

*U.S. v. Olson*, 546 U.S. 43 (2005)............................................................................12

*United Scottish Ins. Co. v. U.S.*, 614 F.2d 188 (9th Cir. 1979) ......................... 13, 20

*United States v. Neustadt*, 366 U.S. 696 (1961) ......................................................38


**Statutes**

28 U.S.C. §1346(b) ....................................................................................................12

42 U.S.C. §300f...........................................................................................................3


**Other Authorities**

Safe Drinking Water Act §1413 .................................................................................4

Safe Drinking Water Act §1431 .........................................................11, 15, 18, 22

iv

**Treatises**

Restatement (Second) of Torts §324A (1965) .................................................. passim

**Regulations**

40 C.F.R. §140.15 ..............................................................................17

40 C.F.R. §141.82 ...............................................................................4

40 C.F.R. §141Q.................................................................................11

40 C.F.R. §142.15 ...............................................................................4

40 C.F.R.§142.17 .............................................................................4, 40

56 Fed. Reg. 26,460 ............................................................................5

## INTRODUCTION

The Flint Water Crisis arose when the City of Flint reverted to the Flint River for its drinking water source without properly treating the highly corrosive water with the necessary corrosion control. The lack of corrosion control caused lead to leach from service pipes and plumbing into the public drinking water of Flint homes and businesses. Despite its statutory and regulatory responsibility and obligation to ensure safe drinking water, and warn the public of potential damages to their health, the EPA's negligence in performing those obligations resulted in the contamination of an entire community.

EPA's excuses for its actions have been ever changing during this litigation, but are limited to two rationalizations in its current motion. First, it argues that because the State of Michigan had primary enforcement responsibility EPA cannot be held responsible for the lead poisoning of Flint residents. However, primacy, which is granted and can be revoked by the EPA, is not absolute. EPA sets the terms and retains responsibility for monitoring, oversight, review and enforcement of both the terms of primacy and federal rules and regulations governing public drinking water. EPA abdicated its responsibilities resulting in severe damages to the Plaintiffs for which it should be found liable under the Federal Tort Claims Act (FTCA).

Second, EPA claims that it lacked specific knowledge that the Flint River water was not being treated with corrosion control and lacked knowledge of the

contamination for a full year after the switch in water source in April 2014. Any actual delay in EPA's awareness of these facts resulted from EPA waiving Michigan's obligation to submit water monitoring reports and data, waiving testing requirements under the federal Lead and Copper rules and failing to ensure enforcement of the regulation requiring maintenance of corrosion control when a large public water system switches its water source. Moreover despite these waivers of compliance with crucial health-based requirements, EPA officials knew that the water reaching Flint homes and businesses was not being treated with corrosion control, with inevitable harmful consequences.[1] Their feigned ignorance should be rejected.

The instant motion is one of a series filed by EPA in its attempt to avoid responsibility for its central role in the Flint Water Crisis. EPA argues that Plaintiffs lack subject matter jurisdiction for their claims because they cannot satisfy the analogous private liability requirement of the FTCA, and that claims are barred by the misrepresentation exception to the FTCA. Although these same arguments were raised and rejected by this Court in ruling on prior motions to dismiss, the EPA suggests that new facts obtained during discovery justify rearguing the motion. But EPA has not identified any new facts providing support for its renewed Motion to

---

[1]EPA scientists were aware of high residential lead results in February 2015 and reported that, "The science would strongly suggest that there was going to be a big problem in Flint." (**Ex. 1**, Schock Dep. Vol. I, 5/5/2020, pp. 49-51, 54, 61, 100-101).

Dismiss.[2] To the contrary, any newly disclosed evidence supports this Court's earlier rulings. *Burgess v. U.S.*, 375 F.Supp.3d 796 (2019). This renewed motion to dismiss should similarly be denied in its entirety.

## STATEMENT OF FACTS

In 1967, the City of Flint joined the Detroit water system (DWSD), which sourced its water primarily from Lake Huron. Because the City of Flint had an aging housing stock with extensive lead and iron water service lines, DWSD had consistently been adding orthophosphates as the corrosion control method to maintain safe drinking water.

EPA was at all times responsible for monitoring and oversight of public water systems, including Flint, and for enforcing applicable federal regulations. The Safe Drinking Water Act (SDWA) is the principle law to ensure safe drinking water and EPA is charged with its implementation and enforcement. 42 U.S.C. §300f *et seq*.

The SDWA authorizes EPA to delegate primary enforcement duties to a state agency, and pursuant to this authority, EPA approved primacy for the Michigan Department of Environmental Quality (MDEQ). EPA's grant of primacy is conditioned on the state agency maintaining compliance with the terms of primacy

---

[2]The new fact relied upon by Defendant is that the Bellwether Plaintiffs never communicated directly with the EPA. Defendant argues, based upon this fact, that Plaintiffs cannot demonstrate a violation of the Good Samaritan doctrine. However, direct communication is not a required element of that claim.

3

agreements, including conducting, monitoring and providing EPA with water quality monitoring and reports and passing EPA's reviews of the state's compliance with federal regulations. 40 C.F.R. §142.15, §142.17. (*See also*, **Ex. 2**, Olson Decl., p. 4, ¶18). Despite the grant of primacy, EPA maintains full oversight, supervisory and enforcement authority.[3]

In 2013 EPA learned that Flint intended to switch the public water source to the Flint River, a more corrosive water source than Lake Huron, which had been the source for the Flint public water system since 1967. EPA was also made aware that Flint would reopen an old plant to handle the distribution of drinking water instead of DWSD. Since DWSD had an optimized corrosion control treatment program (which added orthophosphates to prevent lead from leaching into the public drinking water), federal regulations required maintenance of this fully optimized corrosion control when Flint made the source water switch. 40 C.F.R. §141.82(f) ("All systems optimizing corrosion control shall continue to operate and maintain optimal corrosion control treatment, including maintaining water quality parameters at or above minimum values…."). (*See also*, **Ex. 2**, Olson, p. 7, ¶¶ 27-8, 35).[4]

---

[3] If a primacy state fails to comply with its obligations, EPA is required to initiate proceedings to withdraw the state's primacy status under SDWA §1413 and 40 C.F.R. §142.17.

[4] Review of water tap samples detailed in water quality reports are essential for EPA to exercise its oversight. EPA required Michigan, as part of the primacy agreement, to provide such reports in a timely manner. However, as the Office of Inspector General's report on EPA's supervisory failures in the Flint Water Crisis, found, EPA

Preventing lead from leaching into the public's drinking water is the primary reason for the requirement to maintain corrosion control treatment. Recognizing that lead exposure is exceptionally dangerous to the public health and that corrosion of plumbing is the primary source of lead in drinking water the Lead and Copper Rule (LCR) provides that "the most important element of the final treatment technique is corrosion control treatment." 56 Fed. Reg. 26,460 at 26,479 (June 7, 1991). (*See* also, **Ex. 2**, Olson, pp. 5-6, ¶24).[5]

Within a month after the switch, the EPA became aware of quality problems with the Flint River water when they were "inundated" with citizen complaints on the water quality and health concerns. (*See* **Ex. 3**, OIG 2018; **Ex. 4**, Crooks Dep., 11/16/17, pp. 29, 30-32, 48, 70;[6] **Ex. 5**, T. Poy, EPA Region 5 Chief, Groundwater

---

condoned extensive delays in providing the water quality reports which contributed to the crisis. (**Ex. 3,** EPA Office of the Inspector General (OIG) Report, Management Weaknesses Delayed Response to Flint Water Crisis, Report No. 18-P-0221, 7/19/18, pp. 17-19, describing MDEQ disinvestments).

[5]Defendant repeatedly asserts that a source switch did not require EPA approval. It is not a relevant fact. What is relevant is that EPA was required to maintain oversight, require water quality data and ensure that regulations were being followed. Given knowledge of the source switch to a highly corrosive water source and the federal requirement that corrosion control treatment be maintained, EPA had an obligation to ensure compliance with their own regulations and also ensure that the primacy agency was monitoring the water quality and providing data to EPA for review.

[6]Defendant suggests that it just turned complaints over to MDEQ to respond (citing to a single page of Jennifer Crooks' deposition). Her testimony, as well as other witnesses, make it clear that EPA would investigate complaints and relied on EPA health effects expert and scientists including Miquel Del Toral and Andrea Porter. However, when Crooks learned that the assurances that she had provided to Flint

and Drinking Water Branch, email to Jennifer Crooks, EPA and Mike Prysby, MDEQ, May 29, 2014, and Jennifer Crooks, EPA Region 5, email to Mike Prysby, MDEQ, May 28, 2014; and **Ex. 2**, Olson, p. 7, ¶37).

In response, the EPA acknowledged to Flint residents that "[t]he quality of the water in the Flint River is different from that from Lake Huron; *and requires additional treatment to ensure an acceptable quality drinking water.*" These letters assured Flint residents that "…MDEQ has been working closely with the Operator-in-Charge at the City of Flint's Water Treatment plant *to ensure that the citizens of Flint are provided drinking water that meets health standards.*" (**Ex. 6**, T. Hyde, Letters to Flint Residents, emphasis added). The EPA, through these letters, affirmatively led the public to believe that "additional treatment" was being used, when it was not, and that MDEQ was doing everything required to ensure that the water was safe, when it was not.

EPA worsened the crisis by waiving the primacy agency's requirement to obtain and provide to the EPA timely water parameter and water quality reports by granting disinvestments. EPA fostered its own ignorance by allowing noncompliance with federally mandated rules and policies to continue for two years, (**Ex. 3**, OIG 2018) and waiving the obligation to submit required forms under the LCR intended

---

residents was incorrect, she made no effort to provide accurate information about the health risks of the lead contamination. (**Ex. 4**, Crooks Dep., pp. 60, 84).

to ensure proper testing for lead in the drinking water. EPA's own experts testified that review of the data including water quality reports would have made it apparent that that there was no corrosion control in violation of federal regulations as early as 2014. (**Ex. 7**, Lytle Dep., 11/4/20, pp. 190-192).

As this Court previously determined:

> The EPA was well aware that the Flint River was highly corrosive and posed a significant danger of lead leaching out of the City's lead-based service lines at alarming rates into residents' homes. The EPA was well aware of the health risks posed by lead exposure, particularly to children and pregnant women. Mr. Del Toral certainly made the risks clear to his Region 5 colleagues within the first half of 2015.
>
> Further, the EPA knew that MDEQ and Flint officials were not warning Flint's residents that they were being supplied lead-laced water. Quite to the contrary, the EPA learned that State and local officials were misleading residents to believe that there was nothing wrong with the water supply and that the lead levels in some homes resulted from the interior plumbing (as MDEQ tried to do with the EPA when alerted to the high lead levels in the Walters' home—a myth the EPA quickly debunked). These lies went on for months while the people of Flint continued to be poisoned.

*Burgess v. U.S.*, 375 F.Supp.3d at 815-16.

Contrary to Defendants assertions, EPA's actions throughout 2014 and into 2015 allowed the continued distribution of drinking water, without any corrosion control treatment, to the Flint community thereby exacerbating and increasing the damage to the Plaintiffs as a result of the source water switch. EPA's actions in providing false reassurances regarding the safety of the water increased the harm as the Flint community continued to drink and utilize the water that had no corrosion

control, without taking precautions to protect their health and safety. The harm to the

community was both preventable and inevitable based on the acts and negligence of

the EPA as recognized by EPA's expert in this area:

> …A simple application of scientific principles to the circumstances in Flint along with the limited data are enough to know that **there is a problem there. They have had no corrosion control treatment in place for over a year now and they have lead service lines. It's just basic chemistry on lead solubility**.

**Ex. 8**, DelToral Email, 6/25/15.

In addition to the knowledge that was available regarding the lack of corrosion

control and EPA's failure to enforce regulations or issue violations, EPA was advised

of high lead levels in a resident's home in January 2015. Flint resident LeeAnne

Walters informed the EPA that she and her family members were becoming

physically ill from exposure to the Flint water. Crooks invited her to contact Miguel

Del Toral to come and test her water. (**Ex. 4**, Crooks Dep., p. 68). On February 11,

2015, the water in Walters' home tested extremely high for lead levels, (**Ex. 9**,

Crooks Emails 2/26/15, 10:53 am and 4:15 pm), testing at 104 parts per billion

("ppb"), nearly seven times the federal and state limit of 15 ppb. On February 25,

2015, Ms. Walters recontacted the EPA regarding the lead levels in her home. Two

months after the first alert of high lead levels, the EPA contacted the MDEQ to

express concern regarding the high lead levels, and was told by MDEQ that the lead

was "…due to lead sources in the homeowner's plumbing." (D.s' Brf., ECF No. 291-

11, PageID 7063). However, Ms. Walters had informed the EPA that "…the plumbing has always been all plastic," EPA discounted the concern that the Walters' tests were an example of what was happening in Flint, not an outlier.[7] *Id.*

On February 26, 2015, EPA's Jennifer Crooks also learned that MDEQ was not including elevated lead level test results like the Walters home in its reports on compliance and was pre-flushing in advance of taking compliance water samples which was in violation of the LCR.[8] (*See* **Ex. 3**, Crooks Dep., pp. 19, 22; and **Ex. 9**, Crooks and DelToral Emails 2/26/15).

---

[7]Over two months later, on April 27, 2015, the EPA undertook to test the Walters' home and "…confirmed that all pipes, fittings, valves in the…home are NSF-approved CPVC pipe…and that there are no sources of lead in the home plumbing," eliminating the outlier argument. *Id*. Yet, EPA stood by while concerned Flint residents were being lied to by the local officials, i.e.…that the high lead from Ms. Walters' residence is from the internal plumbing…and…this is what residents are being told." (**Ex. 10**, Del Toral Email, 4/27/15).

[8]EPA was aware that in addition to excluding the Walters sample the MDEQ had excluded 4 other samples, all of which had tested significantly higher than the Action Level of 15 ppb (42 ppb, 22 ppb, 20, ppb and 17 ppb). It knew that by excluding those results, the 90th percentile results would be at 11.2 or 11 ppb, below the Action Level, but if they had included those 4 results, (not even counting Ms. Walters' exorbitantly high lead levels, as confirmed by EPA's DelToral during his deposition, (**Ex. 11**, DelToral Dep., 10/12/17, pp. 131:1-19, 132:8-16), the 90th percentile would have been at 17.6 or 18 ppb, *higher than the 15 ppb Action Level, mandating issuing violations and taking corrective action*. (**Ex. 12**, Rosenthal Email 6/8/15). In addition, EPA was well aware that pre-flushing artificially lowered the lead levels captured in the water samples, as EPA scientists had published a paper in 2013 on this very issue. *See* **Ex. 13**, Supplemental Report of L. Russell, Op. 7, p. 4: DelToral, M. et al, 2013 *Detection and Evaluation of Elevated Lead Release from Service Lines: A field study*, Environmental Science and Technology 2013, 47,9300-9307.

By early 2015, EPA knew of the source switch, knew it was allowing disinvestments delaying water quality reports and lead testing forms, knew the new water source was the Flint River which was highly corrosive, knew it was inundated with complaints, knew corrosion control treatment was required, knew that there was a problem maintaining chlorine levels in the water (which relates directly to lack of corrosion control), knew about extremely high lead levels in Flint homes, and knew that the manner of testing was noncompliant with federal rules and was taken in a manner that would result in underreporting the lead levels. Yet, EPA failed to exercise any of their obligations in the face of the primacy agency's failure to act and known violations of federal regulations and imminent harm to a community.

In April 2015 the primacy agency admitted that Flint *had not* been practicing corrosion control since the source switch a year earlier, and that untreated corrosive water from the Flint River had been coursing through the lead service lines, iron service lines and copper lines using lead solder of Flint resident's pipes for twelve months. (*See* **Ex. 2**, Olson).

Despite confirming that the MDEQ had lied about having corrosion control treatment, was publicly misrepresenting the source of the high lead levels in the Walters' home, and was manipulating the water testing process itself, the EPA did nothing to correct the misstatements from its previous letters and statements to Flint residents which affirmatively reassured them that they were being provided drinking

10

water that met health standards and was compliant. Nor did the EPA take any steps to otherwise notify or warn the public about what was now confirmed to be a serious risk to the public health despite their obligation for public notification. 40 C.F.R. §141Q; (**Ex. 2**, Olson, p. 14, ¶66 ("[I]f the primacy state agency fails, (to perform its public notification responsibilities), it is incumbent upon EPA…and as part of its responsibility for overseeing primacy state programs to provide notice and inform the public."). EPA also did not initiate an enforcement action under the mandatory provisions of SDWA §1414 or §1431, despite knowing that Michigan had failed to cure the violations for a year. (*See* **Ex. 2**, Olson, p. 5, ¶21). *In re Flint Water Cases*, 482 F.Supp.3d 601, 629 (2020); *Burgess v. U.S.*, 375 F.Supp.3d 796, 815 (2019).

The 2018 EPA OIG report, issued after the filing of Plaintiffs' prior briefing in this matter, concluded that the EPA's failures and delay in responding to the Flint Water Crisis, was as a result of failure to supervise and exercise their authority stating that "the Flint Water Crisis demonstrates that public health is not protected when EPA regional staff – with multiple warning signs – do not use the agency's SDWA authority in conjunction with EPA oversight tools." (**Ex. 3**, OIG 2018, p. 26).

In testimony under oath at a Congressional Hearing, EPA's administrator, McCarthy recognized the damage caused by the EPA's failure to properly exercise its supervisory oversight duties:

Well, I wanted you to be all clear that the *emergency order I issued in January* was because of continued failure to address the issue… Were we late in getting it done? Yes. Are there consequences to that? Absolutely.

ECF No. 185-7, PageID 3763, 3767, 3805.

## ARGUMENT

## I. PLAINTIFFS HAVE INTRODUCED EVIDENCE SUFFICIENT TO ESTABLISH EACH ELEMENT OF A MICHIGAN GOOD SAMARITAN CLAIM.

The Federal Tort Claims Act waives sovereign liability for certain tort claims for damages. Pursuant to the Act, the United States is liable in tort, "in the same manner and to the same extent as a private individual under like circumstances," "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §1346(b); 2674; *FDIC v. Meyer*, 510 U.S. 471, 478 (1994).

In considering the private analogous liability requirement, the "words '*like* circumstances' do not restrict a court's inquiry to the *same* circumstances but require it to look further afield." *U.S. v. Olson*, 546 U.S. 43, 46 (2005); *Indian Towing Co. v. U.S.*, 350 U.S. 61, 64 (1955). The court need only identify a "proper analogy" and is not limited to identical private activity.

Misconstruing Plaintiffs' allegations, Defendant asserts that Plaintiffs' claims are limited to EPA's failure to intervene in the crisis sooner and failure to comply

with SDWA requirements. (D.'s Brf., ECF No. 291, PageID 6922).[9] Plaintiffs have

identified a myriad of failed undertakings by the EPA, emanating from EPA's

negligence in monitoring, reviewing and providing oversight to MDEQ to ensure

that it was fulfilling its obligations as a primacy agency. After conferring primacy

status on the MDEQ and setting the terms, upon EPA's knowledge of MDEQ's

misrepresentations and failure to issue violations, EPA took no steps to enforce or

revoke primacy agreements. EPA undertook to communicate with Flint and its

residents as to the adequacy and safety of its drinking water then misrepresented the

safety of the water and failed to cure these assurances despite mounting evidence

and knowledge of the imminent risk of safety posed by the drinking water. EPA also

undertook to require and review water quality reports yet condoned extensive delays

and failures to submit the required reports and data that would have alerted EPA

early on of the dangerous conditions of the water and noncompliance with federal

regulations. EPA undertook to conduct its own testing for lead to ensure a safe water

supply, yet failed to advise the pubic of the lead test results and failed to issue

violations or ensure compliance with federal regulations. EPA undertook to assess

---

[9]Defendant repeatedly states that the FTCA cannot be used to enforce statutory
duties, despite that not being the focus of Plaintiffs' claims. Rather, Plaintiffs have
established a duty under state law pursuant to the Good Samaritan doctrine and the
SDWA's regulations provide the standard of reasonable care under which the EPA's
negligence in performing that duty is measured. *United Scottish Ins. Co. v. U.S.*, 614
F.2d 188, 192-3 (9th Cir. 1979); *Lutz v. U.S.*, 685 F.2d 1178, 1184 (9th Cir. 1982).

the health implications of the lack of corrosion control and the failure of MDEQ to follow protocol in performing water testing for lead levels, including offering technical assistance, yet delayed in acting and exercising its obligation to take steps to protect the public health by requiring corrosion control or a source water change, while simultaneously allowing MDEQ to make assurances of safety of the water and failing to exercise its obligations to provide the public notice of known risks to health and safety.

Throughout this litigation, Plaintiffs have identified the Good Samaritan doctrine as the private liability analogue applicable to this case. Michigan's Good Samaritan doctrine is framed by the Restatement (Second) of Torts Section §324A, which provides:

> One who undertakes gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
> a) his failure to exercise reasonable care increases the risk of harm, or
> b) he has undertaken to perform a duty owed by the other to the third person, or
> c) the harm is suffered because of reliance of the other or the third person on the undertaking.

Restatement (Second) of Torts §324A (1965); *Smith v. Allendale*, 410 Mich. 685; 303 NW2d 702 (1981). Under this doctrine, when the government undertakes to act, it is required to act carefully and will be liable for injuries proximately caused by the failure to do so. *Neal v. Bergland*, 646 F.2d 1178, 1181-82 (6th Cir. 1981). Despite

Defendant's arguments to the contrary, Plaintiffs actually satisfy the elements required under the Good Samaritan doctrine, requiring denial of its renewed motion to dismiss.

### A. The EPA Undertook to Render Services to Another.

The threshold inquiry is whether the EPA undertook to render services to another which it should recognize as necessary for the protection of a third party. This Court has previously identified: oversight and monitoring of the State and Flint's water system's compliance with the SDWA and direct communication with Flint residents in response to complaints about the Flint water – as undertakings sufficient to support application of the Good Samaritan doctrine to this claim. *Burgess v. U.S.*, 375 F.Supp.3d at 818.

Judge Levy, considering the same motion by this Defendant in the *Walters* case, agreed with this Court's identification of undertakings and recognized several additional undertakings by the EPA as sufficient to support a claim, including responding to citizen complaints, meeting with citizens to conduct water testing, communicating with MDEQ about the lack of corrosion control and high lead levels, offering technical assistance, and belatedly issuing the §1431 emergency order. *In re Flint Water Cases*, 482 F.Supp.3d at 618. While both Judge Levy and this Court identified these undertakings from the pleadings, Defendant has offered nothing to change these rulings. Plaintiffs, however, through discovery, have ascertained

additional undertakings by the EPA, providing even greater support for this Court's prior ruling.

Defendant argues that EPA's undertaking to monitor and oversee Flint's water system is too broad in scope to establish an undertaking related to the Plaintiffs' injuries for purposes of a Good Samaritan claim, relying upon *McAtee v. Fluor Constructors Intern., Inc.*, 188 F.3d 508, *7 (6th Cir. 1999) where the plaintiff described the defendant's undertaking as "plant safety." and could not identify any specific safety services with respect to the plaintiffs work or the claimed electric shock injuries. The Court concluded that a general corporate safety program was an insufficient undertaking to establish liability as it was unrelated to and had no causal impact on the plaintiff's injuries.

This is not the scenario before this Court. Plaintiffs are not alleging an EPA undertaking to protect the general environment, but rather specific undertakings to supervise, monitor and provide oversight over Flint's public drinking water and to ensure that specific regulations set forth in the SDWA and the LCR are followed and enforced so that the drinking water is safe. EPA itself, and through its exercise of grant of primacy duties to the MDEQ, is the sole entity responsible for and able to undertake services to safeguard public drinking water. EPA's failure to exercise reasonable care in this undertaking is directly responsible for Plaintiffs' injuries due

to lead contaminated drinking water – the very result EPA is tasked with preventing under the SDWA and LCR.

EPA undertook to monitor and then alter the required water quality report schedules, oversee and advise MDEQ on corrosion control, the lead and cooper rule requirement, the need for corrosion control, and perform lead testing, provide technical assistance, and assume supervisory enforcement on compliance, albeit in a negligent manner. These undertakings were for the benefit of Flint water users including the Bellwether Plaintiffs. *Gaines v. Excel Industries, Inc.*, 667 F.Supp. 569 (M.D. Tenn. 1987) (review of subsidiaries safety program and records, conducting safety audits and participating in inspection tours constituted an undertaking).

EPA maintained full responsibility for enforcement of federal regulations to ensure Flint's public drinking water was safe and met federal standards.[10] Required undertakings which relate directly to Plaintiffs' injuries included receipt and review of water quality reports, receipt and review of MDEQ's submission of testing sites and testing protocol for lead levels in the public drinking water, receipt and review of the issuance of violations of the SDWA and the LCR, oversight over public notification of water quality concerns, independent obligation to issue violations for

---

[10]EPA set the terms of the primacy agreement with the MDEQ including requirements to provide all relevant data, technical experts attend training, determine violations and report to EPA sampling and reporting data quarterly in compliance with 40 C.F.R. §140.15. Flint FOIA Production 12-120000189; 1087-00004970-00002-00004.

noncompliance with the SDWA and LCR, independent obligation to provide Public Notice of risk of lead contamination in the water, enforcement actions, and an annual review of the MDEQ's compliance with primacy regulations. Following MDEQ's failures in its primacy role, the EPA also undertook to get Flint to utilize corrosion control as well as provide Flint residents with safe drinking water after the lead contamination. These are not broad generalizations but specific monitoring and oversight undertakings by the EPA, which are far different than those rejected in the case cited by Defendant.[11]

Defendant also argues that the Plaintiffs' Good Samaritan claim cannot be based on the failure to act, including failure to issue a §1431 order sooner. Clearly, a failure to act, after committing to an undertaking, is actionable. Defendant's argument was raised and rejected by Judge Levy in *In re Flint Water Cases*, 482 F.Supp.3d at 618-19, and Defendant provides no new case law to disturb that analysis. As the court held, Plaintiffs' allegations that the EPA's inaction in response to the Flint Water Crisis caused them harm and constituted a "failure to act was in

---

[11]In the one other case cited by Defendant, the court determined that while a general corporate safety program was not enough to create a duty on the parent corporation's part toward a subsidiary's employee, similar facts such as those present in this case, including the parent company being aware of roof control problems, the parent's corporate director of safety visiting the mine and offering advice about the roof, were sufficient to demonstrate that an undertaking *was* established. *Merrill ex rel Estate of Merrill v. Arch Coal*, 118 Fed. Appx. 37, 44-5 (6th Cir. 2004).

the course of an undertaking." *Id.* This analysis is wholly consistent with Michigan law.[12] See *Talucci v. Archambault*, 20 Mich. App. 153; 173 N.W.2d 740 (1969) (failure to remove snow and ice from a walkway pursuant to an obligation to do so, was subject to liability for injuries to a third-party pedestrian who was injured.)

Defendant also argues it should not be liable for its actions and failure in the context of the Flint Water Crisis, relying on a case in which the defendant "voluntarily" undertook duties. *See e.g. Myers v. Muffler Man Supply Co.*, 2008 WL 4330240 (Mich. Ct. App. Sept. 23, 2008) (defendant not liable for injury which occurred three years after it discontinued voluntary undertaking to repair and maintain conveyor). Both because EPA's duty is required by statutes, rules and primacy agreements and because it did not (and legally could not) abandon its oversight of the agency to which it had granted primacy, this argument is both logically and legally deficient and should be rejected.

Defendant also repeats a previously rejected argument that Plaintiffs are attempting to create a private cause of action for violations of the SDWA by the EPA.

---

[12]Defendant attempts to distinguish the reasoning of the Michigan Supreme Court case, analyzed by Judge Levy, by misreading the case which properly focused on the "fundamental concept of duty rather than action or inaction." *Hart v. Ludwig*, 347 Mich. 559; 79 N.W.2d 895 (1956). Contrary to Defendant's argument, the peril at issue in this case was not the switch of water source but the actions of the EPA which led to a delay in recognizing the absence of corrosion control, and their subsequent delay in responding to awareness of the lead contamination of the Flint water system despite its obligation to monitor, supervise, oversee and enforce compliance. Negligence in rendering those duties establishes a Good Samaritan claim.

This argument is misplaced. The SDWA regulations simply provide the standard of care by which the EPA's duty to render services is judged, and the public, including the Plaintiffs as residents of Flint, justifiably rely on the EPA doing its duty to enforce those regulations and to properly exercise their obligations to warn the public of risks to their health from the public water system. Indeed, EPA has the sole authority to perform these functions. When the EPA assumes the duty and is negligent by failing to exercise the duty in a reasonable and prudent manner, it is liable to the Plaintiffs for the resultant harm. *United Scottish Ins. Co. v. U.S.*, 614 F.2d at 196 (recognizing the United States' liability under FTCA for negligent provision of services upon which the public has come to rely); *Gill v. U.S.*, 429 F.2d 1072, 1075 (5th Cir. 1970) ("tort liability cannot be predicated upon a violation of federal law alone [but] the existence of federal regulations or statutes may provide evidence that the government assumed a duty and may strengthen claims of justifiable reliance.")

Next, Defendant argues that Plaintiffs cannot challenge the actions taken pursuant to the rules and regulations promulgated under the SDWA because a private person cannot take actions under that statute. (Ds.' Brf., ECF No. 291, PageID 6931). That argument has been soundly rejected by the Supreme Court as the FTCA requires a court to look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability under the FTCA, "in the performance of activities which private persons do not perform." The FTCA waives

sovereign liability where a private person under similar circumstances would be liable under Michigan law. *Indian Towing Co. v. United States,* 350 U.S. at 64, (1955) (rejecting the Government's contention that there was "no liability for negligent performance of 'uniquely governmental functions.' "); *Monk v. United States*, 2024 WL 1344712 (D. Conn. Mar. 24, 2024) ("the United States may be liable even if the relationship between the federal actors and the claimants is uniquely federal in character or the negligence was committed in the performance of a uniquely governmental function").[13]

Moreover, the Plaintiffs need only identify an *analogous* tort claim. The words 'like circumstances' do not restrict a court's inquiry to the *same circumstances,* but require it to look further afield. *Indian Towing Co*, 350 U.S. at 64; *see* also S. Rep. No. 1400, 79th Cong., 2d Sess., 32 (1946) (purpose of FTCA was to make the tort liability of the United States "the same as that of a private person under like circumstance, in accordance with the local law").

Lastly, while Defendant admits that communication about the water quality constituted an undertaking, it argues that that undertaking does not apply here

---

[13]The case that Defendant points to as a comparable situation was brought under the Administrative Procedures Act, challenging the EPA's decision not to issue a notice of deficiency. The court found that the decision was not subject to judicial review because it was committed to agency discretion. *Ohio PIRG, Inc. v. Whitman*, 386 F.3d 792, 798 (6th Cir. 2004). The plaintiffs there did not bring a tort claim or challenge any undertaking by the EPA.

because none of these bellwether plaintiffs had one on one communications with the EPA. That, however, is neither required nor an element of the claim.[14] If Plaintiffs establish that the negligent communications by the EPA increased the risk of harm or caused harm due to reliance on the communications, the fact that these bellwether plaintiffs did not have personal communication with the EPA is irrelevant.

### B. Evidence Establishes that the EPA Failed to Exercise Reasonable Care in its Undertakings.

Under the Good Samaritan doctrine, Plaintiffs must demonstrate that the EPA was negligent in performing these undertakings. While generally conceding that there are issues of fact with regard to this element, Defendant contends that the EPA's failure to issue the §1431 order until January 2016 was not negligent because its failed attempt at persuasion was a better idea.[15] Plaintiffs addressed this argument in

---

[14]Defendant's sole support for arguing against this Court's prior holding that EPA's engagement with citizen complaints constituted an understanding under §324A are two products liability cases, in one of which the Magistrate Judge found Restatement 324A to be inapplicable to a duty to warn of medication dangers *Nichols v. McNeilab, Inc.*, 850 F.Supp. 562, 569 (E.D. Mich. 1993), and the other which recognized that the reliance on a warning could be satisfied by persons other than those to whom defendant undertook to provide services. *Fox v. Amazon, Inc.*, 930 F.3d 415, 426 (6th Cir. 2019). Based on this case, not only would reliance by other Flint residents satisfy this subsection of 324A, with regard to the Bellwether Plaintiffs, but reliance of MDEQ which was provided copies of EPA's letters to citizens would satisfy the reliance by others component, where MDEQ was emboldened in their subsequent actions and inactions by EPA's assurances of safe water to Flint residents.

[15]Defendants also argue that the decision whether to issue an emergency order was not negligent because this Court previously found that the decision was discretionary. However, courts have made clear that whether discretionary or

22

response to the Defendant's motion to dismiss based on the discretionary function, and EPA's own Office of Inspector General rejected the legitimacy of this assertion. The OIG concluded that it was "implementation and oversight lapses," lack of "effective communication," absence of "risk assessment procedures;" failure to "establish clear roles and responsibilities" and failure to take "enforcement action" to obtain compliance that were at the root of EPA's negligence, not policy decisions. (*See* **Ex. 3**, OIG 2018; Pl.s' Rsp. D.s' Mot., ECF No. 274, PageID 6237-61). The OIG found that EPA lacked a sense of urgency and failed to recognize citizen complaints as a "critical indication of potential problems," resulting in the disastrous failure to enforce the central requirement to prevent lead from leaching into the public's drinking water. At the very least, an issue of fact exists as to whether the EPA's action in the face of the failure of the primacy agency to fulfill its obligations under the SDWA was negligent.

The OIG report also found that EPA Region 5 had condoned years of Michigan's failure to provide timely monitoring results of the water system and tap samples and a failure to submit lead sampling forms without issuing any violations. EPA did not just look the other way, it affirmatively granted MDEQ extensive 'disinvestments' from timely water quality reporting requirements (**Ex. 3**, OIG 2018,

---

mandatory, the question of whether EPA's actions were negligent is a separate analysis. *Kohl v. United States*, 699 F.3d 935, 941 (6th Cir. 2012).

pp. 17-19) despite being advised to insist that MDEQ discontinue the disinvestments and knowing how essential timely receipt of the data was for maintaining water quality. EPA National Public Water System Compliance Report 2007/2008, available at    https://www.epa.gov/sites/default/files/2014-04/documents/sdwacom2007.pdf; ("Without accurate and complete data from primacy agencies, EPA cannot fulfill its oversight responsibilities to fully assess the state of compliance of the nation's public water systems."); National Public Water Systems Compliance Report, 2013, pp. 3-4, available at https://www.epa.gov/sites/default/files/2015-06/documents/sdwacom2013.pdf; ("[I]f a system does not monitor and report on the quality of its water, it is impossible to know if there are health-based violations." "Primacy agencies must provide complete and accurate data to the public and to EPA." )

Defendant also argues that Plaintiffs cannot show that the water sampling conducted by the EPA was negligently performed, claiming that Plaintiffs have not introduced any expert testimony regarding testing protocol. That is false. Both Dr. Larry Russell and Erik Olson testified to the water sampling failures. As Dr. Russell stated: "the methods used to collect and measure lead concentrations for LCR sampling in Flint underreported the lead concentrations at levels below the lead levels consumed by the residents of Flint." (**Ex. 14**, L. Russell Expert Report, p. 43). Olson also identified several testing failures by the EPA including pre-flushing,

using 1-liter jars and sample selection which "meant that it falsely appeared that Flint was below the lead action level regulations." (**Ex. 2**, Olson, p. 13).

Further, EPA's own experts provide ample support for the negligence in water testing. Miguel DelToral, EPA's expert in the LCR, testified at length about EPA's knowledge of the sampling and testing violations that led to underreporting the high levels of lead. (**Ex. 11**, DelToral Dep., pp. 131;1-19,132:8-16; **Ex. 8**, DelToral email 6/25/15) ("The fact that their sampling is designed not to capture lead...does not negate our scientific understanding of what is going on…the City of Flint is flushing away the evidence before measuring for it… The State is complicit in this and the public has a right to know what they are doing..."). DelToral also reported that in addition to improper sampling techniques, Flint was not including water tests conducted at homes that revealed high lead levels and had it done so EPA's action level would have been exceeded. (D.s' Brf., ECF No. 291-11, PageID 7057-64; **Ex. 12**, Rosenthal email, 6/8/15).

Plaintiffs have established a genuine issue of fact that the EPA's performance of its undertakings to render services was negligent.

**C. Plaintiffs Satisfied the Requirements of Good Samaritan Doctrine by setting forth sufficient evidence on each of the alternative bases to support the imposition of liability under the Restatement.**

1. The EPA's actions increased the risk of harm to Plaintiffs

To establish that the EPA's action increased the risk of harm, Plaintiffs must demonstrate that "the government actor affirmatively either made, or caused to be made, a change in the conditions which change created or increased the risk of harm" to Flint water users. *Myers v. U.S.*, 17 F.3d 899, 903 (6th Cir. 1994).

As Judge Levy correctly noted, in response to Defendant's argument that since EPA was not involved in the decision to switch the water source without maintaining corrosion control it did not increase the risk of harm, once EPA learned of this fact, "the harm to Plaintiffs increased every day they drank, fed their babies formula made with contaminated water and took showers in lead and bacteria infested water." *In re Flint Water Cases*, 482 F.Supp.3d at 621.

Unlike *Myers*, in which the mine inspectors failed to identify a safety hazard, the EPA knew, at least by April 2015, that Flint residents were exposed to a year of water that lacked corrosion control, and that high lead levels were being found in resident testing and that increasingly high lead levels were inevitable. It knew there was lead contaminated water but failed to properly and timely fulfill its obligations to ensure safe drinking water and/or notify Flint citizens of the contamination. The State and City were able to continue to violate the SDWA and continue to distribute

26

water without corrosion control and continue to do so without notifying the public, because EPA supported and enabled these actions. EPA, who had the ultimate authority, responsibility and obligation of enforcement and public notice, allowed the contamination to worsen and the harm to increase on a daily basis for more than eight months without taking action to notify the public or issue an Emergency Order communicating the serious risk of harm to public health. *See Sagan v. United States*, 342 F.3d 493, 498-500 (6th Cir 2003) (genuine issue of material fact existed as to whether the Coast Guard's delay in rescue increased the risk of physical harm). (**Ex. 15**, EPA Emergency Administrative Order (EAO), 1/21/16).[16]

Relying on *Myers, supra* and other cases where conditions remained constant,[17] Defendant continues to argue that no action taken by the EPA increased the harm, which it alleges arose solely from the failure to maintain corrosion control

---

[16]The delay did not just result in continued exposure to contaminated water, the delay exacerbated the degradation of the lead service lines and interior plumbing in houses which actually increased the levels of lead leaching into the public drinking water, and increased Plaintiffs' property and psychological damages. (**Ex. 13**, Russell, Supp. Report, 9/14/24).

[17]*Raymer v. United States*, 660 F.2d 1136 (6th Cir. 1981) (safety violations involving miners' equipment were constant and not made worse due to the passage of time); *Howell v. United States*, 932 F.2d 915 (11th Cir 1991) (failure in inspections of contaminated airplane fuel did not change status quo or did not increase risk of harm from the status quo); *Maier v. Green Eyes, USA, Inc.*, 845 Fed. Appx. 869 (11th Cir. 2021) (record of a driver involved in a fatal action did not increase the risk of harm as no change occurred in the record). Here, it is indisputable that the pipes degraded and lead contamination increased on a daily basis as did the harm to property and the physical and psychological health of the Plaintiffs.

when the water was switched from DWSD to the Flint River. Unlike the cases cited by Defendant, the dangers of consuming and using lead contaminated water are not constant and accumulate over time resulting in an increased risk of harm as each day passed. *In Re Flint Water Cases*, 482 F.Supp.3d at 621 ("Every passing day that the EPA knew of the high lead levels in the water, but did not take appropriate action, resulted in increased contaminates being extracted from the water, pipes, hot water tanks and dishwashers and ultimately ingested, harming Plaintiffs and their property. The longer untreated water flows through pipes and into homes, the more the lead levels increase.").

The EPA actors also took action which made or caused to be made a change in conditions that increased the harm beyond which would have occurred had EPA not acted. EPA created and continued MDEQ's primacy role despite MDEQ lying and failing to exercise its obligations delegated by EPA. EPA extended exceptions so that MDEQ was allowed to delay required water quality reports required as part of the primacy agreement, and continued to condone the failure of MDEQ to which was central to EPA fulfilling its duties to provide oversight, monitor, and enforce law and regulations. By failing to require timely reports, failing to issue violations of federal rules and regulations and failing to issue order of compliance, the EPA delayed action in Flint and allowed increased degradation of pipes and resultant lead

to leach into the water supply for additional time, increasing the risk of harm, daily. (**Ex. 2**, OIG 2018).[18]

EPA also took authority over responding to resident complaints and deterred actions by Flint residents to pressure the City and State and deterred precautions by Flint residents by assurances of water safety and oversight.

EPA continuously defends their actions by asserting that they were not aware that corrosion control was not maintained and of rising lead levels in the public water supply, and when they did become aware, they worked to nudge MDEQ and the PWS toward compliance. To defend its lack of knowledge, EPA relies on the first round of testing in 2014 which showed only 6 ppb, when the action level is 10% of samples exceeding 15 ppb. EPA argues that it was not until September 20, 2015 that they were aware that "the City's lead data were not reliable" because of improper sampling sites, and the omission of samples from homes with lead service lines and/or high lead tests. (D.'s Brf., ECF No. 291, PageID 6917). Yet, EPA was aware that no one was complying with SDWA requirements to "submit reporting forms to the state, including the location of each site and the criteria under which the site was

---

[18]Four years before the water switch, it was recommended that EPA revoke the disinvestments and require MDEQ to comply with the primacy agreements. EPA ignored the recommendations, and the disinvestments continued allowing the primacy agency and Flint to circumvent providing information that directly impacted knowledge of public health risks. . and were only discontinued by the January 2016 emergency order. (**Ex. 2**, OIG 2018 at p. 18).

selected for the system's sampling pool." (**Ex. 2**, OIG 2018, p. 19, Table 1). As OIG

concluded "without the LCR reporting forms, the state could not review information

showing whether lead sampling met LCR requirements" and therefore whether the

lead data was reliable. EPA clearly would have known in 2014 had they not ignored

the recommendation in 2010, to get rid of the disinvestment on this very

requirement. (*See* also fn. 8 *infra*).

Simply put, had EPA not advised the state that they need not follow the

regulations and primacy conditions and abrogated their oversight, supervision and

enforcement duties, on both water reports and sampling protocol – the crisis could

have been largely averted, as it would have been clear in mid-2014 that there was no

corrosion control and lead levels were rising. EPA increased the risk of harm by

failing to meet its responsibilities to oversee and monitor the primacy agency before,

during and after the switch of water source.

2.  <u>The EPA undertook to perform a duty owed by another to the Plaintiffs.</u>

To establish this alternate theory of relief, Plaintiffs must establish that the

EPA undertook to perform a duty owed by another to Plaintiffs. Restatement

§324A(b). Defendant argues that because MDEQ continued to exercise its primacy

oversight authority over the Flint water system, EPA never undertook to perform

those duties.

EPA's oversight, monitoring, supervision and enforcement role encompassed the obligation to step in when necessary to ensure Plaintiffs and other Flint water users had clean and safe drinking water. That is precisely what occurred here. Although MDEQ retained its primacy status, due to its misrepresentation to EPA and its failures to perform, the EPA undertook duties and services including water sample collection, testing, evaluating and analysis of the water as well as providing technical and supervisory services to Flint. *In Re Flint Water Cases*, 482 F.Supp.3d at 622 ("For example, [EPA] began monitoring lead test results from Flint, doing independent investigations of citizens' lead levels in their homes, supervising a service line replacement of a home with high lead levels and offering additional technical assistance to managing the water quality issues in Flint.").[19]

Again, Defendant's reliance on the *Myers, supra* case is misplaced. There, the court, in dicta, found that the federal mine inspections did not supplant the mine owner's duty of ensuring safety in the mines because the Mine Safety and Health Act provides that the goal of these inspections are to ensure that mine owners comply

---

[19]Defendant cites a case interpreting Georgia law, where the parent company supplied advice but the subsidiary still was responsible for security at the individual stores, *Catalano v. GWD Management Corp.*, 2005 WL 5519861 (S.D. GA 2005), to suggest that EPA would have had to supplant MDEQ entirely in order to meet the elements of §324A(b). Here, the EPA did more than advise MDEQ. It actually assumed many responsibilities and duties for which MDEQ had been responsible. There is no support for Defendant's position as Plaintiffs need only identify specific duties and responsibilities owed by the MDEQ to others, either Flint or its water users, which were assumed by EPA. Plaintiffs have met that burden.

with their duties, not to relieve the mine owners of those duties. *Myers, supra* at 903. In contrast, the goal of the SDWA is not merely to ensure that states comply with their duties regarding safe water, but rather to ensure compliance with SDWA, and "the EPA retains the ability to intervene when a state with primary enforcement authority fails to meet the requirements to maintain such authority." *Mays v. City of Flint*, 871 F.3d 437, 447 (6th Cir. 2017). Moreover, unlike the MSHA or the FAA, the SDWA provides that the EPA must withdraw primacy or take other enforcement actions to ensure compliance with the SDWA. Its role is not limited to inspections or ensuring that primacy agencies perform their duties, but rather to ensure safe drinking water and protection of the public health.[20] There can be no dispute that the EPA assumed many of the MDEQ's duties which were owed to Flint and Flint water users. Plaintiffs have satisfied this basis for establishing the liability under the Good Samaritan doctrine.

---

[20]Defendant claims that Flint would still have operated the water system even if primacy was withdrawn. Defendant's argument misses the mark as the duties supplanted were not the operation of the water system, but several duties involved in the monitoring, oversight and supervision of Flint including water testing and analysis and ordering corrosion treatment. In fact, EPA had the authority, and was the only one with the authority, to order Flint to switch water sources. In their Emergency Order EPA undertook to perform a multitude of duties of both the state and the City of Flint by restricting the City's ability to transition to any other water source, controlling requirements for personnel hired by the City to operate the water distribution system, ordering the hiring of consultants, getting treatment parameters among other duties that were previously handled by the State and/or Flint. (**Ex. 15**, EAO, ¶¶ 53-64).

3.  <u>Plaintiffs relied on the EPA to their detriment.</u>

Under the reliance alternative set forth in Section 324A(c) of the Restatement, Plaintiffs must demonstrate that they forwent other remedies or precautions against the risk because of the EPA's undertakings. Restatement §324A. (1965). Defendant argues that discovery revealed that because none of the current Bellwether Plaintiffs communicated directly with the EPA and were unaware of EPA and its role, this element cannot be met. This is both an inaccurate summary of the discovery and a misunderstanding of the Plaintiffs' evidentiary burden.[21]

That most Plaintiffs answered Defendant's question, on whether they had directly communicated with the EPA, in the negative does not demonstrate a lack of reliance as Plaintiffs all relied on the EPA to perform the duties it undertook including to monitor, supervise, and enforce all federal regulations to ensure that their drinking water is safe in a non-negligent manner. Further they relied on the government, including the EPA, to warn them of potential dangers and harms from water contaminated by lead.

---

[21]Whether Plaintiffs testified in their depositions that they "did not recall reading or seeing anything about EPA's involvement in the Flint Water Crisis" is irrelevant to the detrimental reliance component of the Good Samaritan doctrine. (D.s' Brf., ECF No. 291, Page ID 6918-19. Extending Defendant's reasoning, no child Plaintiff would have a basis for recovery because they could not attest that they knew of the EPA's involvement with the Flint Water Crisis.

As Dr. Lebowitz reported, although many Bellwether Plaintiffs were alarmed when they heard that the water source was switched to what was widely understood to be a polluted river, they "trusted that the government would treat the water appropriately" and would alert them to the concerns with "lead in the water sufficiently to put them on notice of the dangers and allow them to take precautionary measures to protect themselves and their children." (**Ex. 16**, L. Lebowitz Report, p. 7). The failure of their government to warn them about lead levels in the water that could cause harm led to a deep sense of betrayal and Plaintiffs' lack of trust that their government was overseeing and assuring their water was not harmful. As Plaintiff Vance reported:

> You want to have trust in your institutions that they will do what is in the best interest of the public….It went on for months and months before the government admitted we had a problem … It was upsetting. You want to have that…even for people that don't like the government –everyone has a minimal level of trust in the government. You have to trust that the water coming out of your tap isn't filled with chemicals or that the plane you are flying on isn't going to crash or the steak is good because the FDA stamped it.

*Id.* at p. 35.[22]

---

[22]During his deposition, counsel sought to clarify what one Plaintiff meant by government and asked. Q: "And would you agree–would you say that your feelings about trust eroding, does it apply to the EPA as strongly as it does to other levels of government as a result of what happened here? A: Yeah, they're kind of like at the top of the pyramid. Like, the buck should stop with them kind of. When they found this out, like immediate actions should have been taken, like, I don't know." (**Ex. 17**, A. Vance Dep., 4/7/23, pp. 208-209).

Defendant did not ask the majority of Plaintiffs, who they relied upon to ensure their water is safe to consume and to warn them of any concern. Nor did Defendant ask any Plaintiff about how, in the absence of the warning, they were lulled into the mistaken belief that the water was safe. Defendant also did not ask Plaintiffs about complaints to MDEQ to which EPA delegated certain initial responsibilities under the SDWA, while retaining full supervisory oversight and enforcement obligations. Nor did Defendant ask any questions about Plaintiffs' reliance upon the MDEQ representations, which were authorized by EPA.

Defendant also incorrectly argues that the only reliance at issue relates to Plaintiffs' reliance on EPA communications with regard to water safety. The Restatement has a much broader view of reliance, recognizing that harm can be suffered because "of reliance of the other or the third person upon the undertaking". Restatement §324A(c). The Plaintiffs, the City of Flint and MDEQ all detrimentally relied on EPA and such reliance satisfies this section of the Good Samaritan doctrine.

MDEQ and the City of Flint relied on the EPA's supervision and enforcement conduct as well as their technical assistance and analysis of controlling requirements.[23] EPA did not issue any violations of the LCR despite knowledge of

---

[23]EPA condoned a delay of corrosion control for many months pending EPA seeking legal clarification of the LCR requirements despite there being no ambiguity in the LCR requirements for corrosion control. (**Ex. 18**, Flint Water Advisory Task Force Final Report, 3/21/16, pp. 49-52; *see also* **Ex. 19**, C. King Dep., 4/17/23, pp. 203-09; **Ex. 20**, M. Pollins Dep., 8/9/23, pp. 145-46).

lack of corrosion control and despite asserting that MDEQ lied to them about the implementation of corrosion control. And EPA never issued a violation of the LCR or SDWA despite learning that MDEQ misrepresented the water test results by not testing the right sites with lead distribution lines. EPA stood by and did not contradict the City of Flint and MDEQ's public representations that the water was safe and did not issue any public notification. EPA did not insist that the water be switched back to Detroit Water despite their authority to do so. As Plaintiffs set forth in their complaint, "The EPA undertook the duty of rendering services to the MDEQ for the protection" of the Flint water users. And MDEQ and the City of Flint detrimentally relied on the EPA as it negligently performed that duty which resulted in harm to the Plaintiffs. (ECF No. 29, PageID 301, ¶102). Based upon this reliance, Judge Levy concluded that the reliance prong of the Good Samaritan doctrine was satisfied. *In re Flint Water Cases*, 482 F.Supp.3d at 623 ("Plaintiffs have sufficiently alleged here that the MDEQ and the City of Flint detrimentally relied on the EPA and that this reliance harmed Plaintiffs.").[24]

Defendant simply misunderstands the concept of negligent reliance in the context of the facts of this case. The United States created the system for protecting

---

[24] EPA was not a mere observer, but an active participant in ensuring safe water for Plaintiffs on which the Plaintiffs, MDEQ and City of Flint all justifiably relied to their detriment. For that additional reason, the court found the *Myers* case relied upon by Defendant entirely distinguishable. *In re Flint  Water Cases*, 482 F.Supp.3d at 631-32.

the public drinking water in this country by the creation of the EPA and its oversight of the SDWA and accompanying regulations, recognizing that regulation and oversight were necessary for the protection of the public. EPA undertook to ensure safe drinking water with awareness that any failure in carrying out its statutory and regulatory duty would increase the risk to the public health from contaminated water. As the primary and ultimate enforcer on the federal safe drinking water regulations, the EPA "created public reliance on a federally regulated regime." *Estate of Rideout by and through Woods v. United States*, 677 F.Supp.3d 1112, 1125-26 (S.D. Cal. 2023) (where the United States undertook to provide background checks for gun purchasers and was negligent in performing this undertaking it increased Plaintiffs risk of harm by gun violence and deprived Plaintiffs of the precautions and alternative measures that Plaintiff and others may have taken if not for reliance on federal gun control measures which was sufficient to establish an analogous duty under the Good Samaritan law).

## II. DEFENDANT HAS FILED AN UNTIMELY MOTION FOR RECONSIDERATION OF THIS COURT'S PRIOR OPINION AND ORDER DENYING THEIR MOTION TO DISMISS UNDER THE FTCA'S MISREPRESENTATION EXCEPTION, WITHOUT ANY NEW FACTS OR LAW WARRANTING THIS COURT'S ATTENTION OR RECONSIDERATION.

On March 2, 2018, Defendant filed a Motion to Dismiss arguing that Plaintiffs' claims must be dismissed based on the 'misrepresentation' exception to

the FTCA. (D.s' Brf., ECF No. 37, PageID 725; D.s' Reply Brf., ECF No. 56, PageID 2285). This Court denied that motion.

In rejecting the same argument raised here, this Court on April 18, 2019, citing, *United States v. Neustadt*, 366 U.S. 696, 706 (1961), described the "misrepresentation exception" to the FTCA as precluding a claim against the government "arising out of…misrepresentation, deceit, or interference with contract rights." arising from "a failure to use due care in obtaining and communicating information upon which that party may reasonably be expected to rely in the conduct of his *economic* affairs." *Burgess v. U.S.*, 375 F.Supp.3d at 817

This Court held that the "gravamen of Plaintiffs' complaint is that EPA was negligent in its performance of operational tasks, that being to respond to residents' complaints and provide them with guidance. As such, this Court finds the FTCA misrepresentation exception inapplicable." *Id*. Further, this Court held that the misrepresentations alleged in the present matter were not of a financial or commercial character.[25]

---

[25]Defendant, in a footnote in the current motion, seriously misconstrues the misrepresentation exception which is tethered to a financial or commercial character involving economic affairs. They argue that "at a minimum" this Court should find that this exception bars business loss damages. (D.s' Brf., ECF No. 291, PageID 6950, fn. 30). The nature of Plaintiffs' damages, however, is irrelevant. Rather it is the *misrepresentations* themselves that must arise in the context of commercial or financial matters for the exception to apply.

While Defendant's current Motion acknowledges that courts must first determine what constitutes the "essence or gravamen of a plaintiff's complaint" (D's' Brf., ECF No. 291, PageID 6947), it completely ignores the fact that this Court has already made this determination and concluded that the government's misrepresentations do *not* constitute the gravamen of Plaintiffs' complaint, which at its essence, is a claim of negligence in EPA's performance of operational tasks. Defendant's attempt to relitigate this issue, without any change in the Plaintiffs' complaint or the applicable facts or law, is simply an improper and untimely motion for reconsideration.

Subsequent to this Court's earlier Opinion and Order denying Defendant's Motion to Dismiss, Judge Levy also addressed Defendant's identical argument in the companion case. In also denying Defendant's motion, Judge Levy held:

> As Judge Parker found, "the gravamen of Plaintiffs complaint is that the EPA was negligent in its performance of operational task, that being to respond to residents' complaints and provide them with guidance. *Burgess*, 375 F.Supp.3d at 817. Here too, Plaintiffs argue that the EPA's misrepresentations are not essential to their negligence claims. As set forth above, even though the EPA was not required to respond to citizen complaints, once it undertook the duty to respond, it was required to do so without negligence."

*In Re Flint Water Cases*, 482 F.Supp.3d at 639.

Judge Levy further held that Plaintiffs allege that EPA was acting negligently when "EPA reassured citizens that EPA was providing oversight and that Flint and the MDEQ were providing safe drinking water." The Court concluded that the

misstatements by EPA to Flint citizens are not essential to Plaintiffs' claims which are about negligence. (Citing *Neustadt*, 366 U.S. at 711 n. 26). *Id.*

It is concerning that EPA fails to address this Court's prior published opinion, or provide a basis for this Court to reverse its prior controlling ruling. *Burgess v U.S.*, 375 F.Supp.3d 796 (E.D. Mich. 2019).

Nor does EPA address either of the published decisions of Judge Levy, in which the Court held that: 1) any misrepresentations alleged are not essential to Plaintiffs' claims, and therefore the exception will not bar Plaintiffs' claims. *In re Flint Water Cases*, 482 F.Supp.3d 601, 639 (E.D. Mich. 2020); and further that, 2) the United States' argument that the misrepresentation exception should apply to shield EPA from liability, "is meritless." *In re Flint Water Cases*, 627 F.Supp.3d 734, 739 (E.D. Mich. 2022). Defendant offers nothing counter to these rulings.[26]

## CONCLUSION

For all the reasons given and authorities cited above, Defendant's motion should be denied in its entirety.

Respectfully submitted,
By: *s/ Deborah LaBelle*
Deborah A. LaBelle (P31595)
LAW OFFICES OF DEBORAH A. LABELLE
221 N. Main Street, Suite 300
Ann Arbor, MI 48104

DATED:      January 29, 2025      (734) 996-5620      deblabelle@aol.com

---

[26]*See* also, *Abbott v. United States*, 78 F.4th 887 (6th Cir. 2023) ("Plaintiff's failure to warn claim sounds in negligence and not in misrepresentation.")

Cary S. McGehee (P42318)
Beth M. Rivers (P33614)
PITT McGEHEE PALMER & RIVERS, PC
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
(248) 398-9800
cmcgehee@pittlawpc.com
brivers@pittlawpc.com

Julie H. Hurwitz (P34720)
GOODMAN HURWITZ & JAMES, PC
1394 E. Jefferson Avenue
Detroit, MI 48207
(313) 567-6170
jhurwitz@goodmanhurwitz.com

*Attorneys for Plaintiffs*

By: */s/ Paul J. Napoli*
Paul J. Napoli
NAPOLI SHKOLNIK PLLC
270 Munoz Rivera Avenue, Suite 201
Hato Rey, Puerto Rico 00918
(787) 493-5088
PNapoli@NSPRlaw.com

*Co-Lead Counsel for the FTCA Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was filed with the U.S. District Court through the ECF filing system and that all parties to the above cause was served via the ECF filing system on January 29, 2025.

*/s/Betsy L. Lewis*
221 N Main St., Ste 300
Ann Arbor, MI 48104
734-996-5620
betsyllewis@gmail.com

41