# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

*In re*: FTCA Flint Water Cases,

No. 4:17-cv-11218

Hon. Linda V. Parker

Mag. Curtis Ivy, Jr.

## PLAINTIFFS' OPPOSITION TO THE UNITED STATES'
## MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................... i

TABLE OF AUTHORITIES ..................................................... iii

INDEX OF EXHIBITS ............................................................ iii

INTRODUCTION .................................................................... v

STATEMENT OF FACTS ......................................................... 2

LEGAL STANDARD ............................................................... 6

ARGUMENT .......................................................................... 7

  I.    THE GOVERNMENT HAS NOT MET ITS RULE 56(C) BURDEN TO DISPROVE THE EXISTENCE OF A GENUINE ISSUE OF MATERIAL FACT ON STATUTE OF LIMITATIONS ................................................ 7

      A. Where a Plaintiff Claims That He or She Was Injured Because the Federal Government, Acting in the Background, Failed to Prevent Harm Directly Caused by Another Person or Entity, the Plaintiff's FTCA Claim Only Accrues Once the Plaintiff Learns the Facts Regarding That Failure to Act ...................................................................................... 8

      B. The Government Has Failed to Submit Any Evidence That Any Plaintiff Was on Inquiry Notice That the EPA Was a Cause of the Flint Water Crisis Prior to 2018 ................................................................... 17

  II.   THE GOVERNMENT HAS FAILED TO MEET ITS BURDEN OF SHOWING NO GENUINE ISSUE OF MATERIAL FACT CONCERNING THE ADULT BELLWETHER PLAINTIFFS' CLAIMS ....................................................................................... 19

      A. Plaintiffs' Property Damage Claims Are Supported By Expert Testimony, and There Exist Genuine Issues of Material Fact ................. 20

      B. A Genuine Issue of Material Fact Exists With Respect to Bellwether Plaintiffs Langston's and Campbell's Personal Injury Claims ............. 23

C.    A Genuine Issue of Material Fact Exists With Respect to Bellwether Plaintiff McClain's Business Loss and Property Damage Claims ........27

D.    A Genuine Issue of Material Fact Exists With Respect to Bellwether Plaintiffs Vance's Property Damage Claim ...........................................28

CONCLUSION .......................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adickes v. S.H. Kress & Co*., 398 U.S. 144 (1970)....................................................7

*Amburgey v. United States*, 733 F.3d 633 (6th Cir. 2013)................................ 13, 14

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)........................................6, 20

*Blake v. Columbia Gas Transmission, LLC*, No. CV 3:19-0847, 2021 WL 4255619 (S.D.W. Va. Sept. 17, 2021) ................................................................................21

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .........................................................7

*Coffie v. United States*, 43 F.App'x 808 (6th Cir. 2002) ....................................9, 10

*Cotter v. United States*, 2006 WL 3253289 (W.D. Mich. Nov 8, 2006)................15

*Diminnie v. United States*, 728 F.2d 301 (6th Cir. 1984) ........................................15

*Drazen v. United States*, 762 F.2d 56 (7th Cir. 1985) ..................................... 12, 13

*Dyniewicz v. United States*, 742 F.2d 484 (9th Cir. 1984) .....................................16

*Eberline v. Douglas J. Holdings, Inc.*, 339 F. Supp. 3d 634 (E.D. Mich. 2018).....19

*Gibson v. United States*, 781 F.2d 1334 (9th Cir. 1986) .........................................16

*Gould v. U.S. Dep't of Health & Human Servs.*, 905 F.2d 738 (4th Cir.1990).......15

*Hertz v. United States*, 560 F.3d 616 (6th Cir. 2009) ..............................................14

*In re Flint Water Cases*, 579 F. Supp. 3d 971 (E.D. Mich. 2022)................... 28, 29

*In re Flint Water Cases*, 584 F.Supp.3d 383 (E.D. Mich. 2022)..............................7

*Matsushita Electrical Industries Company v. Zenith Radio Corporation*, 475 U.S. 574 (1986).............................................................................................................6

*PNC Bank, Nat'l Ass'n v. Select Com. Assets, LLC*, 2022 WL 1609433 (E.D. Mich. May 20, 2022).....................................................................................................6

*Rhodes v. Michigan*, 10 F.4th 665 (6th Cir. 2021) ...................................................7

*Roque v. United States*, 676 F.Supp.2d 36 (D. Conn. 2009) ....................................17

*Rorrer v. City of Stow*, 743 F.3d 1025 (6th Cir. 2014) ...........................................20

*Skwira v. United States*, 344 F.3d 64 (1st Cir. 2003) ...............................................16

*Smith v. United States*, 518 F.Supp.2d 139 (D.D.C. 2007) .....................................16

*Snyder-Hill v. Ohio State University*, 48 F.4th 686 (6th Cir. 2022) ........................13

*United States v. Kubrick*, 444 U.S. 111 (1979) ........................................... 1, 10, 11

*Valdez ex rel. Donely v. United States*, 518 F.3d 173 (2d Cir. 2008)......................13

*Whittlesey v. Cole*, 142 F.3d 340 (6th Cir. 1998) ...................................................16

## Rules

Fed. R. Civ. P. 56(a)................................................................................................19

Fed. R. Civ. P. 56(c)(1)(B) .......................................................................................8

## INDEX OF EXHIBITS

**Exhibit A**:   EPA Office of the Inspector General (OIG) Report, Management Weaknesses Delayed Response to Flint Water Crisis, Report No. 18-P0221

**Exhibit B**:   Email Chain between Thomas Poy, Jennifer Crooks and Michael Prysby, 05/29/14 and 05/28/14

**Exhibit C**:   Jennifer Crooks Deposition Transcript, 11/16/2017, Relevant Pages Only

**Exhibit D**:   Erik D. Olson Declaration, 02/23/2024

**Exhibit E**:   Tinka Hyde Letters to Flint Residents

**Exhibit F**:   Darren Lytle Deposition Transcript, 11/04/2020, Relevant Pages Only

**Exhibit G**:   Miguel DelToral Email 06/25/2015

**Exhibit H**:   EPA Emergency Administrative Order, 01/21/2016

**Exhibit I**:   EPA Letter to Governor Snyder, 01/21/2016

**Exhibit J**:   Jamal Saad Appraisal Reports

**Exhibit K**:   AnThony Legins Commercial Broker Opinion (CBO)

**Exhibit L**:   Jamal Saad Deposition Transcript, 07/30/2024, Relevant Pages Only

**Exhibit M**:   Expert Report of Gabriel Lade, PhD, 02/23/2024

**Exhibit N**:   Expert Report of Dr. Bruce A. Brod, MD, MHCI, FAAD, 02/22/2024

**Exhibit O**:   Rebuttal Expert Report of Dr. Bruce A. Brod, MD, MHCI, FAAD, 05/05/2024

**Exhibit P**:   Stanley Langston Deposition Transcript, 04/21/2023, Relevant Pages Only

**Exhibit Q**:   John Campbell Deposition Transcript, 12/01/2022, Relevant Pages Only

**Exhibit R**:   Leo McClain Deposition Transcript, 04/24/2023, Relevant Pages Only

**Exhibit S**:   Anthony Vance Deposition Transcript, 04/07/2023, Relevant Pages Only

**Exhibit T**:   Karen Vance Deposition Transcript, 09/13/2023, Relevant Pages Only

**Exhibit U**:   Zak Rostar Deposition Transcript, 08/20/2024, Relevant Pages Only

## **INTRODUCTION**

This brief is submitted in opposition to the United States' Motion for Summary Judgment (ECF No. 297). The heart of this opposition focuses on the Government's flawed conception of the legal framework governing the accrual of claims under the Federal Tort Claims Act ("FTCA"). The Government argues that Plaintiffs' claims accrued as soon as they were aware of the water contamination in Flint, Michigan, and that the FTCA's two-year statute of limitations began ticking from that moment. This contention, however, fundamentally misconstrues the legal standard for FTCA claim accrual, particularly in cases in which the Government's involvement in causing an injury is not immediately apparent.

The Government's argument hinges on the assertion that Plaintiffs' knowledge of the Flint Water Crisis, in and of itself, triggers the running of the statute of limitations. This simplistic approach ignores the crucial "who" aspect of claim accrual, as examined by the Supreme Court in *United States v. Kubrick*, 444 U.S. 111 (1979). As highlighted in **Part I-A** of this brief, a plaintiff's awareness of an injury does not equate to awareness of the federal government's role in causing that injury. In cases in which the harm is directly caused by one entity (e.g., the City of Flint) and the federal government's negligence operates only *in the background*, consisting of a *failure to prevent, or at least minimize*, the injury, the statute of

limitations begins to run only when the plaintiff becomes aware, or should reasonably have become aware, of the federal government's potential culpability.

The United States has failed to meet its burden of proving that Plaintiffs were on inquiry notice of the EPA's involvement in the Flint Water Crisis within the statutory period. The Government's motion improperly conflates awareness of the water crisis with awareness of the EPA's potential liability, a distinction that is crucial to the proper application of the FTCA statute of limitations.

## **STATEMENT OF FACTS**[1]

In 1967, the City of Flint abandoned the use of the Flint River as its drinking water source, and joined the Detroit water system (DWSD), which sourced its water primarily from Lake Huron. The DWSD had in place an optimized corrosion control treatment program which involved adding orthophosphates to prevent lead from leaching into the public drinking water. (*See* Ex. D, Olson Decl., §§ 27-8).

On April 25, 2014, the City of Flint, under the unilateral governance of an emergency manager appointed by Governor Snyder, switched its water source back to the Flint River, *without* any corrosion control treatment. Within a month, EPA, by its own description, was "inundated" with complaints regarding the quality of the water. **Ex. A** (EPA Office of Inspector General (OIG) Report, Management

---

[1] Plaintiffs incorporate and adopt the factual findings of this Court's Opinion and Order denying the United States' Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF No. 76).

Weaknesses Delayed Response to Flint Water Crisis Report No. 18-P-0221, 7/19/2018 at 34; **Ex. B** (Email from Thomas Poy, EPA Region 5 Chief, Groundwater and Drinking Water Branch, to Jennifer Crooks, EPA and Mike Prysby, MDEQ, 5/29/14, and Email from Jennifer Crooks, EPA Region 5, to Mike Prysby, MDEQ, 5/28/14); **Ex. C** (Crooks Dep., 11/16/17), at 29, 30-32, 48, 70; **Ex. A**, OIG 2018; **Ex. D**, Olson Decl., p. 7, ¶37.

In response, the EPA acknowledged to Flint residents that "[t]he quality of the water in the Flint River is different from that from Lake Huron; *and requires additional treatment to ensure an acceptable quality drinking water.*" These letters assured Flint residents that "MDEQ has been working closely with the Operator-in-Charge at the City of Flint's Water Treatment plant *to ensure that the citizens of Flint are provided drinking water that meets health standards.*" **Ex. E** (T. Hyde, Letters to Flint Residents, emphasis added). The EPA, through these letters, affirmatively led the public to believe that "additional treatment" was being used, when it was not, and that MDEQ was doing everything required to ensure that the water was safe, when it was not. *Id.*

The EPA worsened the crisis by waiving the primacy agency's requirement to obtain and provide to it timely water parameter and water quality reports by granting disinvestments. The EPA fostered its own ignorance by allowing noncompliance with federally mandated rules and policies to continue for two years,

3

Ex. A (OIG, 2018), and waiving the obligation to submit required forms under the LCR, intended to ensure proper testing for lead in the drinking water. The EPA's own experts testified that review of the data, including water quality reports, would have made it apparent that that there was no corrosion control in violation of federal regulations as early as 2014. **Ex. F** (Lytle Dep., 11/4/20), at 190-192.

> As this Court previously determined:
>
> The EPA was well aware that the Flint River was highly corrosive and posed a significant danger of lead leaching out of the City's lead-based service lines at alarming rates into residents' homes. The EPA was well aware of the health risks posed by lead exposure, particularly to children and pregnant women. Mr. Del Toral certainly made the risks clear to his Region 5 colleagues within the first half of 2015.
>
> Further, the EPA knew that MDEQ and Flint officials were not warning Flint's residents that they were being supplied lead-laced water. Quite to the contrary, the EPA learned that State and local officials were misleading residents to believe that there was nothing wrong with the water supply and that the lead levels in some homes resulted from the interior plumbing (as MDEQ tried to do with the EPA when alerted to the high lead levels in the Walters' home—a myth the EPA quickly debunked). These lies went on for months while the people of Flint continued to be poisoned.

*Burgess v. U.S.*, 375 F.Supp.3d 796, 815-16 (E.D. Mich. 2019).

Contrary to the Government's assertions, the EPA's actions throughout 2014 and into 2015 allowed the continued distribution of drinking water to the Flint community, without any corrosion control treatment, thereby exacerbating and increasing the damage to Plaintiffs as a result of the source-water switch. The EPA's

actions in providing false reassurances regarding the safety of the water increased the harm, as the Flint community continued to drink and utilize the water that had no corrosion control, without taking precautions to protect their health and safety. The harm to the community was both preventable and inevitable based on the acts and negligence of the EPA, as recognized by the EPA's expert in this area:

> A simple application of scientific principles to the circumstances in Flint along with the limited data are enough to know that **there is a problem there. They have had no corrosion control treatment in place for over a year now and they have lead service lines. It's just basic chemistry on lead solubility**.

**Ex. G** (Del Toral e-mail, 6/25/15, emphasis added).

On January 21, 2016, nearly two years after the EPA first became aware of the impending Flint River water disaster, the agency issued an Emergency Order, **Ex. H**, in which "continuing delays," "lack of transparency," "the public health emergency now unfolding," "multiple health-based drinking water violations," "inadequate accountability," "immediate need to reduce lead levels," **Ex. I** (1/21/16 EPA Ltr to Snyder re Emerg Order), were officially acknowledged.

On July 19, 2018, the OIG released a report on the EPA and Flint titled "Management Weaknesses Delayed Response to Flint Water Crisis. **Ex. A**. The OIG Report concluded that the EPA's oversight of state drinking water programs was inadequate, and that EPA Region 5 could have issued a Section 1431 emergency order as early as June 2015.

## LEGAL STANDARD

An issue of material fact is genuine if it has a real basis in the record before the summary judgment court. *Matsushita Electrical Industries Company v. Zenith Radio Corporation*, 475 U.S. 574, 586-87 (1986). The test for substantiality is whether a reasonable jury could find the fact in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Gonzales v. Target Corp*., 622 Fed.Appx. 517, 518 (6th Cir. 2015). A fact is considered "material" if its proof would affect the outcome of the case. *PNC Bank, Nat'l Ass'n v. Select Com. Assets, LLC*, No. 18-CV-10711, 2022 WL 1609433, at *5 (E.D. Mich. May 20, 2022). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*; *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986). The Court must view the facts and any reasonable inferences drawn from them in the light most favorable to the nonmoving party. *Rhodes v. Michigan*, 10 F.4th 665 (6th Cir. 2021). The moving party has the initial burden of supporting its position with affidavits, depositions, admissions, or other documentary evidence. The burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists. *In re Flint Water Cases*, 584 F.Supp.3d 383 (E.D. Mich. 2022).

## **ARGUMENT**

I.  **THE GOVERNMENT HAS NOT MET ITS RULE 56(C) BURDEN TO DISPROVE THE EXISTENCE OF A GENUINE ISSUE OF MATERIAL FACT ON STATUTE OF LIMITATIONS**

More than half a century ago, the U.S. Supreme Court held that to meet its initial "burden of showing the absence of a genuine issue" and thereby require its opponent to come forth with a response, a summary judgment movant must, in its opening papers, "foreclose the possibility" of the opponent proving the "critical element" at issue. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-58 (1970). Unless and until that burden is met, the Court held, the nonmovant has no obligation to demonstrate that it has admissible evidence sufficient to prove the fact at issue. *Id*. at 160. In *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the Court reiterated: "Of course, a party seeking summary judgment always bears the initial responsibility of . . . identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323. *See also* id. at 325 (burden entails "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.").

This feature of summary judgment practice is now embodied in the current wording of Rule 56(c)(1)(B), providing, in relevant part, that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . showing . . . that an adverse party cannot produce admissible evidence to support the fact."

The Government has utterly failed to meet its Rule 56(c) burden, because it has ignored controlling U.S. Supreme Court and Sixth Circuit precedent concerning *what* a plaintiff must be on inquiry notice of before his or her FTCA claim accrues, and the statute of limitations to file an administrative claim within two years then begins to run. As explained in **Part I-A**, the Government is mistaken as a matter of law in contending that Plaintiffs' claims *against the EPA* accrued as soon as they were on constructive or actual notice that the water in Flint contained lead, due to the actions of Flint authorities and regulatory failure of Michigan state officials. Rather, the legally relevant question is: when were Plaintiffs put on inquiry notice that actions or inactions *of EPA regulators* may have been *one* cause of injuries suffered by Plaintiffs? **Part I-B** then explains that none of the factual analysis in the Government's papers even addresses that question—requiring the conclusion that the Government failed to meet its Rule 56(c) burden, so that Plaintiffs have no obligation to come forward with any evidence as to when they obtained inquiry notice regarding the EPA's complicity.

A.   **Where a Plaintiff Claims That He or She Was Injured Because the Federal Government, Acting in the Background, Failed to Prevent Harm Directly Caused by Another Person or Entity, the Plaintiff's FTCA Claim Only Accrues Once the Plaintiff Learns the Facts Regarding That Failure to Act**

Plaintiffs agree with the Government's general analysis of when a claim accrues under the FTCA. It accrues once a plaintiff has constructive notice of both

the *fact* of an injury, and of the *cause* of the injury. *See* Govt. Mot. at 11-14. Further, we agree that an objective test applies: the question is at what juncture a reasonable person would have been on inquiry notice that he or she should "'seek professional advice regarding legal recourse.'" Govt. Mot. at 14 (quoting *Coffie v. United States*, 43 F.App'x 808, 811 (6th Cir. 2002)).

But in quoting the Sixth Circuit's *Coffie* decision, the Government has omitted one additional, critical aspect of the applicable legal question. *When* a FTCA claim accrues must be analyzed on *a defendant-by-defendant* basis. That is, the question isn't when Plaintiffs in this case were on inquiry notice that *some* person or entity might have caused them injury, for example, the City of Flint, or one or more state officials. Rather, the question is when Plaintiffs were on inquiry notice that *the EPA* may have been one cause of the harm they suffered, due to its regulatory actions or inaction. This much is clear from the paragraph in *Coffie* immediately following the paragraph quoted by the Government. *Coffie*, 43 F.App'x at 812 (FTCA claim "accrues when the plaintiff is, or in the exercise of reasonable diligence should be, aware of both her injury and its connection with *some act of the defendant*.") (citing *McDonald v. United States*, 843 F.2d 247, 248 (6th Cir. 1988)) (emphasis added)).

Apart from its selective quotation of the *Coffie* decision, the Government's legal analysis is flawed in ignoring a U.S. Supreme Court decision on point and two controlling Sixth Circuit decisions--all mandating the conclusion that to meet its

9

Rule 56(c) burden as a summary judgment movant, the Government must prove that Plaintiffs were on inquiry notice of facts suggesting that *the EPA's actions or inaction* may have been *one* cause of their injuries. It is plainly not enough that Plaintiffs were aware that they had injuries caused *by tainted water* in Flint, Michigan. Also, material are the facts concerning ***who*** was responsible for the continued flowing of the tainted water.

That is made clear by a key element of the Supreme Court's decision in *United States v. Kubrick*, 444 U.S. 111 (1979), ignored by the Government. The Government acknowledges *Kubrick* only for its general analysis of the FTCA statute-of-limitations framework enacted by Congress. Govt. Mot. at 13-14. But it ignores the Court's application of that legal framework to the facts of the case, which explicated exactly what, factually, the Government must prove in order to demonstrate accrual of a FTCA claim. The plaintiff in *Kubrick* was treated in a federal (Veterans Administration) hospital. He sued, alleging that negligent treatment with a particular drug had caused his hearing loss. He opposed a statute-of-limitations dismissal on the ground that, even though he became aware, after the treatment, that his hearing loss had been *caused* by the drug, his claim did not accrue until he learned that this treatment decision was *negligent*. 444 U.S. at 115-16.

The Court rejected this reasoning. It made clear that, assuming a plaintiff is "in possession of the critical facts that he has been hurt and ***who has inflicted the***

*injury*," the "plaintiff's ignorance of his legal rights" does not prevent accrual of the claim. *Id*. at 122 (emphasis added). It concluded: "We thus cannot hold that Congress indented that 'accrual' of a claim must await awareness by the plaintiff that his injury was negligently inflicted." *Id*. at 123.

Completely ignoring this **"who"** aspect of the *Kubrick* decision, the Government nonetheless asserts: "Plaintiffs need not know the United States' role in the Flint Water Crisis or whether the EPA was potentially negligent for their claims to accrue." Govt. Mot. at 17. Rather, it contends that as soon as Plaintiffs knew that there was a water crisis (by October 2015, it insists), the two-year clock to file an administrative claim with the EPA started ticking, even if there was no basis to conclude that Plaintiffs were on inquiry notice that *the EPA* was among the **"who"** responsible for causing, or perpetuating, the crisis.

This argument flies in the face of uniform Court of Appeals precedent, including two Sixth Circuit decisions (in addition to *Coffie*), applying *Kubrick*'s recognition that the matter of **who** caused the injury is a critical aspect of analyzing accrual of claims under the FTCA.

The leading appellate decision applying this aspect of *Kubrick* is Judge Posner's opinion in *Drazen v. United States*, 762 F.2d 56 (7th Cir. 1985). *Drazen* was a wrongful death lawsuit brought by the widow of a man who had died of lung cancer. The question was whether the claim had accrued when he died, or whether

it had accrued when the widow had learned that "the government had failed to follow up on the results of an x-ray examination," which might have *prevented* his death. *Id*. at 58-59. Applying *Kubrick*, Judge Posner explained the applicable rule concisely, as follows: "When there are two causes of an injury, and only one is the government, the knowledge that is required to set the statute of limitations running is *knowledge of the government cause*, not just of the other cause." *Id*. at 59 (emphasis added).

Applied to this case of course, the knowledge of Plaintiffs required to set the statute of limitations running on their FTCA claim is *knowledge of the EPA being a cause* of the Flint Water Crisis, not just of other causes (e.g., Flint, and state officials). Further sharpening the analysis, Judge Posner elaborated that the FTCA statute of limitations "begins to run either when the government cause is known or when a reasonably diligent person (in the tort claimant's position) reacting to any other suspicious circumstances of which he might have been aware would have discovered the government cause—whichever comes first." *Id*. at 59.

Quoting this language, the Second Circuit acknowledged four years later that Judge Posner's application of *Kirby* as "settled law." *Valdez ex rel. Donely v. United States*, 518 F.3d 173, 177-78 (2d Cir. 2008).

Five years later, the Sixth Circuit, also applying *Kubrick*, agreeing that the statute of limitations in a FTCA case begins running upon proof "that the conduct

attributable to *the government* was more likely than not the cause." *Amburgey v. United States*, 733 F.3d 633, 638 (6th Cir. 2013). *See also id.* at 639 ("claim accrual does not depend on a plaintiff's knowledge of what precisely the government actor did to cause the injury"; it is enough that there are "circumstances that would alert a reasonable person to the possibility" of harm caused by the government).

In the Sixth Circuit's most recent application of the *Kubrick* rule, it summarized that "a claim accrues when a plaintiff knows or has reason to know that *the defendant* injured them," so that "[i]f a plaintiff has no reason to know **who** injured them, their claim has not accrued." *Snyder-Hill v. Ohio State University*, 48 F.4th 686, 701 (6th Cir. 2022) (emphasis added). *See also id.* at 704 ("To summarize, we agree with several of our sibling circuits, and we expressly hold that, pursuant to the discovery rule, a claim accrues when a plaintiff knows or has reason to know that they were injured and that the defendant caused their injury.").[2]

The Government, ignoring the language in the Sixth Circuit's *Coffie* decision in the paragraph immediately following the one it quotes, as well as the holdings in the subsequent *Amburgey* and *Snyder-Hill* cases confirming that the Sixth Circuit applies *Kubrick* to require a defendant-by-defendant analysis of claim accrual, cites

---

[2] The Sixth Circuit's holding regarding the correct interpretation of the **"who"** element of the *Kubrick* decision was rendered as part of an analysis of Michigan's "discovery" rule. However, this holding helps clarify the meaning of the Sixth Circuit's "inquiry-notice" rule applicable in FTCA cases, as the Court earlier made clear that these are mere differences in terminology. *Amburgey*, 733 F.3d at 636.

six decisions in support of its view that "Plaintiffs need not know the United States' role in the Flint Water Crisis or whether the EPA was potentially negligent for their claims to accrue." Govt. Mot. at 17-19. None support this extraordinary assertion.

The first case cited, *Hertz v. United States*, 560 F.3d 616 (6th Cir. 2009), actually undermines the Government's argument, because of its unusual facts. *Hertz* was a wrongful death claim arising out of an airplane crash in which it was immediately obvious that a failure in federal air-traffic control might have played a role, as the widow of the man killed actually learned two months after the crash. *Id.* at 619. The Sixth Circuit later emphasized this unusual factual circumstance in reading *Hertz* narrowly, in its decision rejecting the Government's argument to dismiss the FTCA claim involved in *Auburgey*, 733 F.3d at 637-38.

In the second case cited, *Diminnie v. United States*, 728 F.2d 301, 305 (6th Cir. 1984) (per curiam), the FTCA plaintiff was a man who had been falsely accused, tried, and convicted of extortion, in a federal court. Being innocent, he knew that the federal government was the cause of his injury. Accordingly, the Sixth Circuit held that the claim accrued at the conclusion of the plaintiff's trial, *not* on the later date when he finally learned the identity of the person who had framed him for the crime (a corrupt A.T.F. agent). *Id.* at 303-05. By contrast, here the Government has made no argument that Plaintiffs were put on inquiry notice of possible *federal*

involvement in the Flint Water Crisis more than two years prior to their filing of administrative claims (see **Part I-B**, *infra*).

The third case cited, *Cotter v. United States*, No. 1:06-CV-382, 2006 WL 3253289 (W.D. Mich. Nov 8, 2006), was a garden-variety medical malpractice case in which an infant's "alleged injuries were obvious shortly after the infant's birth," and the mother was on inquiry notice that the doctor was a federal employee, as any diligent inquiry into the situation would have readily revealed that fact. *Id.* at *4-*5

The same holding was announced in a fourth case relied on by the Government, *Gould v. U.S. Dep't of Health & Human Servs.*, 905 F.2d 738 (4th Cir.1990), brought by the widow of a man who had died at a rural health center staffed by federal employees. As in *Cotter*, the Fourth Circuit held that because the identity of the doctors who had allegedly committed malpractice was known from the start, due diligence required the widow and her counsel to inquire into the facts and learn of the doctors'a federal employee status within the two-year limitations period. *Id.* at 744-45.

A fifth case cited by the Government did not even involve a FTCA claim, and simply referenced the *Gould* decision in a lawsuit against a private doctor. *Whittlesey v. Cole*, 142 F.3d 340, 343 (6th Cir. 1998).

The sixth and final case relied on by the Government is *Dyniewicz v. United States*, 742 F.2d 484 (9th Cir. 1984). Apart from the fact that its analysis is

inconsistent with the analysis of inquiry notice embraced by the Sixth Circuit in the three decisions we rely on (including *Coffie*, cited by the Government), *Dyniewicz* failed to acknowledge the **"who"** aspect of *Kubrick*, a point noted by a later Ninth Circuit panel (which felt obliged to adhere to *Dyniewicz*, as circuit precedent). *Gibson v. United States*, 781 F.2d 1334, 1344 (9th Cir. 1986) (noting that *Kubrick* "emphasiz[ed] the strategic importance to the litigant of knowing whom to sue," but holding that "binding circuit precedent forecloses us from" relying on that aspect of *Kubrick*). Further, *Dyniewicz* has been sharply rejected, and criticized, by other courts. *E.g.*, *Skwira v. United States*, 344 F.3d 64, 69 (1st Cir. 2003); *Smith v. United States*, 518 F.Supp.2d 139, 153-54 (D.D.C. 2007) (finding *Dyniewicz* analysis "unpersuasive").

The Government, of course, also fails to cite other cases in which courts have adhered to the reading of *Kubrick* articulated by Judge Posner in *Drazen*, and have rejected arguments made by the Government that a plaintiff's claim can somehow accrue *before* the plaintiff has a basis for knowing that a federal entity or employee was a cause of the injury. As just one example, consider *Roque v. United States*, 676 F.Supp.2d 36 (D. Conn. 2009), a wrongful death claim brought by the father of a man choked to death in federal prison by a fellow inmate. Rejecting the Government's statute-of-limitations argument, the court held that the claim did not accrue on the date of death, because the **"who"** element of *Kubrick* became apparent

16

only later, when the father learned of security lapses constituting part of the causal chain leading to the death. *Id*. at 43-44.

**B.    The Government Has Failed to Submit Any Evidence that Any Plaintiff Was on Inquiry Notice That the EPA Was a Cause of the Flint Water Crisis Prior to 2018.**

The Government's Statement of Facts omits any assertion that the Bellwether Plaintiffs were aware of the EPA's potential culpability in the Flint Water Crisis prior to 2018. The Government details the widespread public knowledge of the crisis itself, with its focus remaining squarely on the actions and inactions of the City of Flint and the Michigan Department of Environmental Quality (MDEQ). The narrative presented by the Government emphasizes the timeline of when the public became aware of the water contamination, the lead issues, and the various responses from the City and State. However, it notably lacks any evidence suggesting that Plaintiffs, or the public at large, had any indication of the EPA's role in the crisis until the release of the Office of Inspector General (OIG) report in 2018.

The Government's statement outlines a series of events: boil water advisories in 2014, General Motors halting its use of Flint River water due to corrosion concerns, and violation notices for exceeding maximum contaminant levels. It further details the increasing media coverage and public awareness of the water contamination and lead issues, culminating in the Genesee County Health Department's "Do Not Drink the Water" advisory in October 2015. The timeline

17

progresses through the State's and City's emergency declarations and the EPA's eventual issuance of an emergency order in January 2016. However, throughout the Government's detailed timeline, there is no mention of *any* public awareness or knowledge of the EPA's potential liability.

The Government's statement further underscores this point by referencing the differing dates on which Plaintiffs submitted their administrative claims. It argues that certain Bellwether Plaintiffs submitted their claims more than two years after the October 1, 2015, advisory, suggesting their claims are untimely. This argument, however, relies on the assumption that Plaintiffs were aware of the *cause* of their injuries—specifically, the EPA's involvement—as of that date. The United States provides no evidence to support this assumption. The fact that there was widespread knowledge of the water crisis does not equate to knowledge of the EPA's specific role and potential involvement.

It is reasonable to concede that the release of the OIG report in 2018 likely provided inquiry notice to Plaintiffs regarding the EPA's involvement. However, the United States has failed to provide any evidence demonstrating that Plaintiffs had any such notice prior to this date. The detailed timeline presented by the United States focuses on the actions of the City and State, with no mention of any indication that the EPA was also a culpable party.

18

## II.   THE GOVERNMENT HAS FAILED TO MEET ITS BURDEN OF SHOWING NO GENUINE ISSUE OF MATERIAL FACT CONCERNING THE ADULT BELLWETHER PLAINTIFFS' CLAIMS[3]

Under the Federal Rules of Civil Procedure, summary judgment is permitted only where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view "the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party.'" *Eberline v. Douglas J. Holdings, Inc.*, 339 F. Supp. 3d 634, 641 (E.D. Mich. 2018) (quoting *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004)), and "[c]redibility judgments and weighing of the evidence are prohibited during the consideration of [the motion]." *Rorrer v. City of Stow*, 743 F.3d 1025, 1038 (6th Cir. 2014). Accordingly, the Court may grant summary judgment only where no reasonable juror could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[3] Bellwether Plaintiff Langston is no longer pursing a claim for prostate cancer. Bellwether Plaintiff Cooley is no longer pursuing a claim for loss of teeth. Bellwether Plaintiff William Daly is no longer pursuing a wrongful death claim on behalf of his wife, Carolyn Daly. However, Mr. Daly is pursuing his claim for emotional stress, which is not subject to the United States' Motion for Summary Judgement.

**A.**   **Plaintiffs' Property Damage Claims Are Supported By Expert Testimony, and There Exist Genuine Issues of Material Fact**

The Government asserts that Plaintiffs' claims for property damage due to the diminution of value lack factual support and proof of causation. As established, summary judgment is appropriate only when there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law.

The Government argues that Plaintiffs' experts, Mr. Saad and Mr. Legins, did not provide sufficient evidence to support the diminution in value claims. Govt. Mot. at 30-31. Specifically, it contends that these experts failed to calculate a retrospective pre-Flint Water Crisis value or opine on the effects of contamination, the Flint Water Crisis, or the EPA's conduct on housing prices. *Id*. However, Plaintiffs have indeed presented sufficient evidence, including sound expert testimony, to create genuine disputes of material fact, thereby precluding summary judgment.

The United States relies on a single, non-controlling case, *Blake v. Columbia Gas Transmission, LLC*, No. CV 3:19-0847, 2021 WL 4255619, at *2-*3 (S.D.W. Va. Sept. 17, 2021), in support of its position. In *Blake*, the court's decision rested heavily on the absence of expert testimony and the plaintiffs' reliance on their personal knowledge of property values. *Blake v. Columbia Gas Transmission, LLC*, No. CV 3:19-0847, 2021 WL 4255619, at *2 (S.D.W. Va. Sept. 17, 2021).

Unlike the plaintiffs in *Blake*, the Bellwether Plaintiffs here have presented expert testimony regarding the diminution of their property values. *See* **Ex J**, Sadd

Residential Appraisal Reports; **Ex. K**, Legins Commercial Broker Price Opinion (BPO), Bellwether Plaintiffs have provided expert reports and testimony from Mr. Saad, a qualified appraiser, who has conducted detailed assessments of the properties' current values. *Id.* This expert analysis directly addresses the core issue of property valuation.

The Government argues that Saad's analysis is flawed because he only calculated the present value and did not provide a retrospective pre-Flint Water Crisis value. This argument overlooks the very nature of Saad's expertise and the practical realities of real estate appraisal. Saad is a certified residential appraiser with extensive experience. He testified, "I've been a licensed appraiser since 2002. I've been certified since 2006. I probably completed, I don't know, over 5,000 appraisals in the past 20 years, 24 years." **Ex. L** (Saad Tr.) at 30.

The assertion that Saad failed to opine on the effects of contamination, the Flint Water Crisis, or the EPA's conduct on housing prices, is also misleading. Saad's role as an appraiser is to assess property values based on market data and comparable sales. As he clarified, "My expertise is doing appraisals. I really don't have much expertise regarding any of those issues [water issues]." *Id*. at 24. His expertise lies in evaluating how these external factors *manifest* in property values, not in making scientific or engineering pronouncements. By providing present value

21

assessments in the context of the Flint Water Crisis, Saad effectively provides the very information that is relevant to Plaintiffs' claims.

In fact, Plaintiffs have proffered expert proof regarding the effects of the Flint Water Crisis on housing prices in Flint, most notably through the expert report of Dr. Gabriel Lade, a tenured Associate Professor of Economics at Macalester College. **Ex. M** (Lade Report).

Dr. Lade's analysis is rooted in the "hedonic property value model," a well-established economic theory that posits that home prices reflect both market and non-market attributes of a home, including environmental quality. *Id*. at 5. As Dr. Lade explains, "The hedonic property value model fundamentally relies on the same logic" as other economic valuation methods and has been used for decades in academic, policy, and legal settings. *Id*. at 6. This model allows for the inference of individuals' valuation of non-market attributes, such as clean drinking water, by examining housing market transactions.

To quantify the impact of the Flint water crisis, Dr. Lade utilizes the "difference-in-differences" (DD) statistical model, a widely recognized method for evaluating the impacts of events like the Flint water crisis. As stated in the report, "The technique is among the most common methods researchers use to evaluate the impacts of events like the Flint water contamination." *Id*. at 7. The DD model compares changes in property values in Flint to those in carefully selected control

cities before and after the water contamination event. This methodology effectively isolates the impact of the water crisis from other potential factors that could influence housing prices.

Dr. Lade's application of the DD model reveals statistically and economically significant harm to property values in Flint. The report states, "CKL (2023), a peer-reviewed study using well-accepted econometric methods, show that the Flint drinking water contamination caused statistically and economically significant harm to property values across the city." Specifically, the citywide model estimates an average household loss of $36,800 due to the Flint water contamination. This figure is not a mere speculation, but rather is derived from a rigorous statistical analysis with a 95% confidence interval of $25,400 to $48,200. *Id*. at 27.

In conclusion, the United States' Motion for Summary Judgment regarding Plaintiffs' property damage claims should be denied. Genuine disputes of material fact exist, supported by substantial evidence, including the expert testimony of Jamal Michael Saad, Anthony Legins, and Gabriel Lade.

**B.     A Genuine Issue of Material Fact Exists With Respect to Bellwether Plaintiffs Langston's and Campbell's Personal Injury Claims**

The Government seeks to dismiss Mr. Langston's and Mr. Campbell's claims of skin rashes, arguing a lack of evidence linking their conditions to the Flint water crisis. This argument disregards compelling evidence that demonstrates a clear association between exposure to the contaminated water and widespread skin issues

within the Flint community. Dr. Brod's expert report, in conjunction with Plaintiffs' assertions, paints a concerning picture of a public health crisis that directly affected individuals like Mr. Langston and Mr. Campbell.

Dr. Brod's report details the significant changes in Flint's water quality after the switch to the Flint River, changes that profoundly impacted public health. **Ex. M** (Brod Report). The 2016 Unified Coordination Group (UCG) report, cited by Dr. Brod, revealed a disturbing number of skin disease cases within the Flint population. Specifically, 390 residents reported skin diseases, and among those examined by dermatologists, 66% were classified as possibly related to the public tap water exposure. *Id*. at 2. The majority of these cases involved dermatitis, with a significant number of individuals experiencing rashes in early 2016. *Id*. These findings are crucial to understanding the widespread nature of the skin problems.

The Government attempts to minimize the significance of the UCG report, suggesting that the number of cases is too small, and the reporting is unreliable due to its self-reported nature. However, Dr. Brod effectively counters these arguments. The UCG report indicated that the demographics of patients who underwent dermatologic screening were reflective of the broader Flint population. While the survey was voluntary, Dr. Brod argues that this likely *underestimates* the problem, as it relies on individuals able to access and complete the survey. **Ex. O** (Brod

Rebuttal Report) at 1. This means that the 390 reported cases are likely just the tip of the iceberg.

Furthermore, the argument that self-reported symptoms are unreliable is flawed. Dr. Brod rightly points out that self-reporting is a common and accepted method for assessing health status, especially in a community like Flint, where many residents have limited access to healthcare professionals. It is unrealistic to expect anything other than self-reporting in this context.

The Government also asserts that dermatologists could not definitively link any skin condition to the water. However, this ignores a key finding from the UCG report, which states that only 19.7% of screened patients had skin conditions *unrelated* to Flint tap water. This strongly implies that the vast majority of dermatitis cases *were* related to water exposure. Dr. Brod further supports this by referencing the temporal relationship between the onset of dermatitis and exposure to the poor-quality water. **Ex. N** (Brod Report) at 3. In both Mr. Langston's and Mr. Campbell's cases, their reported onset of symptoms aligns with this timeframe.

Mr. Stanley Langston testified to the onset and persistence of skin rashes he attributes to the contaminated Flint water. His testimony provides a firsthand account that corroborates the broader findings of widespread skin issues in the Flint community. Mr. Langston's initial exposure to the problematic water began when the city switched its water source. He described the water as having a noticeable

brown color. **Ex. P** (Langston Tr.) at 14:14-16. This change in water quality marked the beginning of his skin problems. He states:, "Yeah, every time I take a shower from that water, I get bumps on it. I got bumps on my arms." *Id*. at 114:18-19.

Mr. Langston reported that the condition persisted and worsened over time. The chronic nature of his skin problems is evident in his statement that the rashes occurred "every time" he showered with the Flint water. *Id*. at 114:18. In addition to the visual and physical manifestations of the rashes, Mr. Langston also described the discomfort they caused. He described the rashes as "bumps" that appeared on his back and arms. *Id*. at 114:18-19.

In his deposition, Mr. Campbell described the onset and nature of his skin rashes, which manifested during the period of water contamination. When asked about his health conditions, Mr. Campbell detailed his experience with skin rashes, stating, "I never had any skin problems, so—you know, throughout my life, and just —it appeared during that time frame. **Ex. Q** (Campbell Tr.) at 89:5-7. He further elaborated on the appearance of the rash, calling it "kind of a reddish, puffy." *Id*. at 94:1-2.

The testimony of Mr. Langston and Mr. Campbell aligns temporally with the timeline of the Flint water crisis. The onset of their rashes occurred after the switch to the Flint River water source, and the problem continued as long as they were exposed to that water. This temporal relationship is crucial in establishing a link

between their skin condition and the contaminated water, as discussed in Dr. Brod's expert report. Furthermore, their testimony should be considered in the context of the broader community impact. As Dr. Brod's report indicates, many Flint residents reported similar skin issues during the same period.

The evidence presented by Dr. Brod, coupled with these Plaintiffs' own testimony, provides a compelling case for the link between the Flint water crisis and the skin rashes experienced by Mr. Langston and Mr. Campbell. Therefore, the Court should allow Mr. Langston and Mr. Campbell to present their testimony regarding their skin rashes.

### C.    A Genuine Issue of Material Fact Exists With Respect to Bellwether Plaintiff McClain's Business Loss and Property Damage Claims

The Government argues for summary judgment on Margie McClain's business loss and property damage claims, asserting a lack of evidence and a failure to establish causation. However, the testimony of Mrs. McClain's husband, Leo McClain, establishes genuine disputes of material fact that preclude summary judgment. The McClains have presented sufficient evidence from which a reasonable jury could find in their favor. *See generally In re Flint Water Cases*, 579 F. Supp. 3d 971, 989 (E.D. Mich. 2022).

It is undisputed that the McClains' rental properties at 551 Mary Street and 1006 8th Avenue were exposed to Flint River water during the period it was used as the primary water source for the City of Flint. Leo McClain's testimony provides

27

direct evidence of the resulting property damage. He specifically recalls replacing pipes at the Mary Street property after the switch to Flint River water, testifying, "It was after then, you know," referring to the period after 2014 when the water source changed. **Ex. R** (L. McClain Tr.) at 79. He further elaborated, "Because they was rusty, they was leaking," indicating an observation of pipe damage. *Id.*

The Government also argues that there is no evidence linking the diminished property value to the water contamination. Mr. McClain addressed this issue as well, stating, "Part of it was, yeah," when asked if his inability to get $70,000 for the Mary Street property was related to water contamination. *Id.* at 68. He further explained, "Well, the people, they didn't really know what was going on, so they didn't want to get into something with a problem, so . . . ." *Id.* This indicates that potential buyers were aware of and concerned about the water issues, which directly impacted the property's marketability and value.

The McClains have presented sufficient evidence to establish genuine disputes of material fact regarding causation and damages. Therefore, the United States' Motion for Summary Judgment on Margie McClain's business loss and property damage claims should be denied.

**D.    A Genuine Issue of Material Fact Exists with Respect to Bellwether Plaintiffs Vance's Property Damage Claim**

Causation is a question of fact for the trier of fact. *See generally In re Flint Water Cases*, 579 F. Supp. at 989. With respect to Plaintiff Tony Vance's claim for

property damage, there are several material issues of fact from which the trier of fact could find that the untreated caustic Flint River water running through their home caused the damage to their pipes and their property value.

First, it is undisputed that the Vance house was exposed to the Flint River water for the years during which the Flint public water system was running through it.

Moreover, Plaintiff, Anthony Vance, and his wife Karen Vance, both testified to their first-hand observations and experiences with the serious plumbing problems in their home that required extensive and costly repair. **Ex. S** (Tony Vance Dep.) at 60, 101, 124-25, 138-39. The record also establishes that the problems did not start until after the switch to the Flint River in April 2014. *Id*. at 218-19; **Ex. T** (Karen Vance Dep.) at 99-100.

As testified to by Karen Vance, after being asked about how she relates the damage to her home to the tainted Flint River water:

> "Well, first of all, it didn't happen until after the lead contamination happened. We never had discoloration, we never had to put on filters, so we never really saw the sediment that was sitting in the pipes because it never happened before that date. The drip—I mean, the drip never had any significant impact on the look of the bathroom, the look of the damage to the bathtub itself didn't happen until after we had the leak from the shower, which all happened after we were informed and had to live our lives completely different from this Flint water crisis, from the lead—from the water being untreated—untreated.

*Id*. at 99-100.

Finally, there is the opinion of the professional plumber, Zak Rostar. Whether or not deemed an "expert" within the meaning of *Daubert,* he is obviously qualified to testify for the limited purpose of testifying as to his first-hand observations of the pipes and water damage and the conclusions he drew from those observations, based on his experience, and specialized knowledge, as a licensed plumber. *See* ECF No. 330 (Plaintiffs' Response to Defendant's Motion to Exclude Testimony of Zak Rostar, Anthony Legins, Jamal Saad, and John Meyers). Further, based on his professional experience, he has testified that the corrosive Flint River water caused the pipes in the Vance home to accumulate so much sediment that it corroded the pipes and blocked the ability of the water to run through their house, thus causing the serious water damage in the home. **Ex. U** (Rostar Tr.) at 201-204.

Within the context of the overall impact that the untreated, highly abrasive, Flint River water had on the pipes throughout the entire community of Flint, coupled with the evidence of actual damage to the Vance home and the timing of when such damage occurred, a reasonable trier of fact could conclude that the property damage to the Vance house was indeed caused by that tainted water.

## CONCLUSION

For all the reasons given and authorities cited above, Defendant's motion should be denied in its entirety.

Dated: February 20, 2025

Respectfully submitted,

By: */s/ Patrick J. Lanciotti*
Patrick J. Lanciotti, Esq.
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY, 10017
(212) 397-1000
planciotti@napolilaw.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 20, 2025, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing upon counsel of record.

Dated: February 20, 2025

<u>*/s/ Patrick J. Lanciotti*</u>