# __Exhibit 4__

Page 1

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF MICHIGAN

3                   SOUTHERN DIVISION

4         _____

5    IN RE:                  |

6    FLINT WATER CASES   | No: 4:17-cv-11218

7                            | (consolidated)

8                            | HON. LINDA V. PARKER |

9    _____| United States District Judge

10   Pages 1 - 175.

11

12   Volume 2 of the videotaped deposition of

13   JULIE E. GOODMAN, Ph.D.

14   taken via Golkow Virtual Remote,

15   commencing at 10:01 a.m.

16   Wednesday, October 9, 2024

17   before Ann L. Bacon CSR-1297.

18

19   VIDEOGRAPHER:  MS. DEVYN MULHOLLAND

20

21

22                   HIGHLY CONFIDENTIAL

23

24

25

Page 2

1        APPEARANCES:

2

3        MS. CARY S. McGEHEE (P42318)

4        Pitt McGehee Palmer Bonanni & Rivers, P.C.

5        117 W. Fourth Street, Suite 200

6        Royal Oak, Michigan 48067

7        (248) 398-9800

8        cmcgehee@pittlawpc.com

9        Appearing on behalf of the Plaintiffs.

10

11       MS. DEBORAH A. LABELLE (P31595)

12       Deborah La Belle Law Offices

13       221 N. Main Street, Suite 300

14       Ann Arbor, Michigan 48104

15       (734) 996-5620

16       deblabelle@aol.com

17       Appearing on behalf of the Plaintiffs.

18

19

20

21

22

23

24

25

Page 3

1          APPEARANCES, Continued:

2

3          MR. TIMOTHY B. WALTHALL

4          United States Department of Justice

5          Civil Division, Torts Branch

6          Environmental Tort Litigation

7          1100 L St. NW

8          Washington, DC 20005

9          (202) 305-0692

10         timothy.walthall@usdoj.gov

11         Appearing on behalf of the United States.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                              Page 10
  1   A.   No, I wouldn't say required.
  2   Q.   Okay.  Is there any type of quota that you have
  3        or expectation on billable hours?
  4   A.   We have goals for billable hours, yes.
  5   Q.   And what are those goals?
  6   A.   I believe it's 70 percent of our time.
  7   Q.   Okay.  Seventy percent of the time that you
  8        work, you should be billing for, correct?
  9   A.   Yes.
 10   Q.   Okay.  And does that compute to a certain number
 11        of hours per year that you should be billing?
 12   A.   Well, I believe it's, I mean 70 percent of a
 13        40-hour week times 50 weeks or however many
 14        weeks without taking away vacation and holidays.
 15   Q.   Okay.  So do you know what that number is?
 16   A.   Not off the top of my head, no.
 17   Q.   So you're saying 70 percent of 40 hours times 52
 18        weeks, so 1,456 hours?
 19   A.   Well, there's holidays and vacation days, so it
 20        would be less than that.
 21   Q.   Okay.  And is there a certain amount of revenue
 22        that you're supposed to generate as a principal
 23        of Gradient per year?
 24   A.   I set a revenue goal, but I don't know that
 25        there's a requirement.  There's not a requirement.
```

Page 11

1    Q.   What's your revenue goal?

2    A.   I do not know if that's -- I believe that's

3         business confidential information.

4    Q.   Well, I don't think that that's -- first of all,

5         your attorney will, you know, offer objections

6         to the extent that they're appropriate, so I

7         think it's fair game for us to know what your

8         revenue goals are.

9    A.   I would have to go back to my company and find

10        out if that is confidential or not.  I'm not --

11        I believe that is confidential information.

12             MS. McGEHEE:  Well, Tim, are you going

13        to instruct her not to answer that?  Because I

14        think we get an answer for that.

15             MR. WALTHALL:  I'm not going to

16        instruct her not to answer, but I am going to

17        request that this deposition be placed, at least

18        this portion of that deposition be placed as

19        confidential and privileged -- strike that --

20        confidential, and so that, Julie, you can answer

21        that question because this portion of the

22        deposition will be deemed confidential so that

23        it does not go out to the public.  Is that

24        satisfactory to you or --

25             THE WITNESS:  I don't know, honestly I

Page 12

```
 1          don't know how it works in terms of if we have
 2          things that are company confidential, I don't
 3          know that even if it's a confidential deposition,
 4          that it's allowed.  I would have to find out.
 5     Q.   (Continuing, by Ms. McGehee) Well, all we're
 6          trying to find out is what your revenue goals
 7          are for your company.  I don't think that that
 8          is something that would be considered proprietary
 9          or confidential, so why don't we do this?  When
10          we take a break, you can ask whoever needs to be
11          consulted as to whether you can provide that
12          information and we will agree that it's provided
13          confidentially under seal in relation to this
14          deposition so you can tell whoever you would
15          have to ask permission from that that will be
16          the case.
17               MR. WALTHALL:  All right.  That works
18          for us.
19     Q.   (Continuing, by Ms. McGehee) Okay.  Dr. Goodman,
20          your reports and opinions are strictly based on
21          lead exposure, correct?
22     A.   Yes.
23     Q.   They're not based on any other kind of
24          contaminant that was present in the Flint River
25          during the Flint Water Crisis, correct?
```

Page 23

1          individual, are you talking about observable

2          change by a clinician?

3     A.   Yes.

4     Q.   Okay.  But you're aware of the fact that even

5          one I.Q. drop can have an impact -- sorry.

6     A.   I disagree with that.

7     Q.   Well, I haven't even finished my question.

8                    MR. WALTHALL:  I was going to say there

9          is no question pending there.

10    Q.   (Continuing, by Ms. McGehee) Okay.  My question

11         is you testified that an I.Q. drop might not be

12         observable by a clinician and my question is

13         isn't it true that while a clinician might not

14         observe an I.Q. drop of one or two points, that

15         a drop of one or two points in I.Q. can have an

16         impact on the earning capacity of an individual?

17                    MR. WALTHALL:  Objection, form.

18    A.   No, I disagree with that statement.

19    Q.   (Continuing, by Ms. McGehee) Have you read any

20         studies in that regard?

21    A.   I have.

22    Q.   And what studies have you read?

23    A.   I can't name them as I sit here.

24    Q.   Isn't it true that health economists in 2009

25         estimated that each I.Q. post -- I'm sorry.

Page 24

1      Each I.Q. point loss to elevated blood lead levels
2      represents a loss of $17,815 in discounted value
3      of lifetime earnings?  Are you aware of that?
4           MR. WALTHALL:  Objection, form.
5  A.   I would have to look at whatever document you're
6      referring to.
7  Q.   (Continuing, by Ms. McGehee) Have you read a
8      report by Sheppard and Burnett regarding
9      confounding exposure measurement errors in air
10     pollution epidemiology?
11  A.   It's possible.  I would have to see it.
12  Q.   Okay.  What articles have you published on lead
13     exposure in cognitive development?
14           MR. WALTHALL:  Objection, asked and
15     answered.
16  A.   I do not believe I have published any on lead
17     and cognitive development.
18  Q.   (Continuing, by Ms. McGehee) Have you reviewed
19     any academic papers for publication on either
20     the impact of lead exposure on cognitive
21     development or behavioral development?
22  A.   Yes.
23  Q.   What papers have you reviewed?
24  A.   I have reviewed many papers.  Many of them are
25     cited in the reference list of my report.

```
                                            Page 25
 1   Q.   Have you taught any classes in any school or at
 2        university or graduate study on the impact of
 3        lead exposure on cognitive development?
 4   A.   I'm sorry.  You cut out at the beginning of the
 5        question.
 6   Q.   Sure.  Have you taught any classes in any school
 7        or university or graduate study on the impact of
 8        lead exposure on cognitive development?
 9   A.   I've taught epidemiology and toxicology and risk
10        assessment classes where the focus of the class
11        was certainly not on lead, but it may have been
12        brought up in some of the lessons.
13   Q.   Okay.  Other than that?
14   A.   No.
15   Q.   Okay.  What about the impact of exposure on
16        behavioral development?
17   A.   It would be the same answer.
18   Q.   Same answer.  Have you participated in any
19        studies or designed any studies with regard to
20        looking at the impact of lead exposure on
21        cognitive development?
22   A.   I have not.
23   Q.   Have you given any presentations or papers in
24        any situation, any conference symposium, any
25        meeting on the impact of lead exposure on
```

Page 107

1           MR. WALTHALL:  Fair enough.  All right.
2      So shall we come back at say --
3           MS. LABELLE:  Cary, is that because the
4      game starts at three?
5           MS. McGEHEE:  No, I've got it recorded.
6      I record all the games.  I don't even watch them
7      in realtime.
8           MR. WALTHALL:  Shall we come back at
9      like 1:15?
10           MS. McGEHEE:  Yeah, that's fine.
11           MR. WALTHALL:  All right.  Eastern time.
12           VIDEOGRAPHER:  Off the record at 12:40 p.m.
13           (Recess 12:40 p.m. to 1:17 p.m.)
14           VIDEOGRAPHER:  Back on the record at
15      1:17 p.m.
16           MS. McGEHEE:  Okay.  We're back again,
17      Dr. Goodman.  So I hate to beat a dead horse
18      here, but really I'm having a little bit of a
19      problem with your unwillingness to provide us
20      with your salary, which is a pretty basic
21      question asked of an expert, goes to issues of
22      influence and bias and there's just really no
23      justification for you not to answer that
24      question and I think your attorney knows that,
25      and so I'm going to ask you again, and if we

```
                                              Page 108

 1        can't get an answer, Tim, I'm going to ask you

 2        to consult with your client and tell her that

 3        she needs to answer that and, if not, I guess we

 4        can get Judge Parker on the line to get us

 5        through this issue.

 6                MR. WALTHALL:  Let me ask you this.

 7        What you want is a salary number from her?  Is

 8        that what you're interested in?

 9                MS. McGEHEE:  Yeah, I want to know what

10        her salary is.

11                MR. WALTHALL:  So I can narrow the

12        issue, and let's take a break and I'll go

13        off-line and let's chat and see if she can't get

14        some consent from her folks to do that in the

15        knowledge that it will be in strict confidence,

16        this portion of the deposition will be in strict

17        confidence.

18                MS. McGEHEE:  Yeah, that's fine.  I

19        have no problem with that.  I prefer not to

20        bother Judge Parker.

21                MR. WALTHALL:  I prefer that, too.

22        Let's go off the record and let me talk to my

23        client and I'll be right back.

24                MS. McGEHEE:  Okay.  No problem, Tim.

25                MR. WALTHALL:  Or talk to my expert.
```

Page 109

1                VIDEOGRAPHER:  Going off the record at
2       1:19 p.m.
3                (Recess 1:19 p.m. to 1:36 p.m.)
4                VIDEOGRAPHER:  Back on the record at
5       1:36 p.m.
6                MS. McGEHEE:  Okay.  So Dr. Goodman,
7       I understand we have a disagreement on your
8       ability to refuse to answer a question regarding
9       your salary and your employer has indicated that
10      it is not giving you permission to do so even
11      though we think that it's a question that's
12      valid and should be answered, so we're going to
13      mark the record, address it with the court and
14      come back if necessary.
15               MR. WALTHALL:  And just while we're on
16      it, I'll just point out that Dr. Goodman has
17      already turned over what's required under the
18      rule and that the salary is not as relevant as
19      what's already been turned over.  All right.
20      Thank you.
21   Q.  (Continuing, by Ms. McGehee) So we do have your
22      billing that you've submitted and the billing
23      reflects that Gradient has billed the USA for
24      your services in an amount over $400,000.  In
25      fact, the bill I'm looking at which is Bates

Page 110

```
 1          stamped Goodman 000046 states that the current
 2          bill at the time of this particular invoice,
 3          which I believe was January 23, 2022 to
 4          October 31, I guess that's just the performance
 5          period, because that goes into 2025.  At any
 6          rate, it shows a bill of $541,175, and as I
 7          understand, you were retained by the USA in
 8          November of 2022.  Is that accurate?
 9  A.      I think I was retained in 2020, but I'm not
10          positive.
11                  MR. WALTHALL:  Would it help if you
12          showed her that invoice?  Because I'm not
13          familiar with it either.  It's up to you.
14  Q.      (Continuing, by Ms. McGehee) Yeah, I've got an
15          award effective date of November 23, 2022 on a
16          solicitation contract order, so that's where I
17          get that date and I have a period of performance
18          of November 23, 2022 through October 31, 2023 on
19          that particular document Bates stamped Goodman 1.
20  A.      I don't -- I think that's a continuation of a
21          prior contract and I also think it includes work
22          that somebody else did on a project that didn't
23          involve me possibly.  I'm pretty sure.  I have
24          to look to see.
25                  MR. WALTHALL:  And was that all work
```

Page 111

1        for the Flint case?

2                MS. McGEHEE:  Are you asking Dr. Goodman?

3                THE WITNESS:  I would have to see it.

4        I can't say.

5                MR. WALTHALL:  Yeah, okay.  All right.

6                THE WITNESS:  I can't answer.

7    Q.   (Continuing, by Ms. McGehee) The invoices that

8         have been submitted to us for the work that you

9         performed indicate at least as of the date of

10        this invoice, which is Goodman 22, was a current

11        bill of -- and, I'm sorry, it's Goodman 46, of

12        541,175.  And so can you tell us of the billing

13        that you have submitted to the EPA, I'm sorry,

14        the USA, what percentage of that would you say

15        is your salary?

16   A.   Okay.  Well, I don't actually think that's a

17        bill.  I don't think there's ever been a bill

18        that high, so I really would need to see what

19        you're looking at, but I work on many different

20        projects at Gradient.  I've been working on this

21        over the past four years, but I've worked on

22        many others, so I don't think I could -- it's

23        not like a one-to-one in terms of project billings

24        and my salary.  My salary is just a salary.

25   Q.   Okay.  On one of the bills that I'm looking at

1          that was produced in association with this case,

2          it indicates that there was quite a bit of work

3          done on this by a senior project manager named

4          Anna Engle or Ingle?

5     A.   Yes.

6     Q.   Who is she?

7     A.   She's my project manager.

8     Q.   And what type of work was she performing in

9          relation to this retention?

10    A.   When I -- for any of my projects, litigation or

11         non-litigation, whatever it is, I generally work

12         very closely with the project manager, so

13         everything is, I determine the scope and the

14         direction of the project, but we work closely

15         together.  She helps me staff the project and

16         oversees the staff and so we figure out who to

17         delegate to and then she receives it before it

18         comes back to me.  She keeps track of the budget

19         and the deadlines, oversees, for example, we

20         have what we call copy editors that will help

21         with references, so she oversees that, so really

22         kind of keeping the project moving day-to-day.

23    Q.   Okay.  But she's not a toxicologist or

24         epidemiologist?

25    A.   She is not.

Page 123

1   A.   Oh, I don't know, ten years ago maybe.
2   Q.   Okay.  And what about the USA retentions, are
3        you working on those currently?
4   A.   One of them, yes.  One of them, no.
5   Q.   Okay.  What percentage of the work that you
6        performed in the last five years for your
7        employer Gradient would you estimate is coming
8        from work that has been contracted with the USA?
9             MR. WALTHALL:  This one I will object
10        to because Patrick Haynes did get into that.
11        Asked and answered, but you can go ahead and
12        answer.
13             MS. McGEHEE:  All right.  Thanks.
14   A.   I don't know in the last five years.  I'm really
15        not sure about the percentage.  I would say less
16        than a quarter, but I'm not positive.
17   Q.   (Continuing, by Ms. McGehee) Okay.  And of the
18        work that you're currently performing, let's
19        just say for this year, 2024, what percentage of
20        the time, of your time is dedicated to this case?
21   A.   Oh, this year?  Probably less than five percent,
22        but I'm not sure.
23   Q.   Okay.  What about in 2023?
24   A.   Probably five percent.  I don't -- I'm not
25        exactly sure.  I'd have to look to be sure, but

Page 124

1           it's on the low side.

2    Q.    Okay.  Assuming that you were retained in 2020,

3           in what year did you perform most of the work

4           that you've been retained to perform in this case?

5    A.    Oh, I'm not sure.  It would all be on the invoices.

6    Q.    Are you working on any lead cases currently

7           other than this one?

8    A.    I am not right now, but I had been, you know,

9           over the course of the last four years.

10   Q.    Okay.  Let's move on to your report.  Okay.  So

11          starting at page 77 of your report, you provide

12          your analysis of the Plaintiffs' claimed health

13          effects caused by lead, correct?

14   A.    Sorry.  I want to make sure.  The question is

15          from page 77 is where I discussed the claimed

16          health effects of lead?

17   Q.    For the Plaintiffs, right?

18   A.    Yes, that's correct.

19   Q.    Okay.  And in relation to your analysis of the

20          claimed medical effects by the Plaintiffs'

21          health conditions, your analysis was strictly

22          based on the adverse health effects of lead, not

23          any other contaminant, right?

24   A.    Correct.

25   Q.    Okay.  And you didn't do any type of analysis in

Page 175

1      STATE OF MICHIGAN)
                        )
2      COUNTY OF MACOMB )

3           I, Ann L. Bacon, a Notary Public in and for
4      the above county and state, do hereby certify
5      that the witness, whose attached deposition was
6      taken before me in the entitled cause on the
7      date, time and place hereinbefore set forth, was
8      first duly sworn to testify to the truth, and
9      nothing but the truth; that the testimony
10     contained in said deposition was reduced to
11     writing in the presence of said witness by means
12     of stenography; that said testimony was
13     thereafter reduced to written form by mechanical
14     means; and that the deposition is, to the best
15     of my knowledge and belief, a true and correct
16     transcript of my stenographic notes so taken.

17          I further certify that the signature to and
18     the reading of the deposition by the witness was
19     waived by counsel for the respective parties
20     hereto; also, that I am not of counsel to either
21     party or interested in the event of this case.

22     _____

23     Ann L. Bacon, Notary Public, Macomb County
24     Acting in Macomb County
25     My commission expires:  6/29/29