UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

*In re* FTCA Flint Water Cases,

           Case No. 17-cv-11218

_____/     (Consolidated)

This Order Relates to:

*All Cases*           Honorable Linda V. Parker

_____/

## OPINION AND ORDER DENYING THE UNITED STATES OF AMERICA'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION PURSUANT TO THE FEDERAL TORT CLAIM ACT'S ANALOGOUS PRIVATE LIABILITY REQUIREMENT AND MISREPRESENTATION EXCEPTION

This is a Federal Tort Claim Act ("FTCA") lawsuit arising from the Flint Water Crisis. Plaintiffs allege that the United States Environmental Protection Agency ("EPA") responded negligently when the City of Flint (hereafter "City" or "Flint") switched the source of its water supply from the Detroit Water and Sewerage Department ("DWSD") to the Flint River without utilizing necessary corrosion controls. As a result, water with excessive lead and copper levels and other contaminants flowed into City homes and businesses, causing Plaintiffs serious physical injury, business loss, and property damage, and harm to water main and service lines throughout the City.

Early in the litigation, the United States of America (hereafter "Government") moved to dismiss Plaintiffs' claims, arguing that Plaintiffs failed to satisfy the FTCA's analogous private liability requirement and that the statute's misrepresentation exception barred the action. This Court rejected the Government's arguments in a decision filed on April 18, 2019, finding that Plaintiffs adequately established analogous liability of a private person under the Good Samaritan doctrine and the misrepresentation exception inapplicable. (ECF No. 76); *see also Burgess v. United States*, 375 F. Supp. 3d 796 (E.D. Mich. 2019). The Government raised the same arguments in a related FTCA case pending before the Honorable Judith E. Levy. Judge Levy rejected them, too. *See In re Flint Water Cases*, 482 F. Supp. 3d 601 (E.D. Mich. 2020).

The Government is raising the arguments again here, focusing on the claims of the 11 Bellwether Plaintiffs for which fact and expert discovery is now complete. (ECF No. 291.) According to the Government, the further-developed record reveals that the Good Samaritan doctrine is inapplicable to the claims of these 11 Bellwether Plaintiffs. The Government also reasserts its contention that the misrepresentation exception bars those claims, at least in part.

As discussed below, further discovery has not revealed facts warranting a different conclusion than the one this Court reached before with respect to the FTCA's private-person liability requirement. In fact, as the statement of facts in

the Government's brief reflects, the current record contains few new facts—perhaps because, before this Court's decision in 2019, extensive discovery had already occurred in other lawsuits arising from the Flint Water Crisis, which had been brought against City and Michigan officials and state contractors. And, there is no reason to disturb the Court's purely legal reasoning for finding the misrepresentation exception inapplicable to Plaintiffs' claims.

## I.    Standard of Review

"[I]t is a universal rule . . . that a party who invokes the jurisdiction of a federal court must allege all facts necessary to give the court jurisdiction of the subject matter." *Carlyle v. United States*, 674 F.2d 554, 556 (6th Cir. 1982) (quoting *Stewart v. United States*, 199 F.2d 517, 520 (7th Cir. 1952)). Therefore, a plaintiff suing under the FTCA must invoke jurisdiction by alleging facts not excepted under the statute. *Id*. If the plaintiff succeeds, the burden falls on the government to prove the FTCA's inapplicability, including that the plaintiff's claims fall within any of the statute's exceptions.

Motions to dismiss for lack of subject matter jurisdiction may be brought as a facial attack or a factual attack. *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). The Government is bringing a factual attack here. In that scenario, the court must "weigh the conflicting evidence to arrive at the factual predicate that subject-matter does or does not exist." *Wayside*

3

*Church v. Van Buren Cnty.*, 847 F.3d 812, 817 (6th Cir. 2017) (quoting *Gentek Bldg. Prods.*, 491 F.3d at 330). "[N]o presumptive truthfulness applies to the [plaintiff's] factual allegations" and the "court has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

When the facts necessary to sustain jurisdiction implicate the merits of the plaintiff's claim—in other words, if the jurisdictional issue is intertwined with the underlying substantive merits of the case—the court must assume jurisdiction over the case and decide it on the merits. *See Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 443-44 (6th Cir. 2006) (citing *Bell v. Hood*, 327 U.S. 678, 681-82 (1946)). "[I]n the unique context of the FTCA, all elements of a meritorious claim are also jurisdictional." *Brownback v. King*, 592 U.S. 209, 217 (2021) (citing *FDIC v. Meyer*, 510 U.S. 471, 477 (1994)). In that instance, the court must comply with Federal Rules of Civil Procedure 12(b)(6) or 56 when ruling on the defendant's motion to dismiss for lack of subject-matter jurisdiction. *Gentek Bldg. Prods.*, 491 F.3d at 332 (citation omitted).

Because the parties already conducted discovery with respect to the Bellwether Plaintiffs' claims and present materials outside the pleadings, Rule 56 provides the appropriate standards for evaluating the Government's motion. The

4

standards for a Rule 56 motion are well established.  *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *BlueCross BlueShield of Tenn., Inc. v. Nicolopoulos*, 136 F.4th 681, 686-87 (6th Cir. 2025) (citing *Walden v. Gen. Elec. Int'l, Inc.*, 119 F.4th 1049, 1056 (6th Cir. 2024)).

## II.    Background

### A.    The Safe Drinking Water Act and EPA's Role

In 1974, Congress enacted the Safe Drinking Water Act ("SDWA") to ensure that the nation's water supply systems "meet minimum national standards for protection of public health."  H.R. Rep. No. 93-1185 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6454, 6454.  The statute authorizes EPA "to establish Federal standards for protection from all harmful contaminants[] … applicable to all public water systems[.]"  *Id*. at 6454-55.  It also "establish[es] a joint Federal-State system for assuring compliance with th[o]se standards and for protecting underground sources of drinking water.  *Id.* at 6455.

States adopting, among other things, drinking water regulations that are no less stringent than the national primary drinking water regulations are eligible to obtain primary enforcement authority (i.e., "primacy") over their public water systems.  42 U.S.C. § 300g-2(a)(1).  Michigan has obtained primacy, and the Michigan Department of Environmental Quality ("MDEQ") thus has primary enforcement authority with respect to the State's water systems.  *See Mays v. City*

5

*of Flint*, 871 F.3d 437, 446 (6th Cir. 2017).  As the Sixth Circuit has described it,

"the MDEQ-EPA relationship is a model of cooperative federalism . . .."  *Id*. at

447.

Nevertheless, the SDWA reserves EPA's oversight and primacy states must

periodically submit compliance reports to EPA for that purpose.  42 U.S.C.

§§ 300g-3, 300i; *see also* 40 C.F.R. §§ 141.82(i), 141.83(b)(7), 141.90, 142.15,

142.19, 142.30.  For example, Section 1414 of the statute sets forth EPA's

response when a public water system is not in compliance.  With respect to

primacy states, the provision reads in relevant part:

> (a) Notice to State and public water system; issuance of administrative
> order; civil action
>
> (1)(A) Whenever the Administrator finds during a period during
> which a State has primary enforcement responsibility for public water
> systems (within the meaning of section 300g-2(a) of this title) that any
> public water system--
>
> (i) for which a variance under section 300g-4 or an exemption under
> section 300g-5 of this title is not in effect, does not comply with any
> applicable requirement, or
>
> …
>
> he shall so notify the State and such public water system and provide
> such advice and technical assistance to such State and public water
> system as may be appropriate to bring the system into compliance
> with the requirement by the earliest feasible time.
>
> (B) If, beyond the thirtieth day after the Administrator's notification
> under subparagraph (A), the State has not commenced appropriate
> enforcement action, the Administrator shall issue an order under

6

subsection (g) requiring the public water system to comply with such applicable requirement or the Administrator shall commence a civil action under subsection (b).

42 U.S.C. § 300g-3. Section 1431 of the statute grants EPA certain emergency

powers:

**(a) Actions authorized against imminent and substantial endangerment to health**

Notwithstanding any other provision of this subchapter, the Administrator, upon receipt of information that a contaminant which is present in or is likely to enter a public water system or an underground source of drinking water, or that there is a threatened or potential terrorist attack (or other intentional act designed to disrupt the provision of safe drinking water or to impact adversely the safety of drinking water supplied to communities and individuals), which may present an imminent and substantial endangerment to the health of persons, and that appropriate State and local authorities have not acted to protect the health of such persons, may take such actions as he may deem necessary in order to protect the health of such persons. To the extent he determines it to be practicable in light of such imminent endangerment, he shall consult with the State and local authorities in order to confirm the correctness of the information on which action proposed to be taken under this subsection is based and to ascertain the action which such authorities are or will be taking. The action which the Administrator may take may include (but shall not be limited to) (1) issuing such orders as may be necessary to protect the health of persons who are or may be users of such system (including travelers), including orders requiring the provision of alternative water supplies by persons who caused or contributed to the endangerment, and (2) commencing a civil action for appropriate relief, including a restraining order or permanent or temporary injunction.

42 U.S.C. § 300i.  EPA has enacted regulations pursuant to the SDWA setting forth primacy states' obligations and EPA's oversight and responsibilities.  *See* 40 C.F.R. §§ 142.10 *et seq.*

Specifically relevant here, EPA issued the Lead and Copper Rule ("LCR") in 1991, 40 C.F.R. § 141.80 *et seq.*, to minimize lead and copper in drinking water. (ECF No. 33-1 at PageID.12158-59.)  The LCR establishes the treatment technique requirements to minimize lead exposure.  (*Id.* at PageID.12159.)  For example,

> [the LCR's requirements] compel drinking water systems to conduct
> tap sampling for lead and copper to determine the treatment
> techniques and other steps systems must take to reduce exposure.  To
> adhere to the LCR, utilities must conduct monitoring for lead and
> copper in water systems, and demonstrate that they comply with
> monitoring and treatment technique requirements.

(*Id.*)  Because the "corrosion of plumbing is the primary source of lead in drinking water, . . . the [LCR] provides that corrosion control treatment of drinking water is essential in addressing treatment of water from the source."  (ECF No. 327-3 at PageID.11002-03); *see also* 56 Fed. Reg. 26,460 at 26479 (June 7, 1991) (recognizing that "the most important element of the final treatment technique is corrosion control treatment").

Regulations set forth EPA's duties if a State fails to approve appropriate treatment plans.  *See* 40 C.F.R. § 142.19.  The LCR authorizes EPA regional administrators to review state treatment determinations and issue alternate federal determinations when "[a] State has failed to issue a treatment determination by the

8

applicable deadlines, . . . has abused its discretion in a substantial number of cases or in cases affecting a substantial population, or [t]he technical aspects of a [S]tate's determination would be indefensible in an expected federal enforcement action taken against a system." *Id.*

EPA has ten regional offices, each of which is responsible for executing EPA programs within several States and territories. "Region 5" serves six States, including Michigan, and a number of tribes. Congress has granted the EPA Administrator the authority to "delegate any of his functions under [the statute] (other than prescribing regulations) to any officer or employee of the Agency." 42 U.S.C. § 300j-9. The EPA Administrator has delegated his authority under Sections 1414 and 1431 of the SDWA, 42 U.S.C. §§ 300g-3 and 300i, to the Regional Administrators and the Assistant Administrator for Enforcement and Compliance Assurance. (ECF Nos. 41-7, 41-8, 41-9.)

### B.  The Flint Water Crisis

Flint owns and operates a public water system which provides drinking water to its nearly 100,000 citizens. Before April 2014, Flint purchased finished drinking water from DWSD. DWSD drew its water from Lake Huron and treated the water to control potential contaminants, including copper and lead levels.

In approximately late April 2014, Flint switched its water source from DWSD to the Flint River. The use of the Flint River as a water source was

intended to be temporary, as Flint planned to connect to the Karegnondi Water Authority pipeline in 2016, which also draws its water from Lake Huron.  (*See* ECF No. 40-3 at PageID.1349.)

MDEQ approved Flint's water source change, but did not require Flint to begin corrosion control prior to the switch.  (ECF No. 38-1, ECF No. 38-2 at PageID.1142.)  MDEQ interpreted the LCR as allowing Flint to complete two consecutive six-month rounds of sampling prior to determining what, if any, corrosion control treatment was needed for the Flint River water.  (ECF No. 39-3 at PageID.1206-07; ECF No. 39-5 at PageID.1209-1211.)  However, federal regulations provide that, when there is a source switch, "all systems optimizing corrosion control shall continue to operate and maintain optimal corrosion control treatment, including maintaining water quality parameters at or above minimum values . . .."  40 C.F.R. § 141.82(f).

The Flint River provided inconsistent water quality because of elevated levels of organic matter.  (ECF No. 39-18 at PageID.1313.)  By August 2014, elevated levels of fecal coliform and E. coli bacteria were detected in the water and MDEQ issued a "boil water advisory" instructing Flint residents to not drink the water.  (ECF No. 37-5 at PageID.975; ECF No. 53-27 at PageID.2114.)  A second E. coli exceedance occurred on September 5, 2014.  (*Id.*)  The City's use of chlorine to address bacteria exceedances led to another problem—high levels of

10

total trihalomethane ("TTHM"), which poses health risks to consumers.  (ECF No. 53-4 at PageID.1931; ECF No. 53-27 at PageID. 2114.)

Flint residents immediately noticed the change in the quality of the water when the City switched its water source to the Flint River.  Jennifer Crooks, Region 5's Michigan Program Manager, was responsible for reviewing and responding to complaints from Michigan citizens on the agency's behalf.  Ms. Crooks testified in this matter that, since she began working for EPA in 1987, she had never received as many citizen complaints than she did after the Flint water switch.  (ECF No. 37-5 at PageID.965-66.)  Region 5 was "inundated" with citizen complaints.  (ECF No. 327-5 at PageID.11101.)

Of the complaints received by EPA before January 2016, more than a third included concerns about lead.  (ECF No. 333-1 at PageID.12178.)  Nevertheless, "Region 5 staff did not identify the volume of complaints as indications of unusual problems in Flint's water system." (*Id*.)  This resulted in Region 5 failing to "assess the severity of the situation, and staff" not being "able to alert management to an emerging incident." (*Id*.)  Complaints were answered "with form letters" directing consumers to resolve their concerns with MDEQ or Flint officials.  (*Id*.)  There is no evidence of an EPA response to several complaints, while others were responded to more than a year after EPA received them.  (*Id.*)  These deficiencies

could have been due to the fact that "[s]taff and managers in Region 5 did not have a system for cataloguing and responding to citizen complaints[.]"  (*Id.*)

Nevertheless, generally, when Region 5 received citizen complaints from Michigan residents, employees would discuss the issues with technical contacts, check for violations in the various databases, and contact MDEQ staff responsible for the water system and discuss the complaint.  (ECF No. 37-5 at PageID.964, 970; ECF No. 37-6 at PageID.1018-19.)  After Region 5's employees conducted background research and communicated with the State, they responded to citizens through emails, phone calls, and written letters.  (*see id*. at PageID.967; *see also, e.g.*, ECF Nos. 38-14, 38-15, 39-1.)

In its communications with Flint residents, EPA acknowledged that "[t]he quality of the water in the Flint River is different from that from Lake Huron [the source of DWSD water]" and "requires additional treatment to ensure an acceptable quality drinking water."  (*See, e.g.,* ECF No. 327-7; ECF No. 58-14 at PageID.1184.)  But EPA assured residents that MDEQ was working closely with the City "to ensure that the citizens of Flint are provided drinking water that meets health standards."  (*Id.*)  EPA informed Flint residents that "[t]he most recent laboratory analyses obtained from MDEQ of the City of Flint's drinking water indicate that almost all regulated contaminants meet State and Federal health standards, as required under the Federal and Michigan Safe Drinking Water Acts."

(*Id*.)  Despite acknowledging that testing showed the maximum containment levels for E. coli and TTHMs being exceeded in August 2014 and September 2013, respectively, and knowing that TTHMs pose a health risk for some sub-populations, such as the immune-compromised and pregnant women, EPA did not convey those risks in at least some of its communications with Flint residents.  (*See id.*; *see also* ECF No. 53-10 at PageID.1957.)

The Bellwether Plaintiffs who were asked during their depositions if they ever communicated in writing or orally with EPA between April 2014 and January 2016, indicated they had not.  (ECF No. 292-8 at PageID.7185; ECF No. 292-9 at PageID.7191; ECF No. 292-10 at PageID.7198-99; ECF No. 292-11 at PageID.7205; ECF No. 292-12 at PageID.7213; ECF No. 292-13 at PageID.7220; ECF No. 292-14 at PageID.7225; ECF No. 292-14 at PageID.7232-33; ECF No. 292-15 at PageID.7233-35; ECF No. 292-16 at PageID.7248-50; ECF No. 292-17 at PageID.7257-58; ECF No. 292-18 at PageID.7264; ECF No. 292-19 at PageID.7273-74; ECF No. 292-20 at PageID.7280-81; ECF No. 292-21 at PageID.7286.)  Those Bellwether Plaintiffs who were asked also testified that they did not know anyone who personally communicated with EPA during that period, or that they at least did not know the content of those communications.  (ECF No. 292-8 at PageID.7185-86; ECF No. 292-10 at PageID.7199; ECF No. 292-11 at PageID.7205; ECF No. 292-12 at PageID.7213; ECF No. 292-13 at PageID.7220;

ECF No. 292-14 at PageID.7225-26; ECF No. 292-16 at PageID.7250; ECF No. 292-18 at PageID.7264; ECF No. 292-19 at PageID.7274.)  There is no testimony or documentation reflecting any Bellwether Plaintiff's detrimental reliance on any statement by the EPA between April 2014 and January 2016, or to show that any Bellwether Plaintiff saw or read about EPA's involvement in the Flint Water Crisis during that period.

In early 2015, Flint citizen LeeAnn Walters contacted EPA after receiving the test results of drinking water samples Flint had collected from her home.  (ECF No. 38-2 at PageID.1142-43.)  Those results showed highly elevated lead and iron levels.[1]  (*Id.*)  Ms. Crooks from Region 5 sent an email to MDEQ the day after receiving the test results, documenting her concerns and requesting assistance in dealing with the high lead levels in the Walters' home.  (ECF No. 37-5 at PageID.975.)  MDEQ indicated in response that the lead was coming from the home's plumbing, although Ms. Walters had indicated that all of the plumbing was plastic.  (ECF No. 38-2 at PageID.1143.)

On February 26, 2015, Ms. Crooks also learned that MDEQ was not including elevated lead level test results like those from the Walters' home in its reports on compliance and was pre-flushing in advance of taking compliance water

---

[1] The LCR results from the Walters' home showed a lead level of 104 parts per billion ("ppb").  (ECF No. 53-2 at PageID.1924).  The regulatory limit is 15 ppb. (*Id.*)

samples, which were violations of the LCR.  (ECF No. 327-10 at PageID.11136-37; ECF No. 327-12 at PageID.11143.)  Had these elevated levels been included in MDEQ reports, lead concentrations would have exceeded the federal action level of 15 ppb.  (ECF No. 327-13 at PageID.11147.)

Ms. Crooks and Miguel Del Toral, Region 5's Regulations Manager for the Groundwater and Drinking Water Branch, were in communication with MDEQ and the City concerning Ms. Walters' situation and whether there was a more widespread lead issue.  (ECF No. 53-2.)  In an email to MDEQ officials on February 26, 2015, Ms. Crooks directed that (1) Flint must have Optimized Corrosion Control Treatment ("OCCT"), (2) the test results for the Walters' home must "be included in with compliance calculation of the 90th percentile", and (3) the City cannot flush the system in advance of taking compliance samples.  (*Id.* at PageID.1921-22.)  Mr. Del Toral, who had been copied on Ms. Crooks' email, sent a follow-up email to MDEQ on February 27, 2015, explaining his concerns about the lead situation and Flint's testing protocols.  (*Id.* at PageID.1920-21.)  Mr. Del Toral conveyed that pre-flushing the tap before collecting testing samples "biases the results low by eliminating the highest lead values" and "provides false assurance to residents about the true lead levels in the water."  (*Id.*)  Mr. Del Toral suggested that MDEQ contact Region 5's "resident expert," Mike Schock, for help

with compliance.  (*Id.*)  Ms. Crooks forwarded Mr. Schock's contact information

to MDEQ the same day.  (*Id.*)

On February 27, 2015, Stephen Busch from the MDEQ responded to Ms.

Crooks' and Mr. Del Toral's emails, thanking them for their information and

indicating: "[W]e will take it under consideration."  (*Id.* at PageID.1919.)  Mr.

Busch represented in the same email, among other things, that Flint "[h]as an

Optimized Corrosion Control Program," "[c]onducts quarterly Water Quality

Parameter monitoring at 25 sites and has not had any unusual results[,]" and "[h]as

never had a 90th percentile lead AL exceedance[.]"  (*Id.*)

Region 5 representatives visited the Walters' home to inspect the plumbing

and conduct additional testing on April 27 and May 6, 2015.  (ECF No. 38-2 at

PageID.1143.)  Testing revealed extremely high lead levels.  (*Id.* at PageID.1144.)

Confirming that the interior plumbing was primarily plastic, EPA concluded that it

was not the source of the high lead levels found in the water at the residence.  (*Id.*)

Shockingly, as Mr. Del Toral noted in an email to colleagues within Region 5,

local officials were telling Flint residents that the source of the high lead was the

home's internal plumbing.  (ECF No. 53-3 at PageID.1929.)  Region 5 collected

water samples from other homes in Flint, which also showed noncompliant lead

levels.  (ECF No. 38-2 at PageID.1144.)

16

Meanwhile, on April 23, 2015, Mr. Del Toral sent an email to MDEQ asking: "What's Flint doing now (post Detroit) for corrosion control treatment?" (ECF No. 53-3 at PageID.1928.)  MDEQ responded the following day, indicating that Flint is not practicing CCT and that the results of testing for two six-month periods indicated that no treatment was needed.  (*Id.* at PageID.1927.)  Mr. Del Toral emailed MDEQ on April 25, 2015, expressing his concern regarding the lack of CCT following the water source switch considering the known corrosivity of the Flint River and the City's extensive lead service lines.  (*Id.* at PageID.1925.)  Mr. Del Toral further reemphasized that the City's pre-flushing ahead of compliance sampling may be distorting test results.  (*Id.*)  Mr. Del Toral expressed that "[g]iven the very high lead levels found at one home and the pre-flushing happening at Flint . . . the whole town may have much higher lead levels than the compliance results indicated . . .."  (*Id.*)

In May and June 2015, EPA Region 5 staff continued to express concern to MDEQ and the City about increasing concentrations of lead in Flint's drinking water and the City's lack of corrosion control treatment and offered EPA's expertise to move forward and rectify the water quality problems.  (ECF No. 39-15 at PageID.1294; ECF No. 38-2 at PageID.1144; ECF No. 53-7 at PageID.1945.)  During this period, Mr. Del Toral prepared EPA's interim report on high lead levels in Flint's water system, which was circulated to his colleagues.  In the

17

report, Mr. Del Toral indicated that Flint was not including tests from homes

showing high lead levels in its compliance sampling pool.  (ECF No. 53-4 at

PageID.1935.)  He also expressed concern that this omission, as well as Flint's

sampling procedures, conceal a more wide-spread problem with high lead levels

throughout the City's water supply.  (*Id.* PageID.1932.)  As Mr. Del Toral further

explained in an email to his colleagues:

> The widespread high lead is my judgment based on a couple of
> decades of working with lead issues and I stand by it despite the
> limited data set from Flint.  A simple application of scientific
> principles to the circumstances in Flint along with the limited data are
> enough to know that there is a problem there.  They have no corrosion
> control treatment in place for over a year now and they have lead
> service lines.  It's just basic chemistry on lead solubility.  You will
> have high lead leaching into the water where you are doing nothing to
> mitigate that.  We don't need to drop a bowling ball off every building
> in every town to know that it will fall to the ground in all of these
> places.  The fact that their sampling is designed not to capture lead
> (everything is fine) does not negate our scientific understanding of
> what is going on.  The only reason we don't have more data is
> because the City of Flint is flushing away the evidence before
> measuring it. . . .

(ECF No. 53-6 at PageID.1942.)

Tinka Hyde, Director of the Water Division for Region 5, convened a formal

conference call with MDEQ management on July 21, 2015, to discuss the status of

Flint's lead sampling results (including MDEQ's position on pre-flushing) and

MDEQ's interpretation of the LCR, which conflicted with Region 5's

interpretation.  (ECF No. 39-3 at PageID.1206-07.)  EPA interpreted the rule as

requiring a public water system to use optimal corrosion control treatment upon switching water sources.  (ECF No. 37-3 at PageID.863-64; ECF No. 38-10 at PageID.1169-70.)  MDEQ decided to treat Flint's change as a "new source" which would require OCCT only after monitoring reflected the need for treatment.  (ECF No. 39-3 at PageID.1206.)

In preparation for the July 21, 2015 conference call between EPA and MDEQ, EPA drafted a "Briefing Paper" which reflected what EPA already knew about Flint's water crisis and state and local officials' response (or lack thereof) to that crisis.  (*See* ECF Nos. 53-8, 53-16.)  This included the fact that Michigan was not requiring corrosion control in Flint.  (*Id.*)  It further reflected EPA's knowledge that MDEQ was not including in its testing the citizen-requested samples where high-lead levels were detected—despite EPA's direction that they needed to be included—and EPA's knowledge that MDEQ was "pre-flushing" lines before sampling—again, despite EPA's explanation of why this distorts testing.  (*Id.*)  These documents also reflected EPA's expectation that proper sampling would show high lead levels in the water supplied to Flint residents and a need for corrosion control.  (*Id.*)

During the conference call on July 21, 2015, MDEQ requested an opinion from EPA headquarters to resolve the discrepancy in the LCR interpretation.  (*Id.*; *see also* ECF No. 37-3 at PageID.864.)  MDEQ nevertheless communicated a

willingness "to initiate discussion with Flint sooner rather than later on corrosion control." (ECF No. 39-3 at PageID.1206.) But MDEQ was unwilling to budge on its pre-flushing requirement until new regulations were issued, maintaining that the State's lead compliance sampling procedures comply with federal SDWA requirements and that pre-flushing instructions are not requirements but suggestions. (*Id*. at PageID.1207.) Although Region 5 staff agreed at this meeting to seek a legal opinion from EPA headquarters, an official request for that opinion was not made until two months later, on September 30, 2015. (ECF No. 333-1 at PageID.12175.)

On August 17, 2015, MDEQ instructed Flint to implement corrosion control as soon as possible, but no later than January 1, 2016, and to fully optimize its treatment within six months. (ECF No. 37-3 at PageID.866; ECF No. 39-15 at PageID.1294; ECF No. 53-27 at PageID.2122.) During a conference call between MDEQ and Region 5 on August 31, 2015, the results of the second six-month (January-July 2015) monitoring test results for Flint were discussed, which confirmed that corrosion control was needed. (ECF No. 53-27 at PageID.2122.) During this call, Region 5 discussed the need for outreach to Flint's citizens to reduce their exposure to high lead levels in the drinking water and reiterated the offer of technical assistance in implementing corrosion control treatment. (ECF No. 39-15 at PageID.1294.) But Region 5 viewed MDEQ as having the

20

responsibility to alert the public as the primacy agency.  (ECF No. 37-3 at

PageID.880).

EPA maintained this approach despite knowing that City officials continued

to assure Flint residents that there was no corrosivity issue and that MDEQ and

EPA found the City in compliance with safe water standards.  (ECF No. 53-22 at

PageID.2059.)  At the same time, EPA learned that pediatricians at Hurley Medical

Center in Flint had conducted a study which showed a rise in the blood lead levels

of Flint's children after the switch to the Flint River as the City's water source.

(*Id*. at PageID.2058-59.)  For example, in the two zip codes where the highest level

of lead was found in the water, the EBL (elevated blood lead) levels for infants less

than fifteen months old rose from 1.5% to 4.4%.  (*Id.*)  The rest of Flint had an

increase from .6 to 1.1% for the same age group.  (*Id*.)  There was no change, in

comparison, for non-Flint infants less than fifteen months old.  (*Id.*)  For children

less than five-years old, EBL levels rose from 2.1% to 4.0% throughout Flint and

from 2.5% to 6.3% in the two most-affected zip codes.  (*Id.*)

On September 3, 2015, Flint's Mayor announced that the City would

implement corrosion control treatment and invited EPA corrosion control experts

to join the Flint Technical Advisory Committee ("TAC").  (ECF No. 39-15 at

PageID.1295.)  On October 7, 2015, TAC recommended that MDEQ direct Flint to

resume purchasing treated water from DSWD, now called the Great Lakes Water

Authority.  (ECF No. 37-3 at PageID.1078; ECF No. 39-15 at PageID.1295.)  On

October 16, 2015, EPA established the Flint Safe Drinking Water Task Force

("EPA Flint Task Force") to provide technical expertise to MDEQ and the City.

(ECF No. 39-15 at 1295.)  On the same date, Flint switched back to purchasing

finished water from Detroit.

Despite the switch, corrosion control treatment remained necessary because

the corrosive Flint River water had eroded away the protective coatings in the

system.  (ECF No. 37-7 at PageID.1078; ECF No. 39-15 at PageID.1296.)  On

November 25, 2015 and subsequent dates, the EPA Flint Task Force requested

information that was not being shared to assess the City's progress with corrosion

control.  (ECF No. 39-15 at PageID.1295.)  Without the information, EPA could

not evaluate whether the contamination in the City's water system had been

eradicated.  (*Id.*)  While the City began additional corrosion control treatment in

early December 2015, EPA was not assured that high levels of lead and other

contaminants had been removed from the water system.  (*Id.*)

On December 14, 2015, the City declared an emergency.  On January 14,

2016, Michigan's Governor requested emergency disaster assistance.  Two days

later, President Obama declared a federal emergency in the City.  On January 21,

2016, EPA issued an emergency order pursuant to Section 1431 of the SDWA.

(ECF No. 39-15 at PageID.1292-1309.)

EPA identified several reasons for issuing the emergency order at that time, including continued "delays in responding to critical EPA recommendations and in implementing the actions necessary to reduce and minimize the presence of lead and other contaminants in the water supply" presently and moving forward.  (*Id.* at PageID.1299.)  Further, EPA noted MDEQ's and the City's failure and continued failure to provide necessary information to EPA, the EPA Flint Task Force, and Flint citizens "to fully understand and respond promptly and adequately to the current deficiencies."  (*Id.*)  Additionally, the City viewed its switch back to Detroit water as temporary and planned to eventually move to untreated water from the Karegnondi Water Authority.  EPA viewed the transition as posing "complex technical and managerial challenges … that have serious implications for drinking water safety and public health."  (ECF No. 41-4 at PageID.1723.)  EPA was concerned that the City lacked the professional expertise and resources to manage the transition and carry out the recommended actions to safely manage the City's water system.  (ECF No. 39-15 at PageID.1299.)

On October 20, 2016, EPA's Office of Inspector General (OIG) issued a "Management Alert" in which it found that "Region 5 had the authority and sufficient information to issue a SDWA Section 1431 emergency order to protect Flint residents from lead-contaminated water as early as June 2015."  (ECF No. 53-25 at PageID.2019.)  The OIG indicated that "EPA's 1991 guidance on SDWA

Section 1431 orders states that if state actions are deemed insufficient, the EPA can and should proceed with a SDWA Section 1431 order, and the EPA may use its emergency authority if state action is not protecting the public in a timely manner." (*Id.*)

The OIG issued a comprehensive report on July 19, 2018 ("OIG Report"). (*See* ECF No. 333-1.)  The OIG Report describes EPA's responsibilities in connection with overseeing water systems and enforcing the SDWA.  (*Id.*)  It also discusses EPA's actions, omissions, and delays in connection with the Flint Water Crisis.  (*Id.*)

For example, the OIG Report describes how "Region 5 managers did not use their knowledge about the MDEQ's incomplete implementation of the SDWA when assessing the risks in Flint."  (*Id.* at PageID.12173.)  It discusses EPA's knowledge, as far back as 2010, of MDEQ's disinvestments from 10 SDWA requirements, which increased to 11 by 2015, and how EPA allowed the disinvestments to continue without Region 5 intervention until 2016.  (*Id.*)  The OIG found that, as a result of these disinvestments, the identification of contaminants in water systems was delayed, there was insufficient oversight as to whether the water system's lead sampling met LCR requirements, and important information about water quality was not being provided to EPA and consumers. (*Id.* at PageID.12174.)

24

More generally, the OIG found that "EPA Region 5 did not manage its drinking water oversight program in a way that facilitated effective oversight and timely intervention in Flint." (*Id.* at PageID.12172.)  Specifically, the OIG Report provides that Region 5 did not "[e]stablish clear roles and responsibility with the MDEQ[,] . . . [c]ommunicate clearly and effectively[,] . . . [u]se effective risk assessment protocols[,]" or "[p]roactively use available SDWA authorities and oversight tools to intervene in Michigan's drinking water program." (*Id.*) According to the OIG Report, "[t]he weaknesses limited Region 5's ability to monitor, adapt[,] and respond to changing situations in Michigan and the City of Flint." (*Id.*)  The OIG concluded that "Flint drinking water contamination continued, in part, because the public health protection authorities of the SDWA were not used effectively." (*Id*. at PageID.12182.)

## III.    Applicable Law & Analysis

### A.    The FTCA's Private Liability Requirement

The FTCA permits a plaintiff to obtain compensation from the United States government for injuries caused by the "negligent or wrongful act or omission" of any government employee acting within the scope of employment.  18 U.S.C. § 1346(b)(1).  "The FTCA was not intended to create new causes of action; nor was it intended as a means to enforce federal statutory duties." *Howell v. United States*, 932 F.2d 915, 917 (11th Cir. 1991).  Instead, the statute waives

25

governmental immunity "only 'under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'"  *Burgess*, 375 F. Supp. 3d at 817 (quoting 28 U.S.C. § 1346(b)); *see also id.* at 809 (citing 28 U.S.C. § 2674) (explaining that "the FTCA does not waive the Government's sovereign immunity *unless* a private person under similar circumstances would be liable under Michigan law to Plaintiffs for the EPA's alleged conduct").  Here, the "law of the place" is Michigan.  *Id.*

Michigan recognizes a claim for negligence under the Good Samaritan doctrine.  *See Fultz v. Union-Commerce Assoc.*, 683 N.W.2d 587, 598 (Mich. 2004); *Smith v. Allendale Mut. Ins. Co.*, 303 N.W.2d 702, 711-12 (Mich. 1981).  The doctrine provides "that one who undertakes to act, even though gratuitously, is required to act carefully and with the exercise of due care and will be liable for injuries proximately caused by [the] failure to use such care[.]"  *Block v. Neal*, 460 U.S. 289, 293 (1983) (citing Restatement (Second) of Torts § 323 (1965)); *Myers v. United States*, 17 F.3d 890, 901 (6th Cir. 1994).  Proximate cause may be established by showing either that: (a) the "failure to exercise reasonable care increase[d] the risk of . . .  harm," (b) the undertaking was "to perform a duty owed by the other to the third person," or (c) the harm was suffered "because of reliance

26

of the other or the third person upon the undertaking."  Restatement (Second) of

Torts § 324A (1965).

### 1.    Evidence of EPA's Undertakings & Negligence

The current record does not undermine the Court's previous finding that,

"[l]ike the mine inspectors in *Myers*, EPA undertook to render services to Plaintiffs

by engaging in oversight, including monitoring, of the State's and local water

systems' compliance with the SDWA and by responding directly to citizen

complaints."  *Burgess*, 375 F. Supp. 3d at 818 (citing *Myers*, 17 F.3d at 902).  The

record supports several specific undertakings by EPA under the broader categories

of "oversight" and "monitoring," and a reasonable fact finder could conclude that

such undertakings were performed negligently.

Before discussing those specific undertakings, the Court addresses the

Government's contention that many do not reflect an undertaking, but a "failure to

act."  (ECF No. 291 at PageID.6928.)  As the Government points out, inaction is

insufficient to satisfy the Good Samaritan doctrine.  (*Id.* (citing *Ashbrook v. Block*,

917 F.2d 918, 926 (6th Cir. 1990) (citing *Hart v. Ludwig*, 79 N.W.2d 895 (Mich.

1956)).)  However, as the Michigan Supreme Court discussed in *Hart*, and Judge

Levy pointed out in her related Flint Water cases, there is a "slippery distinction

between action and inaction."  *In re Flint Water Cases*, 482 F. Supp. 3d at 618

(quoting *Hart*, 79 N.W.2d at 898).

27

Inaction during an undertaking—for example, a surgeon failing to sterilize his or her instruments or a train engineer who fails to sound the whistle as the train approaches a crossing—will support the doctrine's application. *See Hart*, 79 N.W.2d at 898. The focus of the inquiry must be on "the fundamental concept of 'duty[.]'" *Id.* Here, EPA engaged in the following actions or inactions *in the exercise of* its duties to oversee and enforce the SDWA.

EPA collected and reviewed water quality reports from MDEQ to assess compliance with safe water standards, but condoned the failure to submit reports. (*See* ECF No. 333-1 at PageID.12173-74.) In conjunction with its monitoring duties, EPA was aware, as far back as 2010, of MDEQ's disinvestments in ten SDWA requirements and the potential impact on public health as a result of at least one of those disinvestments. (*Id.* at PageID.12173.) Yet, EPA did nothing in response. (*Id.*) As a result, in the case of the Flint water system, EPA allowed noncompliance with federal rules and policies to continue for years. (ECF No. 327-4.)

Essentially, EPA waived the primacy agency's obligation to obtain and provide to EPA timely water quality data. This resulted in EPA not receiving information that would have alerted it earlier to the dangerous conditions of the Flint River water and the water system's noncompliance with federal regulations.

28

EPA communicated with MDEQ and the City to address concerns about the quality of the water, at which time it offered technical oversight and discussed the need for corrosion control.  Yet the OIG concluded that EPA did not "communicate clearly and effectively," that there were "communication weaknesses[,]" and that "[c]ommunication within EPA was also problematic." (ECF No. 333-1 at PageID.12172, 12174.)  Accurate and complete information was not effectively shared and "key information about human health risks from lead contamination" were not conveyed.  (*Id*. at PageID.12174.)

Despite EPA's position that the LCR required Flint to maintain corrosion control when switching its water source to the Flint River, receiving confirming information about the lack of corrosion control in April 2015, and having a report from a Region 5 scientist outlining concerns about lead in the drinking water and lack of corrosion control treatment, EPA neglected to intervene and delayed making an official request for a legal opinion from EPA headquarters.  (*Id.* at PageID.12175.)  Moreover, EPA also failed to intervene despite knowing that there was a high risk of lead in Flint's drinking water and that the violations of federal testing requirements by MDEQ and the City would underreport lead levels.

Tragically, Flint residents continued to be poisoned with contaminated water for many more months before EPA reached an agreement with MDEQ in July 2015 to require the Flint Water system to begin corrosion control treatment.  But,

even then, EPA permitted MDEQ to set a January 2016 deadline for the City to

select the treatment.  As the OIG report concluded:

> [T]he combined information available to Region 5 painted a picture of
> a system at risk from multiple angles.  By compiling and examining
> these factors, Region 5's staff and managers could have intervened
> sooner after the source switch, as evidence of risk grew.  Instead, the
> federal response was delayed while residents continued to be exposed
> to lead in their drinking water.

(ECF No. 333-1 at PageID.12176.)

In short, EPA collected information in the exercise of its oversight duties,

which offered multiple signs of the significant health risks posed by Flint's

contaminated water.  When responding to this information, EPA failed to utilize or

used ineffectively its authority under the SDWA.  (*See id*. at PageID.12179-82.)

Further, EPA received and responded to numerous complaints from Flint

residents about the water quality.  OIG found that more than a third of the

complaints discussed concerns about lead.  But Region 5 staff and managers

neglected to establish a system for cataloging and responding to citizen complaints,

and they failed to use the complaints or their volume as indicators of a problem.

(*Id.* at PageID.12178.)  This resulted in Region 5 "not assess[ing] the severity of

the situation" swiftly and failing "to alert management to an emerging incident."

(*Id.*)

In its communications with Flint residents, EPA misrepresented the safety of

the water, offering that it met national safety standards.  Then, in the face of

mounting evidence to the contrary and knowledge of the imminent health risks posed by the contaminated water, EPA failed to correct the record.  EPA assured the residents that MDEQ was working with the City to ensure that they were provided drinking water that met federal health standards.  Yet, when EPA learned that necessary corrosion control was not being taken and that misrepresentations were being made by state and local officials about lead levels in the water, it failed to correct those misstatements.  For example, Michigan and City officials told Flint residents that the high level of lead in the Walters' residence was from the internal plumbing, not the Flint water; however, EPA knew the home's interior plumbing was PVC.

The undertakings discussed above, which EPA performed during its oversight and enforcement duties, are more akin to the specific acts the Sixth Circuit found sufficient to support the denial of summary judgment in *Merrill ex rel. Estate of Merrill v. Arch Coal, Inc.*, 118 F. App'x 37 (6th Cir. 2004), as opposed to those in *McAtee v. Fluor Constructors International, Inc.*, No. 98-5927, 1999 WL 685928 (6th Cir. Aug. 27, 1999), which the Government cites for comparison.  Not only did EPA undertake specific acts to monitor and oversee the Flint Water system after the switch to the Flint River, but like the parent company in *Merrill*, these acts were part of the duties and responsibilities EPA retains even when States are granted primacy.

31

As to whether these undertakings were performed negligently, the Government concedes that there is a lack of a genuine issue of material fact for purposes of its motion.  (*See* ECF No. 291 at PageID.6934.)  In any event, the preceding discussion reflects sufficient evidence from which the trier of fact could conclude that EPA performed these undertakings negligently.  Thus, the Court turns to the Good Samaritan doctrine's remaining requirement: proximate causation.

### 2.      Whether EPA's Negligence Proximately Caused Plaintiffs' Harm

The Good Samaritan doctrine imposes liability for a negligent undertaking only if it increased the risk of harm to the plaintiff, was a duty owed by another to the plaintiff, or the plaintiff suffered a harm because the other or the plaintiff relied on the undertaking.  *Good v. Ohio Edison Co.*, 149 F.3d 413, 420 (6th Cir. 1998).

### (a)      Increased Risk of Harm

To show an increased risk of harm to the plaintiff, the question "is not whether the risk was increased over what it would have been if the defendant had not been negligent.  Rather, a duty is imposed only if the risk is increased over what it would have been had the defendant not engaged in the undertaking at all." *Myers*, 17 F.3d at 903.  In other words, the evidence must show that the defendant "affirmatively either made, or caused to be made, a change in the conditions which

32

change created or increased the risk of harm that befell [the plaintiff]." *Id.*; *see also Good*, 149 F.3d at 421.

In support of their assertion that EPA's negligence increased the risk of harm, Plaintiffs argue:

> The State and City were able to continue to violate the SDWA and continue to distribute water without corrosion control and continue to do so without notifying the public, because EPA supported and enabled these actions. EPA . . . allowed the contamination to worsen and the harm to increase on a daily basis for more than eight months without taking action to notify the public or issue an Emergency Order communicating the serious risk of harm to public health.

(ECF No. 327 at PageID.10969-70 (citing *Sagan v. United States*, 342 F.3d 493, 498-500 (6th Cir. 2003)).) But Plaintiffs do not describe a "change in the conditions" caused by EPA. MDEQ and the City would have continued to provide contaminated water to Flint residents, and that delivery would have resulted in increased lead exposure and corrosion of water service lines and internal plumbing, regardless of EPA's purported support or inaction.

This distinguishes the present matter from *Sagan*, where the delay in transporting the victim to the hospital was *caused by* the United States Coast Guard's negligence, and the delay worsened the victim's condition, contributing to his respiratory complications and susceptibility to pneumonia. *Sagan*, 342 F.3d at 498-500. Further, in *Sagan*, local rescuers wanted to transport the victim to the hospital "from the moment they arrived on the scene" and they had a plan in place

to do so, but "the Coast Guard prevented them from carrying out this plan[,]" resulting in an "approximate one hour delay" in getting the victim there.  *Id.*

Unlike *Sagan*, EPA did not cause or create the situation which led to the contamination of the Flint water, and MDEQ and the City did not have a plan in place to remedy the contamination, which EPA stalled or stopped.  Neither MDEQ nor Flint had a plan that would have delivered safe water to Flint residents sooner. Contaminated water would have continued to be distributed even if EPA had not undertaken the duties discussed earlier and performed those duties negligently. This scenario is more akin to the one presented in *Good*.

In *Good*, the risk or hazard was an unilluminated concrete and steel pier, with which a pleasure craft collided, leading to the death of four passengers.  149 F.3d at 421.  The plaintiff claimed the United States Coast Guard was negligent in its alleged duties to annually inspect navigational aids, report any discrepancy in a private aid to those responsible for the aid, and broadcast notice of the discrepancy to mariners.  *Id.* at 419.  The Sixth Circuit concluded that the Coast Guard's asserted negligence did not increase the risk of harm to the decedents because, while it "did nothing to diminish the risk posed by this hazard, it likewise did nothing to increase the risk that this hazard posed."  *Id.*  The unilluminated navigational aid did not become a greater hazard to unaware mariners as a result of the Coast Guard's asserted negligence.

34

Similarly, the water consumed and used by Flint residents did not become more contaminated because of EPA's negligent undertakings.  Undoubtedly, the evidence shows that the dangers from lead exposure and consumption are not constant.  Lead accumulates in a person's system and higher lead levels cause greater harm.  Continued lead exposure further corrodes water service lines and internal plumbing, causing even more lead to leach into the system. And, perhaps, as Plaintiffs argue, the dangerous lead levels in the water would have been detected earlier if EPA had not tolerated MDEQ's disinvestments.  But the relevant question is whether the EPA's alleged negligence "affirmatively either made, or caused to be made, a change in the conditions which change created or increased the risk of harm that befell" Plaintiffs, not whether EPA's asserted negligence allowed the risk to continue.  *See, e.g., Myers*, 17 F.3d at 903 .  The failure to detect the risk earlier here is not unlike the failure to detect and disseminate information about the discrepancy in the navigational aid in *Good*.

### (b)     Undertaking to Perform a Duty Owed by Another to a Third Person

"To be liable under § 324(b), the defendant must supplant the duty it undertakes from the party that originally held the duty, not merely assist or supplement the service provided by the other."  *Hutchison v. Fitzgerald Equip. Co.*, 910 F.3d 1016, 1024 (7th Cir. 2018) (internal quotation marks and citation omitted); *see also Myers*, 17 F.3d at 903; *Howell*, 932 F.2d at 919.  The

Government maintains that EPA did not supplant MDEQ's or the City's

responsibilities to provide safe drinking water to Flint residents, but merely

provided assistance.  MDEQ, the Government argues, and the Sixth Circuit has

found, "continued to have SDWA primacy in the State, including over Flint's

water system."  (ECF No. 291 at PageID.6939 (quoting *Mays*, 871 F.3d at 447).)

The Government therefore maintains that this case is comparable to *Myers* and

*Howell*.

　　　　However, the SDWA places different duties on EPA than the federal Mine

Safety and Health Act ("MSHA") and the Federal Aviation Act ("FAA") placed on

the defendants in *Myers* and *Howell*, respectively.  With respect to the MSHA,

"Congress intended that the primary duty of ensuring safety would be on the mine

owners and the miners."  *Myers*, 17 F.3d at 903 (citing 30 U.S.C. § 801(e)).

MSHA's inspections serve to ensure their compliance; inspectors do not assume

any duties owed by the mine owners or miners.  *Id.*  Similarly, under the FAA,

neither the Federal Aviation Administration nor its inspectors undertake the non-

delegable duties owed by an airline to its passengers when safety inspections are

performed.  *Howell*, 932 F.2d at 918-19 (citing 14 C.F.R. §§ 91.163(a),

135.413(a)) ("Whatever the FAA does or does not do, the Federal Aviation

Regulations assign the chief responsibility for ensuring the airworthiness of an

aircraft and its crew to the craft's owner, operator, or pilot.").

36

In comparison, the SDWA does not serve to merely ensure a State's or public water system's compliance with national water safety standards. The statute, instead "establishes a joint Federal-State system," H.R. Rep. No. 93-1185 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6454, 6455, which obligates EPA to intervene if a State or public water system fails to adequately carry out its responsibilities, *see Mays*, 871 F.3d at 447 (citing 40 C.F.R. § 142.17(a)(2)). As set forth earlier, under the SDWA, those duties belong to EPA in the first instance. And while the statute permits EPA to shift primary enforcement responsibilities to a State if certain conditions are satisfied, it likewise obligates EPA to withdraw that delegation and/or intervene and take over those responsibilities if doing so is necessary to meet national standards. *See* 42 U.S.C. §§ 300g-2(a), 300*i,* 40 C.F.R. § 142.17(a)(2). As the OIG report explains: "The EPA is empowered *and required to intervene* when [S]tates do not fulfill their responsibilities." (ECF No. 333-1 at PageID.12172 (emphasis added).)

Based on the record presented, the fact finder could conclude that, during the Flint Water Crisis, EPA assumed the duties imposed by the SDWA to provide safe drinking water to the people of Flint, like Plaintiffs.

### (c)    Reliance

This alternative method of demonstrating causation requires proof that Plaintiffs' reliance on EPA's undertakings induced Plaintiffs, MDEQ, or the City

37

"to forgo other remedies or precautions against the risk."  *Myers*, 17 F.3d at 903 (quoting Restatement § 324A cmt. e (1965)).  Plaintiffs' reliance on EPA also must have been reasonable and justified.  *See id.* at 904 (citations omitted) (finding that the plaintiffs' reliance upon MSHA inspections "would have been manifestly unreasonable and unjustified" due to "the clear Congressional purpose to ensure that the primary responsibility for safety remains with the mine owners and miners").  The Government argues that the Bellwether Plaintiffs fail to demonstrate their reliance on EPA's undertakings because the record reflects that not one of them communicated with EPA, obtained information from the EPA, or were aware of EPA's role in connection with the Flint Water Crisis.

However, as Plaintiffs point out and *Myers* reflects, reliance under § 324A(c) is broader than the Government suggests.  Harm can be suffered because the Bellwether Plaintiffs relied on EPA *or* because MDEQ *or* Flint did so.  *Myers*, 17 F.3d at 903 (quoting Restatement § 324A cmt. e (1965)) ("The comments to the Restatement with respect to the element of reliance make clear that the reliance must have induced either the miners or Grundy 'to forgo other remedies or precautions against the risk'"); Restatement (Second) of Torts § 324A(c) (1965) ("the harm is suffered because of reliance *of the other* or the third person upon the undertaking") (emphasis added).  The record supports that MDEQ and the City relied on EPA's undertakings in connection with the Flint

Water Crisis.  It also would support the fact-finder's conclusion that such reliance was reasonable and justified because, as discussed already, unlike the MSHA, EPA retains the ultimate responsibility to ensure the safety of the nation's drinking water.

Moreover, commonsense supports a finding that the Bellwether Plaintiffs relied on EPA's undertakings even if they did not communicate directly with the agency or were unable to identify it as the federal entity protecting their drinking water.  *See Est. of Rideout ex rel. Woods  v. United States*, 677 F. Supp. 3d 1112, 1125 (S.D. Cal. 2023) (citing *Cuffy v. City of New York*, 505 N.E.2d 937 (N.Y. 1987); *Moch Co. v. Renssalaer Water Co.*, 159 N.E. 896 (N.Y. 1928)) ("Courts have recognized the commonsense principle that public reliance on government protections and the proper functioning of government systems necessarily impacts individual choices and courses of action.").  "[R]eliance on the government's undertakings of certain protections can 'lull the injured party into a false sense of security and thereby induce him to either relax his own vigilance or to forgo other available avenues of protection.'"  *Id.* (quoting *Cuffy*, 505 N.E.2d at 261) (alterations omitted).  Here, through the SDWA, the federal government undertook to oversee and monitor our nation's water systems and ensure their safety.  The statute identifies EPA as the primary enforcer of federal safe drinking water standards.  As such, the Government "created public reliance on a federally

39

regulated regime that would keep [dangerous contaminants out of the water] and provided an implicit assurance that this system would function to protect the public." *Estate of Rideout*, 677 F. Supp.3d at 1125. Relying on that promise, the people of Flint continued to drink, bathe in, and otherwise use the contaminated Flint River water.

### 3. Conclusion

In summary, under the SDWA, EPA has the duty to oversee the nation's drinking water, including Flint's water system. In connection with the Flint Water Crisis, it engaged in several undertakings in accordance with that duty and on behalf of MDEQ and the City, knowing that such actions were for the protection of Flint residents and business owners. EPA knew that its negligence in connection with those undertakings could lead to harm. Plaintiffs, including the Bellwether Plaintiffs, relied on the promise that the Government would protect their water from harmful contaminants, and that it would warn them if the water became unsafe. Thus, the record supports the satisfaction of the FTCA"s private-liability requirement.

### B. Misrepresentation Exception

The Government maintains that Plaintiffs' claims, to the extent they are based on a misrepresentation by EPA, are barred by the FTCA's "misrepresentation" exception. 28 U.S.C. § 2680(h) (providing that liability under

the FTCA does not apply to "[a]ny claim arising out of . . . misrepresentation").

The bar applies to the government's breach of "its 'duty to use due care in

obtaining and communicating information upon which the plaintiff may reasonably

be expected to rely . . . ." *Block v. Neal*, 460 U.S. 289, 296 (1983) (quoting *United*

*States v. Neustadt*, 366 U.S. 696, 706-07 (1961)).  It "applies to claims arising out

of negligent, as well as intentional, misrepresentation."  *Id.* at 295-96 (citing

*Neustadt*, 366 U.S. at 702).

As this Court previously found, however, application of the

misrepresentation exception "has been confined 'largely to the invasion of interests

of a *financial* or *commercial* character*,* in the course of *business dealings*.'"

*Burgess*, 375 F. Supp. 3d at 817 (quoting *Block*, 460 U.S. at 296 n.5 (1983))

(emphasis added); *see also Neustadt*, 366 U.S. at 706, 711 n.26 (explaining that

Congress intended to adopt "the traditional and commonly understood legal

definition of the tort of negligent misrepresentation" when it enacted the FTCA,

which is the breach of "the duty to use due care in obtaining and communicating

information upon which that party may reasonably be expected to rely *in the*

*conduct of his economic affairs*") (emphasis added); see *also Zelaya v. United*

*States*, 781 F.3d 1315, 1338 (11th Cir. 2015) (collecting cases where the exception

did not apply because the injuries involved did not arise from the plaintiffs'

commercial decisions based on the government's misrepresentations); *Vogelaar v.*

*United States*, 665 F. Supp. 1295, 1304-05 (E.D. Mich. 1987).  The present action does not fit within that application.

The Court acknowledges that "circuit courts have reached discordant answers" as to whether the scope of the FTCA's misrepresentation exception is limited to financial or commercial loss.  *In re Flint Water Cases*, 482 F. Supp. 3d at 638 (quoting *Carter v. United States*, 725 F. Supp. 2d 346, 357 (E.D.N.Y. 2010)).  But even if the exception applies to communications that are not of a financial or commercial character, it is inapplicable if the plaintiff claims that the government breached a duty distinct from the duty not to make a misrepresentation, and if that breach caused the plaintiff's injury.  *See Block*, 460 U.S. at 297-98; *Vogelaar*, 665 F. Supp. at 1305.  The question is whether the government's communication of false information is the "essence" or "gravamen" of the plaintiff's claim or "if it is predicated on 'the [g]overnment's breach of a different duty'—even if false information is collaterally involved."  *Abbey v. United States*, 112 F.4th 1141, 1146-47 (9th Cir. 2024) (quoting *Block*, 460 U.S. at 297); *Vogelaar*, 665 F. Supp. at 1305 ("The government may be liable under the FTCA for negligently performing operational tasks even if misrepresentations are 'collaterally involved.'").

To the extent Plaintiffs' claims are based on EPA' assurances that it was providing the required oversight to supply safe drinking water and that the Flint

42

River water was fit for consumption and use, the communications are collateral. They are akin to the inspection report in *Block*.  There, the Supreme Court concluded that the asserted negligence was the Farmers Home Administration representative's failure to properly inspect and supervise the construction of the plaintiff's home, rather than the inspection report which failed to identify defects in the construction.  460 U.S. at 297-98.  Here, the focus of Plaintiffs' claims is EPA's negligence in providing the oversight and other operational tasks required to protect the Flint water system, not EPA's communication as to what it and/or MDEQ and City officials were doing or had found.

For these reasons, the Court continues to conclude that the misrepresentation exception is inapplicable to Plaintiffs' claims.

## IV.   Conclusion

The completion of discovery with respect to the Bellwether Plaintiffs' claims has not revealed significant new facts about the Flint Water Crisis or EPA's role in connection with that crisis.  The developed record does not alter this Court's previous conclusions.  The record provides sufficient evidence to hold the Government liable under the Good Samaritan doctrine.  The misrepresentation

exception is inapplicable.  Therefore, the Court is denying the Government's

renewed motion to dismiss for lack of subject matter jurisdiction.[2]  (ECF No. 291.)

Accordingly,

**IT IS ORDERED** that the United States of America's Motion to Dismiss

for Lack of Subject-Matter Jurisdiction Pursuant to the Federal Tort Claim Act's

Analogous Private Liability Requirement and Misrepresentation Exception (ECF

No. 291) is **DENIED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: September 22, 2025

---

[2] The Court is well aware of the Government's renewed request for interlocutory appeal of the January 28, 2025 decision regarding the discretionary function exception, in which it also seeks interlocutory appeal of the current decision *if* the Government's motion to dismiss is denied.  (*See* ECF No. 349.)  The Court will be issuing a separate decision shortly addressing the Government's request, as well as whether to allow an interlocutory appeal of this current Opinion and Order.  The Government need not file another motion.

44