UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

*In re* FTCA Flint Water Cases,

Case No. 17-cv-11218
(Consolidated)
Honorable Linda V. Parker

_____/

## **OPINION AND ORDER**

In this lawsuit, brought under the Federal Tort Claims Act ("FTCA"),

Plaintiffs allege that the United States Environmental Protection Agency ("EPA")

responded negligently to the "Flint Water Crisis."  In anticipation of a bench trial

on the claims of several Bellwether Plaintiffs, the parties have filed the following

motions concerning the admissibility of expert testimony and reports:

- The United States of America's motion to exclude the expert report and testimony of Leslie Liebowitz, Ph.D. (ECF No. 293);

- The United States of America's motion to exclude the expert reports and testimony of Erik Olson and Larry L. Russell, Ph.D. (ECF No. 295);

- The United States of America's motion to exclude the expert testimony of Zak Rostar, Anthony Legins, Jamal Saad, and John Meyers, Ph.D. (ECF No. 300);

- Plaintiffs' motion to exclude certain opinions of Jennifer Huffman, Ph.D. (ECF No. 304); and

- The United States of America's motion to strike the "supplemental" reports of Dr. Russell and Vonnie C. McLoyd, Ph.D. (ECF No. 305).

These motions are fully briefed.  Also pending is Plaintiffs' motion to compel the production of documents from and the deposition testimony of Julie Goodman, Ph.D., which also is fully briefed.  (ECF No. 322.)

## Standards Applicable to the Parties' *Daubert* Motions

Federal Rule of Evidence 702 requires trial judges to perform a "gatekeeping role" when considering the admissibility of expert testimony.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  The Sixth Circuit Court of Appeals describes this gatekeeping function as an "obligation . . . to exclude from trial expert testimony that is unreliable and irrelevant."  *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (internal quotation marks omitted).  It is designed "to protect *juries* from being swayed by dubious scientific testimony."  *United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018) (quoting *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012) (emphasis in original)).

As the gatekeeper, the trial court must determine whether the proposed expert's opinion satisfies three requirements parsed from Rule 702.  *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008).  First, the witness must be qualified according to his or her "knowledge, skill, experience, training, or education."  *Id.* at 529 (quoting Fed. R. Evid. 702).  Second, the expert's testimony must be relevant, in that it will help "the trier of fact to

2

understand the evidence or to determine a fact in issue." *Id*. (same).  Third, the

testimony must be reliable.  *Id*. (same).

Rule 702 also provides "general standards to assess reliability: whether the

testimony is based upon 'sufficient facts or data,' whether the testimony is the

'product of reliable principles and methods,' and whether the expert 'has applied

the principles and methods reliably to the facts of the case.'"  *Id*. (quoting Fed. R.

Evid. 702).  In *Daubert*, the United States Supreme Court set forth a non-

exhaustive list of factors for trial courts to consider in evaluating the reliability of

expert testimony.  509 U.S. at 592-93; *see also In re Scrap Metal Antitrust Litig.*,

527 F.3d at 529 (citing *United States v. Langan*, 263 F.3d 613, 621 (6th Cir.

2001)).  Those factors include "testing, peer review, publication, error rates, the

existence and maintenance of standards controlling the technique's operation, and

general acceptance in the relevant scientific community."  *In re Scrap Metal Litig.*,

527 F.3d at 529 (quoting *Langan*, 263 F.3d at 621).  "The test of reliability is

'flexible,'" however, "and the *Daubert* factors do not constitute a 'definitive

checklist or test,' but may be tailored to the facts of a particular case."  *Id*. (quoting

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)).

Reliability should not be confused with credibility or accuracy.  *See id.*  "[A]

determination that proffered expert testimony is reliable does not indicate, in any

way, the correctness or truthfulness of such an opinion."  *Id*.  The court's task in

assessing reliability is not to decide whether the expert's opinion is correct, but "whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation. *Id.* (citing Fed. R. Evid. 702; *Conwood Co.*, 290 F.3d at 792). Further, "rejection of expert testimony is the exception, rather than the rule[.]" *Id.* at 530 (citation omitted).

### Government's Motion to Exclude Dr. Lebowitz's Report and Testimony

Dr. Lebowitz is a licensed clinical psychologist, who earned her master's degree in psychology in 1985 and her doctorate degree in 1990. (*See* ECF No. 362-1 at PageID.13427.) For over thirty years, Dr. Lebowitz's clinical and research work has centered on the assessment and treatment of traumatic life experiences. (*Id.*) Plaintiffs retained Dr. Lebowitz to evaluate some of the adult Bellwether Plaintiffs to assess the following: (1) "whether they . . . experienced any negative emotional, cognitive, and/or behavior effects, and/or diminished quality of life as a result of [the] Flint [W]ater [C]risis"; (2) "whether any of these harms are ongoing and likely to extend into the future"; and (3) "to what extent the injuries and harm are related to, and/or exacerbated by, decisions made by government agencies before, during[,] and after what is referred to as the Flint Water Crisis." (*Id.*)

The United States of America (hereafter "Government") seeks to exclude Dr. Lebowitz's report and testimony, arguing that her opinions are unreliable and

not helpful to the trier of fact.  The Government asserts that Dr. Lebowitz's

opinions are unreliable because they were formed primarily from "unstructured

interviews" of her subjects and her "improper use" of the Impact of Event Scale

("IES") assessment tool, and because she did not review the individuals' medical

or psychological records or speak with their healthcare providers.  Dr. Lebowitz

cannot opine on the etiology of these individuals' symptoms, the Government

maintains, because she did not investigate additional or alternative traumas and

stressors in their lives pre- and post-dating the Flint Water Crisis.

The Government further maintains that Dr. Lebowitz's opinions are not

helpful to the trier of fact because she does not offer any diagnosis or describe any

future psychological or medical treatment needed.  Instead, she only summarizes

these individuals' subjective beliefs and emotional reactions to the Flint Water

Crisis, which the Government argues can be presented without expert testimony.

The Government also argues that Dr. Lebowitz is not qualified to opine on the

nature and etiology of Plaintiffs' alleged physical ailments—more specifically, that

they are "consistent with" lead exposure.

The Court is denying the Government's motion to exclude Dr. Lebowitz's

expert report and testimony.  Turning to the Government's last challenge first,

based on the Court's reading of Dr. Lebowitz's report, she does not seem to be

offering an opinion on whether the exposure to or ingestion of the tainted Flint

River water caused the physical ailments experienced by the individuals she interviewed and/or their family members.[1]  What the Court instead understands Dr. Lebowitz to be conveying is that the Fint Water Crisis and the believed impact of the tainted water on the physical wellbeing of the interviewed Plaintiffs and their family members—regardless of whether those beliefs are correct or mistaken—has changed the interviewed Plaintiffs' world view.  For example, as Dr. Lebowitz conveys, what these individuals believe (again, whether correct or mistaken) has caused them to no longer trust government officials, to feel not valued individually, as a community, race, and/or socio-economic group, and to fear consuming and using tap water even after it has been deemed safe.  Thus, the Court does not understand Dr. Lebowitz to be offering opinions that she is unqualified to provide.

The Court next turns to the Government's challenge to the reliability of Dr. Lebowitz's opinions.  Dr. Lebowitz conducted lengthy clinical interviews lasting multiple hours each with the Bellwether Plaintiffs.  During those interviews, she

---

[1]  There are statements in the report which appear to offer an opinion on the cause of the physical ailments experienced by the interviewed individuals and/or their family members—that being, exposure to and/or consumption of the tainted Flint River water.  (*See, e.g.,* ECF No. 362-1 at PageID.13430 ¶ 1 ("All respondents reported some symptoms consistent with exposure to lead . . ."); *id.* at PageID.13435 (providing that some physical symptoms "are consistent with exposure to significant levels of lead and/or chronic stress").)  To the extent Dr. Lebowitz is expressing such an opinion, she does appear unqualified to do so.

made clinical observations, including their affect, and gathered data on their life histories, beliefs, viewpoints, any trauma experienced before the Flint Water Crisis, and their functioning after the Flint Water Crisis.  She also administered the IES assessment tool.  Courts have recognized "that these types of diagnostic techniques are part of a valid methodology for psychological evaluation."  *Vicente v. Barnett*, 415 F. App'x 767, 770 (9th Cir. 2011) (citing *United States v. Finley*, 301 F.3d 1000, 1008 (9th Cir. 2002)).  To the extent the Government is critical of Dr. Lebowitz's methods, including her administration of the IES tool, those are issues going to the weight of her opinions and her credibility.

As to the requirement that Dr. Lebowitz's opinions assist the trier of fact to understand the evidence or to determine a fact in issue, the Court believes that this requirement is satisfied.  Dr. Lebowitz does not simply restate the feelings and experiences of the interviewed Plaintiffs.  She explains, based on her education, training, and experience, how a traumatic event like the Flint Water Crisis impacts individuals and communities, in particular minority and economically-disadvantaged populations.  Her expert opinion helps the trier of fact understand the complexity and depth of the psychological impact of such a traumatic event, which is particularly useful to the Court, which may have never experienced such an event.

If the Court ultimately finds Dr. Lebowitz's opinions unreliable or unhelpful based on, or for reasons independent of, the Government's criticisms, it can choose to ignore her opinions. The Court has the flexibility to make the assessment after listening to the evidence, instead of before the evidence is presented, as this will be a bench trial. There is no jury "to protect . . . from misleading or unreliable expert testimony[.]" *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 851 (6th Cir. 2004).

As Plaintiffs and the Government ironically both argue when responding to the other's motion(s) to exclude testimony, a district court's "gatekeeping" role and *Daubert* are "largely irrelevant in the context of a bench trial." *Id.* at 852; *see also TCWC, LLC v. Kelvin Corp.*, No. 18-13863, 2022 WL 22932769, at *2 (E.D. Mich. Sept. 21, 2022) (citing *Deal*, 392 F.3d at 852; *League of Women Voters of Mich. v. Benson*, No. 17-14148, 2019 WL 8106155, at*1 (E.D. Mich. Jan. 15, 2019)). As several judges in this District have concluded when presented with *Daubert* motions preceding a bench trial, "[t]he proper course of action . . . is to admit the evidence and then afford it whatever weight the Court deems appropriate." *TCWC*, 2022 WL 22932769, at *2 (quoting *Benson*, 2019 WL 8106155, at *1) (quoting *Mich. State A. Philip Randolph Inst. v. Johnson*, No. 16-cv-11844, 2018 WL 1180886, at *2 (E.D. Mich. Mar. 7, 2018)). Similarly, Circuit Courts have expressed:

8

> In bench trials, the district court is able to "make its reliability determination during, rather than in advance of, trial. Thus where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702."

*United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018) (quoting *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006)).

For these reasons, the Court is denying the Government's motion to exclude Dr. Lebowitz's expert report and testimony.

### Government's Motion to Exclude Mr. Olson's and Dr. Russell's Reports and Testimony

Plaintiffs retained Mr. Olson as an expert in the structure, policies, rules, and regulations related to the operations of the EPA, including the Safe Drinking Water Act ("SDWA"), the Lead and Copper Rule, and related rules and regulations. (*See* ECF No. 308-4 at PageID.10044.) In summary, Mr. Olson concludes that, if the EPA had been complying with its obligations under the applicable law, the Flint Water Crisis could have been averted or ended more swiftly because the EPA would have identified, avoided, and/or remedied the serious problems with the Flint River water far earlier. (*See id.* at PageID.10045-46.) Plaintiffs retained Dr. Russell, in part, to similarly opine on EPA's duties and whether it breached those duties. (*See* ECF No. 295-3 at PageID.7504-06.) Dr. Russell is a professional

engineer with expertise in water quality, water distribution systems, and environmental regulations.  (*Id*. at PageID.7505.)

The Government seeks to exclude Mr. Olson's and Dr. Russell's reports and testimony, arguing that they are providing legal conclusions, which are prohibited under Federal Rule of Evidence 702.  "A witness' testimony contains a legal conclusion only if 'the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular." *United States v. Volkman*, 797 F.3d 377, 388 (6th Cir. 2015) (quoting *Torres v. Cnty. of Oakland*, 758 F.2d 147, 151 (6th Cir. 1985)).  For example, in the context of a criminal case, the Sixth Circuit provided:  "An expert may not opine on the overarching question of guilt or innocence, but he or she may 'state opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue."  *Id.* (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994)).

In the context of a civil case, where the plaintiff alleged the use of excessive force in violation of the Fourth Amendment, the Sixth Circuit delineated which expert opinions are and are not legal conclusions as follows:

> The expert can testify, if a proper foundation is laid, that the discipline in the Detroit Police Department was lax.  He also could testify regarding what he believed to be the consequences of lax discipline.  He may not testify, however, that the lax discipline policies of the Detroit Police Department indicated that the City was *deliberately indifferent* to the welfare of its citizens.

10

25 F.3d at 1353.  Further, to explain the scope of the defendant's duty, an expert may testify as to industry standards and customs, including by referencing applicable laws and regulations.  *See Malburg v. Grate*, No. 11-14856, 2014 WL 4473786, at *4 (E.D. Mich. Sept. 9, 2014); *see also Allen v. Cam's Transport Co.*, No. 3:22-cv-403, 2024 WL 3970897, at *5-6 (E.D. Tenn. June 24, 2024) (collecting cases).  An expert is not precluded from opining on whether the defendant complied with those standards, customs, or laws, or on whether the defendant breached its duties, provided those opinions are not offered as evidence of negligence per se.  *Malburg*, 2014 WL 4473786 at *5 (citations omitted); *Allen*, 2024 WL 3970897, at *5.

As a general matter, the opinions stated in Mr. Olson's and Dr. Russell's reports are directed to the applicable standards of care and whether EPA complied with those standards.  Mr. Olson and Dr. Russell do not need to be legal or regulatory experts to offers those opinions because they are otherwise qualified based on their knowledge, skill, experience, training, and/or education.  *See supra*. There is at least one instance, however, where Mr. Olsen opines on how the law should be interpreted, which crosses over to being a legal conclusion.  Beginning at page 11 of Mr. Olsen's report, he interprets a provision of SDWA.  (ECF No. 308-4 at PageID.10054-55.)

11

Nevertheless, this limited instance is not a reason to entirely strike Mr. Olson's report or testimony. To the extent Plaintiffs' counsel crosses the line into seeking legal opinions from these experts at trial, as discussed earlier, because this will be a bench trial, the Court can limit its consideration of these experts' testimony to only that which is admissible.

Lastly, the Court rejects the Government's contention that Dr. Russell is not qualified to offer his opinions because he is not a lawyer or regulator. He has the education, training, and experience to opine on water quality assessment, corrosion mitigation, and the impact on materials exposed to improperly treated drinking water. He can be an expert on the statutes and regulations relevant to his field, without being a lawyer or regulator.

For these reasons, the Court is denying the Government's motion to exclude the expert reports and testimony of Mr. Olson and Dr. Russell.

**Plaintiffs' Motion to Partially Exclude Dr. Huffman's Report and Testimony**

Plaintiffs move to exclude portions of the testimony and report of the Government's expert, Dr. Huffman. Specifically, Plaintiffs seek to limit Dr. Huffman's report and testimony to her neuropsychological evaluations of the minor Bellwether Plaintiffs. Plaintiffs argue that Dr. Huffman lacks sufficient expertise, qualifications, and basis to opine on the Flint Water Crisis' impact on community, behavioral, and mental health, the adult Bellwether Plaintiffs, or the

socioeconomic and mental health consequences on the Flint Community and

Plaintiffs, broadly.  Plaintiffs point out that Dr. Huffman never met with or

examined the adult Bellwether Plaintiffs.

Dr. Huffman is a board certified clinical neuropsychologist, with a

subspecialty certification in Pediatric Clinical Neuropsychology.  (ECF No. 304-

2.)  She earned her doctorate degree in 2000.  To be accepted as a specialist in the

field of Clinical Neuropsychology, Dr. Huffman was evaluated on neuropathology,

neurophysiology, and neurocognitive problems primarily in adults.  (ECF No. 319-

19 at PageID.10772-73.)  While Dr. Huffman's private practice may place a

"particular emphasis on children" (*see* ECF No. 304-2 at PageID.9343), and most

of her assessments in that setting during some years may be of children (*see* ECF

No. 319-10 at PageID.10542), her education, training, and experience render her

qualified to provide the opinions to which Plaintiffs object.

In her private practice, Dr. Huffman provides neuropsychological

assessments to individuals of all ages.  (ECF No. 304-2 at PageID.9343-44; *see*

*also* ECF No. 319-10 at PageID.10542.)  She has extensive experience assessing

emotional distress and trauma associated with a wide range of causes and

disorders.  (ECF No. 304-2 at PageID.9343-44; *see also* ECF No. 319-10 at

PageID.10542-44.)  In addition to her private practice, Dr. Huffman has worked in

various hospital and medical clinic settings, where she conducted

neuropsychological assessments and therapy for diverse populations, which included adults and children with varying disorders, including trauma.  (*See* ECF No. 304-2.)

Dr. Huffman did not meet with or examine the adult Bellwether Plaintiffs. But Plaintiffs cite no caselaw holding that an in-person examination is necessary to render psychological expert testimony reliable.  Dr. Huffman did engage in a systematic review of the individual's available records.  (*See* ECF No. 319-19 at PageID.10776.)  Courts recognize this to be a reliable method to assess an individual's physical and/or mental health.  *See, e.g., Kushner v. Lehigh Cement Co.*, 572 F. Supp. 2d 1182, 1192 (C.D. Cal. 2008) (rejecting the plaintiff's attack on a psychiatrist's opinion based on the lack of an exam, finding the plaintiff's position "undermined by the wide acceptance in ERISA and disability cases of record reviews by psychiatrists and other doctors, without in person examinations, to uphold the propriety of claims decisions based on such reviews") (collecting cases); *Empire Fire & Marine Ins. Co. v. Patton*, No. CV-17-02159, 2019 WL 11544461, at *4-6 (D. Ariz. Aug. 26, 2019) (noting that reviewing depositions and other documents is a reliable method for a psychologist expert); *Kanellakopoulos v. Unimerica Life Ins. Co.*, No. 15-CV-04674, 2018 WL 984826, at *2 (N.D. Cal. Feb. 20, 2018) ("The Court is unpersuaded by Plaintiff's contention that Dr.

Perrillo's methodology—a review of Plaintiff's records—was unreliable because Dr. Perrillo did not examine Plaintiff in person.").

Nor is Dr. Huffman unqualified because Plaintiffs' experts may arguably have more experience in the specific areas about which they and Dr. Huffman offer expert testimony. This goes to weight and credibility, not admissibility.

Thus, the Court is denying Plaintiffs' motion to exclude certain opinions of Dr. Huffman (ECF No. 304).

### <u>The Government's Motion to Exclude the Testimony of Messrs. Rostar, Legins, and Saad, and Dr. Meyers Pursuant to Federal Rule of Civil Procedure 37(c)(1)</u>

In Spring 2024, Plaintiffs identified Messrs. Rostar, Legins, and Saad as experts under Federal Rule of Civil Procedure 26(a)(2)(C). (ECF No. 300-2.) Plaintiffs also designated rebuttal expert Dr. Meyer under the same rule. (ECF No. 300-4.) Rule 26(a)(2)(C) witnesses need not provide a written report. *See* Fed. R. Civ. P. 26(a)(2)(C).

The Government seeks to exclude the testimony of these witnesses, contending that they, in fact, should have been designated as witnesses under Rule 26(a)(2)(B) and, therefore, should have furnished a written report. *See* Fed. R. Civ. P. 26(a)(2)(B). The Government also argues that Mr. Rostar is not qualified and that his opinions are irrelevant and unreliable.

Rule 26(a)(2)(B) requires a written report from any witness "retained or specially employed to provide expert testimony in the case or . . . whose duties as the party's employee regularly involve giving expert testimony.  Fed. R. Civ. P. 26(a)(2)(B).  A witness who forms his or her opinions from information obtained and observations made independent of the litigation, and does not form those opinions "in anticipation of litigation," is not such an expert.  *See Adkins v. Marathon Petroleum Co., LP*, 105 F4th 841, 849 (6th Cir. 2024) (citing *Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 869 (6th Cir. 2007)).  Under which subsection of Rule 26(a)(2) an expert witness falls "is determined primarily by the scope, substance, and source of the[ir] intended testimony—not on whether the witness is being compensated."  *Ulbrick v. UPR Prods., Inc.*, No. 08-13764, 2011 WL 500034, at *4 (E.D. Mich. 2011) (citing *Fielden*, 482 F.3d at 871).

In response to the Government's motion, Plaintiffs assert that Messrs. Rostar, Legins, and Saad were retained to provide their "observations," and Dr. Meyers was retained to testify as the "creator and owner of the Meyers Neuropsychological Battery ("MNB") and software program and its application. (*See* ECF No. 330 at PageID. 11316-20.)  Notably absent from Plaintiffs' assertion, however, is that these experts' observations *and* opinions were not formed in anticipation of litigation, which is what exempts them from the report

requirement in Rule 26.[2]  Plaintiffs' primary argument in response to the

Government's motion is that exclusion is not the proper remedy where the

Government did not previously file a motion seeking to compel reports from these

experts, went ahead anyway with their depositions, and then waited until after

discovery closed to seek their exclusion.

Federal Rule of Civil Procedure 37 sets forth the consequence for failing to

provide an expert witness report required under Rule 26(a)(2)(B):

> If a party fails to provide information or identify a witness as required
> by Rule 26(a) or (e), the party is not allowed to use that information or
> witness to supply evidence on a motion, at a hearing, or at a trial,
> unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1); *see also Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325

F.3d 776, 782 (6th Cir. 2003) (quotation marks and citations omitted) (stating that

Rule 37(c)(1) "mandates that a trial court punish a party for discovery violations in

connection with Rule 26 unless the violation was harmless or is substantially

justified").  The party that has violated Rule 26 bears the burden of showing that

---

[2] Having reviewed Mr. Rostar's deposition to address the Government's other
challenges to his opinions, the Court does not believe his observations or opinions
were formed in anticipation of litigation.  Instead, the plumbing company where he
works, Goyette Mechanical, was called by the homeowner of 926 Maxine Street to
address various plumbing issues, at which time water damage was observed in the
ceiling.  (ECF No. 330-2 at PageID.11407.)  Other Goyette plumbers found
substantial leaking and corrosion of the home's pipes.  (*Id.* at PageID.11407,
11409, 11413.)  Mr. Rostar was then brought in to provide the homeowner with an
estimate to remove and replace the damaged piping.  (*Id.*)

the violation "was either justified or harmless." *Roberts ex rel. Johnson*, 325 F.3d at 782 (collecting decisions from other circuits placing burden on the potentially sanctioned party); *see also RJ Control Consultants, Inc. v. Multiject, LLC*, 100 F.4th 659, 668 (6th Cir. 2024) (quoting *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn., P.C.*, 388 F.3d 976, 983 (6th Cir. 2004)) (providing that exclusion is " 'automatic and mandatory' unless the offending party can show that its nondisclosure was substantially 'justified or harmless'").

The Sixth Circuit has offered five factors for district courts to consider when assessing whether the failure of a party to comply with Rule 26(a)'s requirements is justified or harmless:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*RJ Control Consultants*, 100 F.4th at 668-69 (quoting *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015)).  The Sixth Circuit also has advised that "[d]istrict courts have broad discretion in applying these factors and need not apply each one rigidly."  *Id.* at 669 (quoting *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 219 (6th Cir. 2019)).  Having considered these factors, Plaintiffs demonstrate that the omission of reports from these witnesses was harmless.

At least eight months before the Government filed its motion to exclude the testimony of these experts, it knew that they were going to testify and to what they were going to testify.  As the Sixth Circuit pointed out in *Roberts ex rel. Johnson*, "[t]his fact alone makes this case atypical of cases where sanctions have been justified under Rule 37(c)(1)."  325 F.3d at 783 (citing *Ames v. Van Dyne*, No. 95-3376, 1996 WL 662899, at \*4-\*5 (6th Cir. Nov. 13, 1996); *Bowe v. Consol. Rail Corp.*, No. 99-4091, 2000 WL 1434584, at \*3-\*4 (6th Cir. Sept. 19, 2000)).  The Government also knew that it had not received a Rule 26(a)(2)(B) report from these experts.  Thus, there was no surprise to the Government.  While the Government may have voiced objections to Plaintiffs about the lack of reports from these experts, it never made a motion to compel their disclosure under Rule 37(a)(2)(A), when there was time to cure the deficiency.

Had the Government filed such a motion when Plaintiffs made clear that no reports would be produced, there would have been ample time to cure the omission.  Even now, with no trial date set, reports could be produced without harm to the Government.  And because no trial date has been set, it cannot be said that allowing the evidence will necessarily disrupt trial.  The testimony of these experts is important to address the damage the tainted Flint Water caused to the property of Bellwether Plaintiffs.

19

Turning to the final factor, Plaintiffs' explanation for their failure to produce reports from these experts is not persuasive.  As indicated, Plaintiffs do not address whether the opinions being offered by these witnesses were formed in anticipation of litigation.  Nevertheless, this does not alter the Court's conclusion that the failure to produce reports from these witnesses is harmless.

For these reasons, the Court declines to exclude the testimony of these witnesses because they failed to provide expert reports.  If the Government still demands a report from any of these witnesses, with the exception of Mr. Rostar for the reasons set forth in footnote two, it shall inform Plaintiffs' counsel and Plaintiffs shall produce a report within thirty days of the request.  If the Government finds it necessary to re-depose any of these witnesses after obtaining the witness's Rule 26(a)(2)(B) report, it shall confer with Plaintiffs' counsel, explaining why the deposition is needed.  If Plaintiffs do not agree, the Government may seek leave of the Court to depose the witness(es), explaining why further questioning is needed.

The Court turns lastly to the Government's challenge to Mr. Rostar's testimony based on his alleged lack of qualifications and underlying methodology. Plaintiffs retained Mr. Rostar to testify about the corroded and clogged plumbing removed from 926 Maxine Street, the damage caused to the home when the pipes failed, and the cost of repairing the plumbing.  The Government maintains that Mr.

Rostar, a certified journeyman plumber, lacks the requisite education, training, or experience to qualify him to testify about the chemical impact of inadequately treated river water on galvanized pipes.  The Government also challenges the reliability of Mr. Rostar's opinions based on numerous asserted deficiencies in his methods, including that he did not perform any tests on the damaged pipes, does not know the composition of the sediment in the pipes or of the tainted Flint River water he attributes to the corrosion, and did not investigate other possible causes of the corrosion.

Mr. Rostar may lack the education, training, or experience to opine on whether the tainted Flint River Water, specifically, caused the damage to the replaced pipes at 926 Maxine Street.  Plaintiffs indicate, however, that Mr. Rostar will not be testifying about the chemical impact of inadequately treated water on galvanized pipes, like those which needed to be replaced in that home.  Mr. Roster is qualified, though, as an experienced plumber who observed the pipes in and damage to the home, to testify about the plumbing's condition, the likely cause of the pipes' corrosion and clogging, the damage that resulted, what was involved to repair the damage, and the cost of the repair.  To the extent Mr. Rostar offers testimony beyond his qualifications or offers unreliable conclusions, the Government can seek to exclude or challenge that testimony at the bench trial.

21

Again, because it is a bench trial, the Court will be able to ignore that testimony if it upholds the Government's challenge.

The Court, therefore, is denying the Government's motion to exclude the expert testimony of Messrs. Rostar, Legins, and Saad and Dr. Meyers.

### The Government's Motion to Exclude Drs. Russell's and McLoyd's "Supplemental" Reports Pursuant to Federal Rule of Civil Procedure 37(c)(1)

The Government asks the Court to strike additional reports prepared by Drs. Russell and McLoyd, which Plaintiffs served on the Government on September 25 and 26, 2024, respectively. The Government argues that they are not "supplemental" materials but provide new opinions and rely on new sources never previously disclosed. The Government maintains that the reports are, therefore, untimely.

### Applicable Law

As previously mentioned, Federal Rule of Civil Procedure 26(a)(2)(B) requires a signed, written report from an individual retained to provide expert testimony. The report must include:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case.

22

Fed. R. Civ. P. 26(a)(2)(B). These disclosures are required "at the time and in the sequence directed by the court." Fed. R. Civ. P. 26(a)(2)(B). Here, opening expert reports were due in February 2024, rebuttal reports were due in May 2024, and discovery closed on September 9, 2024. As discussed earlier, the failure to timely disclose an expert report leads to the exclusion of that expert's opinion and testimony unless the violation was harmless or is substantially justified. *See* Fed. R. Civ. P. 37(c)(1).

Rule 26 imposes a duty to supplement the report of an expert whose report was disclosed under Rule 26(a)(2)(B), and requires additions or changes to be "disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(a)(2)(B). Under Rule 26(a)(3)(B), pretrial disclosures must be made at least 30 days before trial "[u]nless the court orders otherwise." Fed. R. Civ. P. 26(a)(3)(B). Pretrial disclosures are not yet due in this case. Thus, the timeliness of Dr. Russell's and Dr. McLoyd's additional reports depends on whether they are, in fact, supplements.

Rule 26 contemplates the need for supplementation where an earlier disclosure "is incomplete or incorrect[.]" Fed. R. Civ. P. 26(e)(1)(A). As judges in this Circuit have explained, a true supplement corrects an "error or inaccuracy in [an earlier report's] reasoning[,]" or "serve[s] as a response to an opposing expert's pointing out gaps in [the expert]'s chain of reasoning." *Knudson v. Am. Steamship*

23

*Co.*, No. 14-14854, 2018 WL 914930, at *3 (E.D. Mich. Feb. 15, 2018) (quoting

*Eiben v. Gorilla Ladder Co.*, No. 11-cv-10298, 2013 WL 1721677, at *6 (E.D.

Mich. 2013)); *see also Ullman v. Auto-Owners Mut. Ins. Co.*, No. 2:05-cv-1000,

2007 WL 1057397, at *4 (S.D. Ohio 2007).  A supplement may "include

information thereafter acquired" or reflect "an expert's changed opinion[.]"

*Ullman*, 1007 WL 1057397, at *4; *Eiben*, 2013 WL 1721677, at *5, *6; *see also*

*Minebea Co. v. Papst*, 231 F.R.D. 3, 6 (D.D.C. 2005) (citations omitted)

(explaining that Rule 26(e)(1) "permits supplemental reports only for the narrow

purpose of correcting inaccuracies or adding information that was not available at

the time of the initial report).  In comparison, "[i]t is not mere 'supplementation'

when a party submits a manifestly incomplete report lacking analysis or a

supporting rationale . . . and then submits a fuller report that contains actual

reasoning." *Eiben*, 2013 WL 1721677, at *5 (quoting *Ullman*, 2007 WL 1057397,

at *4) (brackets and alterations omitted).  Nor is the duty to supplement an

opportunity to provide untimely new opinions.  *See id*.

### Dr. Russell's Reports

Plaintiffs argue that Dr. Russell's additional report is "clearly supplemental,"

as he initially references and discusses the impact of the tainted Flint River water

on residential plumbing systems and, in his later report, applies his opinions to the

plumbing later removed from 926 Maxine Street, which is owned by Bellwether Plaintiff Anthony Vance.  The Court agrees.

In his February 23, 2024 report, Dr. Russell discusses how improperly treated corrosive water—such as the Flint River water during the Flint Water Crisis—causes certain plumbing, such as galvanized pipes, to pit and eventually collude.  (*See* ECF No. 295-3.)  This results in, among other things, the pipes failing (e.g., leaking) and increased lead being released into the drinking water. (*Id*.)  In his initial report, Dr. Russell also offers his opinions regarding the faulty water-quality testing that local, state, and federal officials employed during the Flint Water Crisis.  (*Id*.)  According to Dr. Russell, this led to the concentration of the lead in the water being underreported.  (*Id*.)

In his September 24, 2024 report, Dr. Russell confirms his opinions based on his analysis of the plumbing from Mr. Vance's home.  He is not offering new opinions, nor is he trying to bolster a previous incomplete report or unsupported opinions.  Instead, Dr. Russell is merely applying his opinions to later-acquired plumbing.  In this situation, the Court deems the later report to be a timely-provided supplement.

### Dr. McLoyd's Reports

In her initial report, dated February 22, 2204, Dr. McLoyd opines on the impact of the Flint Water Crisis on the physical and mental health and academic

25

progress of Fint residents.  (ECF No. 305-4.)  Dr. McLoyd's opinions are based

heavily on three Community Assessment for Public Health Emergency Response

household surveys of Flint residents between May 2016 and July 2018: CASPER 1

(May 2016); CASPER 2 (December 2017); and CASPER 3 (July 2018)

(collectively "CASPER reports").  (*Id*.)  The Government's expert, Dr. Huffman,

has criticized Dr. McLoyd's findings and opinions, in part because earlier

CASPER surveys were of Genesee County, as a whole, and did not provide

information limited to Flint, resulting in a lack of pre-Flint-Water-Crisis

comparative data.  (*See* ECF No. 319-10 at PageID.10566.)

To overcome these limitations, Dr. McLoyd explains in a September 18,

2024 report, she obtained data from the 2012 through 2014 state-wide Michigan

Behavioral Risk Factor Surveys ("MiBRFS"), which were conducted by the

Michigan Department of Health and Human Services.  (*See* ECF No. 305-6.)  This

data could be segregated to obtain the results from Flint residents.  Three of the

questions in the MiBRFS overlap questions asked during the CASPER surveys.

(*Id*.)  Therefore, Dr. McLoyd obtained data disaggregated by geographic location

and preceding the Flint Water Crisis to compare to the CASPER reports.  (*Id*.)  In

her September 18, 2024 report, Dr. McLoyd outlines her findings based on the

additional data and reaches the same overall opinion expressed in her earlier

report: "that the Flint Water Crisis had negative effects on the behavioral health of Flint residents." (*Id*. at PageID.9592.)

Thus, Dr. McLoyd's second report merely addresses a claimed error in her earlier reasoning and/or responds to a gap in her reasoning which Dr. Huffman identified. As such, it is a "true supplement[.]" *Knudson*, 2018 WL 914930, at *3 (quoting *Eiben*, 2013 WL 1721677, at *6). Accordingly, it is not untimely.

**Plaintiffs' Motion to Compel the Production of Documents and Additional Deposition Testimony from Dr. Goodman**

The Government retained Dr. Goodman, whose expertise is in epidemiology and toxicology, to opine on the causal connection between lead exposure and various health conditions. According to Plaintiffs, the level of Dr. Goodman's billings in this case (totaling over $700,000 through July 2024), led them to seek information concerning her source of income from other clients through her employment with Gradient Corporation. To that end, during Dr. Goodman's deposition, Plaintiffs' counsel asked Dr. Goodman about: (1) her "salary/compensation for the years she was retained by [the Government in this litigation]"; (2) "her base salary and bonuses" from Gradient Corporation; (3) "her yearly revenue goals"; and (4) "additional compensation received by Dr. Goodman based on a percentage of billings she generated in this case." (*See* ECF No. 322 at PageID.10841-42; ECF No. 336-1 at PageID.12707-11.) Dr. Goodman refused to provide the information, claiming Gradient deems it confidential. (*Id*.)

27

According to Plaintiffs, they also have not received all of Dr. Goodman's invoices for her work in the present matter.  Plaintiffs received invoices beginning in November 2022; however, Dr. Goodman testified that she was retained by the Government in 2020.  (*See id.* at PageID.12709.)  Plaintiffs argue that this evidence is relevant to Dr. Goodman's potential bias or any undue influence.

In their pending motion, Plaintiffs ask the Court to compel Dr. Goodman to provide documentation and submit to another deposition to allow their counsel to question her about these areas: (a) her "base salary during her retention in this case"; (b) her "bonuses and the formula used to calculate her bonuses during her retention in this case"; (c) her "yearly revenue goals with Gradient and the formula utilized to determine these goals during her retention in this case"; and (d) "[a]ny documentation regarding [her] compensation or benefits associated with her expert billings during her retention in this case."  (ECF No. 322 at PageID.10856.)  Plaintiffs also seek an award of their attorney fees and costs in bringing the motion, although they do not specify against whom the award should be imposed.

The Government argues in response that the information Plaintiffs seek goes beyond information relevant to Dr. Goodman's potential bias.  Plaintiffs request information concerning all of Dr. Goodman's income during the period she was retained by the Government, not simply the money she earned from sources that might reflect a bias or undue influence.  In other words, Plaintiffs' request is not

28

limited to income representing clients, much less the Government or clients with interests similar to the Government's here.

Parties may discover information related to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). This includes information tending to show a witness' bias, undermining a witness' credibility, or impeaching the witness. *See Behler v. Hanlon*, 199 F.R.D. 553, 556-57 (D. Md. 2001) (citing *United States v. Abel*, 469 U.S. 45, 49-52 (1984)) (additional citations omitted). District courts recognize that parties may want to obtain more information from expert witnesses than what is included in their reports "because of the proliferation of expert witnesses who are, 'in effect, hired guns, who, while educated and experienced in the field, are willing and able to hire themselves out to the highest bidder to provide opinions in favor of the hiring party.'" *Profitt v. Highlands Hosp. Corp.*, No. 7:19-cv-00015, 2021 WL 5435171, at *4 (E.D. Ky. Nov. 19, 2021) (quoting *Campos v. MTD Prods.*, No. 2-07-0029, 2009 WL 920337, at *2 (M.D. Tenn. Apr. 1, 2009)). As the court reasoned in *Behler*:

> [T]he fact that an expert witness may have a 20 year history of earning significant income testifying primarily as a witness for defendants, and an ongoing economic relationship with certain insurance companies, certainly fits within recognized examples of bias/prejudice impeachment, making such facts relevant both to the subject matter of the litigation, and the claims and defenses raised, and placing it squarely within the scope of discovery authorized by Rule 26(b)(1).

29

*Behler*, 199 F.R.D. at 557 (footnote omitted).

Judges in this District therefore held that an expert witness' financial information is discoverable if its purpose is to uncover potential bias. *Estate of Jackson v. Billingslea*, No. 18-10400, 2019 WL 2743750, at *2 (E.D. Mich. July 1, 2019) (citing *Behler*, 199 F.R.D. at 556); *see also Burger v. Allstate Ins. Co.*, No. 07-11870, 2009 WL 1587396, at *2 (E.D. Mich. June 8, 2009).  For example, in the case of a defense expert, "information related to the expert's volume of work, number of defendants he worked for, the amount paid by those defendants, and the percentage of income derived from his expert witness services was found within the scope of discovery." *Estate of Jackson*, 2019 WL 2743750, at *2 (citing *Burger*, 2009 WL 1587396, at *2-3; *Great Lakes Anesthesia, PLLC v. State Farm Mut. Auto. Ins. Co.*, No. 11-10658, 2011 WL 4507417, at *5-6 (E.D. Mich. Sept. 29, 2011)).

"However, as Rule 26(b)(2) instructs, the mere fact that such information falls within the scope of legitimate discovery does not mean that parties are entitled to unfettered discovery of impeaching information, by whatever means of discovery they seek." *Behler*, 199 F.R.D. at 561.  A court may restrict or preclude discovery found to be "burdensome, duplicative, unnecessarily costly, or insufficiently probative to the issues in the litigation to warrant the expense of production." *Id.* (citation omitted); *see also* Fed. R. Civ. P. 26(b)(2)(C).

30

In *Behler*, although recognizing the relevancy of the expert's activities as a defense witness in other matters, the court held that discovery of the total income earned by the witness for the previous five years, his earnings from Rule 35 examinations, records of the hours spent as an defense expert, copies of his tax returns, and lists of all insurance companies with which he was affiliated and cases where he provided expert services was "overkill." 199 F.R.D. at 561. The court reasoned:

> While there may be cases in which an expert's gross income, and the specific amounts thereof earned by providing services as an expert witness, may be discoverable, this should not be ordered routinely, without a showing, absent here, why less intrusive financial information would not suffice. . . . permitting routine disclosure of the expert's gross compensation, from all sources—including those unrelated to litigation activities—would provide the jury with little information relevant to a fair assessment of the expert's credibility, while concomitantly introducing the real possibility of creating confusion, distraction and even prejudice.
>
> Instead, the jury readily should be able to assess possible bias on the part of an expert witness if they are made aware of the total percentage of his or her gross income that is earned from providing expert witness services. Similarly, there is no need for the expert to have to produce his or her tax returns, if the party seeking the discovery has accurate information regarding the percentage of income earned as an expert.
>
> Additionally, while documents relating to all cases within a stated period of time for which an expert was retained are relevant to possible bias impeachment, . . . [the expert witness] should [not] be required to assemble these records, provided the plaintiff is able to obtain the equivalent information by a more expedient, less costly method.

*Id*. at 561-62.

The court in *Estate of Jackson*, in comparison, found the expert witness'
gross income, not only the percentage of his income derived from his expert
witness services, relevant to potential bias.  2019 WL 2743750, at *2.  The court
reasoned:

> The percentage of income informs the jury about how dependent the
> expert is on the income from providing those services, whereas gross
> income reveals the expert's total monetary incentive to produce
> favorable results.  One can imagine a scenario where an expert's
> percentage of income from providing expert witness services is low
> but he still received substantial amounts of money from them.

*Id.* The court also disagreed with the decision in *Behler* that discovery of an expert
witness' 1099s should generally be precluded.  *Id.* (citing *Chauvin v. State Farm
Mut. Auto. Ins. Co.*, No. 10-cv-11735, 2011 WL 2490870 (E.D. Mich. 2011))
(indicating that "1099s are within the scope of discovery[,]" and that any fears that
this will deter experts from serving as witnesses "are likely assuaged because
sensitive information can be censored").  Thus, in *Estate of Jackson*, the court
allowed for discovery of all 1099s issued to the defendant's expert witness or his
company "for any company they rendered an expert opinion for within the last five
years."  *Id*. at *1, *3; *see also Chauvin*, 2011 WL 2490870, at *2-3 (allowing
discovery of several financial documents from the defendant's independent
medical examiner, including partially redacted 1099s for all insurance companies
the expert provided examinations for in the previous four years).

Here, the Court finds some of Plaintiffs' requests to be "overkill."  Plaintiffs are not simply seeking the income Dr. Goodman generated from expert services that might reflect a bias, such as income earned from serving as an expert witness for the federal government or the defense.  The disclosure of Gradient's compensation and incentive programs, Dr. Goodman's bonuses, and Dr. Goodman's yearly revenue goals are unduly intrusive, while offering Plaintiffs only a marginally greater ability to demonstrate any potential bias.  Therefore, the Court declines Plaintiffs' request for an award of their attorneys' fees and costs for bringing this motion.[3]

The Court will order Dr. Goodman to appear at a remote deposition, not to exceed two hours, for Plaintiffs to inquire as to her total compensation from all sources, her total compensation from serving as an expert witness for the federal government, and her total compensation from serving as an expert witness for any defendant.  This information is limited to the period during which Dr. Goodman has been retained as an expert in this case.  The deposition will be subject to a protective order in that the information obtained may not be used or disseminated for any purpose other than the prosecution of the Flint Water cases pending before

_____

[3] To the extent Plaintiffs were seeking attorney fees and costs as a sanction against the Government, counsel for the Government did not instruct Dr. Goodman not to answer Plaintiffs' question.  It was the Government's suggestion that her answers be kept confidential to encourage her to answer.  Thus, for this reason, as well, the Court finds sanctions unwarranted.

the undersigned and the Honorable Judith E. Levy.  Prior to the deposition, Dr.

Goodman shall make a diligent search of all records in her possession, custody,

and control, to be able to provide this information.  Plaintiffs may seek leave of

Court to seek additional information following the deposition if they believe Dr.

Goodman's answers warrant such additional information.

Moreover, to the extent Dr. Goodman has not produced all of her invoices

for her work in the present matter, she shall provide that information to Plaitiffs.

## **Conclusion**

For the reasons set forth herein, the Court is denying the Government's

motions to exclude the expert report and testimony of Dr. Lebowitz (ECF No.

293), Mr. Olson and Dr. Russell (ECF No. 295), and Messrs. Rostar, Legins,  and

Saad and Dr. Meyers (ECF No. 300).  The Court is denying Plaintiffs' motion to

exclude portions of Dr. Huffman's testimony and report.  (ECF No. 304.)  The

Court also denies the Government's motion to strike the supplemental reports of

Drs. Russell and McLoyd.  (ECF No. 305.)

The Court is granting in part and denying in part Plaintiffs' motion to

compel the production of documents and testimony of Dr. Goodman.  (ECF No.

322.)  The Court is ordering Dr. Goodman to appear for a remote deposition, not to

exceed two hours, to provide the information set forth above.

**SO ORDERED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: December 1, 2025