UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

*In re* FTCA Flint Water Cases,

Case No. 17-cv-11218
(Consolidated)
Honorable Linda V. Parker

_____/

## OPINION AND ORDER (1) GRANTING IN PART AND DENYING IN PART THE MOTION FOR SUMMARY JUDGMENT FILED BY THE UNITED STATES OF AMERICA AND (2) DENYING AS MOOT PLAINTIFFS' MOTION TO COMPEL COMPLIANCE WITH THE CASE MANAGEMENT ORDER

This is a Federal Tort Claims Act ("FTCA") lawsuit arising from the Flint

Water Crisis. Plaintiffs allege that the United States Environmental Protection

Agency ("EPA") responded negligently when the City of Flint switched the source

of its water supply from the Detroit Water and Sewerage Department to the Flint

River without utilizing necessary corrosion controls, resulting in water with

excessive lead and copper levels and other contaminants flowing into Flint homes

and businesses. This allegedly caused Plaintiffs serious physical injury, business

loss, and property damage.

The matter is presently before the Court on a motion for summary judgment

filed by the United States of America (hereafter "Government"). (ECF Nos. 297-

299.) In the motion, the Government contends that the claims of the following

Bellwether Plaintiffs are barred by the FTCA's statute of limitations, 28 U.S.C.

§ 2401(b), because their administrative claims were received by the EPA more than two years after their claims accrued: Vivian Anderson, Stanley Langston, Jason Keys, Patricia Crews, Margie McClain, and Lawrence Cooley (collectively "the alleged time-barred Bellwether Plaintiffs"). The Government further contends that the claims of the alleged time-barred Bellwether Plaintiffs, along with Bellwether Plaintiffs Carolyn Daly, Anthony Vance, and John Campbell, fail because they cannot prove causation. The Government's motion is fully briefed. (ECF Nos. 333, 342.)

Until the Court rules on its summary judgment motion, the Government has declined to meet and confer with Plaintiffs to pick the FTCA trial group from the FTCA discovery group and discuss a case management order governing the proceedings going forward. Case Management Order No. 4 ("CMO 4") requires the parties to meet and confer within 21 days of the resolution of all dispositive motions to discuss the first matter and within 30 days to discuss the latter matter. (*See* ECF No. 172.) Claiming that the pending motion is not among the dispositive motions contemplated by CMO 4, and that the contemplated dispositive motions have now all been decided, Plaintiffs have moved to compel the Government to meet and confer with them. (ECF No. 363.) Because the Government's motion is now being decided, and the Government acknowledges its duty to meet and confer once that occurs, the Court is finding Plaintiffs' motion moot.

2

## I.     Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant meets this burden, "[t]he party opposing the motion must show that 'there is a genuine issue for trial' by pointing to evidence on which 'a reasonable jury could return a verdict' for that party."  *Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021) (quoting *Liberty Lobby*, 477 U.S. at 248).  The non-movant's evidence generally must be accepted as true and "all justifiable inferences" must be drawn in the non-movant's favor.  *Liberty Lobby*, 477 U.S. at 255.

II.     **Background**

A.     **The Flint Water Crisis**

The facts relevant to Plaintiffs' FTCA claims have been set forth in previous decisions and will not be repeated at length here.  To the extent they are repeated, citations to the record are omitted and can be found in the Court's earlier decisions.

Most relevant to the Government's current motion, the City of Flint, with the approval of the Michigan Department of Environmental Quality ("MDEQ"), switched Flint's water source from the Detroit Water and Sewerage Department ("DWSD") to the Flint River water in late April 2014.  Boil water advisories soon followed, and, in January 2015, a violation notice was issued because the water exceeded the maximum contaminant level standard for total trihalomethanes ("TTHM").  By late January 2015, the news media was providing widespread coverage regarding the environmental crisis developing in Flint as a result of the contaminated water and resulting illnesses.

Flint residents immediately noticed the change in the quality of the water when the City switched its water source to the Flint River.  Citizen complaints were made to officials, including at the EPA.  EPA officials assured Flint residents that MDEQ was working closely with the City to provide drinking water that met health standards, and directed consumers to resolve their concerns with MDEQ or Flint officials.

4

On June 24, 2015, EPA scientist Miguel Del Toral issued a report describing his investigation of water quality issues at a Flint resident's home.  In the report, Mr. Del Toral highlighted the lack of corrosion control by Flint and the potential systemwide problems that could result with increased water lead levels.  In late June 2015, Mr. Del Toral's report was made public by local and national media outlets.

On July 9, 2015, Michigan media outlets raised the serious environmental and public health issues discussed in Mr. Del Toral's report.  On July 10, Dr. Susan Hedman, EPA's Region 5 Director, issued a press statement which conveyed in part that "EPA will work with the Michigan DEQ and the City of Flint to verify and assess the extent of lead contamination issues and to ensure that Flint's drinking water meets federal standards."  In early September 2015, the public was made aware of another report showing an immediate public health crisis.  This report had been prepared by Dr. Marc Edwards, an environmental engineering professor from Virginia Tech University, who had taken water samples from Flint homes for lead testing.  Dr. Edwards found lead levels exceeding the EPA Action Level in a large percentage of the samples he tested.

On September 9, 2015, a reporter asked the EPA if "there is any warning to citizens about drinking the water?"  The EPA's Press Officer responded that "lead monitoring shows Flint has not exceeded the lead action level . . .."  This EPA

5

official further stated that "Flint recently accepted EPA's offer to provide technical assistance to the City and MDEQ . . .."

Public information and media reports about the contaminated water and the related lead issues in Flint became more widespread in September 2015.  Late that month, the City of Flint and the Genesee County Board of Commissioners issued lead advisories.  On October 1, the Genesee County Health Department issued a widely publicized "Do Not Drink the Water" advisory.

A day later, the State of Michigan publicly released a 10-Point Plan to address Flint's water problems.  Although an EPA official assisted with the plan, it is not evident from the record that this assistance was publicly disclosed.  On October 8, 2015, the Michigan Governor and Flint Mayor announced that Flint would connect to the Great Lakes Water Authority, which was then operating the Detroit drinking water system.  On October 16, Flint switched back to purchasing finished water from the City of Detroit.

Despite the switch, corrosion control treatment remained necessary because the corrosive Flint River water had eroded away the protective coatings in the system.  High levels of lead and other contaminants remained a threat in the water being furnished to Flint homes and businesses.  On December 14, 2015, the City declared an emergency.  On January 14, 2016, Michigan's Governor requested emergency disaster assistance.  Two days later, President Obama declared a federal

emergency in the city.  On January 21, 2016, EPA issued an emergency order

pursuant to the Safe Drinking Water Act ("SDWA").

On October 20, 2016, EPA's Office of Inspector General ("OIG") issued a

"Management Alert" in which it found that EPA "Region 5 had the authority and

sufficient information to issue a SDWA Section 1431 emergency order to protect

Flint residents from lead-contaminated water as early as June 2015."  The OIG

issued a comprehensive report on July 19 2018, which described EPA's

responsibilities in connection with overseeing water systems and enforcing the

SDWA.  It also discussed EPA's actions, omissions, and delays in connection with

the Flint Water Crisis.

### B.    Claims Arising from the Crisis

Beginning in late 2015, Flint residents and business owners began filing

lawsuits against the State, Genesee County, Flint, and state and local officials

based on their conduct in connection with the Flint Water Crisis.  *See, e.g.*, Compl.,

*Mays, et al. v. Snyder, et al.*, No. 15-cv-14002 (E.D. Mich. Nov. 13, 2015);

Compl., *Waid, et al. v. Snyder, et al.*, No. 16-cv-10444 (E.D. Mich. Feb. 8, 2016),

ECF No. 1.  The plaintiffs in *Waid* amended their Complaint in September 2016, to

*inter alia* add as defendants some of the firms that provided professional services

and expertise concerning the Flint water system during the relevant period. *See,*

*e.g.*, First Am. Compl., *Waid*, No. 16-cv-10444 (E.D. Mich. Sept. 12, 2016) ECF

No. 31.  Additional lawsuits followed against these officials and professional entities.  *See* Compl., *Walters, et al. v. Snyder, et al.*, No. 17-cv-10164 (E.D. Mich. Jan. 18, 2017), ECF No. 1.

Flint residents and property owners also filed administrative claims with the EPA.  For example, Jan Burgess, individually and on behalf of 523 other claimants, filed a complaint with the agency on April 25, 2016.  (*See* ECF No. 297-5 at PageID.7814 ¶ 2.)  As relevant to the pending motion, on October 16, 2017, the EPA received Bellwether Plaintiff Vivian Anderson's administrative claim alleging that she suffered personal injuries and property damage due to the contaminated Flint water.[1]  (ECF No. 297-10.)  Ms. Anderson testified that her physical ailments began in 2014.  (ECF No. 299-3 at PageID.8447-51, 8444-45.) She was aware of the lead in the water by late 2014.  (*Id.* at PageID.8444-45.)

On March 26, 2018, the EPA received an administrative claim from Bellwether Plaintiff Stanley Langston.  (ECF No. 297-11.)  Mr. Langston alleges personal injuries due to his exposure to the contaminated Flint River water, as well as damage to his home.  (*Id.*)  Mr. Langston was aware of the water contamination issues shortly after the City's switch to the Flint River water, and he claims the

---

[1] Ms. Anderson no longer has a property damage claim pending here.  (*See* ECF No. 221 at PageID.4444-45.)

8

damage to his property from the water began in 2014.  (ECF No. 299-5 at

PageID.8464-65, 8477-78.)

Bellwether Plaintiff Jason Keys submitted an administrative claim to the

EPA, which the agency received on July 31, 2018.  (ECF No. 297-12.)  Mr. Keys

claims personal injuries and business loss and property damage to his beauty salon

and barber shop due to the contaminated Flint River water.  (*See id.*)  Mr. Keys

became aware of the problems with the contaminated water in mid-2015.  (ECF

No. 297-26 at PageID.8050.)  His physical injuries manifested by October 15,

2014.  (ECF No. 299-7.)  Damages to his business property began in 2015, when

he had to replace the hot water heater.  (ECF No. 297-26; ECF No. 297-26 at

PageID.8047.)  His business losses and extra business expenses began around 2014

or 2015, with an increased turnover of renters of booths in his barbershop, and

extended to November 2015, when he had to open a new location.  (ECF No. 297-

26 at PageID.8044-46, 8048-49, 8051.)

The EPA received the administrative claim of Bellwether Plaintiff Terry

Crews on February 7, 2019, which Mr. Crews brought individually and on behalf

of his late wife, Patricia Crews.  (ECF No. 297-13.)  Mr. Crews alleges wrongful

death on behalf of Mrs. Crews.  (*See id*.)  Mrs. Crews passed away on November

24, 2015.  (ECF No. 297-17; ECF No. 299-8 at PageID.8494.)  Mrs. Crews' death

certificate lists the following causes of death: acute respiratory failure, health care

acquired pneumonia, and chronic lymphocytic leukemia.  (*Id.*)  Mr. Crews also

alleges diminution in the value of his home due to the contaminated water.  (ECF

No. 297-29 at PageID.8066-67.)

On February 7, 2019, the EPA also received an administrative claim from

Bellwether Plaintiff Margie McClain, in which she claims loss and damage to her

two business properties.  (ECF No. 297-14.)  This includes lost rental income and

damage to the furnace, hot water heater, and pipes at both properties.  (ECF No.

298-1 at PageID.8081-83; ECF No. 298-2 at PageID.8086-87; ECF No. 298-3 at

PageID.8092.)  Mrs. McClain's husband, Leo McClain, who replaced the hot water

heaters, furnaces, and pipes himself, testified that the work was done sometime

between 2014 and 2016. (ECF No. 298-4 at PageID.8109-12.)

Bellwether Plaintiff Lawrence Cooley submitted an administrative claim to

the EPA, which the EPA received on March 14, 2019.  (ECF No. 297-15.)  Mr.

Cooley claims personal injury and property damage as a result of the contaminated

water.  (*Id.*; ECF No. 299-9 at PageID.8497-8500; ECF No. 299-10 at

PageID.8504-07.)  According to Mr. Cooley, his physical injuries manifested

"back at the beginning of the crisis," although he stopped consuming tap water

shortly after the switch to the Flint River as the water came out discolored.  (ECF

No. 299-9 at PageID.8512-15, ECF No. 298-7 at PageID.8136-38; ECF No. 299-

12.)

10

Bellwether Plaintiffs Williams Daly (on behalf of his late wife Carolyn Daly), Anthony Vance, and John Campbell also filed administrative claims with the EPA.  The Government does not challenge the timeliness of their claims.  However, the Government does argue that they and the alleged time-barred Bellwether Plaintiffs are unable to prove causation.

## III.   Applicable Law and Analysis

### A.   FTCA's Statute of Limitations

A tort claim against the United States under the FTCA must be "presented in writing to the appropriate Federal agency within two years after such claim accrues . . .."  28 U.S.C. § 2401(b).  "Because the statute of limitations in an FTCA action is an affirmative defense, the burden is on the government to show that the statute of limitations has run."  *Hogan v. United States*, 42 F. App'x 717, 722 (6th Cir. 2002).  "If the government meets this requirement then the burden shifts to the plaintiff to establish an exception to the statute of limitations."  *Id.* (citing *Drazan v. United States*, 762 F.2d 56, 60 (7th Cir. 1985)).

Although the FTCA does not define when a claim "accrues," federal standards govern when federal statutes of limitations begin to run.  *See Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 698 (6th Cir. 2022) (citing *Sharpe v. Cureton*, 319 F.3d 259, 266 (6th Cir. 2003)).  "The general federal rule is that 'the statute of limitations begins to run when the reasonable person knows, or in the exercise of

due diligence should have known, both his injury and the cause of that injury." *Id.* (quoting *Bishop v. Child.'s Ctr. for Dev. Enrichment*, 618 F.3d 533, 536 (6th Cir. 2010)); *see also United States v. Kubrick*, 444 U.S. 111, 122 (1979) (holding that a tort claim under the FTCA accrues when the plaintiff knows both the existence and cause of his or her injury). In *Kubrick*, the Supreme Court rejected the argument that an FTCA claim does not accrue until the plaintiff knows that the acts inflicting the injury may constitute negligence. 444 U.S. at 122-24.

The petitioner in *Kubrick* developed ear problems six weeks after being discharged from a Veteran's Administration ("VA") hospital in April 1968. 444 U.S. at 113-14. In January 1969, a doctor told him that his problems might have been due to a drug administered at the hospital. *Id.* at 114. So, at that point, the petitioner knew he was injured and knew, albeit without certainty, that the drug was the cause. He also knew that the drug had been administered by the hospital. The Supreme Court held that this was enough for his negligence claim to accrue, even if he was unaware that the acts inflicting the injury constituted medical malpractice.

Subsequently, the Seventh Circuit Court of Appeals in *Drazan v. United States*, 762 F.2d 56 (7th Cir. 1985), distinguished *Kubrick* based on the fact that the plaintiff before it had no reason to know that governmental conduct was the cause of her deceased husband's injury during the two years before she submitted

her administrative claim.  *Id.* at 58.  In *Drazan*, government doctors discovered a tumor through an x-ray of the plaintiff's husband during a routine exam in November 1979.  *Id.* at 57.  They failed to inform the patient or in any way follow-up on the diagnosis.  *Id.*  By January 1981, the tumor had become large and cancerous, and it killed him a month later.  *Id.*

The district court, relying on *Kubrick*, held that the plaintiff's cause of action accrued when she learned that her husband had died of lung cancer.  *Id.* at 58.  On appeal, the Seventh Circuit disagreed, distinguishing *Kubrick* because, when the plaintiff's husband died, she "had . . . no reason to think that the government had killed him by neglecting to follow up the x-ray examination of 16 months earlier." *Id*.  The court explained:

> She thought lung cancer had killed him.  But it is not an either-or proposition.  Lung cancer did kill him, but maybe only because the government had failed to follow up on the results of an x-ray examination.  When there are two causes of an injury, and only one is the government, the knowledge that is required to set the statute of limitations running is knowledge of the government cause, not just of the other cause.

*Id*. at 58-59; *see also Diaz v. United States*, 165 F.3d 1337, 1340 (11th Cir. 1999) (holding that "[i]n certain situations, *such as* medical malpractice" the claim may accrue at a time later than the plaintiff's injury to "protect plaintiffs who are blamelessly unaware of their claim because the injury has not yet manifested itself

or because the facts establishing a causal link between the injury and [negligence] are in the control of the tortfeasor or are otherwise not evident") (emphasis added).

In *Drazan*, the appellate court distinguished two scenarios to further explain its reasoning.  In the first, the tort claimant watches a postal van run over his foot and, therefore, knows the government caused his injury.  In the second, a pedestrian falls and hits his head on the pavement when struck by a postal service vehicle and dies on the scene, but no one else witnesses the accident.  *Id.* at 59. The hospital where the pedestrian's body is taken declares the fractured skull as the cause of death.  *Id.*  The court indicated that a claim against the postal service in the second scenario would not accrue at the time of the accident, reasoning that the decedent's fractured skull "is one cause but the postal service is another; and unless the decedent's survivors know or should know that the postal service caused the decedent's head to hit the pavement, just knowing that he died from a fractured skull does not start the statute of limitations running."  *Id.*

The Court finds *Drazan* particularly instructive in the present matter.  It and the Supreme Court's decision in *Kubrick* lead the Court to reject the Government's contention that Plaintiffs' claims accrued when they were injured and knew that the contaminated Flint River water was the cause of their injuries.  Contrary to the Government's contention, it is not only knowledge of the injury and the contaminated water's role in the injury, but also knowledge of the EPA' causal link

14

that is required to start the clock.  Stated differently, where there is more than one cause, a plaintiff's FTCA claim does not accrue until "the [federal] government cause is known or when a reasonably diligent person (in the tort claimant's position) reacting to any suspicious circumstances of which he might have been aware would have discovered the government cause—whichever comes first." *Drazan*, 762 F.2d at 59.  "Until [Plaintiffs] discovered the [EPA's] link in the causal chain, the statute of limitations did not start to run" on their FTCA claims. *Id.*

The Sixth Circuit's decision in *Hertz v. United States*, 560 F.3d 616 (2009), does not lead this Court to hold otherwise.  In *Hertz*, the district court dismissed on statute of limitations grounds an FTCA negligence claim against the Federal Aviation Administration ("FAA"), which was filed by the wife of a plane crash victim.  The plane crashed after flying into a thunderstorm.  *Id.* at 617.

The plaintiff filed her claim against the FAA within two years of being told that the cause of the accident was air traffic controller negligence; however, the Sixth Circuit held that the claim accrued about a month earlier when the accident occurred.  *Id.* at 617, 619.  Distinguishing a medical malpractice case where a plaintiff may have little reason to suspect anything other than natural causes, the court reasoned:

> But deaths by plane crashes are different, for purposes of this rule . . ..
> Plane crashes by their nature typically involve negligence *somewhere*

15

in the causal chain; and the mere fact of the event is thus typically enough to put the plaintiff on inquiry notice of his claim. . . .

. . . Plaintiff's spouse died, tragically, in a plane crash.  The record makes plain—and Plaintiff herself concedes—not only that she should have been able to determine in the two-year period whether to file a claim, but that she in fact *made* that determination, when the NTSB investigator told her, less than a month after the crash, that "the NTSB believed that the cause of the accident was related to air traffic controller negligence."  The problem was simply that, for whatever reason, her then-counsel chose not to file the claim in the remaining 22 months of the period prescribed by Congress.

*Id.* at 619.

Even if contaminated tap water "typically involve[s] negligence *somewhere* in the causal chain[,]" the expected cause is the entity supplying the water and/or with primary enforcement authority over the public water system: the City of Flint and/or MDEQ, here.  Thus, if the Court was evaluating the timeliness of a claim against the City or MDEQ, there might be no reason to depart from the general rule that the claim accrued at the time of injury.  The City and MDEQ are akin to the FAA in *Hertz*, where a plane crashed because it flew into a thunderstorm.  However, if it was later learned that there was a problem with the plane's controls or that the crash was due to pilot error, which a tort claimant would not or could not have known based on the critical facts presented, a claim against the airline could not reasonably be said to have accrued at the time of the crash.

So the key question here is when were the alleged time-barred Bellwether Plaintiffs armed, or a reasonably diligent person in their position would have been

16

armed, with " 'enough of the critical facts' . . . to be on inquiry notice of a possible tort claim" *against the EPA*. *Amburgey v. United States*, 733 F.3d 633, 637 (6th Cir. 2013) (quoting *Kubrick*, 444 U.S. at 618).  As the Sixth Circuit stated in *Hertz*, "[t]he determination as to *when* a plaintiff has such knowledge is necessarily fact-intensive."  560 F.3d at 619.  Significantly, Plaintiffs' claims against the Government are not based on the decision to switch the City of Flint's water source from the DWSD to the Flint River.  Instead, they are based on the EPA's response to the crisis—its actions and/or omissions—after the switch.  Therefore, the relevant inquiry is when Plaintiffs were aware or should have become aware of these actions and/or omissions and their connection to Plaintiffs' alleged injuries.

In its motion, however, the Government does not identify the necessary facts or indicate when those facts were known or knowable by the alleged time-barred Bellwether Plaintiffs.  This is because, in support of its statute of limitations defense, the Government focuses primarily on when they learned that the water in Flint was contaminated and discovered *their injuries*.

The Government does assert that the filing of claims with the EPA by other victims of the Flint Water Crisis between October 2016 and May 2017, and the filing of the present lawsuit in January 2017, renders it "nonsensical" to delay the accrual of any claims until the OIG issued its report in 2018, which detailed the EPA's role in the Flint Water Crisis.  However, the Government does not show

17

when the individuals who filed these earlier claims and initiated the present lawsuit became aware of the facts underlying their claims.  Nor does the Government show that the facts relied upon by these earlier claimants to establish the EPA's role in the causal chain were facts the alleged time-barred Bellwether Plaintiffs knew or should have known.

As it is the Government's burden to show that a claim is time barred, the Court concludes that it is not entitled to summary judgment on statute of limitations grounds as to the claims of Bellwether Plaintiffs Anderson, Langston, Keys, Crews, McClain, and Cooley.

### B.    Causation

#### i.    Causation Generally

Causation is an element of Plaintiffs' FTCA negligence claims.  *See Flechsig v. United States*, 991 F.2d 300, 303-04 (6th Cir. 1993) (citing *Schindler v. United States*, 661 F.2d 552, 560 (6th Cir. 1981)) (explaining that the elements of state law apply to determine liability under the FTCA); *SFS Check, LLC v. First Bank of Del.*, 774 F.3d 351, 357 (6th Cir. 2014) (citation omitted) (setting forth the elements of negligence under Michigan law).  Generally, this requires a plaintiff to show but-for-cause ("cause-in-fact") and proximate cause ("legal causation").  *See, e.g., O'Neal v. St. John Hosp. & Med. Ctr.*, 791 N.W.2d 853, 858-59 (Mich. 2010) (collecting cases).  In a toxic-tort case like this, the plaintiff must establish both

general and specific causation as part of the cause-in-fact element. *See Pluck v. BP Oil Pipeline Co.*, 630 F.3d 671, 676-77 (6th Cir. 2011); *Lowery v. Enbridge Energy Ltd. P'ship*, 898 N.W.2d 906, 907 (Mich. 2017) (Markman, C.J., concurring).

General causation requires proof that exposure to the substance at issue can cause a particular injury, while specific causation requires proof that exposure to the substance more likely than not caused the plaintiff's injury. *See In re Flint Water Cases*, 579 F. Supp. 3d 971, 985 (E.D. Mich. 2022) (citing *Powell-Murphy v. Revitalizing Auto Cmtys. Env't Response Tr.*, 964 N.W.2d 50, 59 (Mich. Ct. App. 2020) (quoting *Lowery*, 898 N.W.2d at 911-12 (Markman, C.J., concurring)). Both causation inquiries involve scientific assessments which generally must be established through expert testimony. *Lowery*, 898 N.W.2d at 917-18 ("[T]he generally applicable rule in Michigan is that expert testimony is required when highly technical and scientific questions are at issue."); *but see Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 434 (6th Cir. 2009) ("We conclude that when a plaintiff claims that a defendant was negligent in filling a hotel room with a cloud of a poisonous substance, and there is evidentiary support for such claims, expert testimony is not required to show negligence . . .."). In *Lowery*, Chief Justice Markman concluded "that the need for expert testimony regarding causation in a toxic tort case is determined on the basis of whether the matter 'is so obvious that

it is within the common knowledge and experience of an ordinary layperson.'"

898 N.W.2d at 1049 (quoting *Elher v. Misra*, 878 N.W.2d 790, 795 (Mich. 2016)).

The plaintiff's burden of proving cause-in-fact causation has been

summarized by the Michigan Supreme Court as follows:

> All that is necessary is that the proof amount to a reasonable
> likelihood of probability rather than a possibility. The evidence need
> not negate all other possible causes, but such evidence must exclude
> other reasonable hypotheses with a fair amount of certainty. Absolute
> certainty cannot be achieved in proving negligence circumstantially;
> but such proof may satisfy where the chain of circumstances leads to a
> conclusion which is more probable than any other hypothesis reflected
> by the evidence.

*Skinner v. Square D. Co.*, 516 N.W.2d 475 (Mich. 1994).  The plaintiff may rely

on circumstantial proofs to establish the causal link between the defendant's

conduct and the plaintiff's injury.  *See Powell-Murphy*, 964 N.W.2d at 57; *Genna*

*v. Jackson*, 781 N.W.2d 124, 128 (Mich. Ct. App. 2009) ("Cause in fact may be

established by circumstantial evidence").  To overcome the defendant's summary

judgment motion, the plaintiff "need only show sufficient evidence to 'facilitate

reasonable inferences of causation.'"  *In re Flint Water Cases*, 579 F. Supp. 3d at

987 (quoting *Genna*, 781 N.W.2d at 128).  "[T]he Court must consider whether

there is enough evidence to permit a reasonable jury to find in favor of [the

p]laintiff—not whether [the p]laintiff ha[s] brought an open-and-shut claim." *Id*. at

988.

### ii.    Application

The Government maintains that the alleged time-barred Bellwether Plaintiffs and Messrs. Daly, Vance, and Campbell cannot show that their alleged injuries were caused by the contaminated Flint Water.  The Government does not specifically address, however, any personal injury claimed by Ms. Anderson, Mr. Cooley's alleged skin issues, or the injuries Mr. Daly alleges other than the wrongful death of his wife. [2]  The injuries the Government does address are the

---

[2] The Government has, therefore, forfeited its causation argument as to Ms. Anderson's personal injuries and Mr. Cooley's skin issues.  *See United States v. Hendrickson*, 822 F.3d 812, 829 n.10 (6th Cir. 2016) (explaining that arguments adverted to "'in a perfunctory manner' without an 'effort at developed argumentation,'" are deemed forfeited); *see also Herring v. City of Ecorse*, No. 24-1916, 2025 WL 2105263, at *5 (6th Cir. Sept. 16, 2024) (quoting *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019)) (recognizing that the Sixth Circuit has used "waiver" and "forfeiture" interchangeably sometimes, but explaining that "[w]aiver is affirmative and intentional, whereas forfeiture is a more passive failure to make the timely assertion of a right").  "A party may not raise an issue . . . by 'mentioning it in the most skeletal way, leaving the court to put flesh on its bones.'"  *Hendrickson*, 822 F.3d at 829 n.10 (quoting *United States v. Robinson*, 390 F.3d 853, 886 (6th Cir. 2004)) (ellipsis in *Henrickson* removed).

With respect to Mr. Daly, he is no longer pursuing a wrongful death claim, but is pursuing a claim for emotional distress.  (*See* ECF No. 333 at PageID.12136 n.3.)  It is unclear from Plaintiffs' response brief whether Mr. Daly is claiming emotional distress due to his wife's death or his own exposure to the Flint River Water.  If the former, because Plaintiffs do not address the Government's causation argument as to his wife's death in their response brief, they have forfeited any argument that there is evidence linking the tainted Flint River water to her death.  If causation is lacking there, it logically is also lacking as to any emotional distress resulting from her death.  Moreover, this Court must look to Michigan law to determine the damages available to Mr. Daly, *see* 28 U.S.C. § 1346(b)(1), and Michigan courts have held that exemplary damages are not recoverable in a wrongful death action, *Upshaw v. SSJ Grp., LLC*, No. 1:19-cv-341, 2021 WL 1583967, at *3 (W.D. Mich.

skin issues claimed by Messrs. Campbell and Langston, the dental issues claimed by Mr. Cooley,[3] the property damage (plumbing damage and diminution in value) claimed by Mrs. McClain and Messrs. Vance, Langston, Cooley, Crews, and Keys, and the business losses claimed by Mrs. McClain.

### i. Skin Conditions

The Government argues that Messrs. Langston and Campbell cannot show that their skin injuries were caused by the contaminated Flint water because no medical records document their skin issues, their physicians testified that they never treated them for skin issues, and Plaintiffs have identified no dermatologist to testify regarding specific causation. The Court finds "sufficient evidence to 'facilitate reasonable inferences of causation'" between the contaminated water and their skin conditions, however.

Both Mr. Langston and Mr. Campbell testified that their skin injuries manifested during the period when they were being exposed to the contaminated water. (ECF No. 333-16 at PageID.12587; ECF No. 333-17 at PageID.12593.) In

---

Feb. 12, 2021), *R&R adopted* 2021 WL 11428 (W.D. Mich. Mar. 25, 2021) (citing *Fellows v. Superior Prods. Co.*, 506 N.W.2d 534, 536 (Mich. 1993); *White v. FCA US, LLC*, 579 B.R. 804, 814 (E.D. Mich. 2017)).

[3] In response to the Government's motion, however, Mr. Cooley indicates that he is no longer pursuing a claim for those dental issues. (ECF No. 333 at PageID.12136 n.3.)

addition to this temporal connection, Plaintiffs' dermatology expert, Bruce A. Brod, M.D., offers a clear association between Flint residents' exposure to the contaminated water and various skin issues.  (*See* ECF No. 333-14.)  Dr. Brod found that many Flint residents reported skin issues similar to those described by Messrs. Langston and Campbell, which only occurred after the City switched its water source to the Flint River and in response to their exposure to the water (e.g., showering).  (*See id*.)  Contrary to the Government's assertion, the Court does not believe Dr. Brod needed to specifically evaluate Mr. Langston or Mr. Campbell for his expert opinion to constitute evidence of causation for their claims.

### ii.      Property Damage – Diminution in Value

The Government challenges the damages claims brought by Messrs. Vance, Langston, Cooley, Crews, and Keys and Mrs. McClain based on the diminution in the value of their properties.  The Government maintains that the testimony of residential appraiser Jamal Michael Saad and real estate broker Anthony Legins fail to show a decrease in the value of the properties because they calculated only present value, made no attempt to calculate a retrospective pre-Flint Water Crisis or pre-EPA intervention value for comparison, and offer no opinions on the potential effects of contamination, the Flint Water Crisis, or the EPA's conduct on

property values.[4]  In response, Plaintiffs contend that there is sufficient evidence of

causation based on the testimony of Mr. Saad and Gabriel Lade, Ph.D., an

environmental economist with expertise in the economics of water and air quality,

water conservation, and energy policy.

Mr. Saad, an experienced and certified property appraiser, offers proof of the

decline in the value of the Bellwether Plaintiffs' properties.  Dr. Lade opines on the

effects of the Flint Water Crisis on housing markets in the city, which was the

subject of an academic paper he co-authored.  (*See* ECF No. 333-13.)  Dr. Lade

utilized economic theories and models to evaluate the impact of the contaminated

water on property values.  (*Id.*)  The Government argues in reply that there is a

problematic foundation for Dr. Lade's opinions, as his report incorporates and

relies on Mr. Saad's appraisal values to evaluate only Mr. Vance's and Mr.

Cooley's properties.

However, Dr. Lade's opinions are based on far more than the changed

values of these two properties.  Dr. Lade also relied on his peer-reviewed and

published academic paper summarizing home price impacts of the Flint Water

Crisis and several reports by one of his co-authors, Dr. David Keiser, on damages

---

[4] The Government moved to strike the testimony of Messrs. Saad and Legins
because Plaintiffs did not produce expert reports for them.  While the Court
decided that expert reports should have been produced, it concluded that the
appropriate sanction is not exclusion of their testimony.  (*See* ECF No. 364 at
PageID.13497.)

to property values caused by the drinking water contamination.  (*See id.* at PageID.12526.)  Dr. Lade does not opine only on the estimated loss in value of Mr. Vance's and Mr. Cooley's properties, but all properties across Flint.  (*See id.*)

Thus, the Court finds sufficient evidence of causation for these property damage claims based on diminution in value to survive summary judgment.

### iii.    Other Residential Property Damage

In addition to the diminution in the value of his residence, Mr. Vance claims damage to the pipes and plumbing and water damage caused by a burst pipe.  Mr. Cooley's property damage claim relates to the replacement of a hot water heater, a rented Culligan system to provide water to his entire home to avoid using the city-supplied contaminated water, and the amount he was billed for contaminated water.  The Government maintains that it is entitled to summary judgment with respect to these claims because they are dependent on the testimony of plumber Zak Rostar and expert Larry Russell, which the Government has moved to exclude.[5]  The Court, however, has denied the Government's motions.  Thus, it

_____

[5] The Government also asserts that Mr. Cooley provided little information and no documentation to support his property damage claim.  During his deposition, Mr. Cooley in fact lacked details about the costs he incurred and the precise timing of when he incurred those costs.  (*See* ECF No. 299-11.)  He offered sufficient information, however, to show "a reasonable likelihood of probability" that the claimed damages were due to the tainted Flint River water.  For example, after the switch to the Flint River water, his less than five-year-old water heater rusted out and had to be replaced.

rejects the Government's request for summary judgment as to Mr. Vance's and Mr. Cooley's property damage claims.

      **iv.**    **Business Loss**

Lastly, the Government claims that Mrs. McClain lacks sufficient evidence of causation to support her business loss claims related to two rental properties. The claimed damages include lost rental income and the cost to replace hot water heaters, furnaces, and pipes allegedly damaged by the contaminated Flint River water. The Government contends that neither Mrs. McClain nor her husband can produce documentation or other evidence of the claimed losses or to link the contaminated water to them.

Plaintiffs point to little evidence to support Mrs. McClain's business loss claim in response to the Government's motion. (*See* ECF No. 333 at PageID.12145.) They offer no evidence to substantiate the claimed lost rental income or damage to the hot water heaters and furnaces. In support of the damage to the plumbing, Plaintiffs point only to Mr. McClain's testimony that he replaced pipes at one of the rental properties after the switch to the Flint River water because they were rusty and leaking. (*Id*.) While Mr. McClain testified that he first noticed the damage to the pipes after 2014, when they started to leak, the cited portion of his testimony does not reveal when the pipes were replaced or the age

26

and/or condition of the pipes to conclude that any damage was likely caused by the contaminated Flint River water.

The Court therefore concludes that there is insufficient evidence for Mrs. McClain to survive summary judgment as to this aspect of her property damage claim.  As indicated above, Mrs. McClain's claim based on the alleged diminution in the value of her property survives summary judgment.

## IV.    Conclusion

In summary, the Government fails to satisfy its burden of showing that the claims of any Bellwether Plaintiff are time barred.  With the exception of Mrs. McClain as to her business loss claims, only, those Bellwether Plaintiffs, along with Messrs. Daly, Vance, and Campbell, provide sufficient evidence of causation to survive summary judgment.  Mrs. McClain, however, presents no evidence to substantiate her business loss claims.

Accordingly,

**IT IS ORDERED** that the Government's motion for summary judgment on statute of limitations and causation grounds (ECF. No. 297) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that Plaintiffs' motion to compel (ECF No.

363) is **DENIED AS MOOT**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: December 29, 2025